UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 2863

------------------------------------------------------------x

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

                              Plaintiff,

    - against -

CONDOR CAPITAL CORPORATION
and STEPHEN BARON,

                           Defendants.

------------------------------------------------------------x

No. 14-CV-_____(____)

**COMPLAINT**

JUDGE McMAHON

RECEIVED
APR 15 2014
U.S.D.C. S.D. N.Y.

        Plaintiff Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York (the "Superintendent"), through his undersigned attorneys, for his complaint against defendants Condor Capital Corporation ("Condor") and Stephen Baron ("Baron"), alleges as follows:

## NATURE OF THE ACTION

        1.     Defendant Condor is a New York-based sales finance company wholly owned by defendant Baron that acquires and services subprime automobile loans. Condor has been licensed as a sales finance company in New York since 1996. Since the company's inception, Condor has wrongfully retained customers' positive credit balances and taken active steps to conceal such balances from its customers and its regulators, in particular the Department of Financial Services ("Department"), so as to frustrate their ability to detect such balances or request refunds. Condor has maintained a "policy" of refusing and failing to refund such balances to customers absent a specific request, which Condor took active steps to make sure could rarely, if ever, occur. Condor thus has engaged in a longstanding scheme to steal funds from its vulnerable customers.

2.      Condor's customers may have positive credit balances on their accounts because of insurance payoffs, overpayments, trade-ins, and other reasons.  In order to conceal these balances from customers, Condor has deceptively programmed its customer-facing web portal to shut down a customer's access to his or her loan account once the loan has been paid off, even if there is a positive credit balance due and owing to the customer.  As a result, customers cannot detect that Condor owes them money.  Condor also has hidden the existence of positive credit balances by submitting to the New York State Comptroller's Office false and misleading "negative" unclaimed property reports (and, more recently, no reports at all), all of which represented under penalty of perjury that Condor had no unrefunded customer credit balances – again, frustrating customers' ability to detect that Condor owes them money.  In addition to these steps to conceal the existence of positive credit balances from customers, Condor has maintained a practice of failing to refund such balances absent a specific request from a customer.

3.      Condor also has endangered the security of its customers' personally identifiable information, placing them at serious risk of identity theft and other serious consequences.  Among other information-security lapses, the Department's examiners found stacks of hundreds of hard-copy customer loan files lying around the common areas of Condor's offices.  Condor also has failed – despite repeated directives from the Department – to adopt basic policies, procedures, and controls to ensure that its information technology systems – and the customer data they contain – are secure.

4.      Simply put, Condor cannot be trusted to service its customers' loans or handle their funds and data in a safe and lawful manner.

5.     The Superintendent brings this action pursuant to Section 1042(a)(1) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Sections 309 and 408 of the New York Financial Services Law, and Section 499 of the New York Banking Law to enjoin and remedy Condor's admitted, systematic, knowing and abusive theft of funds from customers and Condor's unfair, deceptive and abusive treatment of its customers' personally identifiable information, and to prevent further harm to customers in New York State and more than two dozen other states across the country.  The Superintendent further seeks the appointment of a receiver to halt, investigate, and remedy the egregious mismanagement of Condor, which has led to, and enabled the concealment of, Condor's theft of millions of dollars from customers and the egregious security risk to its customers' personal and financial information.

## PARTIES

6.     Plaintiff is the Superintendent of Financial Services of the State of New York and the successor to the Superintendent of Banks of the State of New York.[1]  Plaintiff maintains his principal office in the City, County, and State of New York at One State Street, New York, New York 10004.

7.     Defendant Condor is a corporation formed under the laws of the State of New York with its principal place of business at 165 Oser Avenue, Hauppauge, New York 11788.  On September 23, 1996, Condor was granted a license by the Superintendent of Banks of the State of New York to engage in business as a licensed sales finance company pursuant to

---

[1] The Department was created by transferring the functions of the New York State Banking Department and the New York State Insurance Department into a new agency, effective October 3, 2011.

Article XI-B of the New York Banking Law.  Condor operates in more than two dozen other states in addition to New York, which is the company's domiciliary regulator.

