UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                  :

BENJAMIN M. LAWSKY, Superintendent of    :
Financial Services of the State of New York,    :
                                                  :
                     Plaintiff,    :        No. 14-CV-_____(_____)
                                                    :
       - against -                    :
                                                      :
CONDOR CAPITAL CORPORATION        :
and STEPHEN BARON,                 :
                                                  :
                    Defendants.    :
                                                  :
-------------------------------------------------------------- x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

NEW YORK STATE DEPARTMENT        FRIEDMAN KAPLAN SEILER &
  OF FINANCIAL SERVICES                  ADELMAN LLP
One State Street                        7 Times Square
New York, NY 10004-1511           New York, NY  10036-6516
(212) 709-3500                        (212) 833-1100

*Of Counsel*                             *Attorneys for Plaintiff*

April 23, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 4

    The Parties ................................................................................................................ 4

    New York's Department of Financial Services and the Superintendent ............................ 4

    Defendant Condor Capital Corporation ............................................................................ 5

    Defendant Stephen Baron .................................................................................................. 6

    Condor's Theft of Its Customers' Positive Balances ........................................................ 6

    Condor's Failure to Adopt Documented Policies, Procedures, and Controls
    Raises Grave Concerns Regarding the Protection of Customer Data and
    Preservation of Evidence ................................................................................................ 11

    The Department Protects Consumers by Requiring That Sales Finance
    Companies Comply with Applicable Laws, Rules, and Regulations ............................... 11

    The Department's Recent Examinations Reveal Numerous Internal Audit,
    Compliance, and Information Security Failures ............................................................. 12

    Customer Complaints Concerning Condor's Business Practices ..................................... 16

ARGUMENT ................................................................................................................... 16

I.      BOTH FEDERAL AND NEW YORK LAW AUTHORIZE THIS COURT TO
       GRANT THE RELIEF REQUESTED ............................................................................ 17

II.    THE DEFENDANTS' VIOLATIONS OF FEDERAL LAW WARRANT
       IMMEDIATE INJUNCTIVE RELIEF ......................................................................... 18

    A.     The Court Should Grant a TRO Pursuant to Dodd-Frank ..................................... 18

        1.     The Evidence Demonstrates That the Superintendent Has a
            Substantial Likelihood of Success on the Claim That Condor
            Violated Dodd-Frank .................................................................................. 19

            a.      Condor's Theft of Positive Credit Balances Is an Unfair,
                Deceptive, and Abusive Practice ................................................... 20

|   | b. | Condor's Failure to Provide Reasonable Data Security for the Private and Confidential Information of its Customers Is an Unfair, Deceptive, and Abusive Practice | 23 |

| | 2. | The Superintendent Has a Substantial Likelihood of Success on the Claim that Stephen Baron Substantially Assisted Wrongful Acts of Condor and Is Individually Liable Under Dodd-Frank | 25 |

| | 3. | The Balance of the Equities Favors Immediate Injunctive Relief | 26 |

| | 4. | Immediate Injunctive Relief Is in the Public Interest | 27 |

III. CONDOR'S VIOLATIONS OF NEW YORK LAW ALSO WARRANT IMMEDIATE INJUNCTIVE RELIEF ................................................................28

    A. The Evidence Demonstrates That the Superintendent Has a Substantial Likelihood of Success on the Claim That Condor Violated the Financial Services Law and Banking Law ..........................................................29

    B. The Equities Heavily Favor the Superintendent ....................................................30

IV. EX PARTE RELIEF IS NECESSARY TO PRESERVE THE *STATUS QUO* AND ENSURE EFFECTIVE RELIEF.............................................................31

V. A PRELIMINARY INJUNCTION SHOULD ALSO BE GRANTED UNDER BOTH FEDERAL AND STATE LAW ..........................................................34

CONCLUSION ................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIM Int'l Trading LLC v. Valcucine SpA.*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002)......................................................................28

*Baker's Aid v. Hussmann Foodservice Co.*,
    830 F.2d 13 (2d Cir.1987)..............................................................................................29

*CFPB v. Gordon, et al.*,
    No. 12-CV-6147 (C.D. Cal. July 18, 2012) ...............................................................35

*CFPB v. Jalan, et al.*,
    No. 12-CV-2088 (C.D. Cal. Dec. 4, 2012) ................................................................35

*CFTC v. Arista, LLC*,
    No. 12-CV-9043, 2012 WL 6929410 (S.D.N.Y. Dec. 13, 2012) ...........................32

*CFTC v. British Am. Commodity Options Corp.*,
    560 F.2d 135, 141 (2d Cir. 1977)................................................................................28

*CFTC v. Morgan, Harris & Scott, Ltd.*,
    484 F. Supp. 669 (S.D.N.Y. 1979).................................................................27, 34, 35

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010)..........................................................................18, 29, 34

*Cosgrove v. Bd. of Educ. of Niskayuna Cent. School Dist.*,
    175 F. Supp. 2d 375 (N.D.N.Y. 2001) ......................................................................28

*FTC v. 1st Guar. Mortgage Corp.*,
    No. 09-CV-61840, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011).........................21

*FTC v. Crescent Publ'g Grp., Inc.*,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001).................................................................19, 20

*FTC v. Cuban Exch., Inc.*,
    No. 12-CV-5890, 2012 WL 6800794 (E.D.N.Y. Dec. 19, 2012) .................... *passim*

*FTC v. Five-Star Auto Club, Inc.*,
    97 F. Supp. 2d 502 (S.D.N.Y. 2000).................................................................17, 32, 35

*FTC v. LeanSpa, LLC*,
    920 F. Supp. 2d 270 (D. Conn. 2013) ........................................................................26

**Page(s)**

*FTC v. Med. Billers Network, Inc.*,
 543 F. Supp. 2d 283 (S.D.N.Y. 2008).........................................................................21

*FTC v. Verity Int'l, Ltd.*,
 335 F. Supp. 2d 479 (S.D.N.Y. 2004).........................................................................20

*FTC v. Verity Int'l, Ltd.*,
 443 F.3d 48 (2d Cir. 2006)....................................................................................20, 21

*FTC v. Wyndham Worldwide Corp.*,
 No. 13-1887, 2014 WL 1349019 (D.N.J. April 7, 2014)...........................................23

*Granny Goose Foods, Inc. v. Teamsters*,
 415 U.S. 423 (1974).....................................................................................................32

*JP Morgan Chase Bank v. Winnick*,
 406 F. Supp. 2d 247 (S.D.N.Y. 2005).........................................................................25

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,
 965 F.2d 1224 (2d Cir. 1993).......................................................................................34

*Miles v. Gilray*,
 No. 12-CV-599S, 2012 WL 2572769 (W.D.N.Y. June 29, 2012).............................32

*New York v. BB's Corner*,
 No. 12-CV-1828, 2012 WL 2402624 (S.D.N.Y. June 25, 2012) ...............19, 29, 34

*People v. British & Am. Cas. Co.*,
 133 Misc. 2d 352 (Sup. Ct. New York Cnty. 1986) ...................................................31

*People v. N.Y.S. Fed. of Police*,
 590 N.Y.S.2d 573 (App. Div. 3d Dep't 1992) ............................................................31

*People v. Woodlawn Cemetery*,
 173 Misc. 2d 846 (Sup. Ct. Albany Cnty. 1997) ........................................................31

*Pharm. Soc'y of the State of N.Y. v. N.Y.S. Dep't of Soc. Servs.*,
 50 F.3d 1168 (2d Cir. 1995).........................................................................................28

*Porter v. Warner Co.*,
 328 U.S. 395 (1946).....................................................................................................18

*Rubin v. MasterCard Int'l, Inc.*,
 342 F. Supp. 2d 217 (S.D.N.Y. 2004).........................................................................21

*SEC v. Bowler*,
 427 F.2d 190 (4th Cir. 1970) .......................................................................................34

<u>**Page(s)**</u>

*SEC v. Cavanaugh,*
    155 F.3d 129 (2d Cir. 1998)...................................................................28

*SEC. v. Credit Bancorp Ltd.,*
    No. 99-CV-11395, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010)...................27

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972).......................................................27, 32, 35

*SEC v. Materia,*
    745 F.2d 197 (2d Cir. 1984)....................................................................17

*SEC v. Universal Express, Inc.,*
    No. 04-CV-2322, 2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007)...............35

*Secs. Indus. & Fin. Markets Ass'n v. Garfield,*
    469 F. Supp. 2d 25 (D. Conn. 2007).........................................................31

*Taylor v. Standard Gas & Elec. Co.,*
    306 U.S. 307 (1939)................................................................................34

*United States v. Blue Ribbon Smoked Fish, Inc.,*
    179 F. Supp. 2d 30 (E.D.N.Y. 2001)........................................................26

*United States v. Diapulse Corp. of Am.,*
    457 F.2d 25 (2d Cir. 1972).......................................................................27

*Ward v. New York,*
    291 F. Supp. 2d 188 (W.D.N.Y. 2003) .....................................................28

