EXHIBIT A


PART 1

## AMENDED AND RESTATED

## LOAN AND SECURITY AGREEMENT

by and among

## WELLS FARGO FINANCIAL PREFERRED CAPITAL, INC.

As Agent

## VARIOUS FINANCIAL INSTITUTIONS

As Lenders

## AND

## CONDOR CAPITAL CORP.

As Borrower

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS..............................................................................................................................1
    Section 1.1 Certain Definitions...................................................................................................................1
    Section 1.2 Rules of Construction...............................................................................................................9

ARTICLE 2 THE REVOLVING CREDIT FACILITY ..................................................................................10
    Section 2.1 The Loan................................................................................................................................10
    Section 2.2 The Notes...............................................................................................................................10
    Section 2.3 Method of Payment ...............................................................................................................10
    Section 2.4 Extension and Adjustment of Maturity Date ..........................................................................11
    Section 2.5 Use of Proceeds.....................................................................................................................11
    Section 2.6 Interest...................................................................................................................................11
    Section 2.7 Advances................................................................................................................................11
    Section 2.8 Prepayment ...........................................................................................................................14
    Section 2.9 Administrative Fee .................................................................................................................15
    Section 2.10 Unused Line Fee ..................................................................................................................15
    Section 2.11 Regulatory Changes in Capital Requirements.......................................................................15
    Section 2.12 Sharing of Payments ............................................................................................................15
    Section 2.13 Pro Rata Treatment ..............................................................................................................16
    Section 2.14 Existing Indebtedness ..........................................................................................................16

ARTICLE 3 SECURITY................................................................................................................................16
    Section 3.1 Security Interest.....................................................................................................................16
    Section 3.2 Financing Statements.............................................................................................................16
    Section 3.3 Documents to be Delivered to Agent.....................................................................................16
    Section 3.4 Collections.............................................................................................................................17
    Section 3.5 Additional Rights of Agent; Power of Attorney......................................................................18

ARTICLE 4 REPRESENTATIONS AND WARRANTIES .............................................................................18
    Section 4.1 Representations and Warranties as to Receivables...................................................................19
    Section 4.2 Organization and Good Standing...........................................................................................20
    Section 4.3 Perfection of Security Interest................................................................................................20
    Section 4.4 No Violations.........................................................................................................................20
    Section 4.5 Power and Authority. .............................................................................................................20
    Section 4.6 Validity of Agreements..........................................................................................................20
    Section 4.7 Litigation...............................................................................................................................20
    Section 4.8 Compliance ...........................................................................................................................20
    Section 4.9 Accuracy of Information; Full Disclosure...............................................................................21
    Section 4.10 Taxes ...................................................................................................................................21
    Section 4.11 Indebtedness.........................................................................................................................21
    Section 4.12 Investments..........................................................................................................................21
    Section 4.13 ERISA..................................................................................................................................21
    Section 4.14 Hazardous Wastes, Substances and Petroleum Products. ......................................................22`
    Section 4.15 Solvency..............................................................................................................................22

i

Case 1:14-cv-02863-CM Document 31-1 Filed 05/02/14 Page 4 of 30

Section 4.16 Business Location ............................................................................................................... 22
Section 4.17 Capital Stock ...................................................................................................................... 22
Section 4.18 No Extension of Credit for Securities .............................................................................. 22

ARTICLE 5 CONDITIONS TO LOAN .................................................................................................... 23
Section 5.1 Documents to be Delivered to Agent Prior to First Advance ................................ 23
Section 5.2 Conditions to all Advances ................................................................................................ 24

ARTICLE 6 AFFIRMATIVE COVENANTS............................................................................................ 24
Section 6.1 Place of Business and Books and Records ...................................................................... 24
Section 6.2 Reporting Requirements .................................................................................................... 24
Section 6.3 Books and Records .............................................................................................................. 25
Section 6.4 Financial Covenants............................................................................................................ 25
Section 6.5 Compliance With Applicable Law. .................................................................................. 26
Section 6.6 Notice of Default................................................................................................................. 27
Section 6.7 Corporate Existence, Properties ....................................................................................... 27
Section 6.8 Payment of Indebtedness; Taxes ..................................................................................... 27
Section 6.9 Notice Regarding Any Plan .............................................................................................. 27
Section 6.10 Other Information .............................................................................................................. 28
Section 6.11 Litigation ............................................................................................................................ 28
Section 6.12 Business Location, Legal Name and State of Organization .................................. 28
Section 6.13 Operations........................................................................................................................... 28
Section 6.14 Further Assurances ............................................................................................................ 28

ARTICLE 7 NEGATIVE COVENANTS................................................................................................... 28
Section 7.1 Payments to and Transactions with Affiliates............................................................. 28
Section 7.2 Restricted Payments............................................................................................................ 29
Section 7.3 Indebtedness......................................................................................................................... 29
Section 7.4 Guaranties ............................................................................................................................ 29
Section 7.5 Nature of Business .............................................................................................................. 29
Section 7.6 Negative Pledge ................................................................................................................... 29
Section 7.7 Investments and Acquisitions .......................................................................................... 29
Section 7.8 Compliance with Formula ................................................................................................. 29
Section 7.9 Mergers, Sales, Divestitures ............................................................................................. 29
Section 7.10 Use of Proceeds.................................................................................................................. 29
Section 7.11 Ownership and Management ........................................................................................... 30
Section 7.12 Amendment to Subordinated Debt................................................................................ 30

ARTICLE 8 EVENTS OF DEFAULT........................................................................................................ 30
Section 8.1 Failure to Make Payments.................................................................................................. 30
Section 8.2 Information, Representations and Warranties................................................................. 30
Section 8.3 Financial and Negative Covenants .................................................................................. 30
Section 8.4 Collateral............................................................................................................................... 30
Section 8.5 Defaults Under Other Agreements .................................................................................. 30
Section 8.6 Certain Events ...................................................................................................................... 30
Section 8.7 Possession of Collateral...................................................................................................... 31
Section 8.8 Guarantor .............................................................................................................................. 31
Section 8.9 Credit Documents................................................................................................................ 31

Section 8.10 Material Adverse Change ........................................................................................ 31

ARTICLE 9 REMEDIES AND WAIVERS ................................................................................ 31
Section 9.1 Remedies .................................................................................................................. 31
Section 9.2 Waiver and Release by Borrowers ......................................................................... 32
Section 9.3 No Waiver ................................................................................................................ 32

ARTICLE 10 MISCELLANEOUS............................................................................................. 32
Section 10.1 Indemnification and Release Provisions............................................................. 32
Section 10.2 Amendments........................................................................................................... 33
Section 10.3 APPLICABLE LAW.............................................................................................. 33
Section 10.4 Notices.................................................................................................................... 33
Section 10.5 Termination and Release....................................................................................... 34
Section 10.6 Counterparts .......................................................................................................... 34
Section 10.7 Costs, Expenses and Taxes................................................................................... 35
Section 10.8 Participations and Assignments. .......................................................................... 35
Section 10.9 Effectiveness of Agreement .................................................................................. 36
Section 10.10 JURISDICTION AND VENUE .......................................................................... 37
Section 10.11 WAIVER OF JURY TRIAL................................................................................. 37
Section 10.12 REVIEW BY COUNSEL..................................................................................... 37
Section 10.13 Exchanging Information....................................................................................... 37
Section 10.14 Acknowledgment of Receipt............................................................................... 37

ARTICLE 11 AGENT................................................................................................................... 37
Section 11.1 Appointment of Agent........................................................................................... 37
Section 11.2 Nature of Duties of Agent..................................................................................... 38
Section 11.3 Lack of Reliance on Agent. .................................................................................. 38
Section 11.4 Certain Rights of Agent ........................................................................................ 38
Section 11.5 Reliance by Agent ................................................................................................. 39
Section 11.6 Indemnification of Agent ...................................................................................... 39
Section 11.7 Agent in its Individual Capacity........................................................................... 39
Section 11.8 Holders of Notes.................................................................................................... 39
Section 11.9 Successor Agent. .................................................................................................... 40
Section 11.10 Collateral Matters. ............................................................................................... 40
Section 11.11 Delivery of Information........................................................................................ 41
Section 11.12 Defaults ................................................................................................................ 41

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT is made as of the 12th day of October, 2006 by and among CONDOR CAPITAL CORP., a New York corporation with its chief executive office at 800 South Oyster Bay Road, Hicksville, New York 11801 ("Borrower Agent"), and such other Persons joined hereto from time to time as borrowers (collectively, the "Borrowers" and each individually is referred to as a "Borrower"), WELLS FARGO FINANCIAL PREFERRED CAPITAL, INC. as agent for Lenders ("Agent"), an Iowa corporation with its principal office located at 206 Eighth Street, Des Moines, Iowa 50309, and the financial institutions from time to time a party hereto (collectively, the "Lenders" and each individually as referred to as a "Lender").

### BACKGROUND

WHEREAS, Borrowers and Wells Fargo Financial Preferred Capital, Inc. ("WFFPC") are parties to that certain Loan and Security Agreement dated as of June 2, 2004 (as has been amended or modified from time to time, the "Existing Loan Agreement"), pursuant to which WFFPC established financing arrangements for the benefit of Borrowers. Borrowers and WFFPC are parties to certain other instruments, documents and agreements related thereto (together with the Existing Loan Agreement, the "Existing Loan Documents").

