UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                        :

BENJAMIN M. LAWSKY, Superintendent of     :
Financial Services of the State of New York,     :
                                          :

                     Plaintiff,     :          No. 14-CV-2863 (CM) (JCF)
                                          :

        - against -     :
                                          :

CONDOR CAPITAL CORPORATION     :
and STEPHEN BARON,     :
                                          :

                 Defendants.     :
                                          :

------------------------------------------------------------------ x

## REPLY DECLARATION OF BRIAN MONTGOMERY
## IN FURTHER SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, BRIAN MONTGOMERY declares as follows:

1.      I submit this declaration in further support of Plaintiff's Motion for a

Preliminary Injunction against Defendants Condor Capital Corp. ("Condor") and Stephen Baron.

This declaration is based on my personal knowledge.

2.      I am an associate counsel in the Financial Frauds and Consumer

Protection Division of the New York State Department of Financial Services (the "Department").

3.      In accordance with the terms of the *ex parte* temporary restraining order

entered by the Honorable Kimba M. Wood on April 23, 2014 (the "TRO"), as well as the

Department's supervisory authority under the New York Financial Services Law, personnel from

the Department have been on-site at Condor's offices at 165 Oser Avenue in Hauppauge, New

York since April 23, 2014 to, among other things, secure and take control of the business

premises (TRO ¶ 29(c)), inspect documents and records (TRO ¶ 24), and monitor defendants'

compliance with the TRO (TRO ¶ 32).

4.     Department personnel reported to me that when they entered Condor's office on April 23, 2014, they found hundreds of files containing customers' personal and financial information in an unlocked garage and in common areas throughout the office. Department personnel took steps to temporarily secure those files, by, among other things, using Department funds to change the locks on the garage and storage rooms throughout Condor's business premises.

5.     As of this writing, Condor and Stephen Baron have failed to provide certain information required by the TRO despite numerous requests and reminders to do so.  For example:

a.     Under Paragraph 22 of the TRO, no later than April 28, 2014, each defendant was required to provide counsel for the Department with a complete financial statement accurate as of April 23, 2014.  Despite repeated demands by counsel for the Department, these statements have not been provided.  On April 29, 2014 (the day after the financial statements were due), Stephen Baron provided an incomplete statement of his net worth, without any line-item detail, which was dated as of January 5, 2014 (not April 23, as required by the TRO). Similarly, on April 29, 2014, Condor provided a financial statement dated as of February 28, 2014 (again, not as of April 23, 2014 as required).  Failure to provide up-to-date financials has prevented the Department from assessing the defendants' financial condition, including to determine whether defendants will be able to refunds positive credit balances to Condor's customers and pay other obligations.

b.     Under Paragraph 25 of the TRO, no later than April 30, 2014 Condor was required to provide counsel for the Department with certain information

2

concerning its computer systems.  To date, Condor has failed to provide all of the required information.  As of this writing, Condor has not provided passwords for websites, email, IT applications, all computers, or financial accounts.  Although Condor did provide through counsel a list of computers and other devices owned by defendants or used in connection with their business, the list did not indicate the location of each device as required.  Without knowing whether a given device is located in Condor's Hauppauge office or its Florida office, the Department cannot determine the completeness or accuracy of Condor's disclosures.

6.      The Department's on-site personnel have also reported myriad observations of Condor's and Baron's continuing non-compliance with the TRO.  For example:

a.      Paragraph 24 of the TRO allows Department personnel to inspect and copy Condor's documents, data, and records.  Accordingly, Information Technology Bank Examiner Steven Lord requested that Condor IT manager Robert Scalone generate a list of all loan accounts with positive credit balances during the entirety of Condor's operations.  Although Mr. Scalone generated the list, he would only show Mr. Lord the requested information on his computer monitor and refused to allow Mr. Lord to copy or retain a print-out of the list, purportedly because it was "preliminary" and subject to review by Todd Baron. Mr. Lord reported that Todd Baron was attempting to remove accounts from the list of loans with positive credit balances.  Complete information about the total amount of outstanding positive credit balances is crucial to the Department's assessment of the magnitude of harm Condor's customers have suffered and Condor and Baron's ability to make restitution.

b.      Similarly, despite the authority granted in paragraph 24 of the TRO, on

April 30, 2014, Department examiners J. Terence Smith and Kedesha Clarke

reported that they heard Todd Baron instruct Condor employees not to cooperate

with the Department, not to provide information or documents the Department

may request, and indeed not to speak to the Department personnel at all.  Mr.

Smith and Ms. Clarke told me that Condor's employees are following Mr.

