```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   BENJAMIN M. LAWSKY,
     Superintendent of Financial
 4   Services of the State of New
     York,
 5
                    Plaintiff,
 6
            v.                                     14 CV 2863 (CM)
 7
     CONDOR CAPITAL CORPORATION and
 8   STEPHEN BARON,

 9                  Defendants.

10   ------------------------------x
                                                New York, N.Y.
11                                              April 25, 2014
                                                4:00 p.m.
12
     Before:
13
                          HON. KIMBA M. WOOD,
14
                                                District Judge
15
                             APPEARANCES
16
     FRIEDMAN, KAPLAN, SEILER & ADELMAN
17        Attorneys for Plaintiff
     BY:  ANNE BEAUMONT
18        RAINA NORTICK
          CHRISTOPHER COLORADO
19
     KATTEN MUCHIN ROSENMANN
20        Attorneys for Defendants
     BY:  MICHAEL ROSENSAFT
21
     ALSO PRESENT:   NANCY RUSKIN, NYS Dept. of Financial Services
22                   TODD BARON, Condor Capital

23

24

25
```

1          (Case called)

2          THE COURT:  All right.  As you know, this case is
3 pending before Judge Colleen McMahon who is out of the
4 district.  I am the emergency Judge, the Part I Judge this
5 week, and so I am handling for her whatever is still open in
6 this case as of today.

7          Have you worked any of this out?

8          MR. ROSENSAFT:  Your Honor, we have not reached on
9 agreement with plaintiff to any of these issues.

10          THE COURT:  As to any of the issues?

11          MR. ROSENSAFT:  No, your Honor.

12          THE COURT:  All right.  Then I think I better hear
13 first from Ms. Beaumont.

14          MS. BEAUMONT:  We did not have an opportunity to send
15 a letter in response to Mr. Rosensaft's letter, so I will
16 address the points that I would have made there.

17          As detailed in the superintendent's moving papers,
18 this case arises out of the defendant's long-running, knowing
19 and deliberate theft of customers funds as well as the
20 egregious mishandling of customers' very sensitive personal and
21 financial information.

22          After a full investigation, the superintendent has
23 brought this action and sought the Court's assistance to bring
24 that to a halt.  The TRO papers and the complaint were served,
25 as directed by the Court, before 5:00 p.m. on Wednesday, and

then I spoke with Mr. Rosensaft a number of times yesterday, and then at a little after 5:15, he called me and I called him back, and he requested a couple of things.  The first was a confirmation that the TRO did not restrict certain loan servicing activities for current customers that might be construed as violating the asset freeze.  The second was he requested that the department consent to modify the TRO to allow the payment of the payroll which is due today.  And then third, he requested that the department consent to modify the TRO to allow Condor to resume taking on new business.  I asked that he send me an email listing the specific activities relating to servicing existing loans that were in question as well as a list of the employees and amounts involved in the request as to the payroll.  I also noted that there was certain information that was due under the TRO yesterday afternoon that I was not sure had been provided, and that that would be necessary to be provided.

About an hour later I received a list the loan servicing activities.  And in response to that, I noted that -- I had confirmed that the information which was required specifically by paragraph 21 of the TRO had not been provided, and I indicated that full compliance with that would be necessary before we could discuss modifying the TRO.

At midnight Mr. Rosensaft sent a copy of the payroll list that was submitted to the Court with the letter, and I saw

Case 1:14-cv-02863-CM   Document 49   Filed 05/09/14   Page 4 of 17        4
E4PTLAWA