8.      Defendant Stephen Baron is the chief executive officer and sole owner of Condor.  During the relevant time frame, defendant Baron has been and/or continues to be responsible for Condor's overall management and operations including, among other things, the formulation and implementation of policies with respect consumer financial products serviced by Condor.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over defendant Condor, because it is incorporated, located, headquartered, and licensed in the State of New York.

10.     This Court has personal jurisdiction over defendant Baron, because he is a resident of the State of New York and he committed the acts complained of herein in the State of New York.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), 12 U.S.C. § 5552(a)(1), 12 U.S.C. § 5565(a)(1), and 28 U.S.C. § 1367(a).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f).

## STATEMENT OF FACTS

**Condor's Business**

13.     Defendant Condor is a "sales finance company," which is wholly owned by defendant Baron.  Condor was founded in 1994 and became licensed by the New York State Banking Department as a sales finance company in the State of New York in 1996.  Condor acquires and services automobile retail installment contracts (referred to herein as "loans") involving customers in New York and more than two dozen other states.

4

14.     Condor has agreements with automobile dealers whereby the dealers submit credit applications from potential automobile purchasers to one or more possible lenders or finance companies, such as Condor.  Condor provides a quotation for the terms of the requested loan – including the interest rate, fees, and term.  The dealer then makes the loan and assigns it to the selected lender or finance company.

15.     Once Condor acquires a loan from a dealer, it sends monthly statements to the customer, receives and applies the customer's payments to the outstanding balance, and takes action to collect on the loan if the customer becomes delinquent or defaults.  Condor also may charge the customer various fees if a payment is late or the loan becomes delinquent, and may collect on the loan through legal or repossession action.

16.     Condor's customers are "subprime" or "non-prime," meaning that they have inadequate credit or resources to borrow from a "prime" or "near-prime" lender or otherwise have a high risk of non-payment.  Subprime customers are particularly vulnerable to harm from unsound lending and business practices because of their precarious economic circumstances.

17.     According to Condor's most recent annual report to the Department, at the end of 2013, Condor held more than 7,000 loans to New York State residents, with total outstanding balances of more than $97 million.  Condor's 2013 loan portfolio contained aggregate outstanding loans of more than $300 million nationwide.

18.     For the year ended December 31, 2013, Condor reported net after-tax income of approximately $7 million on operating income of approximately $68.7 million.

**The Department's Examination Programs**

19.     Condor is licensed by the Department and subject to routine "safety and soundness" examinations, which are conducted by the Department's Licensed Financial Services

("LFS") unit approximately every three years, as well as additional examinations where the Department believes it is necessary.

20.     Condor was subject to routine safety and soundness examinations in 2007 and 2010.  A routine safety and soundness examination was commenced in January 2014 and is ongoing.

21.     LFS conducts safety and soundness examinations using what is known as the "FILMS" system, which provides for an assessment of a licensee's financial condition ("F"), internal controls and audit ("I"), legal and regulatory compliance ("L"), management systems ("M"), and computer systems and information technology ("S").  The Banking Department (the Department's predecessor) instituted the FILMS system in 2006.

**The November 2013 and January 2014 Examinations**

22.     In November 2013, the Department received information indicating possible longstanding wrongdoing by Condor, including allegations that Condor may have stolen and concealed the theft of millions of dollars of its customers' funds and seriously compromised the safety and security of customers' personally identifiable information.  The following week, the Department conducted an unscheduled special examination of Condor.  Examiners from both LFS and the Department's Consumer Examinations Unit ("CEU") spent two days on-site at Condor's headquarters, collecting documents, including approximately 200 loan files, and meeting with Condor's management.

23.     In January 2014, examiners from the Department spent approximately three weeks on-site at Condor's offices, conducting the triennial safety and soundness examination.

24.     These examinations confirmed that the same very serious problems identified by the Department in prior examinations of Condor continue to persist, and that

Condor has been engaging in far more serious and abusive wrongdoing, including theft of its customers' funds and reckless endangerment of customers' personally identifiable information.