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)...................................................................................18

**Statutes and Other Authorities**

12 U.S.C. § 5481 ....................................................................................19

12 U.S.C. § 5531(c)(1)......................................................................1, 20, 23

12 U.S.C. § 5531(d) ............................................................................22, 25

12 U.S.C. § 5536(a)(1).....................................................................1, 17, 19

12 U.S.C. § 5536(a)(3).........................................................................1, 25

12 U.S.C. § 5552(a)(1)..........................................................................4, 17

12 U.S.C. § 5565(a)(1)............................................................................17

**Page(s)**

12 U.S.C. § 5565(a)(2)...........................................................................................4, 17, 34

15 U.S.C. § 45(a)(1).........................................................................................................20

Fed. R. Civ. P. 65............................................................................................................32

Fed. R. Civ. P. 66............................................................................................................33

FTC, FTC Policy Statement on Deception,
  103 F.T.C. 174 (1983)..................................................................................................21

N.Y. Abandoned Property Law § 1314 ............................................................................8

N.Y. Abandoned Property Law § 1413 ............................................................................8

N.Y. Banking Law § 492 ................................................................................................17

N.Y. Banking Law § 499 .............................................................................................1, 30

N.Y. Financial Services Law § 101-a ...........................................................................2, 4

N.Y. Financial Services Law § 102 ........................................................................2, 4, 17

N.Y. Financial Services Law § 104 ................................................................................17

N.Y. Financial Services Law § 202 ................................................................................17

N.Y. Financial Services Law § 301 ............................................................................4, 17

N.Y. Financial Services Law § 309 ......................................................................... *passim*

N.Y. Financial Services Law § 408 ................................................................................29

S. 2811-C, 234th Leg (N.Y. 2011)....................................................................................8

Plaintiff Benjamin M. Lawsky, the Superintendent of Financial Services of the State of New York (the "Superintendent"), respectfully submits this memorandum of law in support of his request, pursuant to Sections 1031, 1036, and 1042 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C. §§ 5531(c)(1), 5536(a)(1), (3), 5552(a)(1), Sections 309 and 408 of the New York Financial Services Law, and Section 499 of the New York Banking Law, for a temporary restraining order and order to show cause why a preliminary injunction should not issue, each to, *inter alia*, enjoin defendants' unlawful conduct and cause defendants to make restitution to each of defendant Condor Capital Corporation's customers who have been injured by the unlawful conduct described herein.

## PRELIMINARY STATEMENT

Defendant Condor Capital Corporation ("Condor") and its sole owner, defendant Stephen Baron (together, "Defendants"), are in the business of acquiring and servicing automobile retail installment contracts (or, for ease of reference, "loans").  The loans acquired by Condor have been made to "subprime" or "non-prime" customers, who have inadequate credit or resources to obtain "prime" loans and thus are particularly vulnerable to harm from unfair, deceptive, and abusive lending practices.  Currently, Condor holds loans with outstanding balances of approximately $300 million nationwide.

The Defendants have systematically stolen money from thousands of Condor's customers across the country by intentionally failing to repay positive credit balances due to those customers when their loans are overpaid.  Condor has admitted this.  Moreover, the Defendants have actively concealed the fact that they owed their customers such balances, through a number of different tactics, including:  (1) programming the company's customer-facing web portal to block customers' access to their loan accounts immediately upon full payment of the loan balance (even where the loan has been overpaid); (2) filing false and

misleading unclaimed property reports with the New York State Comptroller; and (3) refusing to adopt basic policies, procedures, and controls, in defiance of the repeated directives of the Department of Financial Services and its predecessor the New York State Banking Department (collectively, the "Department").[1]  Through these practices, Condor has prevented its customers from learning that Condor owes them, and has for years failed to refund, millions of dollars.

Condor's failure to adopt basic policies, procedures, and controls has also put at risk its customers' most sensitive, private personal and financial information.  While Condor represents to its customers that it "secures [customers'] personal information from unauthorized, use, or disclosure . . . in a controlled, secured environment," it does no such thing.  *See* Condor Capital Corp., "Privacy Statement," *available at* http://www.condorcap.com/Privacy.aspx, (last visited April 22, 2014).  In fact, Condor does not have basic IT safeguards necessary to protect and backup its computer systems or to protect electronic customer data from being stolen or compromised.  Condor also does not have policies and procedures to ensure that information and data related to its business operations are not destroyed, lost, or manipulated.  Backup tapes containing customers' personal and financial information are kept, unencrypted, in the home of defendant Baron's son.  Condor similarly fails to protect hard-copy customer loan files, which include customers' Social Security numbers, bank account numbers, and information about customers' income, savings, and assets, leaving them piled and unsecured in the common areas of Condor's offices, even when they are not in use, and also in open boxes or bins on shelves and on the floor in a garage attached to those offices.

---

[1] Effective October 3, 2011, the New York State Banking Department and the New York State Insurance Department were merged to create the New York Department of Financial Services. *See* N.Y. Fin. Svcs. Law §§ 101-a, 102.

Condor's numerous failures directly contradict its representations to its customers about the security of their data and violate consumer protection laws requiring Condor to take all reasonable and necessary steps to secure that data from unauthorized access.  Moreover, these practices highlight the need for immediate *ex parte* relief to protect customers from the irreparable harm that would be caused by any theft or breach of their personal information and to preserve evidence necessary to redress Condor's admitted widespread theft from its customers.

Lastly, the significant volume of customer complaints about Condor made to the Department, the Better Business Bureau, the United States Consumer Fraud and Protection Bureau ("CFPB"), and the United States Federal Trade Commission ("FTC") raises serious concerns regarding Condor's collection and reporting practices.  Customers have repeatedly alleged that Condor has taken unlawful actions against them including, among other things, harassing customers' parents and friends (even concerning accounts that are current), reporting false, derogatory credit information about customers to credit bureaus, and making unauthorized charges or debits to credit cards or bank accounts, including of third parties who are not customers of Condor.

Defendants' multi-year theft of funds from its customers, its unreasonable, reckless, and unlawful treatment of their sensitive personal and financial information, and the significant volume of complaints make clear that Defendants have harmed and continue to harm thousands of consumers across the country, and cannot be trusted to operate a licensed sales finance company.

Therefore, pursuant to the enforcement authority of Dodd-Frank as well as the New York Financial Services Law, the Superintendent brings this action seeking all available equitable relief, including immediately enjoining Defendants' violations of law, enjoining

Condor from acquiring new loans, requiring the immediate protection of all sensitive personal and financial information of Condor's customers, freezing Condor's assets so as to ensure it can provide restitution to its customers, and, pursuant to a preliminary injunction, appointing a receiver to manage its operations and assets to prevent further harm to customers in New York State and the more than two dozen other states in which Condor is licensed to do business.

## STATEMENT OF FACTS

### The Parties

#### New York's Department of Financial Services and the Superintendent

In 2011, the New York State Legislature created the New York Department of Financial Services by combining the New York State Banking Department and the New York State Insurance Department to vest a single, independent entity with the power to regulate banking, insurance, and financial institutions. *See* N.Y. Fin. Svcs. Law §§ 101-a, 102. The Department has been given a broad mandate to ensure the safety and soundness of institutions providing financial products and services to consumers, *id.* § 102(i), and to reduce and eliminate "fraud, criminal abuse, and unethical conduct by, and with respect to, banking, insurance, and other financial services institutions and their customers." *Id.* § 102(k). The Superintendent is authorized to take all actions "necessary to . . . protect users of financial products and services," including enforcement of New York's Insurance, Banking, and Financial Services Laws. *Id.* § 301(c).

The Department's broad enforcement powers, authorized by both state and federal law, include seeking remedies through this Court. In particular, Dodd-Frank authorizes the Department, as a regulator of New York financial services institutions, to seek an injunction in federal court against violations of Dodd-Frank and to secure all forms of equitable relief as may be appropriate, including restitution, disgorgement, and the appointment of a receiver to manage

Defendants' assets and wind down Condor's business.  *See* 12 U.S.C. §§ 5552(a)(1), 5565(a)(2).

In addition, the Financial Services Law authorizes the Department to seek an injunction to

prevent actual or likely violations of the New York Insurance, Banking, and Financial Services

Laws.  *See* N.Y. Fin. Svcs. Law § 309.

<u>Defendant Condor Capital Corporation</u>

Founded in 1994 and licensed by the New York Banking Department in 1996,

Condor is a New York-based sales finance company wholly owned by Baron which acquires and

services automobile loans in New York and more than two dozen other states.  (Smith Decl.

¶ 6.[2])  Condor has agreements with automobile dealers whereby they submit loan applications

from potential automobile purchasers to one or more possible lenders, such as Condor.  (*Id.* ¶ 7.)