WHEREAS, Borrowers have requested that Agent and Lenders amend and restate the Existing Loan Agreement in its entirety and in connection herewith.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

### ARTICLE 1

### DEFINITIONS

Section 1.1    Certain Definitions. The terms defined in this Section 1.1, whenever used and capitalized in this Amended and Restated Loan and Security Agreement shall, unless the context otherwise requires, have the respective meanings herein specified.

"Advance" means each advance of the Loan made to Borrowers pursuant to Section 2.1 hereof.

"Advance Rate" means the following percentage based upon the Collateral Performance Indicator as of the end of each month then most recently ended for which monthly reports have been delivered to Lender pursuant to Section 6.2:

| Collateral Performance Indicator | Applicable Margin Rate |
|---|---|
| Less than ▉▉ | ▉▉ |
| Equal to or greater than ▉▉ but less than ▉▉ | ▉▉ |
| Equal to or greater than ▉▉ but less | ▉▉ |

1



than ▮▮▮▮

Equal to or greater than ▮▮▮ but less than ▮▮▮▮    ▮▮▮▮

Equal to or greater than ▮▮▮    ▮▮▮▮

"Affiliate" means (i) any Person who or entity which directly or indirectly owns, controls or holds 5.0% or more of the outstanding beneficial interest in a Borrower; (ii) any entity of which 5.0% or more of the outstanding beneficial interest is directly or indirectly owned, controlled, or held by a Borrower; (iii) any entity which directly or indirectly is under common control with a Borrower; (iv) any officer, director, partner or employee of a Borrower or any Affiliate; or (v) any immediate family member of any Person who is an Affiliate.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" means this Loan and Security Agreement and all exhibits and schedules hereto, as the same may be amended, modified or supplemented from time to time.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee Lender, accepted by Agent, in accordance with Section 10.8 in form and substance satisfactory to Agent (in its sole and absolute discretion).

"Availability Statement" means the certificate in substantially the form of Exhibit B attached hereto and made part hereof to be submitted by Borrowers to Agent in accordance with the provisions of Section 2.1 and Section 3.3 hereof.

"Bankruptcy Code" means the United States Bankruptcy Code as now constituted or hereafter amended and any similar statute or law affecting the rights of debtors.

"Books and Records" means all of Borrowers' original ledger cards, payment schedules, credit applications, contracts, lien and security instruments, guarantees relating in any way to the Collateral and other books and records or transcribed information of any type, whether expressed in electronic form in tapes, discs, tabulating runs, programs and similar materials now or hereafter in existence relating to the Collateral.

"Borrowers' Loan Account" has the meaning assigned to that term in Section 2.1 of this Agreement.

"Borrowing Base" means, as of the date of determination and subject to change from time to time as described below, an amount equal to the difference between (a) the product of (i) the Advance Rate multiplied by (ii) the aggregate balance of outstanding Eligible Receivables (net of unearned interest, fees, commissions, discounts and reserves), minus (b) reserves established by Agent from time to time in its reasonable discretion in connection with contingent tax liabilities.

"Business Day" means any day except a Saturday, Sunday or other day on which national banks are authorized by law to close including, without limitation, United States federal government holidays.

2

"Capital Base" means the sum of Borrowers' Tangible Net Worth plus Subordinated Debt.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and regulations with respect thereto in effect from time to time.

"Collateral" means:

   (i)     All of each Borrower's Receivables, now owned or existing or hereafter arising or acquired;

   (ii)    All collateral, security and guaranties now or hereafter in existence for any Receivables, and including all inventory consisting of vehicles and other goods acquired by foreclosure, strict foreclosure, repossession or otherwise;

   (iii)   All insurance related to any Receivables, to any collateral or security for any Receivables or to any obligor in respect of any Receivables and all proceeds of such insurance (including, without limitation, all non-filing insurance, credit insurance and credit life insurance related to any Receivables, to any collateral or security for any Receivables, or to any obligor in respect of any Receivables and all proceeds of such insurance);

   (iv)    All of each Borrower's Books and Records related to any Receivables including all computers and computer related equipment, tapes and software;

   (v)     All notes, drafts, deposit accounts, acceptances, documents of title, deeds, policies and policies or certificates of insurance (including without limitation credit insurance, credit life insurance, non-filing insurance and title insurance) and securities (domestic and foreign) and letter of credit rights now or hereafter owned by each Borrower or in which a Borrower has or at any time acquires an interest in connection with any Receivables;

   (vi)    All of each Borrower's Accounts, Deposit Accounts, Documents, Instruments, General Intangibles and Chattel Paper as defined in Section 1.2 (b) of this Agreement, now owned or existing or hereafter arising or acquired, and all payment obligations owed to a Borrower, now owned or existing or hereafter arising or acquired; together with all collateral, security and guaranties now or hereafter in existence for any of the foregoing; and

   (vii)   All cash and non-cash proceeds of all the foregoing.

"Collateral Performance Indicator" means as of the end of each testing period with respect to Receivables owned by Borrowers, the sum of (i) (A) monthly average of gross Receivables greater than 60 days contractually past due as of the end of the last three calendar months, divided by (B) average total gross Receivables as of the end of the fourth, fifth and sixth calendar months before the end of the such testing period, (ii) (A) monthly average of gross Receivables subject to Excessive Extensions as of the last three calendar months, divided by (B) average total gross Receivables as of the end of the fourth, fifth and sixth calendar months before the end of such testing period, and (iii) (A) net charge-offs for the last twelve month period ending on such date, divided by (B) average net Receivables outstanding

3

during the twelve month period ending on such date which is twelve months before the end of such testing period.

"Collections" means payment of principal, interest and fees on Receivables, the cash and non-cash proceeds realized from the enforcement of such Receivables and any security therefor, or the Collateral, proceeds of credit, group life or non-filing insurance, or proceeds of insurance on any real or personal property which is part of the collateral for the Receivables.

"Commitment" means, with respect to each Lender, a commitment of such Lender to make its portion of the Advance in a principal amount up to each such Lender's Commitment Percentage of the Maximum Principal Amount.

"Commitment Percentage" means, for any Lender, the percentage identified as the Commitment Percentage on Schedule I, as such percentage may be modified in connection with any assignment made in accordance with Section 10.8.

"Consumer Finance Laws" means all applicable laws and regulations, federal, state and local, relating to the extension of consumer credit, and the creation of a security interest in personal property or a mortgage in real property in connection therewith, as the case may be, and laws with respect to protection of consumers' interests in connection with such transactions, including without limitation, any usury laws, the Federal Consumer Credit Protection Act, the Federal Fair Credit Reporting Act, RESPA, the Magnuson-Moss Warranty Act, the Federal Trade Commission's Rules and Regulations and Regulations B and Z of the Federal Reserve Board, as any of the foregoing may be amended from time to time.

"Consumer Purpose Loans" means loans to one or more individuals the proceeds of which are used to purchase goods, services or merchandise for personal, household or family use.

"Corporate Guarantor" means Barco Auto Leasing Corp., a New York corporation.

"Credit Documents" means this Agreement, the Note, the Guaranties, the Subordination Agreement(s), the Custodian Agreement(s) and any and all additional documents, instruments, agreements and other writings executed and delivered pursuant to or in connection with this Agreement.

"Custodian Agreement" means that certain Custodian Agreement dated of even date herewith by and among Agent, Borrowers, and an individual custodian, substantially in the form of Exhibit C attached hereto and made part hereof, as the same may be amended, modified, restated or extended from time to time.

"Debt" means, as of the date of determination, all outstanding indebtedness (other than deferred loan origination fees of Borrowers) including without limitation (a) all loans made by Agent and/or Lenders to Borrowers; (b) accounts payable as of the date of determination; (c) income tax liabilities; (d) mortgages; (e) deposits and debenture instruments; and (f) Subordinated Debt.

"Default" means an event, condition or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"EBITDA Ratio" means the ratio of (a) Borrowers' earnings before payments of interest, taxes, depreciation and amortization expense for the twelve month period ending on the date of

4

determination, net of any deficits from the amount required as an Allowance for Loan Losses under Section 6.4(c) hereof and the amount of any accounts to be charged off, that have not been charged off, in Section 6.4(e), to (b) Borrowers' interest expense during such twelve month period in accordance with GAAP principles pursuant to Section 6.4 of this Agreement.

"Eligible Long Term Receivables" means a Receivable otherwise meeting the definition of an Eligible Receivable except that the remaining term is greater than sixty (60) months, but less than seventy two (72) months.