Baron's orders, blocking the Department's legitimate power to collect information

and creating a hostile environment for everyone on-site.

c.      There are other examples of the defendants' obstructive behavior.  On

April 29, 2014, Condor's Controller, Donald Kalechofsky, who had been on

vacation since the TRO was granted, returned to work.  (Mr. Kalechofsky is the

Condor employee who admitted to the Department last November that Condor

had a "policy" of not refunding customers' positive credit balances).  Mr. Smith

and Ms. Clarke informed me that they met with Mr. Kalechofsky that day to

obtain financial information the defendants had not yet provided to the

Department.  The meeting between Mr. Kalechofsky and the examiners was

interrupted twice, first by Todd Baron and subsequently by Stephen Baron, who

each asked the examiners to leave.  When the examiners returned to Mr.

Kalechofsky's office after his conversations with Todd Baron and Stephen Baron,

Mr. Kalechofsky stopped cooperating with the examiners and informed them that

he would not answer any questions or provide any documents, and that all

requests had to be made through counsel.

d.      Paragraph 20 of the TRO prohibits Condor from moving its operations out

of New York State.  However, payroll records and other information recently

provided to the Department revealed that Condor has commenced operations in Florida. Although we were advised that all of the Florida employees were in training during the week of April 20, 2014, the information received by the Department indicates that they are now performing debt collection work.

e.      Furthermore, despite the restrictions in paragraph 20 of the TRO, on May 1, 2014, Department examiner Wendell Falby confirmed that Condor is routing customer calls received in Hauppauge to its debt collection employees in Florida. Department examiner Rahmel Solomon told me that he reviewed conversation logs of calls fielded by three Condor employees currently located in the Florida office on April 30 and May 1, 2014. Re-routing customer calls violates the TRO and circumvents the Department's ability to monitor whether Condor is giving accurate information to its customers about their continuing obligation to pay their loans and the security of their personal and financial information.

f.      Department personnel similarly told me that Condor has turned down the volume of the ringers on telephones and, at some points, Condor staff have stopped answering the phones entirely. When Condor employees do answer customer calls, they speak in low voices such that the Department personnel cannot hear what they are saying. In a further attempt to evade monitoring, Condor has routed some customer calls to its "legal" department, a physically separate area from Condor's call center. However, Department personnel told me that they were able to hear at least one employee in Condor's legal department because she was screaming so loudly at a customer while demanding payment

that her voice carried despite the distance between her workstation and the call center area where the examiners were located.

g.      Paragraph 19 of the TRO requires Condor to take all necessary steps to safeguard its customers' highly sensitive personal and financial information. However, on April 30, 2014, Mr. Smith and Ms. Clarke told me that they had observed employees leaving their workstations for extended periods of time without locking their computers or turning off their monitors, thus leaving sensitive customer information visible on the screens.

h.      Paragraph 18 of the TRO prohibits Condor or Baron from destroying documents.  However, on April 30, 2014, Ms. Clarke saw two Condor employees carrying thirteen boxes of files.  Ms. Clarke heard the employees tell Stephen Baron that the files were going "to be destroyed."

i.      On April 30, 2014, Mr. Smith told me that Stephen Baron accused him of harassing Condor employees, that Stephen Baron put his cell phone in Mr. Smith's face and took photos of Mr. Smith, and otherwise acted in a menacing and hostile manner to Mr. Smith.

7.      When Mr. Smith and Ms. Clarke were able to review Condor's Citibank operating account statements for December 2013, January 2014, February 2014, and March 2014.  They told me that they noted the following withdrawals:

a.      Monthly checks made out to "Trump Corp. – Trump Palace."

b.      Monthly checks made out to "The Royale Condominium," which is located at 188 East 64th Street, New York, New York, where Stephen Baron owns an apartment.

c.      Monthly checks made out to "Cash."

6

d.     Monthly checks made out to Todd Baron.

e.     Checks made out to American Express.  Mr. Smith and Ms. Clarke could not reconcile the amounts of these checks with the statement balances for Condor's corporate American Express account, suggesting that these checks were not for payments on the corporate account but for some other account.

8.     Mr. Smith and Ms. Clarke also reviewed Condor's corporate American Express account statements for the months ending December 2013, January 2014, March 2014, and April 2014.  They told me that these statements included charges for travel itineraries for people whose names do not appear on the list of Condor employees provided to the Department.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 5, 2014 at One State Street, New York, NY.

_____
Brian Montgomery

7

Filed by:      FRIEDMAN KAPLAN SEILER &
                  ADELMAN LLP
               Eric Corngold
               Anne E. Beaumont
               Christopher M. Colorado
               Raina L. Nortick
               7 Times Square
               New York, NY 10036-6516
               (212) 833-1100

               *Attorneys for Plaintiff*

               NEW YORK STATE DEPARTMENT OF
                  FINANCIAL SERVICES
               Joy Feigenbaum
               Nancy I. Ruskin
               One State Street, 19th Floor
               New York, NY 10004-1511
               (212) 709-3500

               *Of Counsel*