1    that upon getting up this morning and I sent it to my client
2    and discussed it with them, and around 10 o'clock this morning
3    requested some further information.  Parts of the report are
4    easy to read and parts don't speak for themselves, so we asked
5    for some additional information.  And the last of that
6    additional information I received just after 1:00 p.m. this
7    afternoon, right before I received a copy of the letter to the
8    Court.
9             In the meantime, we were still trying to get the
10   information pursuant to paragraph 21 of the order, and I
11   learned just before walking into the courthouse now that we
12   have all that information, and so that has been taken care of
13   and we're pleased to see that.
14            So subject to full compliance with the TRO, including
15   there is some information due on Monday afternoon as well, the
16   department is, of course, open to discussing reasonable
17   modifications to allow Condor to continue servicing existing
18   customers.  But the one thing that the department cannot
19   consent to is lifting the ban on taking in new business.  That
20   ban is really the core of the TRO's protection of consumers,
21   and the justification that's been suggested I think makes no
22   sense on its face.  It essentially says we don't mistreat our
23   customers until they become our customers, so let us take on
24   more customers.  So we can't agree to that.
25            In addition, we're troubled by the timetable that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  we're being put under to respond to these requests.  Some of
2  them we need more information to understand them.  For example,
3  there's one that I saw for the first time in this letter this
4  afternoon regarding dealing with I guess in progress loan
5  transactions, and we don't have information about how many
6  loans are involved, where exactly those are in the process, for
7  example, if they have been closed and the money just needs to
8  get paid and so forth.  It's very hard to respond to these
9  requests under tight time pressure without full information.
10         THE COURT:  Let me ask you if I were to give you time
11 now to talk to your adversary, could you bring your
12 negotiations to more of a close than they appear to be now?
13         MS. BEAUMONT:  I expect on some, but not all of the
14 issues.
15         THE COURT:  Could you try that now?
16         MS. BEAUMONT:  Absolutely, Judge.
17         THE COURT:  And call chambers, call my law clerk and
18 let me know when you have worked out everything you can and
19 then I will know what is still in dispute.
20         MS. BEAUMONT:  Thank you, your Honor.
21         (Recess taken)
22         THE COURT:  Mr. Beaumont, have you reached an
23 understanding on anything?
24         MS. BEAUMONT:  Your Honor, we were able to come to an
25 agreement on two items, number one and number two on page 3 of

1    Mr. Rosensaft's letter.
2             THE COURT:  Sorry?
3             MS. BEAUMONT:  It's on page 3.
4             THE COURT:  Items what?
5             MS. BEAUMONT:  Items one and two.  With respect to the
6    servicing of existing loans, it's of the utmost importance to
7    the department that the existing customers be able to make
8    payments on their loans and proceed and that their credit not
9    be harmed.  For that reason, the proposal in paragraph one is
10   acceptable to the department.
11            And for similar reasons --
12            THE COURT:  When you say paragraph one, you mean the
13   one headed servicing existing loans?
14            MS. BEAUMONT:  That's right.  And then with respect to
15   auctioning off current inventory, obviously that will generate
16   proceeds that can be used to compensate customers, so we have
17   no problem with that.
18            On the other two points we were not able to come to an
19   agreement, partly for informational reasons and partly for more
20   substantive reasons.  With respect to payroll, we do have an
21   agreement that Stephen Baron, the defendant, will not be paid.
22            With respect to the other employees, we have asked for
23   some additional information to confirm that the proposed
24   payroll is consistent more or less with the prior payroll, just
25   so they're not additional payments in light of the current

E4PTLAWA

situation, and we understand we will get that fairly quickly. It may be once we get that we may be able to be in a position to come to a further agreement in short order, but we're not prepared to do that now.

THE COURT:  It's possible, is it not, that I could order that they be no higher?

MS. BEAUMONT:  That would certainly make sense.

THE COURT:  That would solve your problem, at least for the next few days.

MR. ROSENSAFT:  I apologize, your Honor, I didn't hear what you said.

THE COURT:  What I said was it might be that if I order that payroll payments be no higher now than they were during your last payroll time period, that would, I take it, solve the problem.

MR. ROSENSAFT:  I think that would be a good solution in the interim, and obviously we're heard on Tuesday on the first issues.

THE COURT:  So until Judge McMahon can hear you, I order that there be no payroll payments any higher than in the last pay period for each employee, and that no payment be made to Mr. Baron.

MR. ROSENSAFT:  Thank you, your Honor.