25.     Condor continues to lack any documented policies and procedures for virtually all of its operations, including dealer selection, loan application processing, mail handling, payment processing, assessment of fees and charges, account reconciliations, corporate accounting, regulatory reporting, training, information technology ("IT") systems, and disaster recovery/business continuity. Condor also has no systematic plans or programs to assess or monitor compliance with fair lending, fair debt collection practices, or data-security laws and other applicable consumer protection laws. Condor also has no internal audit function, segregation of duties, or other basic accounting controls. As a result of Condor's complete lack of policies, procedures, and controls, opportunities for fraud, manipulation, and error abound.

26.     Condor's IT systems are operated in an equally casual and undocumented fashion. There is no disaster recovery plan, no business continuity plan, no "penetration" testing of Condor's website to ensure that customer data cannot be compromised or stolen, no tracking of modifications to Condor's proprietary IT software applications, and no documentation of or controls on how data is transferred between those applications or from those applications to Condor's corporate books and records.

27.     Moreover, the Department's recent on-site examinations have shown that Condor mishandles customer data and documents routinely and on a massive scale. Condor's website represents that:

> Condor Capital Corp. secures your personal information from unauthorized access, use or disclosure. Condor Capital Corp. secures the personally identifiable information you provide on computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure.

But nothing could be further from the truth.

7

28.     Backup tapes containing customer data – including highly sensitive "personally identifiable information" – for the full 18-year period of Condor's operations are taken home each day by Condor Executive Vice President Todd Baron and stored there without encryption.  (It is unknown whether any measures are taken by Todd Baron to secure the tapes against physical theft or improper use.)

29.     Even more alarming is Condor's mishandling of customers' hard-copy loan files, which are replete with the most sensitive and private personal and financial information.  For example, a typical loan file contains personally identifiable information such as the customer's name, address, telephone numbers, Social Security number, bank account numbers, and a copy of his or her driver's license, as well as highly private and confidential information about the customer's income, expenses, savings, assets, debts, and contact information for personal references.

30.     Despite the obvious and well-known risks of data and identity theft, Condor fails to adhere to *the* most basic information security policy, known as a "clean desk" policy, which all businesses handling sensitive customer data must follow.  It requires that customer documents and files never be left unattended on a desk (or anywhere else) and that all customer documents and files be locked up when not in use.  At Condor, however, customer hard-copy files are piled openly around the offices for indefinite periods.  Condor also stores thousands of customer hard-copy files in a garage attached to its Hauppauge offices, where files are on open shelves or on the floor, many of them in open boxes or bins.

31.     Given Condor's dangerous data- and document-handling practices as well as the fact that its employees informed the examiners at the Department's recent examinations that Condor has purchased an office building in Florida and intends to relocate its offices there,

the Department has serious concerns that Condor may destroy or lose data or documents, and there is an unreasonably high risk that Condor's customers may be exposed to data breaches or identity theft and other serious consequences.

32.     The Department's November 2013 and January 2014 examinations of Condor, together with the results of prior examinations, demonstrate the persistent refusal and failure of Condor and its owner Baron to implement even the most basic policies, procedures and controls necessary to manage a $300 million, state-licensed lending institution.

33.     Condor's mismanagement is demonstrably willful and contumacious. Each time the Department has communicated its examination findings to Condor, Condor has responded by rejecting virtually all of those findings and ignoring and refusing to comply with the Department's repeated, written directives to institute proper policies, procedures, and controls.  Condor's excuse for its admitted non-compliance has been largely economic:  After a 2007 Banking Department examination identified multiple serious problems at Condor, it responded by protesting that "this audit criticizes the existence of a small lending business," and asking "Are you intentionally discriminating against a small business?"  Condor also wrote that "if you are going to allow a small business to hold a lending license you cannot put upon [sic] economic inefficiencies that preclude its existence."  While pleading poverty as an excuse for not complying with the Department's directives, Condor nevertheless has found ample funds to make multi-million-dollar undocumented "loans" to defendant Baron and his affiliates. Condor's cost-benefit analysis speaks for itself – there has been a conscious decision to enrich defendant Baron at the expense of Condor's customers and in flagrant disregard of the law.