Condor provides a quotation of terms for the requested loan, including interest rate, fees, and

term.  (*Id.*)  The dealer then makes the loan and assigns it to the selected lender or finance

company.  (*Id.*)

Once Condor obtains a loan from a dealer, Condor "services" the loan by sending

monthly statements to the customer, receiving and applying the customer's payments to the

outstanding balance, and taking action to collect on the loan if a payment is late or if the loan

becomes delinquent, including by legal action or repossession.  (*Id.* ¶ 8.)

Condor's customers are "subprime" or "non-prime" borrowers, meaning that they

have inadequate credit or resources to borrow from a "prime" or "near-prime" lender or

otherwise have a high-risk of non-payment.  (Montgomery Decl. ¶ 3.[3])  Subprime customers are

---

[2] Citations to "Smith Decl." refer to the Declaration of J. Terence Smith, sworn to April 22, 2014.

[3] Citations to "Montgomery Decl." refer to the Declaration of Brian Montgomery, sworn to April 22, 2014.

particularly vulnerable to unsound lending and business practices because of their personal circumstances.  (*Id.*)

According to Condor's 2013 annual report, submitted to the Department on or about March 13, 2014, Condor holds more than 7,000 loans to New York state residents, with aggregate outstanding balances of more than $97 million.  (*Id.* ¶ 4.)  In total, Condor's current loan portfolio has an aggregate outstanding balance of more than $300 million.  (*Id.* ¶ 5.)  For the year ended December 31, 2013, Condor reported net after-tax income of approximately $7 million on operating income of approximately $68.7 million.  (*Id.* ¶ 6.)

### Defendant Stephen Baron

Stephen Baron is the sole owner of Condor and through that ownership directs and controls the company.  (*Id.* ¶¶ 11, 13.)  Baron is responsible for and oversees Condor's operations, including the review of all financial information and the formulation and implementation of policies.  (*Id.* ¶ 11.)  He is authorized to transfer money between Condor's bank accounts as well as to accounts outside of Condor, including his own.  (Thompson Decl. ¶ 12(d).[4])  In fact, Baron has caused Condor to make approximately $17 million in undocumented "loans" totaling to himself and a number of limited liability companies of which he is the sole member.  (Smith Decl. ¶ 43.)

## Condor's Theft of Its Customers' Positive Balances

Condor has engaged in a multi-year, systematic, and unlawful theft of positive credit balances owed to customers and, until very recently, has failed to refund any such balances owed to its customers.

---

[4] Citations to "Thompson Decl." refer to the Declaration of Don H. Thompson, sworn to April 22, 2014.

In November 2013, the Department received information indicating possible wrongdoing by Condor, including allegations of theft of positive credit balances owed to customers.  (Montgomery Decl. ¶ 16.)  A positive credit balance is simply money owed by Condor to a customer as a result of an overpayment of the customer's account.  (Smith Decl. ¶ 37.)  A positive credit balance can come about in several different ways.  For example, a customer might pay more than the outstanding loan balance; if a car is destroyed (or "totaled"), the insurance proceeds might exceed the outstanding balance of the loan; or, a customer might trade in the car that is the subject of the loan and receive a credit that is greater than the outstanding loan balance.  (*Id*.)

Upon receipt of information concerning Condor's theft from its customers, the Department immediately conducted a targeted examination of Condor to verify the information it had received.  (Smith Decl. ¶¶ 5, 19-26; Falby Decl. ¶¶ 5, 8-14[5].)  Examiners from both the Department's Licensed Financial Services division ("LFS") and Consumer Examinations Unit ("CEU") spent two days on-site at Condor's headquarters collecting documents, including approximately 200 loan files, and meeting with Condor's management.   (Smith Decl. ¶¶ 21-25; Falby Decl. ¶¶ 9-12.)  The Department learned that rather than notifying customers of their positive credit balances and paying refunds, Condor has for years knowingly and systematically hidden from customers the existence of the positive credit balances and retained them for itself, with no intention of refunding them.  (Smith Decl. ¶ 38.)

Condor also has programmed its website to conceal its wrongdoing.  In particular, Condor's website contains a portal that allows customers to log in and view the status of their

---

[5] Citations to "Falby Decl." refer to the Declaration of Wendell Falby, sworn to April 22, 2014.

loan accounts and make payments.  (Martinez Decl. ¶ 28.[6])  Condor has deceptively programmed the website so that a customer's loan account is removed immediately upon repayment in full – even if the loan is overpaid and the account has a positive credit balance due to the customer. (*Id.*)  This makes it impossible for a customer to view the account thereafter and detect any positive credit balance.  (*Id.*)  Condor's actions falsely indicated to customers – who reasonably relied on Condor to accurately represent the current status of their accounts – that they owed nothing to Condor and, more importantly, that Condor owed them nothing.

Condor further impeded its customers' ability to detect their positive credit balances by filing false and misleading "negative" unclaimed property reports with the New York State Comptroller's Office.  (*See* Smith Decl. ¶ 42.)  Pursuant to the New York Abandoned Property Law, Condor, like many New York businesses, is required to submit an annual report to the New York State Comptroller's Office of Unclaimed Funds identifying unclaimed property belonging to New York residents as well as residents of other states, to take certain steps to return unclaimed property to its rightful owner, and, after a "dormancy" period, to turn such property over to the State of New York.  *See* N.Y. Aband. Prop. Law § 1314.  Until April 2011, a business that had no unclaimed property was required to file a report so stating, known as a "negative" report.  Unclaimed property reports are required to be submitted with a certification by a duly authorized officer of the entity stating under oath that the report "is a true and complete statement of all abandoned property held by, or owing by, this organization."  *See* N.Y.S. Comptroller, "Verification and Checklist for Unclaimed Property" (2010), *available at* http://www.osc.state.ny.us/ouf/oufhandbook/2709.pdf.  In addition, Abandoned Property Law § 1413 states that "The making of a willful false oath in any report required under the provisions

---

[6] Citations to "Martinez Decl." refer to the Declaration of Madaline Martinez, sworn to April 21, 2014.

of this chapter shall be perjury and punishable as such according to law."  In April 2011, the Abandoned Property Law was amended such that no negative report is required if a business does not hold any unclaimed property; reports need only be filed if a business holds unclaimed property.  *See* S. 2811–C, 234th Leg. (N.Y. 2011).

Despite the known existence of unrefunded and unclaimed positive credit balances, Condor has consistently filed negative unclaimed property reports with the Comptroller and, beginning in 2012, has filed *no* reports – thus representing to the New York State Comptroller that Condor has no unclaimed property.  (*See* Smith Decl. ¶ 42; Montgomery Decl. ¶ 9.)  Condor's failure to report customers' positive credit balances as unclaimed property has blocked yet another avenue for them to detect their existence or Condor's refusal to refund them.

Condor has admitted both orally and in writing that it has concealed and refused to refund customers' positive credit balances.  At the November 2013 examination, Condor's controller told one of the Department's examiners that it was Condor's "policy" (which, like its other policies and procedures, as discussed below, was not documented) not to refund a customer's positive credit balance unless he or she specifically requested a refund.  (Falby Decl. ¶ 20; Smith Decl. ¶ 38.)  The Department is informed that Condor has been withholding positive credit balances due to customers since it began operations as a sales finance company in 1996.  (Montgomery Decl. ¶ 16.)

After the Department's examiners asked Condor about the positive credit balances during the January 2014 examination, Condor admitted that it had recently begun to attempt to identify customer accounts with positive credit balances and make refunds.  (Falby Decl. ¶ 21; Smith Decl. ¶ 39.)  Condor provided the Department with a list of 410 New York loans with balances that were paid in full during the period June 1, 2012 to December 10, 2013 but which

had positive credit balances due to the customer.  (Falby Decl. ¶ 21; Smith Decl. ¶ 39.)  Condor represented that it had sent approximately $41,000 in refunds to these 410 customers.  (Falby Decl. ¶ 21; Smith Decl. ¶ 39.)  Before the purported refund to these 410 customers, Condor had made no refunds other than in response to direct customer requests (if any).  (Falby Decl. ¶¶ 20-21.)

In the course of sampling the loan files collected from Condor during the November 2013 examination, however, the Department identified dozens of New York loans that had been paid off during the same June 1, 2012 to December 10, 2013 period and had positive credit balances but did not appear on Condor's schedule.  (Smith Decl. ¶ 40; Falby Decl. ¶ 22.)  Thus, Condor's representation to the Department was false and its attempt to refund positive credit balances was woefully and materially underinclusive.  Moreover, Condor's self-review did nothing for New York customers harmed between 1996 and 2012 or for the tens of thousands of customers outside of New York.  The total amount of customers' positive credit balances that Condor has withheld and converted to its own use is not currently known, but the Department is informed and believes the amount to be in the millions of dollars.

The Defendants' purported self-review is particularly unpersuasive in light of Condor's multi-year history of refusing to adopt policies, procedures, and controls necessary to protect its customers as detailed below.[7]

---

[7] By way of example, Condor has indicated that it plans to review its own files for positive credit balances only for the past five years (*see* Smith Decl. ¶ 41), yet its theft has been going on since 1996.