"Eligible Receivables" means, as of the date of determination, Receivables (net of unearned interest, fees, unearned discounts, insurance premiums and commissions thereon) which are Chattel Paper, which conform to the warranties set forth in Section 4.1 hereof, in which Agent has a validly perfected first priority Lien, and which are not any of the following: (i) Receivables for which a payment is 60 or more days past due on a contractual basis; (ii) Receivables in litigation, foreclosure, repossession, termination or bankruptcy proceedings or the account debtor with respect to which is a debtor under the Bankruptcy Code; (iii) Receivables from officers, employees or shareholders of any Borrower or any Affiliate; (iv) Receivables which have been deferred or extended more than two (2) 1 month extensions during any 12 month period with a maximum of 4 deferrals or extensions over the term of the contract; (v) Interest Only Accounts; (vi) Receivables with an original term in excess of seventy two (72) months; (vii) Receivables from which the custodian under the Custodian Agreement or Agent has not received the related original certificate of title within one hundred twenty days (120) of origination; (viii) Receivables arising from deficiency balance accounts; (ix) Receivables not originated in accordance with the Lending Guidelines; (x) Receivables originated by a dealer in excess of an amount equal to fifteen percent (15%) of the gross Receivables; (xi) Receivables which have balloon payments; (xii) Receivables which have been rewritten or had their original terms modified with respect to term, remaining balance or delinquency status; and (xiii) Eligible Long Term Receivables that exceeds greater 30% of Gross Receivables net of unearned interest, fees, unearned discounts, insurance premiums and commissions thereon.

"Environmental Control Statutes" means any federal, state, county, regional or local laws governing the control, storage, removal, spill, release or discharge of Hazardous Substances, including without limitation CERCLA, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Hazardous Materials Transportation Act, the Emergency Planning and Community Right to Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, any similar or implementing state law, and in each case including all amendments thereto and all rules and regulations promulgated thereunder and permits issued in connection therewith.

"EPA" means the United States Environmental Protection Agency, or any successor thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, all amendments thereto, and any successor statute of similar import, and regulations thereunder, in each case as in effect from time to time. References to sections of ERISA shall be construed to refer to any successor sections.

"Event of Default" has the meaning assigned to that term in Article 8 of this Agreement.

5

"Excessive Extensions" means Receivables which have been deferred or extended more than two (2) 1 month extensions during any 12 month period with a maximum of 4 deferrals or extensions over the term of the contract.

"GAAP" means generally accepted accounting principles applied on a consistent basis, in accordance with the Statement of Auditing Standards No. 69, "The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles in the Independent Auditor's Report" (SAS 69) or superseding pronouncements, issued by the Auditing Standards Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or in such other statements by such other entity as Agent may reasonably approve, which are applicable in the circumstances as of the date in question. The requirement that such principles be applied on a consistent basis shall mean that the accounting principles observed in a current period are comparable in all material respects to those applied in a preceding period, or, in the event of a material change in any accounting principle from that observed in any previous period (i) financial reports covering preceding periods during the term of this Agreement are restated to reflect such change and provide a consistent basis for comparison among periods and (ii) the financial covenants set forth in Section 6.4 shall be adjusted as determined by the Required Lenders to reflect similar performance standards as those measured by the existing covenants using the previously observed accounting principles.

"Guarantors" mean collectively, Corporate Guarantor and Individual Guarantors.

"Guaranty" means individually, and "Guaranties" means collectively, the Guaranty Agreements substantially in the form of Exhibit D attached hereto and made part hereof, as the same may be amended, modified, restated or extended from time to time.

"Hazardous Substance" means any toxic, reactive, corrosive, carcinogenic, flammable or hazardous pollutant or other substance, including without limitation petroleum and items defined in Environmental Control Statutes as "hazardous substances," "hazardous wastes," "pollutants" or "contaminants."

"Individual Guarantors" means collectively, Stephen Baron, an individual residing at 2351 Alaqua Drive, Longwood, Florida 32779, and Michael Hawkins, an individual residing at 110 Lisa Drive, Northport, New York 11768.

"Intangible Assets" means all assets of any Person which would be classified in accordance with GAAP as intangible assets, including without limitation (a) all franchises, licenses, permits, patents, applications, copyrights, trademarks, trade names, goodwill, experimental or organization expenses and other like intangibles, and (b) unamortized debt discount and expense and unamortized stock discount and expense.

"Interest-Only Accounts" means those Receivables on which collections are applied entirely to interest and expense charges, with no portion thereof being required to reduce the principal balance on the loan prior to the stated maturity of such accounts.

"Lending Guidelines" means those certain lending guidelines of Borrowers attached hereto as Exhibit J.

6

"LIBOR Rate" means, for any month, a rate of interest equal to the London Interbank Offered Rate for U. S. dollar deposits for an interest period of one month as quoted or published by Telerate, Bloomberg or any other rate quoting service, selected by Agent in its sole discretion for any day during a given month. In the event such rate ceases to be published or quoted, LIBOR Rate shall mean a comparable rate of interest reasonably selected by Agent. Agent's determination of the LIBOR Rate shall be conclusive and binding on Company, absent manifest error.

"Lien" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"Loan" means the aggregate principal amount advanced by Lenders to Borrowers pursuant to Section 2.1 of this Agreement, together with interest accrued thereon and fees and costs incurred in connection therewith.

"Loan Availability" means the amount available for Advances under this Agreement on any date as determined in accordance with the Availability Statement submitted to Agent on such date in accordance with Section 3.3.

"Local Authorities" means individually and collectively the state and local governmental authorities which govern the business and operations owned or conducted by Borrowers or any of them.

"Maturity Date" means August 2, 2009, as such date may be extended from time to time in accordance with the provisions of Section 2.4 of this Agreement.

"Maximum Principal Amount" means $125,000,000.

"Notes" mean collectively the promissory notes to this Agreement of Borrowers in favor of each Lender in substantially the form of Exhibit E attached hereto and made part hereof, evidencing the joint and several obligation of Borrowers to repay the Loan, and any and all amendments, renewals, replacements or substitutions therefore, and each is referred to individually as a "Note."

"Obligations" means each and every draft, liability and obligation of every type and description which Borrowers may now or at any time hereafter owe to Agent and Lenders (whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving Agent and/or any Lender alone or in a transaction involving other creditors of Borrowers, or any of them, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several), and including specifically, but not limited to, all indebtedness of Borrowers arising under this Agreement, the Notes, any fee letter or any other loan or credit agreement between or among a Borrower or Borrowers and Agent and/or any Lender, whether now in effect or hereafter entered into and including, without limitation, all Loans.

"Oser 165 Loan" means a loan by Borrowers to an Affiliate of Borrowers, Oser 165, LLC, which loan shall not exceed $3,000,000.

"Participant" has the meaning assigned to that term in Section 10.8 of this Agreement.

7

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Person" means all natural persons, corporations, limited partnerships, general partnerships, joint stock companies, limited liability companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and federal and state governments and agencies or regulatory authorities and political subdivisions thereof, or any other entity.

"Plan" means any employee benefit plan subject to the provisions of Title IV of ERISA which is maintained in whole or in part for employees of Borrowers or any Affiliate of Borrowers.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Receivables" means all chattel paper, bailment leases, installment sale agreements, instruments, consumer finance paper and/or promissory notes securing and evidencing loans made, and/or time sale transactions acquired, by a Borrower.

"Reportable Event" has the meaning assigned to that term in Section 4.13 of this Agreement.

"Request for Advance" means the certificate in the form of Exhibit A attached hereto and made part hereof to be delivered by Borrowers to Agent as a condition of each Advance pursuant to Section 2.7 hereof.

"Required Lenders" means, at any time, Lenders which are then in compliance with their obligations hereunder holding in the aggregate either (a) if three or more Lenders are parties to this Loan Agreement, Lenders who hold at least seventy five percent (75%) or (b) if two (2) Lenders are parties to this Loan Agreement, one hundred percent (100%) of (i) the Commitment Percentage (and participation interest) or (ii) if this Agreement has been terminated, the outstanding Loans and participation interest.

"Restricted Payments" means payments by Borrowers, or any of them, which constitute (a) redemptions, repurchases, dividends or distributions of any kind with respect to a Borrower's capital stock or any warrants, rights or options to purchase or otherwise acquire any shares of a Borrower's capital stock or (b) payments of principal or interest on Subordinated Debt.

"Schedule of Receivables and Assignment" means a schedule in the form of Exhibit F attached hereto and made part hereof to be submitted by Borrowers to Agent pursuant to Section 2.1 and Section 3.3 hereof, describing the Receivables assigned and pledged to Agent, for the benefit of Agent, on the date hereof and thereafter for the period to which such schedule relates and confirming the assignment and pledge of such Receivables.

"Senior Debt" means all indebtedness and liabilities (including accounts payable) of Borrowers, or any of them, other than Subordinated Debt.

"Senior Debt to Capital Base Ratio" means the ratio of Senior Debt to Capital Base.

"Subordinated Debt" means any indebtedness of Borrowers for borrowed money which shall contain provisions subordinating the payment of such indebtedness and the liens and security interests

8

securing such indebtedness to the Obligations, in form, substance and extent acceptable to Required Lenders in their sole discretion.

"Subordination Agreement" means, individually, and "Subordination Agreements" means, collectively, the Subordination Agreements substantially in the form of Exhibit G attached hereto and made part hereof, as the same may be amended, modified, restated or extended from time to time.