MS. BEAUMONT:  And just to be clear, since Mr. Todd Baron, who is with us today, is not the defendant, it's Stephen

E4PTLAWA

Baron.

THE COURT: I should have said Stephen Baron. Thank you.

MS. BEAUMONT: Then with respect to funding signed contracts, really there we just need more information. It seems that some of those borrowers or prospective borrowers are at different points in the pipeline, if you will, and some are perhaps at the finish line and some further towards the beginning, and without knowing who is where and the dollar amounts involved, we're nervous about having funds sent out of the company at this point, so we've asked for some additional information on that.

THE COURT: Now what would be the effect on the customers and dealers if you -- if the TRO remains in effect until next Tuesday?

MS. BEAUMONT: Well, I think -- I don't know, Mr. Rosensaft may have to speak to that. I think it's different for different customers and different for different dealers, so we don't have that information before us, but I will let Mr. Rosensaft say more if he has it.

MR. ROSENSAFT: Your Honor, our expectation, even though it's a short period of time, is if dealers believe they are not going to receive funding and not assured they're going to receive funding -- these are loans for everything has been signed and everything is ready, the check just has to go out

E4PTLAWA

1   the door.  So dealers are all ready to receive this funding,
2   and they're asking for it.
3           THE COURT:  How much money is involved?
4           MR. ROSENSAFT:  There are approximately -- we can give
5   a full list, but there are approximately 50 loans or so.  We
6   would say approximately $800,000 would be -- yes.
7           THE COURT:  Can you give Ms. Beaumont what she needs
8   in the next few hours?
9           MR. ROSENSAFT:  We can do it immediately, your Honor,
10  as soon as this hearing is over, your Honor, or even -- we
11  could do it now, I could send Mr. Baron out to call his office
12  and print that out, and we're happy to send that out to
13  Ms. Beaumont immediately.
14          THE COURT:  How would you print it out?
15          MR. ROSENSAFT:  It would be run off the system.
16          THE COURT:  How would we get it here?
17          MR. ROSENSAFT:  It would be emailed, and I guess I
18  would email it to a place here that we could print it out.
19          There's an additional complication in that DFS has
20  been monitoring all the computer systems and has not allowed a
21  full access to those computer systems, and so DFS individuals
22  on site would also have to allow that access to occur so that
23  could be printed out.
24          THE COURT:  Now can this -- can your situation be
25  placed on hold until Monday morning?  It's now 5 o'clock.

1           MR. ROSENSAFT:  Yes, your Honor, I understand.  We
2    were moving to try to do this quickly.  Our fear is some
3    dealers are likely to decide the funding is not coming under
4    the circumstances and what they know in the news of the case,
5    and are going to reach out to the customers to repossess cars.
6           THE COURT:  You think they will do it between now and
7    first thing Monday?
8           MR. ROSENSAFT:  I hope not, your Honor, but I think --
9    Mr. Baron indicates yes, they will, based on his experience
10   with them.  These are only -- just to be clear, these are only
11   the contracts that are ready to go immediately, these are not
12   contracts where they have not been agreed upon where the
13   customer does not have a signed agreement with the dealer
14   already.  The customer has a signed agreement with the dealer,
15   the customer has the car.  These are done contracts where the
16   customers are going to be affected adversely.
17          THE COURT:  Ms. Beaumont?
18          MS. BEAUMONT:  Your Honor, this is the first I'm
19   hearing of this repossession issue.  I don't really know how to
20   assess it, and so I'm not really in a position to say that it's
21   founded or unfounded concern.  It would surprise me if, under
22   the circumstances, a dealer would not wait to see what the
23   Court does next week.  It's been just as much publicized about
24   the case that there's a hearing on Tuesday.  So we would ask
25   that if we could wait until Monday morning, that will enable