**Condor's Abusive Conduct Toward Its Customers**

          34.     Condor's mismanagement infects its dealings with its customers, as demonstrated by numerous customer complaints filed with Department, the federal Consumer Financial Protection Bureau, the Federal Trade Commission, and the Better Business Bureau regarding Condor's collection and credit reporting practices.  Many of these complaints relate to Condor's reliance on false and inaccurate information.  For example, multiple customers have alleged that Condor has harassed and threatened customers and friends and relatives of customers, including with respect to accounts that are current.  Other customers have alleged that Condor has reported inaccurate information to credit agencies, imposed fees or late charges where none are appropriate, or has failed to properly apply payments to loan balances.  Still other complainants – including complainants that are not Condor customers – have alleged that Condor has made unauthorized charges to their credit cards or unauthorized debits from their bank accounts.

**Condor's Theft of Its Customers' Positive Credit Balances**

          35.     Most egregiously, Condor's lack of required policies, procedures, and controls, has, until very recently, made it possible for Condor to conceal from both the Department and Condor's customers that it has systematically hidden from its customers the fact that they have refundable positive credit balances and then failed to refund those balances unless specifically requested.

          36.     A positive credit balance is simply money owed by Condor to a customer as a result of an overpayment of the customer's account, and it can come about in several different ways.  For example, a customer might pay more than the outstanding loan balance, a car may be destroyed (or "totaled"), and the insurance proceeds might exceed the outstanding

10

loan balance, or a customer might trade in the car that is the subject of the loan and receive a credit greater than the outstanding balance.

37.     Rather than notifying customers of positive credit balances and promptly paying them refunds, Condor has for years knowingly and systematically hidden the existence of the positive credit balances and retained them for itself, and has maintained a policy of refusing to refund them except when expressly requested by a customer.  Condor has ensured that such requests will occur rarely, if ever, by actively concealing the existence of positive credit balances to prevent customers from detecting them and requesting refunds.

*Condor Deliberately Programs Its Website to Conceal Its Theft*

38.     Condor's website contains a portal that allows customers to log in, view the status of their loan accounts, and make payments.  Condor has deceptively programmed its website so that a customer's account for a loan that has been paid in full is removed from the website immediately upon repayment – even if the account has a positive credit balance due to the customer.  This makes it impossible for a customer to view the account thereafter, detect any positive credit balance, or request a refund.

*Condor's False and Misleading Unclaimed*
*Property Reports Further Conceal Its Wrongdoing*

39.     Condor also has actively impeded its customers' ability to detect their positive credit balances by filing false and misleading "negative" unclaimed property reports with the New York State Comptroller's office.

40.     Pursuant to the New York Abandoned Property Law, Condor is, like many New York businesses, required to submit an annual report to the New York State Comptroller's Office of Unclaimed Funds identifying unclaimed property belonging to New York residents as well as residents of other states, to take certain steps to return unclaimed property to its rightful

owner, and, after a "dormancy" period, to turn such property over to the State of New York. Unclaimed and unrefunded positive credit balances belonging to Condor's customers constitute unclaimed property within the meaning of the Abandoned Property Law.

41.     Until April 2011, a business that had no unclaimed property was required to file a report with the Comptroller so stating, which was known as a "negative" report.  These reports were to be submitted to the Comptroller with a certification by a duly authorized officer of the entity making the report stating under oath that it "is a true and complete statement of all abandoned property held by, or owing by, this organization."  In addition, Abandoned Property Law Section 1413 states that "The making of a willful false oath in any report required under the provisions of this chapter shall be perjury and punishable as such according to law."

42.     In April 2011, the Abandoned Property Law was amended such that no negative report is required if no unclaimed property is held; reports now need to be filed only by businesses that do hold unclaimed property.  A company's non-filing of an unclaimed property report thus constitutes a representation to the Comptroller that the company has no unclaimed property.

43.     Despite the known existence of unrefunded and unclaimed positive credit balances, Condor has consistently filed false and misleading negative unclaimed property reports with the Comptroller and, after April 2011, has filed *no* reports – thus falsely representing to the New York State Comptroller that Condor has no unclaimed property.