**Condor's Failure to Adopt Documented Policies,
Procedures, and Controls Raises Grave Concerns Regarding
the Protection of Customer Data and Preservation of Evidence**

The Department Protects Consumers by Requiring That Sales
Finance Companies Comply with Applicable Laws, Rules, and Regulations

Consumer protection in the context of licensed sales finance companies like

Condor and other regulated financial services is not limited to remedying past wrongs but also

includes preventing future harms through proper policies, procedures, and controls that facilitate

compliance with applicable law and the proper handling of customers' accounts and funds.  The

CFPB which, like the Department, is authorized to enforce Dodd-Frank, has stated that a

financial institution's internal "policies and practices" are essential to limiting risks to customers.

*See* CFPB Supervision and Examination Manual at Overview 4 (2012), *available at*

http://files.customerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf

(hereinafter "CFPB Exam Manual").  This includes an institution's "effective systems and

controls to manage . . . compliance responsibilities," and "an institution's ability to detect,

prevent, and correct practices that present a significant risk of violating the law and causing

customer harm."  *Id.*[8]

Condor, as a sales finance company, must, among other things, comply with state

and federal fair lending, fair debt collection practices, and credit reporting laws; implement

policies, procedures, and controls to ensure it keeps accurate books and records; protect its

customers' data privacy; and properly handle unclaimed property (*e.g.*, funds belonging to

customers).  (Montgomery Decl. ¶ 7.)

---

[8] *See also* Fed. Fin. Institutions Examination Council, Audit Booklet, Introduction, *available at*
http://ithandbook.ffiec.gov/ITBooklets/FFIEC_ITBooklet_Audit.pdf ("A well-planned, properly
structured [IT] audit program is essential to evaluate risk management practices, internal control
systems, and compliance with corporate policies concerning IT-related risks at institutions of
every size and complexity.").

The Department examines the operations of sales finance companies to ensure that they adopt and comply with necessary policies, procedures, and controls. (Smith Decl. ¶¶ 9-11, 13, 16.) Condor is subject to routine "safety and soundness" examinations by LFS every three years, as well as additional examinations where the Department believes it is necessary. (*Id.* ¶ 9.) These triennial safety and soundness examinations are pursuant to what is known as the "FILMS" system. (*Id.* ¶ 11.) The system provides for an assessment of a licensee's financial condition ("F"), internal controls and audit function ("I"), legal and regulatory compliance ("L"), management systems ("M"), and computer systems, and information technology ("S"). (*Id.* ¶¶ 11-16.) After each examination, the Department may direct a licensee to take specific corrective actions where the Department believes it is necessary to protect consumers. (*Id.* ¶ 18.)

The Department's Recent Examinations Reveal Numerous
<u>Internal Audit, Compliance, and Information Security Failures</u>

The Department's November 2013 targeted examination (which followed its receipt of information about Condor's theft) and a subsequent January 2014 examination have exposed Condor's near-total absence of documented policies, procedures, and controls necessary to manage a $300 million state-licensed lending institution. These failures make clear that immediate *ex parte* relief is necessary to protect the interests of Condor's customers, preserve evidence relevant to the prosecution of this action, and prevent future, irreparable harm. (Montgomery ¶ 17.)

In January 2014, examiners from both LFS and CEU examined Condor, spending approximately three weeks on-site at Condor's offices, conducting the triennial FILMS safety and soundness examination. (*See* Smith Decl. ¶¶ 27-43; Falby Decl. ¶¶ 15, 18.) Together with the November 2013 examination, that examination revealed that Condor lacks any documented

policies and procedures for loan application processing, mail handling, payment processing,

customer complaints, assessment of fees and charges, account reconciliations, corporate

accounting, regulatory reporting, or training.  (Falby Decl. ¶¶ 25-27; Thompson Decl. ¶¶ 12-13.)

Condor also has no internal audit function and no documented procedure to assess or monitor

compliance with consumer protection and other laws.[9]  (Falby Decl. ¶ 25; Thompson Decl. ¶ 12.)

At Condor, opportunities for fraud and error, including the loss, destruction, manipulation, or

other improper use of documents or customer data, abound.

Condor is similarly cavalier in its failure to adopt and follow documented policies

and procedures governing its IT systems.  Condor represents to its customers in a "Privacy

Statement" featured on its website that:

> Condor Capital Corp. is committed to protecting your privacy and
> developing technology that gives you the most powerful and safe
> online experience.  This Statement of Privacy applies to the
> Condor Capital Corp. web site and governs data collection and
> usage. . . .  Condor Capital Corp. secures your personal
> information from unauthorized access, use or disclosure.  Condor
> Capital Corp. secures the personally identifiable information you
> provide on computer servers in a controlled, secure environment,
> protected from unauthorized access, use or disclosure.

*See* Condor Capital Corp., "Privacy Statement," *available at* http://www.condorcap.com/

Privacy.aspx (last visited April 22, 2014).  Despite this representation to its customers, Condor

fails to take necessary and reasonable steps to protect electronic or hard-copy private and

confidential customer data.  Condor has never performed a penetration test on its website to

---

[9] For example, Condor does not properly check loan applications against lists of "blocked"
persons published by the Office of Foreign Assets Control ("OFAC") as required by federal law.
*See* Martinez Decl. ¶ 23.  OFAC lists identify persons, including terrorists and narcotics
traffickers, whose assets are blocked in the United States and with whom entities like Condor are
generally prohibited from conducting any business.  See U.S. Dept. of Treasury, "Offices of
Foreign Assets Control," http://www.treasury.gov/about/organizational-
structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

protect against hacking or other unauthorized access.  (Martinez Decl. ¶ 25.)  Condor has never

performed an IT audit or risk assessment to assess the security of its computer passwords, the

universe of persons who have access to those passwords, or what risks would arise in the event

of a change in control.  (*Id.* ¶¶ 15-16, 22.)  Condor has no documented disaster-recovery plan for

its IT systems.  (*Id.* ¶ 19.)  Condor uses a proprietary computer system and programs to manage

its loan portfolio, but has no formal process for managing and documenting changes to that

system.  (*Id.* ¶ 21.)  Said differently, Condor's employees can make changes to its central

computer system and programs "on the fly," and no record of those changes exists.  (*Id.*)

       Adding to the serious concerns regarding Condor's failure to adopt and observe

policies, procedures, and controls, the recent on-site examinations by the Department

demonstrated that Condor fails in multiple respects to safeguard highly sensitive customer

information in both hard-copy and electronic forms.  (*Id.* ¶¶ 26-27, 29.)  At Condor's offices,

hard-copy customer copy files – which include, among other things, customers' Social Security

numbers, bank account numbers, and listings of assets – are piled openly around common areas

of Condor's offices and unsecured for indefinite periods, even when not in use.  (*Id.* ¶ 20; Falby

Decl. ¶ 28.)  Thousands of hard-copy customer files also are kept in a garage attached to

Condor's Hauppauge office building, in open boxes or bins on shelves and on the floor.  (Smith

Decl. ¶ 34; Falby Decl. ¶ 29)  In addition, daily back-up tapes of customer data created by

Condor for the past 18 years are kept, unencrypted, in the home of Condor Executive Vice

President Todd Baron (defendant Baron's son) with no known safeguards there.  (Martinez Decl.

¶ 27.)  In short, there are no apparent policies, procedures, or controls – documented or otherwise

– to ensure that customer data is protected and preserved.

The Department also has learned that Condor recently purchased an office building in Florida to which it intends to relocate its offices.  (Smith Decl. ¶ 44; Falby Decl. ¶ 30.)  A relocation of Condor's business, in light of its willful refusal to adopt necessary, customer-protecting controls, poses a significant threat to its customers and their most sensitive data as well as to the preservation of evidence necessary to identify all customers harmed by Condor's theft and redress that harm.

Although the Department repeatedly instructed Condor, even prior to November 2013, to adopt policies, procedures, and controls necessary to protect its customers, Condor has responded each time by rejecting virtually all of the Department's findings and ignoring and refusing to comply with repeated, written directives.  (Montgomery Decl. ¶¶ 12, 15.)  Condor's excuse for its admitted non-compliance has been primarily economic:  after a 2007 Banking Department examination identified multiple serious problems at Condor, the company responded by protesting that "this audit criticizes the existence of a small lending business," and asking "Are you intentionally discriminating against a small business?"  (*Id.* ¶ 10.)  Condor also wrote that "if you are going to allow a small business to hold a lending license [. . .] you cannot put upon economic inefficiencies that preclude its existence."  (*Id.*)  While pleading poverty to the Department as a purported basis for not implementing basic sound business practices, Condor nevertheless has found ample funds to make multi-million-dollar undocumented "loans" to defendant Baron and other companies wholly owned by defendant Baron.  (Smith Decl. ¶ 43.)  Condor's cost-benefit analysis speaks for itself – there has been a conscious decision to enrich defendant Baron at the expense of Condor's customers and in flagrant disregard of the law.  Simply put, there is no reason, in light of Condor's *ad hoc* approach to running its business that

Condor can be trusted to remedy its long-running theft or its massive mishandling of its customers' highly sensitive data on its own.