"Subsidiary" of any entity means any corporation, limited liability company, partnership or other legal entity of which such entity directly or indirectly owns or controls at least a majority of the outstanding stock or other equity interest having general voting power. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

"Tangible Net Worth" means, at any date, the amount of the capital stock liability of Borrowers on a consolidated basis (but excluding the effect of intercompany transactions) plus (or minus in the case of a deficit) its capital surplus and earned surplus minus, to the extent not otherwise excluded, (i) the cost of treasury shares; (ii) the amount equal to the value shown on its books of Intangible Assets, including the excess paid for assets acquired over their respective book values on the books of the corporation from which acquired as well as for the contingent tax liability of Borrower Agent and Corporate Guarantor until such amounts are paid or resolved; (iii) investments in and loans to any Subsidiary or Affiliate or to any shareholder, director or employee of Borrowers, any Subsidiary or any Affiliate, and (iv) any deficits from the amount required as an Allowance for Loan Losses under Section 6.4(c) hereof and the amount of any accounts to be charged off, that have not been charged off, in Section 6.4(e) hereof

"Termination Date" means the earlier of (a) the Maturity Date; or (b) the date on which the Commitment is terminated and the Loan becomes due and payable pursuant to Section 9.1.

"Total Liabilities" means all liabilities of Borrowers, as determined in accordance with GAAP.

"UCC" means the Uniform Commercial Code as in effect in the State of New York from time to time.

"WFFPC" means Wells Fargo Financial Preferred Capital, Inc.

Section 1.2    Rules of Construction.

(a)    Accounting Term. Except as otherwise provided herein, financial and accounting terms used in the foregoing definitions or elsewhere in this Agreement shall be defined in accordance with GAAP.

(b)    Uniform Commercial Code. Except as otherwise provided herein, terms used in the foregoing definitions or elsewhere in this Agreement that are defined in the Uniform Commercial Code, including without limitation, "Accounts", "Documents", "Instruments", "General Intangibles", and "Chattel Paper" shall have the respective meanings described to such terms in the Uniform Commercial Code as in effect in the State of New York from time to time.

## ARTICLE 2

### THE REVOLVING CREDIT FACILITY

Section 2.1     The Loan.   Borrowers may from time to time prior to the Termination Date request Lenders to make Advances to Borrowers and, subject to the terms and conditions of this Agreement, each Lender severally agrees to lend such Lender's Commitment Percentage of each requested Advance up to such Lender's Commitment.   The aggregate unpaid principal amount at any one time outstanding of all Advances shall not exceed the lesser of the Maximum Principal Amount or Borrowing Base.

(a)     Agent shall establish on its books an account in the name of Borrowers (the "Borrowers' Loan Account").   A debit balance in Borrowers' Loan Account shall reflect the amount of Borrowers' indebtedness to Agent and Lenders from time to time by reason of Advances and other appropriate charges (including, without limitation, interest charges) hereunder.   At least once each month, Agent shall provide to Borrowers and Lenders a statement of Borrowers' Loan Account which statement shall be considered correct and accepted by Borrowers and conclusively binding upon Borrowers unless Borrowers notify Agent to the contrary within 30 days of Agent's providing such statement to Borrowers.

(b)     Borrowers shall prepare a completed Availability Statement as of each month end and forward such statement to Agent and Lenders by the 30th day of the following month.

(c)     Each Advance made hereunder shall, in accordance with GAAP, be entered as a debit to Borrowers' Loan Account, and shall be in a principal amount which, when aggregated with all other Advances then outstanding, shall not exceed the lesser of the then effective Borrowing Base or Maximum Principal Amount.

(d)     The Loan shall be due and payable on the Termination Date.   Upon the occurrence of an Event of Default, Agent and Lenders shall have rights and remedies available to them under Article 9 of this Agreement.

Section 2.2     The Notes.   The indebtedness of Borrowers to Lenders hereunder shall be evidenced by a separate Note executed by Borrowers in favor of each Lender in the principal amount equal to each such Lender's Commitment Percentage of the Maximum Principal Amount, which shall be substantially in the form of Exhibit E attached hereto and made part hereof, dated the same date as this Agreement.   The principal amount of the Notes will be the Maximum Principal Amount; provided, however, that notwithstanding the face amount of the Notes, Borrowers' liability under the Notes shall be limited at all times to the actual indebtedness (principal, interest and fees) then outstanding and owing by Borrowers to Agent and Lenders hereunder.

Section 2.3     Method of Payment.   Borrowers shall make all payments of principal and interest on the Notes in lawful money of the United States of America and in funds immediately available by wire transfer, without setoff defense or counterclaim of any kind, to Agent at its address referred to in Section 10.3 of this Agreement or at such other address as Agent otherwise directs.   Whenever any payment is due on a day, which is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and interest shall be paid for such extended time.   As soon as practicable after Agent receives payment from Borrowers, but in no event later than one (1) Business Day after such payment has been made, subject to Section 2.7, Agent will cause to be distributed like funds relating to the

10

payment of principal, interest or fees (other than amounts payable to Agent to reimburse Agent for fees and expenses payable solely to them pursuant to the terms of this Agreement) or expenses payable to Agent and Lenders in accordance with the terms of this Agreement, in like funds relating to the payment of any such other amounts payable to Lenders. Borrowers' obligations to Lenders with respect to such payment shall be discharged by making such payments to Agent pursuant to this Section 2.3 or, if not timely paid or any Event of Default or Default then exists, may be added to the principal amount of the Loans outstanding.

Section 2.4      Extension and Adjustment of Maturity Date. Upon the mutual agreement of all parties to this agreement, the Maturity Date may be extended. Any extension to the Maturity Date shall be in writing and executed by the authorized representatives of each party.

Section 2.5      Use of Proceeds. Advances shall be used to finance Borrowers' portfolios of Consumer Purpose Loans which constitute Eligible Receivables and for other lawful corporate purposes except as otherwise limited under this Agreement.

Section 2.6      Interest.

(a)      In the absence of an Event of Default or Default hereunder, and prior to maturity, the outstanding balance of the Loan will bear interest at an annual rate at all times equal to the LIBOR Rate plus ███ basis points; provided such rate of interest shall automatically and permanently increase to the LIBOR Rate plus ███ basis points if the aggregate outstanding amount of Advances is less than ██████████ at any time; provided however, Agent shall be entitled to retain, solely for its own account, and not remit to Lenders from such monthly interest payment an interest payment in an amount equal to interest on the outstanding balance of the Loan at an annual rate at all times equal to ███ basis points. Interest shall be payable monthly in arrears on the first day of each month commencing on the first such date after the first Advance under the Loan and continuing until the Commitment is terminated and Obligations are indefeasibly paid in full. Interest as provided hereunder will be calculated on the basis of a 360 day year and the actual number of days elapsed. The rate of interest provided for hereunder is subject to increase or decrease in an amount corresponding to the change in the LIBOR Rate; provided, any such change in interest rate hereunder shall take effect as of the first day of the month following a change in the LIBOR Rate.

(b)      Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default or Default hereunder, including after maturity and before and after judgment, Borrowers hereby agree to pay to Lenders' interest on the outstanding principal balance of the Loan and, other obligations, to the extent permitted by law, overdue interest with respect thereto, at the rate of ███ per annum above the rate otherwise applicable to the Loan.

Section 2.7      Advances.

(a)      Borrower Agent shall notify Agent in writing not later than 10:00 a.m., Central time, on the date of each requested Advance, specifying the date, amount and purpose of the Advance. Such notice shall be in the form of the Request for Advance attached hereto and made part hereof as Exhibit A, shall be certified by the President or Treasurer (or such other authorized Person as Borrower Agent directs from time to time) of Borrower Agent and shall contain the following information and representations, which shall be deemed affirmed and true and correct as of the date of the requested Advance:

11

116549 01051/21523541v.8

(i) the aggregate amount of the requested Advance, which shall be in multiples of $25,000 but not less than the lesser of $25,000 or the unborrowed balance of the Commitments;

(ii) confirmation of Borrowers' compliance with Sections 2.1(c), 6.4 and 7.1 through 7.12 both immediately prior to and after making such Advance; and

(iii) statements that the representations and warranties set forth in Article 4 are true and correct as of the date of the Advance; no Event of Default or Default has occurred and is then continuing; and that there has been no material adverse change in Borrowers' financial condition, operations or business since the date of the monthly and audited annual financial statements most recently delivered by Borrowers to Agent pursuant to Sections 5.1(l) or 6.2 of this Agreement.

(b) Agent shall give to each Lender prompt notice (but in no event later than 1:00 P.M., Central time on the date of Agent's receipt of notice from Borrowers) of each Request for Advance by facsimile. No later than 3:00 P.M., Central time on the date on which an Advance is requested to be made pursuant to the applicable Request for Advance, each Lender will make available to Agent at the address of Agent set forth on Schedule I, in immediately available funds, its Commitment Percentage of such Advance requested to be made. Unless Agent shall have been notified by any Lender prior to the date of Advance that such Lender does not intend to make available to Agent its portion of the Advance to be made on such date, Agent may assume that such Lender will make such amount available to Agent as required above and Agent may, in reliance upon such assumption, make available the amount of the Advance to be provided by such Lender. Upon fulfillment of the conditions set forth in Article 5 for such Advance, and as soon as practicable after receipt of funds from Lenders (but in any event not later than 3:00 P.M., Central time) Agent will make such funds as have been received from Lenders available to Borrowers at the account specified by Borrowers in such Request for Advance.