E4PTLAWA

1  us -- there is a issue with the computer systems having been
2  down all day, which need to get remedied, so I'm not confident
3  this can get dealt with today in any event as a practical
4  matter.
5             THE COURT:  Which computers were down?
6             MS. BEAUMONT:  Condor's computers were down.
7             THE COURT:  All right.  I will leave the TRO in place
8  until Monday morning.
9             MS. BEAUMONT:  Thank you, Judge.
10            MR. ROSENSAFT:  Your Honor, for clarification, I think
11 it would help -- if your Honor's intention is to lift it on
12 Monday morning, I think it would help if we could tell the
13 dealers as to this point we are providing information about
14 these loans to DFS, but we expect them to be funded on Monday
15 morning, or something along those lines, to give them
16 assurance.
17            THE COURT:  I have no expectation, since I have no
18 information.
19            MR. ROSENSAFT:  Okay, your Honor.  Understood, your
20 Honor.
21            THE COURT:  But if you share this information over the
22 weekend with Ms. Beaumont, and if she gives you the okay, then
23 you can do that.
24            MR. ROSENSAFT:  Thank you.
25            MS. BEAUMONT:  I think that's it.

E4PTLAWA

1        THE COURT:  That's it?

2        MR. ROSENSAFT:  The last point, your Honor, we have a

3   disagreement about originating new loans, which is the biggest

4   issue, your Honor, point five.

5        THE COURT:  What would you like to say with respect to

6   that?

7        MR. ROSENSAFT:  Your Honor, since the temporary

8   restraining order has been put in place, loans have been coming

9   in anyway to the business.  There were approximately 60 loans

10  faxed --

11       THE COURT:  You mean loan applications?

12       MR. ROSENSAFT:  Loan applications, your Honor.  I'm

13  told they're contacts, your Honor.

14       To give your Honor a little bit of background, there

15  are agreements already in place with the prospective dealers,

16  so there are not additional agreements that get signed with the

17  dealers.  The dealers then send in the loans for financing to

18  Condor, Condor does a credit check, Condor looks to make sure

19  there's insurance and things like that, and then sends the

20  funding to the dealers to finance these loans.  So this is new

21  business coming in, to be clear, your Honor, and dealers have

22  submitted the information for the financing of these new

23  customers already, they have been submitting them.

24       There have been no allegations raised by DFS as to any

25  improprieties about how these loans are set up, how these loans

1   begin, or any of the contracts that happen at that point.  The
2   improprieties are that the records are not kept in a secure and
3   safe manner, both electronically in files, and the major
4   allegation -- the most substantive allegation concerns customer
5   credits where there are customer credits left in accounts that
6   aren't specifically identified.
7              Right now DFS is in their office and monitoring
8   everything that is being done by the employees.  Mr. Baron has
9   been told multiple times you can only turn on your computer if
10  you're watched by DFS.  They have been working with IT to work
11  on their web site and security measures in their office.  They
12  are being watched and will be watched completely through
13  Tuesday.
14             There will be no concern over these new customers and
15  having credits not identified.  These are all new loans.  These
16  are loan information we would be happy to provide immediately
17  to DFS about what is being originated and what's coming in.
18  There is a message on web site itself indicating this is going
19  on even, so that is probably going to lessen the amount of
20  loans coming in.
21             But there are people at Condor that depend on the new
22  loans coming in for these jobs.  There are approximately 60
23  employees which constitute sales representatives, people that
24  work in the credit department, and people that work at the
25  funding department that are going to be adversely affected --

E4PTLAWA

1   that have been adversely affected already by the TRO.  They
2   depend on bonuses and incentives.  All of their salaries are
3   structured such that there is some kind of base salary, but all
4   of them, and for sales in particular, get a majority of their
5   payments from the origination of these new loans and they won't
6   have the salary.
7           THE COURT:  A day between 5 o'clock, 5:05 on Friday,
8   and the beginning of the day on Tuesday when Judge McMahon is
9   hearing you, I can't see that that time frame makes a
10  difference to what you're saying.
11          MR. ROSENSAFT:  I understand, your Honor, it's not as
12  substantial as if there were a longer delay, and we're talking
13  about a few days.  I can tell you that it does matter to a lot
14  of these employees.
15          THE COURT:  I'm sure it does. I'm sure it matters
16  whether the loans go through, but I doubt -- unless you tell me
17  otherwise, I doubt that it matters that there is a weekend and
18  one business day delay.
19          MR. ROSENSAFT:  Saturday is actually the most
20  significant day for these workers getting new loans and
21  financing new loans.  That is -- Mr. Baron can correct me if
22  I'm wrong, but my understanding that is the bulk of the week in
23  terms of originating loans.  That is the busiest day and the
24  most substantial day.  Most of these workers are paid on a
25  weekly basis, so to not have Saturday -- they're prohibited