44.     Condor's deceptive failure to report customers' positive credit balances as unclaimed property has blocked yet another avenue for Condor's customers to detect the existence of such balances and Condor's refusal to refund them.

*Condor's Admissions of Wrongdoing*

45.    Condor has admitted both orally and in writing that it has concealed and refused to refund customers' positive credit balances.

46.    During the January 2014 examination, Condor's controller told one of the Department's examiners that it was Condor's "policy" (which, like Condor's other policies and procedures, was not written down) not to refund a customer's positive credit balance unless he or she specifically requested it.  The controller also told the Department's examiner that Condor had been withholding refunds due to customers since Condor began operations as a sales finance company in 1996.

47.    Before the Department's most recent examinations, Condor had made no refunds of positive credit balances other than in response to direct customer requests (if any). Despite this "policy," in the course of the January 2014 examination, Condor's controller told the Department's examiners that Condor had begun to identify customer accounts with positive credit balances and make refunds.  Condor sent the Department a list of 410 New York loans that were paid off during the period June 1, 2012 to December 10, 2013 and had positive credit balances, and represented that since the Department had begun making its inquiries, approximately $41,000 in refunds had been sent to these 410 customers.  However, in the course of sampling the loan files LFS had collected from Condor during the November 2013 examination, examiners identified dozens of loans that had been paid off during the same period and had positive credit balances but did not appear on Condor's list.  Moreover, Condor does not appear to have made any effort to pay refunds to customers outside New York.  Thus, Condor's belated attempts to refund positive credit balances were woefully and materially underinclusive.

48.     The total amount of customers' positive credit balances that Condor has withheld and converted to its own use is not currently known, but the Department is informed and believes the amount to be in the millions of dollars.

### CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF DODD-FRANK
### Unfair, Deceptive, and Abusive Practices –
### Theft of Customer Funds
### (Against Condor only)

49.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50.     Sections 1031 and 1036(a)(1) of Dodd-Frank, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

51.     Condor is a "covered person" and "service provider" within the meaning of Dodd-Frank, 12 U.S.C. § 5481(5), (6), and (26).

52.     In connection with the offering and servicing of loans, Condor has falsely represented both to customers and to the Department – directly, indirectly, by omission, and by implication – that none of Condor's customers has a positive credit balance on a loan account and that Condor holds no unclaimed property of its customers, when in fact thousands of Condor customers have positive credit balances which Condor has maintained a "policy" of failing and refusing to refund, and instead has illegally retained and converted to its own use.  In addition, Condor has actively concealed from its customers the existence of these positive credit balances by intentionally and deceptively programming its customer-facing web portal to shut down a customer's access to his or her loan account once the loan has been paid off, even if there is a positive credit balance due and owing to the customer, and by submitting to the New York State

Comptroller's Office false and misleading "negative" unclaimed property reports (and, more recently, no reports at all).

53.     Condor's representations are false and misleading and these false and misleading representations and failure to report and return to customers their positive credit balances constitute unfair, deceptive, and/or abusive practices in violation of Sections 1031 and 1036 of Dodd-Frank, 12 U.S.C. §§ 5531, 5536.

## COUNT II – VIOLATION OF DODD-FRANK
## <u>Unfair, Deceptive, and Abusive Practices –</u>
## <u>Endangerment of Customer Data and Information</u>
### (Against Condor only)

54.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55.     Sections 1031 and 1036(a)(1) of Dodd-Frank, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

56.     Condor is a "covered person" and "service provider" within the meaning of Dodd-Frank, 12 U.S.C. § 5481(5), (6), and (26).

57.     In numerous instances Condor has failed to employ reasonable and appropriate measures to protect the private and confidential personal and financial information of its customers.

58.     Condor's actions have caused or are likely to cause substantial and irreparable injury to customers, who have no control over Condor's wrongful action and no means by which to avoid this harm.  Condor's unreasonable mishandling of this private and confidential information has no countervailing benefits to consumers or competition.

59.     In addition, Condor has repeatedly represented to its customers, directly or indirectly, expressly or by implication, in connection with servicing automobile loans and, more specifically, in connection with obtaining private and confidential financial and personal information from, and of, its customers that it has implemented reasonable and appropriate measures to protect that information against unauthorized access.