**Customer Complaints Concerning Condor's Business Practices**

Condor's unfair, deceptive, and abusive treatment of its customers is further underscored by the numerous customer complaints filed with the Department, the CFPB, the FTC, and the Better Business Bureau regarding Condor's collection and credit-reporting practices.  (Montgomery Decl. ¶¶ 18-19.)  Many of these complaints concern Condor's assertions of false and inaccurate information about its customers' payment histories.  For example, multiple customers have alleged that Condor has harassed and threatened customers and friends and relatives of customers, including with respect to accounts that are current.  (*Id.* ¶ 21.)  Other customers have alleged that Condor has reported inaccurate information to credit agencies, imposed fees or late charges where none are appropriate, or has failed to properly apply payments to loan balances.  (*Id.* ¶¶ 22-24.)  Still other customers, as well as friends and relatives of customers, have alleged that Condor has made unauthorized charges to their credit cards or unauthorized debits from their bank accounts.  (*Id.* ¶ 25.)

**ARGUMENT**

The Superintendent seeks a temporary restraining order and preliminary injunction halting the Defendants' ongoing violations of Dodd-Frank, the New York Financial Services Law, and the New York Banking Law.  The Superintendent asks the Court to grant a TRO enjoining the Defendants from their ongoing violations of law; freezing Condor's assets to preserve them for restitution to victims; restraining the Defendants from destroying evidence; and giving the Superintendent immediate access to Condor's premises, documents, books, and records.  The Superintendent also asks the Court to order the Defendants to show cause why a preliminary injunction should not be entered to continue such relief and appoint an equitable

16

receiver for Condor in order to wind down Condor's business and make restitution to its

wronged customers.  As set forth below, the evidence overwhelmingly supports such relief.

## I.

### BOTH FEDERAL AND NEW YORK LAW AUTHORIZE THIS COURT TO GRANT THE RELIEF REQUESTED

Dodd-Frank authorizes a "State regulator" to prevent and remedy violations of

Dodd-Frank that are committed by "any entity that is State-chartered, incorporated, licensed, or

otherwise authorized to do business under State law."  12 U.S.C. § 5552(a)(1); *see also id.*

§ 5536(a)(1).  The Department is a state regulator created, *inter alia*, to enforce New York's

Insurance, Banking, and Financial Services Laws and promulgate rules and regulations

applicable to companies that provide financial services products, including sales finance

companies.  *See* N.Y. Fin. Servs. Law § 102.  The Superintendent is the head of the Department

vested with the power to enforce those laws and regulations.  *Id.* §§ 202(a), 301(a)-(c).

Defendant Condor Capital is a sales finance company licensed by the State of New York and

subject to the regulatory authority of the Department.  *Id.* § 104(4); N.Y. Banking Law § 492(1).

Dodd-Frank authorizes this Court to order equitable relief to prevent and remedy

violations of law by the Defendants here, including all forms of injunctive relief, restitution,

disgorgement, or compensation for unjust enrichment.  12 U.S.C. § 5565(a)(1), (2).  Where, as

here, Congress has empowered the Court to grant injunctive relief, this authority includes any

temporary or preliminary relief necessary to preserve the possibility of effective final relief,

including an order freezing assets, a TRO enjoining particular conduct, the appointment of a

receiver, and immediate access to business premises.  *See SEC v. Materia*, 745 F.2d 197, 200 (2d

Cir. 1984) ("[A]ny form of ancillary relief may be granted where necessary and proper to

effectuate the purposes of the statutory scheme); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp.

2d 502, 533 (S.D.N.Y. 2000).  Further, where, as here, a regulatory entity seeks the return of money that rightfully belongs to members of the public, the "public interest" is at issue and the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake."  *Porter v. Warner Co.*, 328 U.S. 395, 398 (1946) (Congressional grant of equitable jurisdiction must be read broadly).

In addition to the broad equitable relief authorized by federal law, New York's Financial Services Law authorizes this Court to grant preliminary injunctive relief "upon terms as may be just" to prevent future violations.  *See* N.Y. Fin. Servs. Law § 309(b).

## II.

### THE DEFENDANTS' VIOLATIONS OF FEDERAL LAW WARRANT IMMEDIATE INJUNCTIVE RELIEF

**A.**     **The Court Should Grant a TRO Pursuant to Dodd-Frank**

The Superintendent seeks a TRO and an order to show cause why a preliminary injunction should not issue to stop the Defendants' violations of Dodd-Frank and prevent future violations.

In private civil litigation, a plaintiff may obtain injunctive relief where it demonstrates that (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of immediate preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest.  *See, e.g.*, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  However, in a statutory enforcement action, the government need not demonstrate irreparable injury – it is presumed from the demonstration of a likelihood of success.  *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010) (government not required to demonstrate irreparable harm when enforcing statute that makes specific conduct unlawful "indicating Congress and the New

York Legislature's determination that such conduct, in and of itself, is harmful to the public"); *New York v. BB's Corner, Inc.*, No. 12-CV-1828, 2012 WL 2402624, at *3 (S.D.N.Y. June 25, 2012) ("Where, as here, the party seeks a statutory injunction, the Second Circuit has dispensed with the requirement of showing irreparable harm, and instead employs a presumption of irreparable harm based on a statutory violation." (internal quotations and alterations omitted)); *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) ("The intent is to maintain the statutory or 'public interest' standard which is now applicable, and not to impose the traditional 'equity' standard of irreparable damage . . . ." (internal quotation omitted)).  The Court therefore should grant a TRO if the Superintendent demonstrates a likelihood of success on the merits, that the balance of equities tip in favor of immediate injunctive relief, and that such relief serves the public interest.  As detailed below, these requirements are easily met here.

       *1.*      *The Evidence Demonstrates That the Superintendent Has a Substantial Likelihood of Success on the Claim That Condor Violated Dodd-Frank*

        Dodd-Frank prohibits any "covered person" from engaging in "any unfair, deceptive, or abusive act or practice."  12 U.S.C. § 5536(a)(1)(B).  A "covered person" includes persons or entities that engage "in offering or providing a consumer financial product or service," including making and servicing loans.  *Id.* § 5481(6), (15), (19).  Therefore, Condor, as a sales finance company, is a "covered person."  Condor has violated the prohibition on unfair, deceptive, and abusive practices in at least two ways.  One, Condor's systematic theft of positive credit balances owed to customers is unfair, deceptive, and abusive.  Two, Condor's abject failure to take reasonable and necessary actions to protect the most sensitive, confidential personal and financial data about its customers, putting those customers at a substantial risk for serious and irreparable harm, is also unfair, deceptive, and abusive.

a.      Condor's Theft of Positive Credit Balances
        Is an Unfair, Deceptive, and Abusive Practice

Condor's theft of customers' positive credit balances is undeniably unfair,

deceptive, and abusive.  *First*, Condor's policy of failing to repay money owed to customers is

"unfair."  An "unfair" act or practice is one that actually causes or "is likely to cause substantial

injury to customers which is not reasonably avoidable by customers" and "such substantial injury

is not outweighed by countervailing benefits to customers or to competition."  12 U.S.C.

§ 5531(c)(1)(A), (B).[10]  An injury may be "substantial" even if it causes small harm where it

does so with respect to a large number of people.  *Crescent Publ'g*, 129 F. Supp. 2d at 322 &

n.70 (citing cases) (website operators committed "unfair" acts by making unauthorized charges

to customers' credit cards, creating obstacles to those customers obtaining refunds, and it was

likely that "the injury to consumers was substantial in the aggregate").  Where a defendant takes

money from its customers to which it is not entitled, that practice is unfair.  *See FTC v. Verity*

*Int'l, Ltd.*, 335 F. Supp. 2d 479, 498 (S.D.N.Y. 2004) (website operators committed "unfair" acts

by improperly billing customers for services they did not use); *Crescent*, 129 F. Supp. 2d at 322.

Here, Condor's failure to refund positive balances and its active concealment of the existence of

those balances have injured Condor's customers, with no possible countervailing benefit to

consumers or competition.

*Second*, the Defendants' practices are also "deceptive" in violation of Dodd-

Frank.  Dodd-Frank does not define "deceptive," but that conduct also is prohibited by the

Federal Trade Commission Act ("FTCA") on which Dodd-Frank is based.  *See* 15 U.S.C.