(c) Because Borrowers anticipate requesting Advances on a daily basis and repaying the Advance on a daily basis through the collection, resulting in the amount of outstanding Advances fluctuating from day to day, in order to administer the Loan in an efficient manner and to minimize the transfer of funds between Agent and Lenders, Lenders hereby instruct Agent, and Agent may (in its sole discretion, without any obligation) (i) make available, on behalf of Lenders, the full amount of all Advances requested by Borrowers, not to exceed $5,000,000.00 in the aggregate at any one time outstanding, without giving each Lender prior notice of the proposed Advance, of such Lender's Commitment Percentage thereof and the other matters covered by the Request for Advance and (ii) if Agent has made any such amounts available as provided in clause (i), upon repayment of Loans by Borrowers, first apply such amounts repaid directly to the amounts made available by Agent in accordance with clause (i) and not yet settled as described below. If Agent makes an Advance on behalf of Lenders, as provided in the immediately preceding sentence, the amount of outstanding Loans and each Lender's Commitment Percentage thereof shall be computed weekly rather than daily and shall be adjusted upward or downward on the basis of the amount of outstanding Loans as of 5:00 P.M., Central time on the Business Day immediately preceding the date of each computation; provided, however, that Agent retains the absolute right at any time or from time to time to make the aforedescribed adjustments at intervals more frequent than weekly. Agent shall deliver to each of Lenders after the end of each week, or such lesser period or periods as Agent shall determine, a summary statement of the amount of outstanding Loans for such period (such week or lesser period or periods being hereafter referred to as a "Settlement Period"). If the summary statement is sent by Agent and received by Lenders prior to 12:00 Noon, Central time on any

12

Business Day each Lender shall make the transfers described in the next succeeding sentence no later than 3:00 P.M., Central time on the day such summary statement was sent; and if such summary statement is sent by Agent and received by Lenders after 12:00 Noon, Central time on any Business Day, each Lender shall make such transfers no later than 3:00 P.M., Central time on the next succeeding Business Day. If in any Settlement Period, the amount of a Lender's Commitment Percentage of the Loans is in excess of the amount of Loans actually funded by such Lender, such Lender shall forthwith (but in no event later than the time set forth in the next preceding sentence) transfer to Agent by wire transfer in immediately available funds the amount of such excess; and, on the other hand, if the amount of a Lender's Commitment Percentage of the Loans in any Settlement Period is less than the amount of Loans actually funded by such Lender, Agent shall forthwith transfer to such Lender by wire transfer in immediately available funds the amount of such difference. The obligation of each of Lenders to transfer such funds shall be irrevocable and unconditional, without recourse to or warranty by Agent and made without setoff or deduction of any kind. Each of Agent and Lenders agree to mark their respective books and records at the end of each Settlement Period to show at all times the dollar amount of their respective Commitment Percentages of the outstanding Loans. Because Agent on behalf of Lenders may be advancing and/or may be repaid Loans prior to the time when Lenders will actually advance and/or be repaid Loans, interest with respect to Loans shall be allocated by Agent to each Lender (including Agent) in accordance with the amount of Loans actually advanced by and repaid to each Lender (including Agent) during each Settlement Period and shall accrue from and including the date such Advance is made by Agent to but excluding the date such Loans are repaid by Borrower in accordance with Section 2.3 or actually settled by the applicable Lender as described in this Section 2.7(c). All such Advances made by Agent on behalf of Lenders hereunder shall bear interest at the interest rate applicable hereunder for Advances.

(d)     If the amounts described in subsection (b) or (c) of this Section 2.7 are not in fact made available to Agent by a Lender (such Lender being hereinafter referred to as a "Defaulting Lender") and Agent has made such amount available to Borrowers, Agent shall be entitled to recover such corresponding amount on demand from such Defaulting Lender. If such Defaulting Lender does not pay such corresponding amount forthwith upon Agent's demand therefor, Agent shall promptly notify Borrowers and Borrowers shall immediately (but in no event later than two (2) Business Days after such demand) pay such corresponding amount to Agent. Agent shall also be entitled to recover from such Defaulting Lender and Borrowers, (i) interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by Agent to Borrowers to the date such corresponding amount is recovered by Agent, at a rate per annum equal to either (A) if paid by such Defaulting Lender, the overnight federal funds rate or (B) if paid by Borrowers, the then applicable rate of interest, calculated in accordance with Section 2.6, plus (ii) in each case, an amount equal to any costs (including reasonable legal expenses) and losses incurred as a result of the failure of such Defaulting Lender to provide such amount as provided in this Agreement. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights which Borrowers may have against any Lender as a result of any default by such Lender hereunder, including, without limitation, the right of Borrowers to seek reimbursement from any Defaulting Lender for any amounts paid by Borrowers under clause (ii) above on account of such Defaulting Lender's default.

(e)     The failure of any Lender to make its portion of the Advance to be made by it as part of any Advance shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Advance. The amounts payable to each Lender shall be a separate and independent obligation.

13

(f)     Each Lender shall be entitled to earn interest at the then applicable rate of interest, calculated in accordance with Section 2.6, on outstanding Loans which it has funded to Agent from the date such Lender funded such Advance to, but excluding, the date on which such Lender is repaid with respect to the Loan.

(g)     Notwithstanding the obligation of Borrowers to send written confirmation of a Request for Advance made by telephone if and when requested by Agent, in the event that Agent agrees to accept a Request for Advance made by telephone, such telephonic Request for Advance shall be binding on Borrowers whether or not written confirmation is sent by Borrower or requested by Agent. Agent may act prior to the receipt of any requested written confirmation, without any liability whatsoever, based upon telephonic notice believed by Agent in good faith to be from a Borrowers or their agents. Agent's records of the terms of any telephonic notices of borrowing shall be conclusive on Borrowers in the absence of gross negligence or willful misconduct on the part of Agent in connection therewith.

(h)     Each request for an Advance pursuant to this Section 2.7 shall be irrevocable and binding on Borrowers.

Section 2.8     Prepayment.

(a)     Optional Prepayments. Borrowers may prepay the Loan from time to time, in full or in part not to exceed $5,000,000 without notice, and, in part, in excess of $100,000 upon 7 Business Day's prior notice to Agent without premium or penalty, provided that (i) in the event Borrowers repay the Loan in full prior to the date which is two years before the Maturity Date and is accompanied by the termination of the Commitments, Borrowers shall pay to Agent for the account of Lenders in accordance with their Commitment Percentages a sum equal to ▓▓▓▓ of the Maximum Principal Amount as a prepayment fee; (ii) in the event Borrowers repay the Loan in full after such date, but prior to the date which is one year before the Maturity Date and is accompanied by the termination of the Commitments, Borrowers shall pay to Agent for the account of Lenders in accordance with their Commitment Percentages a sum equal to ▓▓▓▓ of the Maximum Principal Amount as a prepayment fee; (iii) prepayments shall be in a minimum amount of $10,000 and $10,000 increments in excess thereof; and (iv) partial prepayments prior to the Termination Date shall not reduce the Maximum Principal Amount under this Agreement and may be reborrowed, subject to the terms and conditions hereof for borrowing, and partial prepayments will be applied first to accrued interest and fees and then to outstanding Advances. Each Borrower acknowledges that the above described fee is an estimate of Lenders' damages in the event of early termination and is not a penalty. In the event of termination of the credit facility established pursuant to this Agreement, all of the Obligations shall be immediately due and payable upon the termination date stated in any notice of termination. All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Credit Documents shall survive any such termination, and Agent shall retain its liens in the Collateral and all of its rights and remedies under the Credit Documents notwithstanding such termination until Borrowers have paid the Obligations to Agent and Lenders, in full, in immediately available funds, together with the applicable prepayment fee, if any. Notwithstanding the foregoing, so long as no Event of Default has occurred and so long as Borrowers have provided evidence acceptable to Agent (in its sole and absolute discretion) that they have a need for an increased Commitment and Agent determines in its sole and absolute discretion that such increase is commercially reasonable under the circumstances, Borrowers shall not be obligated to pay such prepayment fee if Agent and Lenders do not consent to the increase in the Commitment or increase the Commitment with another lender.

14

(b)   Mandatory Prepayments. In the event that amounts outstanding hereunder at any time exceed the Borrowing Base (whether established by an Availability Statement or otherwise) Borrowers shall pay to Agent immediately and without demand or notice of any kind required, the amount by which Borrowers' indebtedness hereunder exceeds the Borrowing Base then applicable, together with all accrued interest on the amount so paid and any fees and costs incurred in connection therewith.

Section 2.9    Administrative Fee. A non-refundable administrative fee of ▓▓▓▓ shall be due and payable monthly in arrears on the first day of each month solely for the account of the Agent commencing on the first such date after the funding of this Agreement and continuing until the Commitments are terminated and the Obligations are indefeasibly paid in full, in which event a monthly installment of the administrative fee shall be paid on the date of such termination.

Section 2.10    Unused Line Fee. Borrowers shall pay an unused line fee at the rate of ▓▓▓▓ per annum (computed on the basis of a 360 day year and the actual number of days elapsed) on the average daily unused Commitments. Such fee shall be payable Agent, for the account of Lenders in accordance with their Commitment Percentages, monthly in arrears on the first day of each month, and on the Termination Date, unless the Commitment is terminated on an earlier date, in which event the unused line fee shall be paid on the date of such termination.