E4PTLAWA

1   from doing any soliciting, any marketing, to not have Saturday
2   will translate to --
3           THE COURT:  Not to have Saturday to do what?
4           MR. ROSENSAFT:  Solicit loans, accept loans.
5           THE COURT:  I'm a little confused.  You started
6   talking about contracts, existing contracts, and now you're
7   moving to soliciting new loans.
8           MR. ROSENSAFT:  This is a separate point, your Honor,
9   and sorry if it wasn't clear.  There is the original point,
10  point number four, of funding the existing contracts that we
11  spoke about that we're going to get DFS the information they
12  requested and hopefully have this resolved Monday morning.
13  Then there's the fifth point about the bar against any
14  activities soliciting or originating new loans.
15          THE COURT:  I understand now.  And obviously, Saturday
16  is a key day in giving new loans.
17          Let me hear Ms. Beaumont on that.
18          MS. BEAUMONT:  Your Honor, as I noted at the outset,
19  the ban on taking on new business is really the heart of the
20  temporary restraining order.  And there's a great deal of
21  concern, both from what the department served since they have
22  been in there on Wednesday, and both in, quite frankly, the
23  tone of the letter from Mr. Rosensaft to the Court that seems
24  to try to minimize the seriousness of this conduct, and really
25  to shift blame to the department for the consequences of the

1    remedies that we are trying to put into place.

2             The department is well aware and has taken into
3    account the ramifications of this for the defendant's business,
4    and we did not bring this action or seek the TRO without due
5    deliberation and consideration for the varying interests at
6    issue there.  And this lawsuit comes after not a single
7    incident but really a pattern of years of resistance by Condor
8    to the department's efforts to put in place controls and put in
9    place sound and safe business practices.  And while we
10   appreciate the expressions that we just heard this afternoon of
11   concern for customers, they're coming very late in the game,
12   and only after we have really put the defendants' feet to the
13   fire, so we take them with a grain of salt.  And we do not
14   think it is appropriate to expose any new customers to possible
15   harm, because that would defeat entirely the purpose of this
16   action and the temporary restraining order at this point.

17            THE COURT:  All right.  Given how brief the time
18   period is between today and when you will be heard by Judge
19   McMahon, I'm going to leave the temporary restraining in place.
20   I find that the balance of hardships tips towards the
21   plaintiff, and in fact, that there is a likelihood of success
22   on the part of plaintiff, and I believe that only minimal
23   damage would be suffered by the defendant if it is not able to
24   originate loans on Saturday, Sunday and Monday.

25            Is there anything further?

1           MR. ROSENSAFT:  Nothing from defense, your Honor,
2  other than did your Honor want us to -- we prepared a proposed
3  order that will have to be modified in line with the Court's
4  rulings.  Did your Honor wish us to modify that now?
5           THE COURT:  I'll hand it down for you and Ms. Beaumont
6  to agree on a modification, and the one that has the better
7  handwriting can write it in.
8           MR. ROSENSAFT:  I will let Ms. Beaumont write it in.
9           MS. BEAUMONT:  He's obviously never seen my
10 handwriting.
11          (Pause)
12          THE COURT:  I have signed the modification to the TRO,
13 and it's available for you.  I think what we need to do is make
14 some copies for ourselves.
15          Thank you.  We'll be adjourned.  Have a good weekend.
16          MR. ROSENSAFT:  You too, your Honor.
17          MS. BEAUMONT:  You too.
18                              o0o
19
20
21
22
23
24
25