60.     Contrary to these representations, Condor has not implemented reasonable and appropriate measures to protect private and confidential customer information against unauthorized access.

61.     By representing to its customers that it had taken measures to secure their private and confidential information, but failing to take the reasonable and necessary actions and/or expend resources necessary to provide that protection, Condor has taken unreasonable advantage of (1) the inability of its customers to protect their own interests in selecting or using Condor's services (customers who would not be aware that Condor's representations concerning the security of their data was false and misleading) and (2) the reasonable reliance by its customers on Condor to act it their interests.

62.     Condor's mishandling of confidential personal and financial information of its customers constitutes an unfair, deceptive, and abusive act or practice in violation of Sections 1031 and 1036(a)(1) of Dodd-Frank, 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

## COUNT III – VIOLATION OF DODD-FRANK
### <u>Substantial Assistance of Unfair, Deceptive, and Abusive Practices –</u>
### <u>Theft of Customer Funds and Endangerment of Customer Data and Information</u>
(Against Baron only)

63.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

16

64.     Section 1036(a)(3) of Dodd-Frank, 12 U.S.C. § 5536(a)(3), prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031 . . . and notwithstanding any provision of [Dodd-Frank], the provider of such substantial assistance shall be deemed in violation of that section to the same extent as the person to whom such assistance is provided."

65.     Condor is a "covered person" and "service provider" within the meaning of Dodd-Frank, 12 U.S.C. § 5481(5), (6), and (25).  And, as set forth above, Condor has violated the provisions of section 1031 through its unfair, abusive, and deceptive practices causing injury to its consumers.

66.     Defendant Baron, as the CEO and President of Condor, and, further, as the person responsible for oversight of Condor's operations and for setting and effectuating policies has caused Condor to adopt and to continue the "policy" of stealing, converting, and retaining for its positive credit balances belonging to its customers, and endangering the safety and security of its customers' confidential personal and financial information.

67.     Furthermore, as the person responsible for the oversight of Condor's operations and for setting and effectuating policies, defendant Baron has caused Condor to fail to employ reasonable and appropriate measures to protect private and confidential financial and personal information of its customers and also to mislead customers to believe that such information has been protected by such measures.

68.     Defendant Baron has thus violated Section 1036(a)(3) of Dodd-Frank, 12 U.S.C. § 5536(a)(3), by providing substantial assistance to Condor's violations of Section 1031 of Dodd-Frank, 12 U.S.C. § 5531.

## COUNT IV– VIOLATION OF NEW YORK FINANCIAL SERVICES LAW AND BANKING LAW
## <u>Misrepresentations in Connection with the Provision of a Financial Product or Service</u>
### (Against Condor only)

69.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     Pursuant to Section 309 of the New York Financial Services Law, this Court has the power to grant an injunction to restrain a threatened or likely violation of the Financial Services Law, the Insurance Law, or the Banking Law.

71.     Section of 408 of the Financial Services Law makes it unlawful for any person to commit an intentional fraud or make an intentional misrepresentation of material fact with respect to a financial product or service.

72.     Section 499 of the Banking Law makes it unlawful for any person to knowingly misstate or omit to disclose to the Superintendent any material fact where that person is lawfully required to disclose that fact to the Superintendent.

73.     As detailed above, in connection with the offering and servicing of consumer loans, Condor has falsely represented both to customers and to the Department – directly, indirectly, by omission, and by implication – that none of Condor's customers has a positive credit balance on a loan account and that Condor holds no unclaimed property of its customers, when in fact thousands of Condor customers have positive credit balances which Condor has maintained a "policy" of failing and refusing to refund, and instead has retained and converted to its own use.  In addition, Condor has actively concealed from its customers the existence of these positive credit balances by intentionally and deceptively programming its customer-facing web portal to shut down a customer's access to his or her loan account once the loan has been paid off, even if there is a positive credit balance due and owing to the customer,

18

and by submitting to the New York State Comptroller's Office false and misleading "negative" unclaimed property reports (and, more recently, no reports at all).