§ 45(a)(1); *see also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006).  Under the FTCA,

---

[10] This definition is identical to the definition of "unfairness" under the Federal Trade
Commission Act.  *See* 15 U.S.C. § 45(n); *Verity Int'l*, 335 F. Supp. 2d at 498.

an act is "deceptive" if it involves a material representation or omission that is likely to mislead customers acting reasonably under the circumstances.[11]  *Verity Int'l*, 443 F.3d at 63 (defendants' misrepresentation to customers that they could not avoid charges for services they did not use was deceptive).  Courts also have held that "deceptive" practices for the purpose of consumer protection include those that are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Rubin v. MasterCard Int'l, LLC*, 342 F. Supp. 2d 217, 220 (S.D.N.Y. 2004) (discussing allegation that credit card issuer's undisclosed fee was "deceptive" under FTCA).  A representation or omission is "material" so long as it concerns "information important to customers and, hence, is likely to affect their choice, or conduct, regarding a product."  *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 315 (S.D.N.Y. 2008) (failure to disclose $100 fee was "clearly" material).  A statement need not be made intentionally, in bad faith, or with malice to be deceptive.  *Id.*  In particular, false representations or omissions to customers concerning the financial impact of a transaction are "deceptive."  *See Verity Int'l*, 443 F.3d at 63-64; *see also FTC v. 1st Guar. Mortgage Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *3-5, 13 (S.D. Fla. Mar. 30, 2011) (defendants' deceptive acts included false representations that customers' loans would be refinanced and failing to disburse monies owed to customers from purported refinances).

When Condor has received payments in excess of its customers' loan balances, it has intentionally and systematically failed to inform customers of the overpayments or that it owed refunds.  This purposeful and knowing concealment and knowing failure to disclose monies owed – far more than unintentional deception – clearly violates Dodd-Frank.  In addition, Condor has ensured that customers' discovery of its deception is nearly impossible through its

---

[11] *See also* FTC, FTC Policy Statement on Deception, 103 F.T.C. 174 (1983).

practice of blocking customers' access to their accounts on Condor's website upon receipt of a final payment – even where it results in a positive credit balance due to the customer.  Moreover, the likelihood that a customer will know or discover that Condor owes a refund is further reduced where the final payment is made by a third party, such as dealer or insurer (as in the case of trade-in or a totaled car), such that the customer may not know how much was paid (or overpaid) to Condor.  In the absence of any communication from Condor indicating that a positive credit balance exists, the customer reasonably would believe that his or her balance is zero.

*Third*, Condor's practices also are "abusive" in violation of Dodd-Frank.  Dodd-Frank states that an "abusive" act is one that (1) "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service"; or (2) "takes unreasonable advantage of:  (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."  *See* 12 U.S.C. § 5531(d); *see also* CFPB Exam Manual at UDAAP 9.

Here, Condor has taken unreasonable advantage of its customers' reasonable reliance on Condor to act in an honest and ethical manner and communicate accurately and completely regarding the status of their accounts.  Condor's customers, who are particularly vulnerable subprime borrowers, reasonably expected that Condor would disclose and refund any money owed to them.  Condor abused that reliance by failing and refusing to disclose to its customers that it owed them refunds and actively hiding that fact by blocking those customers' access to the customer portal portion of Condor's website.

The evidence thus overwhelmingly demonstrates that Condor's theft and concealment of positive credit balances fall squarely within these types of consumer-harming acts that Congress sought to halt by enacting Dodd-Frank.

        b.     Condor's Failure to Provide Reasonable Data
                Security for the Private and Confidential Information
                <u>of its Customers Is an Unfair, Deceptive, and Abusive Practice</u>

Condor has also engaged in unfair, deceptive, and abusive practices through its failure to safeguard customer data, documents, and information and its misrepresentations to customers about the data security of their private and confidential personal and financial information.

*First*, as set forth above, an "unfair" practice includes any act that is "is *likely* to cause substantial injury to customers which is not reasonably avoidable by customers" and "such substantial injury is not outweighed by countervailing benefits to customers or to competition." 12 U.S.C. § 5531(c)(1)(A),(B) (emphasis added).  Condor has engaged, and continues to engage, in numerous security failures that unreasonably and unnecessarily expose customers' personal and financial data to unauthorized access.  This constitutes an unfair act.  *See FTC v. Wyndham Worldwide Corp.*, No. 13-CV-1887, 2014 WL 1349019, at *14 (D.N.J. Apr. 7, 2014) (allegations of "unfair" act against customers sufficient to state a claim where defendants failed to adhere to basic data security protocols concerning customer data, including use of complex passwords, monitoring access to defendants' networks, and protecting against unauthorized access to customer data).

Condor has failed to take basic steps, such as a "penetration test," necessary to secure its website and its customers' private and confidential information from compromise by unauthorized persons.  Condor has also failed to assess the sufficiency of its password protections or the universe of persons who have access to private and confidential customer

information and cannot ensure that its purported protections are effective.  Changes to Condor's proprietary computer system, central to its business, can be made without documentation, leaving customer data open to manipulation.  Moreover, Condor stores unencrypted backup tapes containing private and confidential customer data at an officer's home.  Each of these practices is highly likely to cause substantial injury to Condor's customers, who are not made aware of them and have no reasonable way to avoid harm.

    *Second*, Condor's failure to adopt reasonable and necessary safeguards concerning customer data is deceptive in violation of Dodd-Frank.  Condor affirmatively misrepresents the measures that it undertakes to protect customers' private and confidential information.  Condor's privacy policy distributed to its customers and published on its website purports to describe Condor's information policies and practices.  Yet the numerous deficiencies in the handling of that data demonstrate that these representations are false and misleading. While Condor leads its customers to believe that personal information is stored on "computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure," this is untrue.  *See* Condor Capital Corp., "Privacy Statement," *available at* http://www.condorcap.com/Privacy.aspx, (last visited April 22, 2014).  Rather, as detailed above and in the Complaint, Condor takes only minimal, if any, steps to ensure that customers' personal and financial information is either stored in a secure environment or protected from unauthorized access.  To the contrary, for example, Condor has not secured its website against unauthorized access, it transfers private and confidential data out of its office unencrypted on a daily basis, and it routinely leaves hard-copy customer files open and unsecured and piled around the common areas of its office for indefinite periods.

*Third*, Condor's misrepresentations to its customers concerning the steps it takes to secure their data from unauthorized access constitute an abusive practice. Customers, having read Condor's privacy statement on its website, reasonably expect that Condor, consistent with its representation, takes reasonable and necessary steps to maintain customers' highly sensitive confidential personal and financial information in "a controlled, secured environment." Yet, Condor has chosen to do next to nothing to protect this data and has not protected it in any controlled or secured environment. Moreover, Condor's customers have no way to know it has failed to take such efforts and, therefore, no way to avoid the substantial harm that may flow from that failure. As such, Condor, in violation of Dodd-Frank, has taken "unreasonable advantage" of (1) its customers' "inability . . . to protect" their own interests "in selecting or using a consumer financial product or service" and (2) "the reasonable reliance" of its customers on Condor to "act in the interests of the consumer." *See* 12 U.S.C. § 5531(d); *see also* CFPB Exam Manual at UDAAP 9.

2.     *The Superintendent Has a Substantial Likelihood of Success on the Claim that Stephen Baron Substantially Assisted Wrongful Acts of Condor and Is Individually Liable Under Dodd-Frank*

Dodd-Frank also makes it unlawful for any person "to knowingly or recklessly provide substantial assistance to a covered person" in violating Dodd-Frank's prohibition against unfair, deceptive, or abusive acts. *See* 12 U.S.C. § 5536(a)(3). As demonstrated above, Condor is a "covered person" that has committed unfair, deceptive, and abusive acts in violation of Dodd-Frank. Baron, through his sole ownership and active control of Condor has provided substantial assistance to Condor in committing those violations.

Although "substantial assistance" is not defined in Dodd-Frank, courts have held that it exists where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the wrongful act] to proceed." *JP Morgan Chase Bank v.*

*Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (allegations of "substantial assistance" held to state a claim where defendant attorneys negotiated and documented transactions that had effect of furthering fraud).  In the context of the FTCA, a court in this Circuit has held that an individual defendant was "substantially involved" in deceptive acts under the FTCA where he had knowledge of deceptive marketing on a company website and discussed with other defendants how to pair products with deceptive content.  *See FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 277-78 (D. Conn. 2013) (denying motion to dismiss, in relevant part, following grant of preliminary injunction pursuant to the FTCA).  Here, Baron has done more to aid Condor's wrongdoing than in either of these cases.

In addition to his sole ownership of Condor, Baron is also its CEO and President. He has ultimate responsibility for all of Condor's operations, including formulation of policies and practices, such as Condor's longstanding practice of stealing positive loan balances from its customers, its failure to properly protect the confidential personal and financial information of its customers, and its false and misleading statements to customers concerning its efforts to protect that information.  Baron's complete control over Condor is underscored by his ability to siphon funds from the company, including by causing it to make multi-million-dollar undocumented loans to him as well as to limited liability companies of which he is the sole member.  Because Baron has controlled all aspects of Condor's operations, and is responsible for the very policies and practices that have injured and threaten to injure Condor's customers, he, too, is liable under Dodd-Frank.