Section 2.11    Regulatory Changes in Capital Requirements. If any Lender shall have determined that the adoption or the effectiveness after the date hereof of any law, rule, regulation or guideline regarding capital adequacy, or any change in any of the foregoing or in the interpretation or administration of any of the foregoing by any governmental authority, central lender or comparable agency charged with the interpretation or administration thereof, or compliance by such Lender (or any lending office of such Lender) or such Lender's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central lender or comparable agency, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the portion of the Loans made by such Lender pursuant hereto to a level below that which such Lender or its holding company could have achieved but for such adoption, change or compliance (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time Borrowers shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered together with interest on each such amount from the date demanded until payment in full thereof at the rate provided in Section 2.6 with respect to amounts not paid when due. Agent will notify Borrowers of any event occurring after the date of this Agreement that will entitle a Lender to compensation pursuant to this Section 2.10 as promptly as practicable after it obtains knowledge thereof and determines to request such compensation.

Section 2.12    Sharing of Payments. If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff or otherwise) on account of the Loans made by it in excess of its pro rata share of such payment as provided for in this Agreement, such Lender shall forthwith purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment accruing to all Lenders in accordance with their respective ratable shares as provided for in this Agreement; provided, however, that if all or any portion of such excess is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion

15

116549 01051/21523541v.8

of (a) the amount of such Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) or any interest or other amount paid or payable by the purchasing Lender in respect to the total amount so recovered. Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 2.11 may, to the fullest extent permitted by law, exercise all of its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation.

Section 2.13    Pro Rata Treatment. Each Advance, each payment or prepayment of principal of the Loan, each payment of interest on the Loans and each payment of the unused line fee under Section 2.10, actually received by Agent shall be allocated pro rata among Lenders in accordance with the respective principal amounts of their outstanding Loans; provided, however, that the foregoing fees payable hereunder (other than the fees payable under Section 2.9 hereof) to Lenders shall be allocated to each Lender based on such Lender's Commitment Percentage.

Section 2.14    Existing Indebtedness. Borrowers acknowledge and confirm that as of the date hereof, Borrowers are indebted to Lenders, without defense, set-off or counter-claim under the Existing Loan Documents ("Existing Indebtedness"). This Agreement amends and restates the Existing Loan Agreement and the Existing Indebtedness shall be deemed to constitute an Advance hereunder. The execution and delivery of this Agreement and the other Credit Documents, however, does not evidence or represent a refinancing, repayment, accord and/or satisfaction or novation of the Existing Indebtedness. All of Lenders' obligations to Borrowers with respect to Advances to be made concurrently herewith or hereafter the date hereof are set forth in this Agreement. All liens and security interests previously granted to Agent, pursuant to the Existing Credit Documents are acknowledged and reconfirmed and remain in full force and effect and are not intended to be released, replaced or impaired.

## ARTICLE 3

## SECURITY

Section 3.1    Security Interest. To secure the payment and performance of the Obligations, each Borrower hereby grants to Agent, for the benefit of Lenders, a continuing general Lien on and a continuing security interest in all of the Collateral, wherever located, whether now owned or hereafter acquired, existing or created, together with all replacements and substitutions therefor, and the cash and non-cash proceeds thereof. The Liens and security interests of Agent in the Collateral shall be first and prior perfected Liens and security interests and may be retained by Agent until all of the Obligations have been indefeasibly satisfied in full and the Commitment has expired or otherwise has been terminated.

Section 3.2    Financing Statements. Agent is hereby authorized by each Borrower to file any financing statements covering the Collateral or an amendment that adds collateral covered by the financing statement or an amendment that adds a debtor to a financing statement, in each case whether or not a Borrower's signature appears thereon. Borrowers agree to comply with the requirements of all state and federal laws and requests of Agent in order for Agent to have and maintain a valid and perfected first security interest in the Collateral.

Section 3.3    Documents to be Delivered to Agent. Concurrently with the execution and delivery of this Agreement and, thereafter, by the 30th day of each month for the prior month and at any other time as Agent may require, Borrowers shall deliver to Agent (for each Borrower and on consolidated basis) an Availability Statement (together with all supporting schedules), a Schedule of Receivables and

16

Assignment, an aging of Receivables, books and records consisting of data tape information and such other documentation as Agent may require; however, the security interest of Agent in the Collateral shall attach immediately upon the creation or acquisition thereof by Borrowers, regardless of whether the same be then or thereafter delivered to Agent. All Receivables of Borrowers shall be stamped and assigned to Agent as follows to evidence the assignment to Agent:

> The within instrument or agreement is pledged as collateral to Wells Fargo Financial Preferred Capital, Inc., its successors and assigns.

Borrowers shall: (a) deliver to the custodian under the Custodian Agreement, as the bailee and designee of Agent, or, upon the request of Agent, to Agent, the Collateral and all Documents, General Intangibles and Instruments relating to Collateral and, upon request of Agent, deliver to Agent or its designee any other property in which Borrowers have granted Agent a security interest hereunder, including, but not limited to, all of Borrowers' Books and Records including all computers, computer related equipment, tapes and software; and (b) execute and deliver to Agent, for the benefit of Lenders, such assignments, mortgages, financing statements, amendments thereto and continuation statements thereof, in form satisfactory to Agent, and such additional agreements, documents or instruments as Agent may, from time to time, require to evidence, perfect and continue to perfect Agent's liens and security interests granted hereunder. For purposes of this Article 3, the parties hereto agree that, until Agent shall otherwise direct or designate, the custodian(s) under the Custodian Agreement or Agreements as from time to time in effect, shall be deemed to be the designee of Agent and Agent shall have the right, at any time and from time to time, to direct or redirect the delivery of all or any of the foregoing items to any other designee. Agent may in its sole discretion record or file any such document, instrument or agreement, including, without limitation, this Agreement, as it may from time to time deem desirable.

Section 3.4    Collections. Notwithstanding the assignment (but not in any way to be deemed or construed to impair or affect the security interest granted hereunder) of the Receivables by Borrowers to Agent, until the occurrence of a Default or an Event of Default, Borrowers may service, manage, enforce and receive Collections on Receivables for the account of Agent. Borrowers shall have no power to make any unusual allowance or credit to any obligor without Agent's prior written consent.

Upon notice by Agent at any time following the occurrence of an Event of Default, Agent may require Borrowers to endorse and deposit all Collections within one Business Day of receipt thereof and in the original form received (except for the endorsement of Borrowers, if necessary, to enable the collection of instruments for the payment of money, which endorsements Borrowers hereby agree to make) in such account maintained with such depository as Agent may from time to time specify, such account to limit withdrawals by Borrowers therefrom only to the order of Agent, but to permit withdrawals by Agent therefrom without the co-signature of a Borrower. Agent may also require Borrowers to enter into an appropriate lock box agreement with Agent or another financial institution acceptable to Agent, in form and content acceptable to Agent, with respect to opening and maintaining a lock box arrangement for the Collections. Such lock box agreements shall be irrevocable so long as Borrowers are indebted to Agent and Lenders under this Agreement and this Agreement remains in effect.

Section 3.5     Additional Rights of Agent: Power of Attorney.

(a)     In addition to all the rights granted to Agent hereunder, Agent shall have the right, at any time following the occurrence and during the continuance of a Default or an Event of Default, to notify the obligors and account debtors of all Collateral to make payment thereon directly to Agent, and to take control of the cash and non-cash proceeds of such Collateral; provided, however, that once such notification is given to such obligors, it shall not be vitiated by a subsequent cure of such Default or Event of Default without the prior written consent of Agent. When Collections received by Agent have been converted into cash form, Agent shall forthwith apply the same first in discharge of all expenses, fees, costs and charges including attorneys' fees and costs of Collections; second to pay all interest accrued under the Notes and this Agreement; third to pay principal due under the Notes and this Agreement; and then to pay any other sums due to Agent and Lenders under the terms of this Agreement.

(b)     Each Borrower irrevocably appoints Agent its true and lawful attorney, with power of substitution, to act in the name of such Borrower or in the name of Agent or otherwise, for the use and benefit of Agent following the occurrence of an Event of Default, but at the cost and expense of Borrowers, without notice to Borrowers: to demand, collect, receipt for and give renewals, extensions, discharges and releases of any Receivables; to institute and to prosecute legal and equitable proceedings to realize upon any Receivables; to settle, compromise, or adjust claims; to take possession and control in any manner and in any place of any cash or non-cash items of payment or proceeds thereof; to endorse the name of such Borrower upon any notes, checks, drafts, money orders, or other evidences of payment of Receivables; to sign such Borrower's name on any instruments or documents relating to any of the Collateral or on drafts against account debtors; to do all other acts and things necessary, in Agent's sole judgment, to effect collection of the Receivables or protect its security interest in the Collateral; and generally to sell in whole or in part for cash, credit or property to others or to itself at any public or private sale, assign, make any agreement with respect to or otherwise deal with the Receivables as fully and completely as though Agent were the absolute owner thereof for all purposes, except to the extent limited by any applicable laws and subject to any requirement of notice to Borrowers or other Persons under applicable laws.