74.     These false and misleading representations constitute misrepresentations to customers and the Department in violation of Section 408 of the Financial Services Law and Section 499 of the Banking Law.

### THE COURT'S POWER TO GRANT EQUITABLE RELIEF

75.     Dodd-Frank empowers this Court to grant all appropriate equitable relief including, without limitation, a preliminary or permanent injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, monetary relief, and the appointment of a receiver, to prevent and remedy any violation of law enforced by the Department pursuant Dodd-Frank.  12 U.S.C. § 5565(a)(2).

76.     The Financial Services Law further empowers this Court to grant temporary and preliminary injunctive relief "upon terms as may be just" to restrain persons from doing any act in violation of the Financial Services Law or the Banking Law.  N.Y. Fin. Servs. Law § 309.

77.     Dodd-Frank further empowers this Court to award the Department the costs it incurs in connection with prosecuting this action.  12 U.S.C. § 5565(b).

WHEREFORE, plaintiff demands judgment as follows:

A.     Pursuant to Section 1055 of Dodd-Frank, 12 U.S.C. § 5565, Section 309 of the Financial Services Law, and this Court's own equitable powers, granting such preliminary injunctive relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective relief, including but not limited to an *ex parte* temporary restraining order and a preliminary injunction, including the following:

1. Prohibiting Condor from acquiring, quoting, or entering into new or amended sales finance contracts with any person;

2. Prohibiting Defendants from using, accessing, transferring, or dissipating any assets of Condor;

3. Prohibiting Defendants from removing, altering, or destroying any documents associated with, or related to, Condor's business; and

4. Prohibiting Defendants from moving Condor's headquarters out of New York State;

B.   Pursuant to Section 1055 of Dodd-Frank, 12 U.S.C. § 5565, Federal Rule of Civil Procedure 66, and this Court's equitable powers, the appointment of an equity receiver to do the following (including without limitation through the retention of appropriate professionals) with such Receiver's reasonable compensation and expenses to be paid by Condor:

1. Take custody and control of Condor's books and records, information systems, mail, premises, and accounts;

2. Operate Condor's business in a lawful and safe manner, including without limitation to accept and process payments from customers, collect loans, and respond to requests for information during the pendency of this action;

3. Take all necessary steps to ensure Condor's compliance with applicable laws and regulations;

4. Take all necessary steps to safeguard confidential customer information and other private and confidential information, whether maintained in electronic form or otherwise;

5. Conduct a financial audit of Condor's books and records and report to the Department thereon; and

6. Conduct an audit of Condor's information systems and report to the Department thereon;

C.     Pursuant to Section 1055 of Dodd-Frank, 12 U.S.C. § 5565, Section 309 of the Financial Services Law, and this Court's own equitable powers, granting a permanent injunction including the following:

1. Prohibiting Condor from acquiring, quoting, or entering into new or amended sales finance contracts with any person; and

2. Directing Condor to refund all positive credit balances in an amount greater than one dollar ($1.00) that are due and owing to Condor's customers, and, to the extent Condor has insufficient funds to do so, directing Baron immediately to provide funds to Condor sufficient to permit it to do so;

3. Directing Condor to comply with and forever cease violations of applicable laws and regulations, including without limitation Sections 1031 and 1036(a)(1) of Dodd-Frank, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), Section of 408 of the New York Financial Services Law, Section 499 of the New York Banking Law, state and federal fair lending laws, state and federal data protection and privacy laws, state

and federal fair debt collection practices laws, and state and federal fair credit reporting laws; and

4. Directing the Receiver to terminate and wind up Condor's business in an orderly and lawful manner, including locating a qualified purchaser for Condor's loan portfolio;

D. Awarding to the Department its costs incurred in connection with this action; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 23, 2014

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

Eric Corngold
Anne E. Beaumont
Christopher M. Colorado
Raina L. Nortick
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiff*

*Of Counsel:*

NEW YORK STATE DEPARTMENT
  OF FINANCIAL SERVICES
Joy Feigenbaum
Nancy I. Ruskin
One State Street, 19th Floor
New York, NY 10004-1511
(212) 709-3500