3.      *The Balance of the Equities Favors Immediate Injunctive Relief*

When a court balances the hardships to the public interest against a private interest, the public interest should receive greater weight.  *See Crescent Publ'g*, 129 F. Supp. 2d at 319 n.52.  The public has a compelling interest in halting the Defendants' unlawful and

injurious conduct and preserving assets that may be used for restitution to their victims. By contrast, the Defendants ceasing their illegal conduct and complying with the law are not a cognizable burden because "[a] business 'can have no vested interest in a business activity found to be illegal.'" *United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001) (quoting *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972)); *see also FTC v. Cuban Exch., Inc.*, No. 12 CV-5890, 2012 WL 6800794, at *2 (E.D.N.Y. Dec. 19, 2012) (equities favor injunction because defendants have no "right to persist in conduct that violates federal law").

### 4. Immediate Injunctive Relief Is in the Public Interest

The public has an interest in halting unlawful policies and practices that deprive consumers of money which is rightfully theirs and in being protected from further harm resulting from those practices. Here, the public interest demands that (1) the Defendants' funds be preserved to remedy harmed consumers, (2) the Defendants be prohibited from acquiring new loans (and potentially harming additional customers), (3) all confidential and sensitive personal and financial customer information be secured from release or unauthorized access, and (4) all documents be preserved and that the Department be permitted access to Condor's premises. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (affirming asset freeze granted in the "public interest").

As a state regulator, the Department is a "statutory guardian" appointed by federal statute to act in the public interest in enforcing consumer protection laws, and the injunctive relief requested here will achieve that purpose. *See SEC. v. Credit Bancorp Ltd.*, No. 99-CV-11395, 2010 WL 768944, at *2-3 (S.D.N.Y. Mar. 8, 2010). The public interest also demands that Defendants' unlawful scheme be stopped and that available assets be preserved to redress harmed consumers. *See CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677-78

27

(S.D.N.Y. 1979) (public interest is served by preventing diversion or waste of assets used to provide restitution to victims).  Moreover, the public interest and the integrity of the regulation of financial institutions necessitate that private and confidential personal financial information provided by consumers to lenders, like Condor, be protected through all reasonable and necessary means.

Because the Department is likely to succeed in demonstrating that the Defendants' practices are unfair, deceptive, and abusive and the public has a strong interest in immediately halting the Defendants' improper and unlawful practices,[12] the Court should issue the requested temporary restraining order.[13]

## III.

## CONDOR'S VIOLATIONS OF NEW YORK LAW ALSO WARRANT IMMEDIATE INJUNCTIVE RELIEF

The Superintendent also seeks a temporary restraining order and an order to show cause based on Condor's violations of New York law.  The New York Financial Services Law contemplates that the Superintendent may obtain injunctive relief, on terms as this Court "deems just," where the Defendants are "threatening or likely" to violate the Financial Services or the Banking Law.  *See* N.Y. Fin. Servs. Law § 309(b).  Where a state statute provides for injunctive

---

[12] As set forth above, the Department need not demonstrate irreparable injury to obtain injunction relief under Dodd-Frank.  *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977); *Cuban Exch.*, 2012 WL 6800794, at *1.  Even if such injury were required, it exists here.  *See infra* note 15.

[13] The Department should not be required to post a bond.  Where, as here, an injunction is sought to protect the public interest, courts routinely waive the requirement that a bond be posted.  *See, e.g.*, *Pharm. Soc'y of the State of N.Y. v. N.Y.S. Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Ward v. New York*, 291 F. Supp. 2d 188, 211 (W.D.N.Y. 2003) (granting exception to the bonding requirement in the public interest); *Cosgrove v. Bd. of Educ. of Niskayuna Cent. School Dist.*, 175 F. Supp. 2d 375, 399 (N.D.N.Y. 2001) (same).  Here, the Department seeks to protect the integrity of the regulation of sales finance companies and thousands of customers from whom funds have been stolen.

relief and that relief is sought in federal court, the standard for granting such relief is provided by federal law.  *See AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386 n.4 (S.D.N.Y. 2002) (citing *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir.1987)).

Therefore, as above, to obtain a TRO in this Court pursuant to Section 309 of the New York Financial Services Law, the Superintendent must demonstrate only a likelihood of success on the merits, that the balance of equities favors immediate injunctive relief, and that such relief serves the public interest.  *See Golden Feather Smoke Shop*, 597 F.3d at 121 (irreparable harm presumed where government entity is enforcing a statute); *Cuban Exch., Inc.*, 2012 WL 6800794, at *1 (same); *BB's Corner*, 2012 WL 2402624, at *3 (same).  The evidence here overwhelmingly demonstrates that such immediate injunctive relief is necessary and appropriate.

**A.**     **The Evidence Demonstrates That the Superintendent Has a Substantial Likelihood of Success on the Claim That Condor Violated the Financial Services Law and Banking Law**

Condor's numerous misrepresentations and omissions to its customers violate Section 408 of the New York Financial Services Law and its misrepresentations and omissions to the Department violate Section 499 of the New York Banking Law.  These violations – and the likelihood of additional continued harm to New York customers – provide an ample basis for the injunctive relief sought here.

The Financial Services Law makes it unlawful for a licensed company, including a sales finance company such as Condor Capital, to make an intentional misrepresentation "with respect to a financial product or service."  N.Y. Fin. Servs. Law. § 408.  Condor has followed a longstanding, unwritten policy of knowingly failing to pay its customers refunds owed to them, while blocking their access to the Condor website where they could learn of such a balance.  In

addition, in Condor's unclaimed property filings with the New York State Comptroller, Condor

has repeatedly misrepresented that it holds no unclaimed property, including funds belonging to

its customers.  This conduct has had the predictable effect of representing to Condor's customers

that their loans have been paid off with no positive credit balances owed, which Condor knew to

be false and misleading.  These misrepresentations – which directly impeded customers' ability

to obtain money owed to them – are precisely the type of consumer-harming conduct that the

New York Legislature intended to prohibit when it enacted the Financial Services Law.

       In addition, the Banking Law makes it unlawful to violate or participate in a

violation of the laws governing sales finance companies by "omit[ting] to state any material fact

necessary to give the superintendent any information lawfully required by him . . . ."

N.Y. Banking Law § 499.  Here, in connection with multiple examinations by the Banking

Department, as predecessor to the Department, Condor knowingly failed to disclose that it had

unlawfully kept funds belonging to its customers.  To the contrary, Condor affirmatively

represented that it held no unclaimed property of others and had filed reports with the New York

Comptroller reflecting that position.

## B.    The Equities Heavily Favor the Superintendent

       As described above with respect to an injunction under Dodd-Frank, the balance

of the equities tips decidedly in favor of granting the immediate *ex parte* relief requested by the

Superintendent.  Restraining Condor from deceiving customers, preserving access to assets and

documents, and ensuring that customers' highly sensitive financial information is not exposed to

potential misuse serves a compelling public interest, while the Defendants can have no interest in

continuing to engage in illegal and improper activities.[14, 15]

---

[14] New York Financial Services Law is express that, in seeking an injunction pursuant to that law the Department shall not be required to post a bond.  *See* Fin. Serv. Law § 309(b) ("[T]he

# IV.

## EX PARTE RELIEF IS NECESSARY TO PRESERVE THE *STATUS QUO* AND ENSURE EFFECTIVE RELIEF

To preserve the *status quo* pending a preliminary injunction hearing, the Department seeks an *ex parte* TRO to halt the Defendants' unlawful conduct and requests that the Court freeze the Defendants' assets, prevent Condor from entering into or acquiring new loan contracts that would expose new customers to similar harm, and grant immediate access to the Defendants' business premises. In the absence of such *ex parte* relief, the Defendants are likely to dissipate or conceal assets, destroy evidence, and expose consumers to the continuing risk of theft of both funds and loss of personal and financial data.

---

superintendent shall not be required to give security before the issuance of any such injunction.").

[15] As set forth above, in federal court, the Department need not demonstrate irreparable injury to obtain injunctive relief. Even if irreparable harm were somehow required here, it clearly exists. New York courts have held that irreparable harm exists where a defendant has made repeated false representations to the public and that conduct has deprived, and threatens to continue to deprive, the public of money. *See, e.g.*, *People v. Woodlawn Cemetery*, 173 Misc. 2d 846, 850 (Sup. Ct. Albany Cnty. 1997) (issuing injunction to prevent irreparable harm from "unauthorized invasion of Woodlawn's trust funds" where repayment is unlikely); *People v. British & Am. Cas. Co.*, 133 Misc. 2d 352, 361 (Sup. Ct. N.Y. Cnty. 1986) (irreparable harm present where "the serious risk exists that respondents are misleading the public and may not be complying with New York law"). This is particularly true where, as here, it is unclear whether the Defendants' assets will be sufficient to pay those harmed. *See People v. N.Y.S. Fed. of Police*, 590 N.Y.S.2d 573, 575 (App. Div. 3d Dep't 1992); *Woodlawn Cemetery*, 173 Misc. 2d at 850. Here, Condor has misrepresented to customers that they have no positive credit balances owed them and has failed to refund such balances. Moreover, the Department does not currently know whether the Defendants' assets will be sufficient to repay all of Condor's customers from whom it has stolen funds. As such, the Defendants' conduct, if unabated, will cause irreparable harm to public interests. In addition, permitting Condor to continue to deal haphazardly with customers' private and confidential information would put those customers at serious risk of suffering the irreparable harm created by unauthorized access to that information. *See Secs. Indus. & Fin. Markets Ass'n v. Garfield*, 469 F. Supp. 2d 25, 41 (D. Conn. 2007) (enjoining the disclosure of personal family information and stating "the harm at issue here – disclosure of confidential information – is the quintessential type of irreparable harm that cannot be compensated or undone by money damages" (internal quotation omitted)).