(c)     Each Borrower hereby agrees to indemnify and hold Agent and Lenders harmless from and against any and all expenses, costs, liabilities or damages (including reasonable attorneys fees) sustained by Agent and Lenders by reason of any misrepresentation, breach of warranty or breach of covenant by Borrowers whether caused by Borrowers or any obligor, or whether caused by any other Person if Borrowers knew of or reasonably should have known that facts, circumstances or information on which Borrowers relied were false, incorrect or incomplete in any material respect, and also all court costs and all other expenses Agent and Lenders incur in enforcing or attempting to enforce payment of the Loan or any Receivables, in supervising the records and proper management and disposition of the Collection of Receivables or in prosecuting or defending any of Agent and Lenders' rights under this Agreement.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants and shall continue to represent and warrant to Agent and Lenders until the Obligations hereunder have been indefeasibly satisfied in full and the Commitment has expired or otherwise has been terminated as follows:

18

Section 4.1    Representations and Warranties as to Receivables.

(a)    As to the Receivables generally:

(i)    Each Borrower or, where a Borrower was not the original lender, to the best of such Borrower's knowledge, the original lender or seller had full power and authority to make the loans (or other extensions of credit) evidenced by the Receivables and all such Receivables and all Books and Records related thereto are genuine, based on enforceable contracts and are in all respects what they purport to be;

(ii)    All Receivables have been duly authorized, executed, delivered by the parties whose names appear thereon and are valid and enforceable in accordance with their terms; constitute Chattel Paper; any chattels described in any Receivable are and will be accurately described and are and will be in the possession of the parties granting the security interest therein; and (A) any applicable filing, recording or lien notation law with respect to any collateral securing a Receivable will have been complied with to the extent such filing or recording is necessary under applicable law to create or perfect such Borrower's security interest in such collateral consistent with its present policy; or (B) a Borrower shall have procured non-filing insurance from a reputable insurer in an amount not less than the value of the collateral securing such Receivables which has been assigned to Agent;

(iii)    The form and content of all Receivables and the security related thereto and the transactions from which they arose comply in all material respects (and in any event in all respects necessary to maintain and ensure the validity and enforceability of the Receivables) with any and all applicable laws, rules and regulations, including without limitation, the Consumer Finance Laws;

(iv)    The original amount and unpaid balance of each Receivable on Borrowers' Books and Records and on any statement or schedule delivered to Agent and/or any Lender, including without limitation the Schedule of Receivables, is and will be the true and correct amount actually owing to a Borrower as of the date each Receivable is pledged to Agent, is not subject to any claim of reduction, counterclaim, set-off, recoupment or any other claim, allowance or adjustment; and no Borrower has any knowledge of any fact which would impair the validity or collectibility of any Receivables;

(v)    All security agreements, title retention instruments, mortgages and other documents and instruments which are security for Receivables contain a correct and sufficient description of the real or personal property covered thereby, and, subject to the rights of Agent hereunder and the interests of Borrowers as holder of such security agreements, title retention instruments or mortgages or other documents or instruments, are or create first and prior perfected security interests and Liens;

(vi)    Borrowers have made an adequate credit investigation of the obligor of each Receivable and has determined that his or her credit is satisfactory and meets the standards generally observed by prudent finance companies and is in conformity in all material respects with Borrowers' policies and standards; and

(vii)    A Borrower has good and valid indefeasible title to the Receivables, free and clear of all prior assignments, claims, liens, encumbrances and security interests, and has the

19

right to pledge and grant Agent, for the benefit of Lenders, a first priority security interest in the same, in the manner provided in this Agreement.

Section 4.2    Organization and Good Standing. Each Borrower is duly organized and validly existing in good standing under the laws of the state identified on Exhibit H attached hereto and made part hereof and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, is not required to be qualified in any other state; or if not so qualified, no adverse effect would result therefrom. The organizational number assigned to each Borrower by the state of its organization is set forth on Exhibit H attached hereto and made part hereof.

Section 4.3    Perfection of Security Interest. Upon filing of financing statements in the central UCC filing office of the State of New York, describing the Collateral and disclosing each Borrower as "Debtor" and Agent as "Secured Party," Agent will have a first perfected security interest in the Collateral superior in right of interest to purchasers from, or creditors or receivers or a trustee in bankruptcy of, Borrowers.

Section 4.4    No Violations. The making and performance of the Credit Documents do not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the charter, bylaws or other organizational documents of any Borrower, or constitute a default or result in the creation or imposition of any security interest in, or lien or encumbrance upon, any assets of any Borrower (immediately or with the passage of time or with the giving of notice and passage of time, or both) under any other contract, agreement, indenture or instrument to which a Borrower is a party or by which a Borrower or its property is bound and no failure of it to comply with any suit, law, rule, regulation, judgment, order, writ, decree, determination or award would have an adverse effect.

Section 4.5    Power and Authority.

(a)    Each Borrower has full power and authority under the law of the state of its organization and under its organizational documents to enter into, execute and deliver and perform the Credit Documents; to borrow monies hereunder, to incur the obligations herein provided for and to pledge and grant to Agent a security interest in the Collateral; and

(b)    All actions (corporate or otherwise) necessary or appropriate for each Borrower's execution, delivery and performance of the Credit Documents have been taken.

Section 4.6    Validity of Agreements. Each of the Credit Documents is, or when delivered to Agent will be, duly executed and constitute valid and legally binding obligations of each Borrower enforceable against such Borrower in accordance with their respective terms.

Section 4.7    Litigation. There is no order, notice, claim, action, suit, litigation, proceeding or investigation pending or, threatened against or affecting any Borrower, whether or not fully covered by insurance, except as identified and described on Exhibit H attached hereto and made part hereof.

Section 4.8    Compliance. Each Borrower is in compliance in all material respects with all applicable laws and regulations, federal, state and local (including all Consumer Finance Laws and those administered by the Local Authorities), material to the conduct of its business and operations; each Borrower possesses all the franchises, permits, licenses, certificates of compliance and approval and grants

20

of authority necessary or required in the conduct of its business and, except as may be described on Exhibit H attached hereto and made part hereof, the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with such Borrower's execution and performance of the Credit Documents.

Section 4.9    Accuracy of Information; Full Disclosure.

(a)    All financial statements, including any related schedules and notes appended thereto, delivered and to be delivered to Agent and/or any Lender pursuant to this Agreement have been or will be prepared in accordance with GAAP and do and will fairly present the financial condition of each Borrower and its consolidated Subsidiaries, if any, on the dates thereof and results of operations for the periods covered thereby and discloses all liabilities (including contingent liabilities) of any kind of such Borrower.

(b)    Since the date of the most recent financial statements furnished to Agent and/or any other Lender, there has not been any adverse change in the financial condition, business or operations of any Borrower.

(c)    All financial statements and other statements, documents and information furnished by Borrowers, or any of them, to Agent and/or any other Lender in connection with this Agreement and the Notes and the transactions contemplated hereunder do not and will not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading. Each Borrower has disclosed to Agent and Lenders in writing any and all facts which materially and adversely affect the business, properties, operations or condition, financial or otherwise, of such Borrower, or such Borrower's ability to perform its obligations under this Agreement and the Notes.

Section 4.10    Taxes. Each Borrower has filed and will file all tax returns which are required to be filed and has paid or will pay when due all taxes, license and other fees with respect to the Collateral and the business of such Borrower except taxes contested in good faith for which adequate reserves have been established by such Borrower on its Books and Records.

Section 4.11    Indebtedness. No Borrower has presently outstanding indebtedness or obligations including contingent obligations and obligations under leases of property from others, except the indebtedness and obligations described in Exhibit H attached hereto and made part hereof and in Borrowers' financial statements which have been furnished to Agent from time to time pursuant to Section 6.2 of this Agreement.

Section 4.12    Investments. No Borrower has direct or indirect Subsidiaries or Affiliates, or investments in or loans to any other individuals or business entities (other than Consumer Purpose Loans), except as described in Exhibit H attached hereto and made part hereof.

Section 4.13    ERISA. Each Borrower and any Subsidiary, and each member of the controlled group of corporations (as such term "controlled group of corporations" is defined in Section 1563 of the Internal Revenue Code of 1986, as amended) of which such Borrower is a member, is in compliance in all material respects with all applicable provisions of ERISA and the regulations promulgated thereunder. No

21

reportable event, as such term (hereinafter called a "Reportable Event") is defined in Title IV of ERISA, has occurred with respect to, nor has there been terminated, any Plan maintained for employees of any Borrower or any Subsidiary or any member of the controlled group of corporations of which a Borrower is a member.

Section 4.14    Hazardous Wastes, Substances and Petroleum Products.

(a)    Each Borrower (i) has received all permits and filed all notifications necessary to carry on its respective business; and (ii) is in compliance in all respects with all Environmental Control Statutes.

(b)    No Borrower has given any written or oral notice to the Environmental Protection Agency ("EPA") or any state or local agency with regard to any actual or imminently threatened removal, spill, release or discharge of hazardous or toxic wastes, substances or petroleum products or properties owned or leased by such Borrower or in connection with the conduct of its business and operations.

(c)    No Borrower has received notice that it is potentially responsible for costs of clean-up of any actual or imminently threatened spill, release or discharge of hazardous or toxic wastes or substances or petroleum products pursuant to any Environmental Control Statute.