A TRO may be entered without notice to the adverse party if "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *See* Fed. R. Civ. P. 65(b).  Orders granting *ex parte* relief are aimed at "preserving the status quo and preventing irreparable harm." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974).  *Ex parte* relief is particularly appropriate where prior notice to a defendant creates some risk of causing irreparable harm, such as by a defendant's destruction of potential evidence or creation of other impediments to law enforcement activities or movement or dissipation of funds or other assets which may be subject to lawful claims.  *See Five-Star Auto*, 97 F. Supp. 2d at 508; *CFTC v. Arista LLC*, No. 12-CV-9043, 2012 WL 6929410, at *2 (S.D.N.Y. Dec. 13, 2012) (granting *ex parte* TRO where "[d]efendants are likely to dissipate or transfer assets, destroy, or otherwise prevent access to business records" and immediate relief was necessary to protect "public customers"); *cf. Miles v. Gilray*, No. 12-CV-599S, 2012 WL 2572769, at *3 (W.D.N.Y. June 29, 2012) (granting *ex parte* injunction where delayed relief might cause plaintiff irreparable harm).  Where, as here, a defendant's operations are permeated with fraud and deception, the risk of dissipation of assets or destruction of documents is significant and court intervention is necessary to preserve the *status quo*.  *See Manor Nursing*, 458 F.2d at 1105 ("In view of appellants' fraudulent conduct, it was not unreasonable for the court to conclude that it could not rely on appellants to locate purchasers . . . and to refund to them the proceeds of the offering.").

Indeed, Defendants here have engaged in a multi-decade deceptive scheme to harm customers, subsequently misrepresented to the Department the scope of that scheme, and demonstrated the willingness and ability of defendant Baron to unilaterally transfer assets from Condor to himself and companies he owns.  Moreover, Defendants' pervasive fraudulent scheme

is of an unknown but substantial scope that has affected thousands of, yet to be identified, customers throughout the country.  Given the ease with which documents and potential evidence may be destroyed and funds or assets may be transferred from Condor, as well as Defendants' willingness to engage in deceptive conduct, an *ex parte* order is fundamental to ensuring that the Department (and, subsequently a receiver) can identify assets and determine the identity of all victims of Defendants' unlawful scheme without the risk that such assets and potential evidence will be dissipated or destroyed.  Notably, the Defendants already have purchased an office building in Florida to which they intend to move their business, which, in light of Condor's near-total absence of protocols governing information and data protection and storage, raises a substantial danger that documents, data, and other potential evidence will be destroyed.

Therefore, as set forth in the accompanying proposed order, *ex parte* relief maintaining the *status quo* pending the resolution of this action is necessary, including, in primary part:  (1) freezing the Defendants' assets; (2) prohibiting the Defendants from acquiring or servicing new customer loans (but requiring Condor to provide lawful services to the customer loans currently in its portfolio); (3) requiring the Defendants to announce via Condor's website that Condor will no longer accept new loans; (4) prohibiting the Defendants from releasing and compromising the security of any personal or confidential customer data and requiring the Defendants to safeguard such data; (5) preserving all documents and other evidence in the Defendants' possession; and (6) permitting the Superintendent immediate access to the Defendants' premises and books and records.

**V.**

## A PRELIMINARY INJUNCTION SHOULD ALSO BE
## GRANTED UNDER BOTH FEDERAL AND STATE LAW

The Superintendent also requests that the Court issue an order requiring the

Defendants to show cause why a preliminary injunction continuing the relief set forth in the TRO

and appointing a receiver, as contemplated by Rule 66 of the Federal Rules of Civil Procedure,

should not be entered based on the Defendants' violations of federal and New York law.  The

same statutes that authorize this Court to issue a temporary restraining order also permit it to

order preliminary injunctive relief.  *See* 12 U.S.C. § 5565(a)(2); N.Y. Fin. Servs. L. § 309.  The

standard for obtaining a preliminary injunction is the same as for issuing a TRO.  *See Local*

*1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir.

1992) ("[T]he traditional standards which govern consideration of an application for a temporary

restraining order . . . are the same standards as those which govern a preliminary injunction.").

This includes that the Department, as a government agency seeking to preclude statutory

violations, need not demonstrate irreparable injury to obtain injunctive relief under Dodd-Frank.

*See Golden Feather Smoke Shop*, 597 F.3d at 121; *Cuban Exch., Inc.*, 2012 WL 6800794, at *1;

*BB's Corner*, 2012 WL 2402624, at *3.  For the reasons described at length above, the

Department readily meets each of the elements and has presented ample evidence to justify the

granting of preliminary injunctive relief.

Relief in the form of the appointment of a receiver is particularly critical to

preserve Condor's assets and manage its business in the manner least harmful to current

customers.  In cases, such as here, where a corporate defendant has deceived members of the

public, "the appointment of a receiver is necessary to prevent diversion or waste of the . . .

defendants' assets, to the detriment of" persons who have been harmed.  *Morgan, Harris &*

*Scott,* 484 F. Supp. at 677.  In addition, a receiver is appropriate to protect the public interest when it is obvious that those in control of an entity which has "inflicted serious detriment in the past must be ousted."  *SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970) (citing *Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307, 324 (1939)).  For example, in a case where the defendants engaged in a systematic pattern of misrepresentations and omissions to customers concerning the risks and commissions associated with illegal commodity options, the defendants' harm to numerous consumers resulted in the court's removal of the individual defendants from management and the appointment of a receiver to oversee the defendant entity, prevent the dissipation of assets, and "protect the public interest."  *Morgan, Harris & Scott*, 484 F. Supp. at 677-78.

   In CFPB, FTC, and SEC actions similar to this case, courts have appointed receivers to manage corporate defendants which have improperly deceived consumers.  *See Manor Nursing*, 458 F.2d at 1105 ("[W]e repeatedly have upheld the appointment of trustees or receivers to effectuate the purposes of the federal securities laws."); *SEC v. Universal Express, Inc.*, No. 04-CV-2322, 2007 WL 2469452, at *11-12 (S.D.N.Y. Aug. 31, 2007) (receiver appointed where management unable to manage company and company's assets insufficient to satisfy judgment); *Five-Star Auto,* 97 F. Supp. 2d at 508 (receiver appointed pursuant to TRO to, *inter alia*, collect all available funds from defendants to redress misrepresentations in violation of FTCA); *CFPB v. Gordon, et al.*, No. 12-CV-6147 (C.D. Cal. July 18, 2012) (Docket No. 12) (granting TRO including asset freeze and appointment of receiver due to defendants' violations of Dodd-Frank) (unpublished opinion); *CFPB v. Jalan, et al.*, No. 12-CV-2088 (C.D. Cal. Dec. 4, 2012) (Docket. No. 14) (same) (unpublished opinion).

The proposed preliminary injunction would continue the relief set forth in the TRO and also appoint a receiver to assume control of Condor and secure all available assets to redress the harm Condor has caused to its customers.  This includes (1) managing the business of Condor; (2) assessing Condor's assets and holding and managing them; (3) assessing the Defendants' liabilities, including determining the identities of the customers from whom the Defendants have stolen positive credit balances; and (4) reporting an assessment of Condor's operations to the Court, including concerning assets and liabilities and the manner in which to wind down Condor's operations.

Given Defendants' longstanding practice of stealing funds from Condor's customers; Condor's near-complete indifference to adopting policies, procedures, and controls that are necessary to protect its customers; the Defendants' failures to correct those practices, even in the face of ongoing examinations by the Department; and defendant Baron's undocumented siphoning of funds from Condor, a receiver is needed to take over and manage Condor's operations as set forth above and in the accompanying proposed order.

The Superintendent will propose to the Court an appropriate candidate to serve as receiver at the time of the preliminary injunction hearing or on such other schedule as the Court may direct.

## CONCLUSION

The Court should issue the proposed TRO and grant a preliminary injunction to

protect the public from further harm and help ensure effective relief for those harmed, and grant

such other and further relief as the Court deems necessary.

Dated:   New York, New York
         April 23, 2014

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP


Eric Corngold
Anne E. Beaumont
Christopher M. Colorado
Raina L. Nortick
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Plaintiff*

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
Joy Feigenbaum
Nancy I. Ruskin
One State Street
New York, NY 10004-1511
(212) 709-3500

*Of Counsel*