Section 4.15    Solvency. Each Borrower is, and after receipt and application of the first Advance will be, solvent such that (a) the fair value of its assets (including without limitation the fair salable value of such Borrower's Intangible Assets) is greater than the total amount of its liabilities, including without limitation, contingent liabilities, (b) the present fair salable value of its assets (including without limitation the fair salable value of its Intangible Assets) is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, and (c) it is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business. No Borrower intends to, or believes that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and is not engaged in a business or transaction, or about to engage in a business or transaction, for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice and industry in which it is engaged. For purposes of this Section 4.15, in computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual matured liability.

Section 4.16    Business Location. Each Borrower's address set forth on Exhibit I attached hereto and made part hereof is the location of such Borrower's principal place of business and such address, together with the addresses set forth on Exhibit I attached hereto and made part hereof, is the only location where such Borrower keeps its records concerning the Collateral. The location of all other places of business of each Borrower and the names in which each Borrower conducts business at each such location are set forth in Exhibit I attached hereto and made part hereof.

Section 4.17    Capital Stock. All of the issued and outstanding capital stock or other ownership interest of each Borrower is owned as described on Exhibit H attached hereto and made part hereof, and all such ownership interests are fully paid and non-assessable.

Section 4.18    No Extension of Credit for Securities. No Borrower is, nor will it be, engaged principally or as one of its important activities in the business of extending credit for the purpose of

22

purchasing or carrying or trading in any margin stocks or margin securities (within the meaning of Regulations T, U and X of the Board of Governors of the Federal Reserve System) or other securities, and no part of the proceeds of the Loan hereunder has been or will be applied for the purpose of purchasing or carrying or trading in any such stock or securities or of refinancing any credit previously extended, or of extending credit to others, for the purpose of purchasing or carrying any such margin stock, margin securities or other securities in contravention of such Regulations.

## ARTICLE 5

## CONDITIONS TO LOAN

Section 5.1    Documents to be Delivered to Agent Prior to First Advance. Prior to the effectiveness of this Agreement, Borrowers shall deliver or caused to be delivered to Agent (all documents to be in form and substance satisfactory to Lenders in their sole and absolute discretion):

(a)    Credit Documents. This Agreement, the Notes and all other Credit Documents duly and properly executed by the parties thereto;

(b)    Searches. Uniform Commercial Code, tax, judgment, PBGC and EPA searches against each Borrower in those offices and jurisdictions as Agent shall reasonably request which shall show that no financing statement, liens, or assignments or other filings have been filed or remain in effect against each Borrower or any Collateral except for those Liens, financing statements, assignments or other filings with respect to which the secured party or existing lender (i) has delivered to Agent Uniform Commercial Code termination statements or other documentation evidencing the termination of its Liens and security interests in Collateral, (ii) has agreed in writing to release or terminate its Lien and security interest in Collateral upon receipt of proceeds of the Advances or (iii) has delivered a Subordination Agreement to Agent with respect to its Lien and security interest in the Collateral, all in a form and substance satisfactory to Agent in its sole discretion;

(c)    Organizational Documents. A copy of each Borrower's and Corporate Guarantor's (i) organization documents, certified as of a recent date by such Borrower's and Corporate Guarantor's corporate secretary (or other appropriate officer), and (ii) bylaws, partnership agreement or operation agreement, as applicable, certified as of a recent date by such Borrower's and Corporate Guarantor's corporate secretary (or other appropriate officer); together with certificates of good standing existence or fact in such Borrower's and Corporate Guarantor's state of organization and in each jurisdiction in which such Borrower and Corporate Guarantor are qualified to do business, each dated within 30 days from the date of this Agreement;

(d)    Authorization Documents. A certified copy of resolutions of each Borrower's and Corporate Guarantor's board of directors, members or partners, as applicable, authorizing the execution, delivery and performance of the Notes, this Agreement and all other Credit Documents, the pledge of the Collateral to Agent as security for the Loan made hereunder and the borrowing evidenced by the Notes and designating the appropriate officers to execute and deliver the Credit Documents;

(e)    Incumbency Certificates. A certificate of each Borrower's and Corporate Guarantor's corporate secretary (or other appropriate officer) as to the incumbency and signatures of officers of such Borrower signing this Agreement, the Notes and other Credit Documents;

23

(f)  Opinion of Counsel. Agent shall have received a written opinion of Borrowers' and Guarantors' counsel addressed to Agent in form and substance satisfactory to Agent in its sole discretion;

(g)  Officer's Certificate. A certificate, dated the date of this Agreement, signed by the President of each Borrower and Corporate Guarantor, to the effect that (i) all representations and warranties set forth in this Agreement are true and correct as of the date hereof in all material respects and (ii) no Default or Event of Default hereunder has occurred;

(h)  Guaranties. The Guaranties duly executed by each Guarantor;

(i)  Subordination Documents. The Subordination Agreement(s) duly executed by each holder of Subordinated Debt, together with copies of the documents, instruments and writings evidencing such Subordinated Debt;

(j)  Availability Statement. A completed and executed Availability Statement as of August 31, 2006.

(k)  Compliance Certificate. A completed and executed compliance certificate as of June 30, 2006.

(l)  Other Documents. Such additional documents as Agent reasonably may request.

Section 5.2  Conditions to all Advances. The obligation of Lenders to make each subsequent Advance hereunder pursuant to Section 2.1 is conditioned upon (a) Borrowers' satisfaction of each of the conditions specified in Sections 2.1, 3.2, 3.3 and 5.1, (b) the continuing accuracy of the representations and warranties made by Borrowers under this Agreement, (c) the absence, after giving effect to such Advance and the receipt of the proceeds thereof and the retirement of any indebtedness then being retired out of the proceeds of such Advance, of any Default or Event of Default; and (d) Borrowers' continued compliance with the requirements of Section 6.3 (with respect to audit of Collateral).

## ARTICLE 6

### AFFIRMATIVE COVENANTS

In addition to the covenants contained in Article 3 and 4 of this Agreement relating to the Collateral, until all Obligations have been indefeasibly satisfied in full and the Commitment has expired or otherwise has been terminated, each Borrower covenants and agrees as follows:

Section 6.1  Place of Business and Books and Records. Each Borrower will promptly advise Agent in writing of (a) the establishment of any new places of business by such Borrower and of the discontinuance of any existing places of business of such Borrower; (b) the creation of any new Subsidiaries or Affiliates and (c) the acquisition and or use of any trade name or trade style.

Section 6.2  Reporting Requirements. Borrowers will deliver to Agent and each Lender:

(a)  within 45 days after the end of each month, company prepared consolidated and consolidating financial statements of Borrowers' business for such previous month, consisting of a balance sheet, income statement, and consolidating schedules as of the end of such month, all in reasonable detail,

24

prepared in accordance with GAAP consistently applied, subject to year-end adjustments, and a covenant compliance certificate;

(b)    within 120 days after the close of each fiscal year, commencing with the fiscal year ending June 30, 2006, consolidated and consolidating financial statements of Corporate Guarantor and Borrowers and their consolidated Subsidiaries for the fiscal year then ended consisting of a balance sheet, income statement and statement of cash flow of Corporate Guarantor and Borrowers and their consolidated Subsidiaries as of the end of such fiscal year, all in reasonable detail, including all supporting schedules and footnotes, prepared in accordance with GAAP consistently applied, and shall be audited and certified without qualification by an independent certified public accountant selected by Corporate Guarantor and Borrowers and acceptable to Agent and accompanied by the unqualified opinion of such accountant; and cause Agent to be furnished at the time of completion thereof, a copy of any management letter for Corporate Guarantor and Borrowers and their consolidated Subsidiaries prepared by such certified public accounting firm;

(c)    the documents required to be furnished pursuant to Section 3.3 of this Agreement;

(d)    within 30 days after the end of each month, for the month then ending, reports in form and substance satisfactory to Agent, as required pursuant to Section 3.3, setting forth an aging of Receivables, Schedule of Receivables and Assignment, an Availability Statement, books and records consisting of data tape information and also such other documentation and information promptly after request therefor by Agent;

(e)    within 120 days after the end of each calendar year, financial statements for each Guarantor, in form and substance satisfactory to Agent;

(f)    upon request by Agent from time to time, copies of Borrowers' corporate income tax returns, including any schedules attached thereto, and copies of each Guarantor's income tax returns, including any schedules attached thereto, filed with the Internal Revenue Service.

(g)    upon request by Agent, an annual certification letter in form and substance acceptable to Agent.

Section 6.3    Books and Records.  Borrowers will keep accurate and complete Books and Records concerning the Collateral and all transactions with respect thereto consistent with sound business practices (including, without limitation, accurately account for insurance commissions) and will comply with Agent's reasonable requirements, from time to time in effect, including those concerning the submission of reports on all items of Collateral including those which are deemed to be delinquent. The form of delinquency reports, the frequency with which such reports shall be submitted to Agent (which in any case shall be no less frequently than monthly) and the standards for determining which Collateral transactions are deemed delinquent for this purpose, shall at all times be satisfactory to Agent. Agent shall have the right at any time and from time to time during regular business hours, at Borrowers' expense, to inspect, audit, and copy the Books and Records of Borrowers and inspect and audit any Collateral and each Lender, at its sole expense, shall be entitled to join Agent in connection with each such audit. Agent shall conduct at least one (1) such audit per year.

Section 6.4    Financial Covenants.  At all times Borrowers shall maintain the following financial covenants (based on consolidated financial statements of Borrowers and their consolidated Subsidiaries unless otherwise indicated):

25