UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

      Plaintiff,

    -against-

CONDOR CAPITAL CORPORATION and
STEPHEN BARON,

      Defendants.

    -and-

WELLS FARGO BANK, N.A., as Agent for
Certain Financial Institutions as Lenders,

      Intervenor.

———————————————————————x



No. 14 Civ. 2863 (CM)

## MEMORANDUM DECISION AND ORDER (1) GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF A RECEIVER AND (2) GRANTING WELLS FARGO'S MOTION TO INTERVENE

McMahon, J.:

    Plaintiff Benjamin M. Lawsky, the Superintendent of Financial Services of the State of

New York, brought this action against Defendants Condor Capital Corporation and Stephen

Baron, alleging violations of the Dodd–Frank Wall Street Reform and Consumer Protection Act,

12 U.S.C. § 5301 *et seq*., and New York state financial services and banking laws.

    On May 12, 2014, the Court held a show cause hearing on (1) the Superintendent's

motion for a preliminary injunction and for appointment of a receiver, and (2) a motion to

intervene filed by Wells Fargo, N.A, as agent for a consortium of Condor's secured lenders (the

"Lenders"). After hearing evidence, the Court this morning granted the Superintendent's motion

for a preliminary injunction and appointment of a receiver, and entered an order to that effect. (ECF No. 64).

This Memorandum Decision and Order explains in greater depth the Court's reasons for granting the Superintendent's motion, and grants Wells Fargo's motion to intervene.

**BACKGROUND**

## I.     The Parties

Plaintiff Benjamin M. Lawsky is the Superintendent of the New York Department of Financial Services ("NYDFS" or the "Department"), which was created in 2011 by the merger of the New York State Banking Department and the New York State Insurance Department.  New York state law authorizes the Superintendent to take all actions necessary to "protect users of financial products and services," including enforcement of New York's Insurance, Banking, and Financial Services laws. *See* N.Y. Fin. Servs. Law §§ 101-a, 102, and 301(c).

Defendant Condor Capital Corporation is a New York-based sales finance company, wholly owned by Stephen Baron, that was founded in 1994 and licensed by the New York Banking Department in 1996.  (Affidavit of Todd Baron ("Baron Aff.") ¶ 2-3).  As of April 28, 2014, Condor had 116 employees.  (*Id.* ¶ 3).

Defendant Stephen Baron is the sole owner of Condor, and through his ownership he directs and controls the company.  (*Id.*).  Baron is responsible for and oversees Condor's operations, including the review of all financial information and the formulation and implementation of policies.  (Declaration of Brian Montgomery ("Montgomery Decl.") ¶ 11, 13). He is authorized to transfer money between Condor's bank accounts as well as to accounts outside of Condor, including his own.  (Declaration of Don H. Thompson ("Thompson Decl.") ¶ 12(d)).

2

## II.    Condor's Business Model

Condor acquires and services automobile loans in New York and more than two dozen other states, primarily for "sub-prime" or "non-prime" borrowers. (Baron Aff. ¶ 4). Condor has agreements with automobile dealers whereby the dealers submit loan applications from potential car purchasers, Condor provides a quote, and the dealer makes the loan and assigns it to Condor. (*Id.*). Once Condor obtains a loan from a dealer, Condor services the loan by sending monthly statements to the customer, receiving and applying the customer's payments to the outstanding balance, and taking action to collect on the loan (including legal action or repossession) if a payment is late or if the loan becomes delinquent. (Declaration of J. Terence Smith ("Smith Decl.") ¶ 8).

According to Condor's 2013 annual report to NYDFS, Condor holds more than 7,000 loans to New York state residents with aggregate outstanding balances of over $97 million. (Montgomery Decl. ¶ 4). Condor's total current loan portfolio has an aggregate outstanding balance of more than $300 million. (*Id.* ¶ 5). In 2013, Condor reported net after-tax income of approximately $7 million, on operating income of approximately $68.7 million. (*Id.* ¶ 6).

## III.    Condor's Alleged Theft of Its Customers' Money

In November 2013, NYDFS received information indicating possible wrongdoing by Condor, including allegations of theft of positive credit balances owed to customers. (Montgomery Decl. ¶ 16). As the term is used in the Superintendent's moving papers, a "positive credit balance" is money owed by Condor to a customer as a result of an overpayment of the customer's account. (Smith Decl. ¶ 37). A positive credit balance may come about if, for example, a customer pays more than the outstanding loan balance; if the car is totaled, and the insurance proceeds exceed the outstanding balance of the loan; or if the customer trades in the car and receives a credit greater than the outstanding loan balance. (*Id.*).

3

After receiving this information, NYDFS conducted a "targeted investigation" of Condor to verify the information it received. (Smith Decl. ¶¶ 5, 19-26; Declaration of Wendell Falby ("Falby Decl.") ¶¶ 5, 8-14). Examiners from NYDFS spent two days at Condor's headquarters meeting with Condor's management and collecting documents, including approximately 200 loan files. (Smith Decl. ¶¶ 21-25; Falby Decl. ¶¶ 9-12). Based on this investigation, the Superintendent alleges that for "years," Condor has "knowingly and systematically hidden from customers the existence of [their] positive credit balances" and has instead "retained them for itself, with no intention of refunding them." Pl. Mem. at 7.

The Superintendent also alleges that Condor has "programmed its website to conceal its wrongdoing." *Id.* Condor's website contains a portal that allows customers to log in, view the status of their loan accounts, and make payments. (Declaration of Madaline Martinez ("Martinez Decl.") ¶ 28). The Superintendent alleges that Condor has "deceptively programmed" its website so that as soon as a customer's loan is repaid in full, his loan account is removed from the system, even if the loan is overpaid and the account has a positive credit balance owed to the customer. Pl. Mem. at 8. This system, the Superintendent alleges, "falsely indicated to customers—who reasonably relied on Condor to accurately represent the current status of their accounts—that they owed nothing to Condor and, more importantly, that Condor owed them nothing." *Id.* Condor contends that use of its website to make payments or access loan information is "completely voluntary," that not all Condor customers use the web portal, and that Condor also provides customers with the option to access their loan information by phone. Def. Opp. at 2.

The Superintendent has also accused Condor of filing false and misleading unclaimed property reports with the New York State Comptroller's Office, as required by New York's

Abandoned Property Law. Pl. Mem. at 8. In a letter dated August 28, 2012, regarding open issues from a previous examination, Condor represented that although New York no longer required the filing of negative unclaimed property reports, Condor's employees understood that any unclaimed funds should be reported to the accounting department so that Condor could file the necessary report. (Montgomery Decl. ¶ 14). Nevertheless, according to the Superintendent, Condor has consistently filed "negative" unclaimed property reports—thereby representing that it had no unclaimed property in its possession—and has filed *no* reports since 2012. (Smith Decl. ¶ 42; Montgomery Decl. ¶ 9).

During NYDFS's November 2013 examination of Condor, two of the Department's investigators, J. Terence Smith and Wendell Falby, spoke with Donald Kalechofsky, the company's Controller. When asked about the positive credit balances that the Department had found in its review of Condor's loan files, Mr. Kalechofsky said that he was aware that Condor had loans with credit balances and had been meaning to take care of it. (Smith Decl. ¶ 38). He said that his predecessor, Michael Hawkins, had not routinely refunded credit balances, and that when Mr. Kalechofsky took over for Mr. Hawkins, he was aware of Condor's obligation to refund credit balances, but he had been very busy at work and had "let it slip." (*Id.*).

When asked if Condor had refunded any credit balances at all, Mr. Kalechofsky told the investigators that it was Condor's "policy" not to refund a customer's positive credit balance unless he or she specifically requested a refund. (*Id.*; Falby Decl. ¶ 20). I credit the testimony of the Department's investigators that these statements were in fact made by Mr. Kalechofsky, as they constitute an admission against interest by Condor. When asked at the preliminary injunction hearing whether Condor ever had "a policy not to issue refunds to customers who had overpaid their loans," Stephen Baron responded, "Certainly not. We did give refunds—in

hindsight it's obvious we didn't give the refunds we should have given.  But we certainly did give refunds."  I do not credit this testimony.  Furthermore, Mr. Baron does not seem to know any of the details of the running of Condor's business, so I have no reason to think that he knows what Condor's refund polices are.

During a subsequent examination in January 2014, Condor indicated that it had begun to attempt to identify customer accounts with positive credit balance and make refunds.  (Falby Decl. ¶ 21; Smith Decl. ¶ 39).  The company provided NYDFS with a list of 410 New York loans with balances that were paid in full between June 2012 and December 2013 and had positive credit balances due to the customers, and represented to NYDFS that it had sent approximately $41,000 in refunds to these 410 customers.  (*Id.*).  In the course of sampling the loan files collected from Condor during the November 2013 examination, NYDFS was able to identify "dozens" of New York loans that had been paid off during that time period, and had positive loan balances, but did not appear on Condor's schedule.  (Smith Decl. ¶ 40; Falby Decl. ¶ 22).

Since the entry of the TRO in this case, Department investigators have been on-site at Condor's headquarters in Hauppauge, New York.  (Declaration of Steven Lord ("Lord Decl.") ¶ 3).  A "preliminary test run" of a report generated in response to the Department's request for information about outstanding loans and the amount of money potentially due to Condor's customers revealed that approximately 39,000 Condor loans have positive credit balances, with a total amount due to customers of approximately $11 million.  (*Id.* ¶¶ 4-5).  Defendants contested this number at the preliminary injunction hearing and suggested instead that the total amount due to customers is closer to $1.6 million.

6

**IV.    Condor's Failure to Adopt Documented Policies, Procedures, and Controls Regarding the Protection of Customer Data and the Preservation of Evidence**

The Superintendent alleges that NYFDS's November 2013 and January 2014 examinations "exposed Condor's near-total absence of documented policies, procedures, and controls necessary to manage a $300 million state-licensed lending institution." Pl. Mem. at 12. Specifically, the Superintendent alleges that Condor "lacks any documented policies and procedures for loan application processing, mail handling, payment processing, customer complaints, assessment of fees and charges, account reconciliations, corporate accounting, regulatory reporting, or training," and that it "has no internal audit function and no documented procedure to assess or monitor compliance with consumer protection and other laws." *Id.* at 12-13; *see* Falby Decl. ¶¶ 25-27; Thompson Decl. ¶¶ 12-13.

According to the Superintendent, Condor has failed to take any reasonable steps to protect its electronic and hard-copy confidential customer data. Condor has never performed a penetration test on its website to protect against hacking or other unauthorized access; it has never performed an IT audit or other risk assessment to assess the security of its computer passwords; and it has no documented disaster-recovery plan for its IT systems. (Martinez Decl. ¶¶ 15-16, 19, 22, 25). Condor uses a proprietary computer system and programs to manage its loan portfolio, but has no formal process for managing and documenting changes to that system. (*Id.* ¶ 21). Condor's employees can make changes to its central computer system and programs at will, and no record of these changes exists. (*Id.*).

Condor's hard-copy customer files are also left unsecured. At Condor's headquarters, customer files—files that include social security numbers, bank account numbers, and listings of assets—are piled openly around common areas of Condor's offices and are unsecured for indefinite periods, even when not in use. (Martinez Decl. ¶ 20; Falby Decl. ¶ 28). Thousands of

7

hard-copy customer files are kept in a garage attached to Condor's Hauppauge office building, in open boxes or bins on shelves and on the floor. (Smith Decl. ¶ 34; Falby Decl. ¶ 29). Daily backup tapes of customer data for the past 18 years are kept, unencrypted, in the home of Condor Executive Vice President Todd Baron (Stephen Baron's son), with no known safeguards there. (Martinez Decl. ¶ 27).

NYDFS has also learned that Condor recently purchased an office building in Florida, where it intends to relocate its offices. (Smith Decl. ¶ 44; Falby Decl. ¶ 30). According to the Superintendent, this relocation, in light of Condor's failure to adopt customer-protecting controls, poses a threat to its customers and their data, as well as to the preservation of evidence necessary to identify the customers who have been harmed by Condor's actions. Pl. Mem. at 15. Payroll records and other information recently obtained by NYDFS reveal that Condor has actually commenced lending operations in Florida, in direct violation of this Court's TRO, which bars Defendants from moving Condor's operations to Florida or from conducting any lending anywhere (there being no geographical limitation in the order). (Declaration of Brian Montgomery in Further Support of Plaintiff's Motion for Preliminary Injunction ("Montgomery Reply Decl.") ¶ 6(d)).

## V.   Condor's Past History with State Regulators

November 2013 was not the first time that Condor was visited by regulators from NYDFS (or rather, from its predecessor agencies). State regulators examined Condor in 2007 and 2010. After the 2007 audit, Condor submitted a letter complaining that "this audit criticizes the existence of a small business" and asking whether the regulators were "intentionally discriminating against a small business." (Montgomery Decl. ¶ 10). Condor also wrote that "if you are going to allow a small business to hold a lending license . . . you cannot put upon [sic]

8

economic inefficiencies that preclude its existence." (*Id.*). Condor's subsequent conduct makes manifest its belief that the rules ought not apply to its operations.

Both the 2007 and 2010 examinations led to findings of lack of controls and procedures. Condor rejected or ignored nearly all the findings from both audits, and refused to comply with state regulators' written directives to institute proper policies, procedures, and controls. (*Id.* ¶ 12).

## VI.   **Procedural History**

On April 23, 2014, the Superintendent filed a proposed TRO and Order to Show Cause for Preliminary Injunction. This Court (Wood, J., sitting in Part I) entered the TRO that same day, and slightly modified it at Defendants' request on April 25 and then again on May 8. As modified, the TRO:

    1. Enjoins Condor from:

        a. engaging in any conduct that violates Dodd-Frank or New York state financial services and banking law;

        b. misrepresenting, failing to disclose, or concealing the existence or amount of any loan balance of any customer of Condor, including any positive credit balance due to such customer;

        c. soliciting or entering into new retail installment contracts or loan agreements;

        d. destroying or denying access to books and records; or

        e. moving the company out of New York State;

    2. Freezes Condor's assets, except to the extent those assets are used to (a) transfer titles between Condor and existing or future customers, (b) release liens for existing or future customers, (c) approve existing customer insurance payments, (d) sell or auction off automobiles in its existing inventory, provided that the proceeds are deposited into Condor's otherwise-frozen Citibank account, (e) issue payroll checks to employees (other than Stephen Baron) in amounts no larger than the previous weekly payroll for each employee; or (f) to make health and dental insurance payments for Condor's employees;

3. Requires Condor to protect the security of its consumers' sensitive personal information;

4. Authorizes the Superintendent to immediately secure and take control of Condor's business premises; and

5. Orders Condor to show cause why a preliminary injunction should not be issued.

On April 28, counsel for Wells Fargo, as agent for the Lenders, wrote to the Court asking for permission to be heard at the preliminary injunction hearing; on May 2, Wells Fargo submitted a formal motion to intervene, which the Court granted conditionally on May 6, subject to revisiting the issue after the Superintendent was able to address the matter. The Superintendent could not speedily address the motion, as it turns out, because its original lawyers represented Wells Fargo on other matters, and although the bank was willing to allow the firm to seek appointment of a receiver, it declined to waive any conflict arising from differences between the Superintendent and Wells Fargo concerning creditor priority. As a result, the Superintendent had to retain new counsel.

## DISCUSSION

### I. Wells Fargo's Motion to Intervene Is Granted.

To intervene as of right under Rule 24(a)(2), a party must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992). To intervene by permission under Rule 24(b), a party must make a timely motion and demonstrate that it has a claim or defense that shares with the main action some common question of law or fact.

In this case, Wells Fargo has timely moved—indeed, it moved within days of the commencement of this action. Under the Loan Agreement, the Lenders unquestionably have an interest in this action; they are effectively the factor of Condor's business operations and they

10

hold a secured interest in its loan portfolio. Meaning no disrespect to the newly-appointed

Receiver, it will take him some time to get up to speed concerning Condor's operations, and the

company has effectively been shut down since April 23; that alone is bound to impair the

Lenders' interest, since it stands to reason that a lengthy period of disengagement from Condor's

sole source of income (making car loans) will decrease the value of the Lenders' security

interest. Furthermore, should the Receiver conclude that Condor must be liquidated, the Loan

Portfolio will undoubtedly sell at a discount, also impairing the interest of the Secured Lenders.

The Superintendent points to two Court of Appeals cases in an attempt to argue that

Wells Fargo does not possess the sort of "interest" that warrants intervention under Rule 24. In

*United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411 (2d Cir. 2001), a civil forfeiture

proceeding, the Second Circuit affirmed the denial of an intervention motion brought by an

insurance company, which claimed that it was holding a constructive trust over certain funds that

it had transferred to a corporation held by one Martin Frankel, who subsequently absconded with

the funds. The Superintendent characterizes *Peoples* as standing for the proposition that "a

generalized claim of entitlement to a category of funds—as opposed to a showing of entitlement

to a specific piece of property—does not create the requisite directness of interest" necessary for

intervention under Rule 24. But the Second Circuit's concern with intervention in *Peoples*

actually had more to do with the fact that the constructive trust, if one existed, was between

Peoples and the *corporation to which it had transferred the funds*, not between it and Frankel,

who held the property that was the subject of the forfeiture action. Thus, although "the

constructive trust might give Peoples a direct interest in assets recovered by [the transferee

corporation], . . . it would only give Peoples an *indirect* interest in the property subject to

forfeiture," and was therefore insufficient to establish a sufficiently direct interest in the action

11

justifying intervention. *Id.* at 417 (emphasis added). Here, of course, the consortium of lenders represented by Wells Fargo has a direct interest in Condor's assets, which are UCC security for the Loan Agreement loans.

In *United States v. Alisal Water Corp.*, 370 F.3d 915 (9th Cir. 2004), another case cited by the Superintendent, a judgment creditor from a previous, unrelated action moved to intervene in an environmental enforcement action after the district court issued an order appointing a receiver to manage the defendant's drinking water systems and oversee their possible sale. The order barred enforcement of any action or lien against the receiver, or any property subject to the receivership, without first obtaining the court's approval. 370 F.3d at 918.

Although it acknowledged that the receiver's sale of the defendant's drinking water systems "may impair the creditor's ability to collect a debt," the Ninth Circuit affirmed the district court's denial of the judgment creditor's intervention motion. *Id.* Echoing the district court's concern that intervention "would raise the specter of a complicated 'battle royal' among rival creditors," the *Alisal* panel emphasized that the interest asserted by the creditor must be "related to the underlying subject matter of the litigation," and concluded that the intervenor's sole interest, the "prospective collectability of [its] debt," was "several degrees removed from the overriding public health and environmental policies" that were the "backbone of this litigation." *Id.* at 920.

Here, Wells Fargo's interest (its lien on substantially all of Condor's assets) is much more closely related to the "backbone of this litigation" than were the remote interests at stake in *Alisal*. Unlike the judgment creditor in that case, whose almost decade-old breach of contract judgment was completely unrelated to the defendants' environmental violations, the Lenders

12

have a direct interest here in ensuring that their first-position liens on Condor's property are respected.

The fourth and final prerequisite to intervention as of right is that no party to this action can adequately protect Wells Fargo's interests. Depending on how the facts pan out, the Superintendent (the party to this action) may well be unable to protect Wells Fargo's interest. The Superintendent and Wells Fargo have dramatically divergent interpretations of whether, under New York law, the money that is allegedly owed to Condor's customers is or is not subject to the Lenders' security interest. If there is any shortage of funds to pay customers, the Superintendent has absolutely no intention of pressing Wells Fargo's claim that all the money in Condor's bank accounts is in fact subject to the security interest.

That said, the Superintendent correctly observes that intervention is ordinarily not appropriate in a regulatory proceeding such as this one. *See, e.g.*, *CFTC v. Efrosman*, No. 05-cv-8422 (KMW), 2012 WL 2510338, at *4 (S.D.N.Y. June 26, 2012) ("Courts are reluctant to allow private parties to intervene in government enforcement actions . . . because it places undue costs and burdens on the government, including increasing the complexity of cases and slowing litigation."); *SEC v. Bear, Stearns & Co. Inc.*, No. 03-cv-2937 (WHP), 2003 WL 22000340, at *3 (S.D.N.Y. Aug. 25, 2003) ("[I]ntervention has been traditionally disfavored, given courts' hesitation to allow scores of investors and other interested persons from becoming full-fledged parties to governmental enforcement actions." (quoting *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 468 (S.D.N.Y. 2000))); *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972) (affirming the denial of Rule 24(b) intervention and expressing doubt as to whether it would ever "be appropriate for a district court to allow a private party to intervene in an SEC enforcement

action"). But all of the authorities cited by the Superintendent for that proposition are readily distinguishable from this case on their facts.

For example, in *SEC v. Byers*, No. 08-cv-7104 (DC), 2008 WL 5102017 (S.D.N.Y. Nov. 25, 2008), Judge Chin denied an intervention motion brought by one of 1,400 Ponzi scheme victims because (1) the intervenor was "not in a substantially different position from other creditors" and (2) the size and complexity of the case meant that "it would not be efficient or effective to permit individual creditors to intervene as parties." Likewise, in *CFTC v. Efrosman*, No. 05-cv-8422 (KMW), 2012 WL 2510338 (S.D.N.Y. June 26, 2012), Judge Wood denied what she construed to be a motion for leave to intervene filed by a group of investors in a fraudulent investment scheme who wanted to reopen the case to add additional defendants and obtain an order freezing their assets. Judge Wood held that intervention was inappropriate because the CFTC was already distributing recovered funds to the putative intervenors, along with over 100 other investors, and because the movants could bring their own, private action against their new defendants. *Id.* at *4.

In *SEC v. Callahan*, No. 12-cv-1065 (ADS) (AKT), 2014 WL 860041 (E.D.N.Y. Mar. 5, 2014), a recent Ponzi scheme case, Judge Spatt entered a preliminary injunction that placed two corporate defendants into receivership and froze the assets of all defendants. Seventeen months later, secured lender RBS Citizen—which had loaned over $1.8 million to two corporations that were partially owned by one of the defendants (and were thus subject to the asset freeze)— moved to intervene in the case in order to lift the freeze on the assets of the corporations. Although the RBS loan was already in default, and the total value of the secured property just barely covered the loan obligations, Judge Spatt denied the bank's motion to intervene. As to intervention by right, he held only that the motion was untimely; he did not analyze the other

14

factors. RBS had been aware of its interest in the corporations' property and business since the commencement of the action, but had waited almost a year and half to move to intervene. Permitting intervention at this late date, he concluded, would prejudice other parties, while denial of intervention would not prejudice RBS because the corporations had been making regular payments on the loans all along.[1]

Having denied RBS's motion for intervention as of right due to its untimeliness, Judge Spatt also denied the bank's motion for permissive intervention, because intervention at this late stage would create "significant interference" with the receiver's duties and his recovery of assets for investors—over $200,000 of investor money had allegedly been diverted to the two corporations that RBS sought to release from the asset freeze. Allowing RBS to intervene in order to foreclose on the corporations' assets would prejudice the receiver because it would prevent him from determining whether a more lucrative sale of the property was possible— thereby maximizing funds that would be available to all investors once the corporations' obligations to RBS were satisfied.

Finally, in *SEC v. Petro-Suisse Ltd.*, No. 12-cv-6221 (AJN), 2013 WL 5348595 (S.D.N.Y. Sept. 25, 2013), another case cited by the Superintendent, a group of investors sought leave to intervene in a SEC securities fraud action in order to object to a consent judgment submitted by the SEC for the court's approval. Judge Nathan held that although the investors "might stand to gain from a more favorable Consent Judgment," the court had no power to alter the judgment, only to approve or reject it, which meant that the intervenors had not established a cognizable interest in the case. She further held that the investors' interests would not be

---

[1] Interestingly, later in his opinion, Judge Spatt warned RBS that these regular payments violated the court's preliminary injunction and ordered RBS, the receiver, and the defendant's father (whom the receiver had been allowing to run the business for no pay) to appear and address what he referred to as a "diversion" of funds. It is hard for this Court to reconcile these two holdings.

15

impaired by entry of the consent judgment, because (1) the consent judgment did not preclude investors from bringing their own, private securities actions against the defendants, and (2) there was no evidence that the defendants' funds were exhausted or otherwise insufficient to pay the investors the money they were allegedly owed. *Id.* at \*3. She therefore denied the motion. *Id.* at \*4.

The facts in our case are entirely different from the facts in any of the cases just discussed.

In *Byers*, one victim among 1,400 had no standing to intervene in an action to, in effect, try to "jump the line" ahead of other victims who were similarly situated, and so were entitled to equal treatment; the SEC was adequately protecting the interests of all the victims. Here, by contrast, the Lenders provide all the money used to run Condor's business and have a perfected security interest in the company's assets. No one else is similarly situated to the Lenders, which, under state law, belong at the head of the creditors' line—unless, of course, the Superintendent is correct that their security interest does not extend to money needed to reimburse customers who unwittingly overpaid their loans. But that is precisely why the Superintendent cannot protect Wells Fargo's interest in this matter; he will not make that argument if there is not enough money to go around.

In *Efrosman*, the proposed intervenors were also a few among many identically-situated victims of an investment scam, who were belatedly dissatisfied with the CFTC's handling of the matter because the Commission had not sued everyone the intervenors believed responsible for defrauding them. Since the intervenors were free to bring a separate lawsuit against any other parties whom they believed to be involved in defrauding them, there was no basis for allowing them to disrupt the Commission's ongoing distribution of recovered funds. Here, by contrast, we

16

are at the inception of the case, not the point when funds are being disbursed, and the proposed

intervenor occupies a unique position among Condor's creditors—indeed, in many ways, is

Condor's only significant creditor, owed 23 times more than the highest current estimate of

amounts due to reimburse customers for overpayment of their car loans.

And in *Petro-Suisse*, the context of the intervention application was entirely different: the

intervenors were attempting to renegotiate a consent judgment obtained by the SEC, thereby

interfering with the Commission's legitimate enforcement powers. Here, Wells Fargo has not

objected to the appointment of a Receiver, the imposition of a preliminary injunction, or other

enforcement actions. Furthermore, in *Petro-Suisse*, nothing prevented the proposed intervenors

from bringing their own actions against the defendants; in this case, the very terms of the

injunction requested by the Superintendent (and authorized earlier today by this Court) preclude

the maintenance of any such separate action.

The Superintendent argues that the closest case to this one is *Callahan*, and in some

respects that is true. However, there are significant differences. In *Callahan*, the lone basis for

denying RBS intervention as of right was lack of timeliness, which is hardly the case here. Also,

there has been no showing that other parties would be prejudiced if the secured lenders were

allowed to protect their unique interest during the pendency and in the context of this action. To

the extent that the Superintendent worries that Wells Fargo would try to jump ahead of the

defrauded customers, I can only note that this Court, in the end, will have to decide which party

is correct about the extent of Wells Fargo's security interest as a matter of law; in the absence of

Wells Fargo, it is not clear that that necessary issue would be presented.

Of course, the other reason for denying the motion for leave to intervene in *Callahan* was

the fact that RBS was being timely paid on its loans. Here, the Superintendent made no express

provision for such payment in his proposed preliminary injunction order, leaving that to the discretion of the Receiver. This Court was not prepared to make repayment of the Loan Agreement loans a matter of Receiver discretion *pendente lite*, and has amended the proposed preliminary injunction order to require the Receiver to keep the loans current or apply to the Court for permission to suspend payments. This does protect Wells Fargo's interests sufficiently—for the moment. But if the Receiver does apply for permission to suspend loan payments, Wells Fargo would have to be heard, which argues in favor of, not against, intervention.

In short, none of the cases on which the Superintendent relies has facts remotely like this one, in which secured lenders—lenders that have essentially bankrolled Defendants' entire business—have moved to intervene at the inception of the case against the company in an attempt to protect their legitimate interests against a regulator whose interests—while mostly aligned with those of the Lenders—deviate in an important and predictable way.

The Superintendent's best argument is that Wells Fargo's motion for leave to intervene is premature, because at this point the Receiver does not know whether Condor's assets will be sufficient to cover both the Loans and the customer repayments; he suggests denying the motion without prejudice until the Receiver can figure out whether there is enough money to pay everyone what is owed. But in the end, that may depend on whether the defrauded customers or Wells Fargo has a greater entitlement to be paid first. And the only party prepared to argue in favor of Wells Fargo is—Wells Fargo.

In short, Wells Fargo has satisfied the criteria for intervention as of right. On the unique facts of this case—the Secured Lenders' position as Condor's lone factor; their priority creditor status; the massive amount they are owed relative to today's best estimate of Condor's assets

18

(which are likely diminishing in value by the day); the fact that the Secured Lenders are owed over five times more than today's largest estimate of what is owed to the customers (whose interests are paramount to the Superintendent); and the fact that the Superintendent will never press the Lenders' legal arguments—satisfaction of Rule 24(a)(2) factors trumps the usual tendency of courts to deny intervention in regulatory actions. That this case affords little in the way of precedential value where the facts are radically different should go without saying.

## II.     The Superintendent's Motion for Preliminary Injunction Is Granted.

Ordinarily, a plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a statutory enforcement action such as this case, however, the government need not demonstrate irreparable injury—it is presumed from the demonstration of likelihood of success. *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010).[2] The Superintendent's evidence easily meets this standard.

### A.     The Superintendent Is Likely to Succeed On His Federal and State Claims.

Dodd-Frank prohibits any "covered person" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). A "covered person" includes persons or entities that engage "in offering or providing a consumer financial product or service," including

---

[2] Defendants argue that the Superintendent's proposed preliminary injunction will effectively force Condor to shut down and that the Superintendent must therefore meet an unspecified "higher standard" to obtain a preliminary injunction, because the injunction "seeks ultimate relief." Def. Opp. at 4. The Superintendent disputes that its proposed injunction would force Condor to cease operations. In any event, even if this "higher standard" applies (which, according to the case cited by Defendants, is "a clear or substantial showing of a likelihood of success," *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995)), the Superintendent has met that standard.

19

making and servicing loans. *Id.* §§ 5481(6), (15), (19). Condor, as a sales finance company, is a "covered person." The Superintendent argues that Condor has violated Dodd-Frank's prohibition on unfair, deceptive, and abusive practices in two ways: (1) the company's "systematic theft" from its customers by failing to refund positive credit balances and cutting off customers' website access, thereby concealing the balances; and (2) Condor's "abject failure" to take reasonable and necessary actions to protect its customers' confidential information.

New York's Financial Services Law makes it unlawful for a licensed company, including a sales finance company such as Condor, to make an intentional misrepresentation "with respect to a financial product or service." N.Y. Fin. Servs. Law. § 408. The Superintendent alleges that Condor has violated this provision by (1) following a longstanding, unwritten policy of knowingly failing to pay its customers refunds owed to them, while blocking their access to the Condor website where they could learn of such a balance; and (2) repeatedly misrepresenting that it holds no unclaimed property, including funds belonging to its customers, in unclaimed property filings with the New York State Comptroller.

In addition, New York's Banking Law makes it unlawful to violate or participate in a violation of the laws governing sales finance companies by "omit[ting] to state any material fact necessary to give the superintendent any information lawfully required by him." N.Y. Banking Law § 499. The Superintendent alleges that Condor has violated this provision by knowingly failing to disclose, in connection with multiple examinations by the Banking Department, that it had unlawfully kept funds belonging to its customers, and instead affirmatively representing that it held no unclaimed property of others and had filed reports with the New York Comptroller reflecting that position.

20

In their brief in opposition to the Superintendent's motion for preliminary injunction, Defendants make no attempt to rebut any of these arguments. At the hearing on May 12, Defendants presented the testimony of Stephen Baron, who, in about a half-hour on the witness stand, admitted that his company owed its customers a lot of money, while repeatedly disclaiming any knowledge of what he called the "minutia of the details of the company."

What little of substance Mr. Baron did say I find utterly incredible. Mr. Baron asserted that Condor's offices contained "stacks" of refund checks that had been prepared by a computer program but "never got signed and never got sent out"—a process that Mr. Baron called a "laborious" one. First, I simply do not believe the story that Condor would print out refund checks first and then go through the exercise of deciding whether refunds were actually owed. And in any event, I fail to see how it could be "laborious" to sign checks.

Mr. Baron also testified that the positive credit balances discovered by the Department were caused in large measure by "accounting changes," which he could not explain; no witness who could explain them was called, including Todd Baron, who was in the courtroom and who was identified to the Court as the man who actually ran Condor's day-to-day operations. But even assuming *arguendo* that there is a kernel of truth in this statement, there is no way a customer would ever realize that the company had altered its accounting methods—unless Condor notified its customers that they had overpaid, the customers would never know it.

Nor did Mr. Baron make any attempt in his testimony to rebut the Superintendent's allegations regarding Condor's website or its allegedly fraudulent unclaimed property reports. When asked by his attorney whether he had "direct[ed] anyone in [Condor's] information technology services to close customer accounts or make them inaccessible with respect to the overpayments," Mr. Baron responded only to say that he "never got involved with the website."

21

As for the unclaimed property reports, when asked, Mr. Baron expressed total ignorance of his company's obligation to file such reports with New York state authorities.

It is perfectly obvious from Mr. Baron's testimony that the triggering event for Condor's sudden interest in refunding customer overpayments was the visit last November from the Superintendent, at which time the company's Controller told NYDFS investigators that it was company policy to retain positive credit balances unless a customer specifically asked for a refund.

Based on the Superintendent's evidence, and the lack of a response from Defendants, the Superintendent has established a likelihood of success on his federal and state-law claims.

**B.      The Balance of Hardships Tilts in the Superintendent's Favor.**

The Superintendent argues that the balance of hardship tilts in his favor because (1) the public has a "compelling interest" in halting Defendants' unlawful conduct and preserving assets that could be used for restitution, and (2) Defendants have no cognizable burden because "a business can have no vested interest in a business activity found to be illegal." Pl. Mem. at 27 (quoting *United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001)).

For their part, Defendants spend much of their briefing (and most of their correspondence with the Court) complaining about the harsh nature of the TRO remedies and pointing to their 100 employees, whom they claim the proposed preliminary injunction would force the company to lay off. The Superintendent responds by (1) arguing that his requested preliminary injunction is "carefully drawn to preserve the status quo" and would not force Condor to shut down, and (2) observing in any event that "every preliminary injunction imposes *some* hardship on the party enjoined" and "the only relevant question is whether the hardship is justified by the severity and proof of the party's misconduct." Reply Br. at 5.

22

Here, any hardship is more than justified. The credible evidence demonstrates that Condor has, for the past 18 years, kept money that should have been refunded to customers. Although Defendants dispute whether this theft was intentional, and they dispute the amount involved, there is no doubt that it occurred. Nor have Defendants presented any evidence contradicting the Superintendent's allegations and evidence regarding Condor's mishandling of customer information and lack of consumer compliance, fair lending, and information technology policies, procedures, and controls. Under these circumstances, the balance of hardships tips in favor of the thousands of customers whose interests the Superintendent seeks to protect. The interests of 100 or so employees—who will keep their jobs while the Receiver analyzes the business—pales by comparison. Mr. Baron's interests count for very little.

## C.    The Public Interest Weighs in Favor of Granting the Requested Injunction.

The public has an interest in halting unlawful policies and practices that deprive consumers of money that is rightfully theirs, and in being protected from further harm resulting from those practices. Here, the public interest demands that (1) Condor's funds be preserved to remedy harmed consumers, (2) Condor be prohibited from acquiring new loans (and potentially harming additional customers), (3) all confidential and sensitive personal and financial customer information be secured from release or unauthorized access, (4) all documents be preserved, and (5) NYDFS have continued access to Condor's premises.

As a state regulator, NYDFS is a "statutory guardian" appointed to act in the public interest in enforcing consumer protection laws, and the injunctive relief requested here will achieve that purpose. *See SEC. v. Credit Bancorp Ltd.*, No. 99-cv-11395, 2010 WL 768944, at *2-3 (S.D.N.Y. Mar. 8, 2010). The public interest also demands that Defendants' unlawful scheme be stopped and that available assets be preserved to redress harmed consumers. *See CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677-78 (S.D.N.Y. 1979). Moreover,

23

the public interest and the integrity of the regulation of financial institutions necessitate that private and confidential personal financial information provided by consumers to lenders, like Condor, be protected through all reasonable and necessary means.

**III.    The Superintendent's Motion for Appointment of an Equitable Receiver Is Granted.**

In addition to a preliminary injunction that continues the temporary equitable relief currently in place by virtue of the TRO, the Superintendent asks the Court to appoint a receiver to manage Condor and its assets. I granted this motion earlier today, appointing Denis O'Connor of Alix Partners LLP as Receiver.

Rule 66 authorizes a Court to appoint an equitable receiver—"an extraordinary remedy to be employed with the utmost caution and granted only on a showing of clear necessity to protect [a] plaintiff's interest." *SEC v. Republic Nat'l Life Ins. Co.*, 378 F. Supp. 430, 438 (S.D.N.Y. 1974). The Superintendent has made such a showing here.

Defendants' objections to the appointment of a receiver are almost entirely baseless. They claim, without evidence, that (1) company property is "in no danger of being lost, concealed, injured, diminished in value, or squandered"; (2) legal remedies are sufficient in this case because Condor has refunded approximately $40,000 to 410 customers; and (3) there is no fraud in this case because Condor's policy of not refunding positive credit balances "at worst, demonstrates a policy at odds with [NYDFS's] regulation, not fraudulent conduct." These assertions are unsupportable.

Defendants also assert in their opposition that if the Court appoints a receiver in this case, "Condor will be would up and will cease to exist as a going concern." Def. Opp. at 7. But the Superintendent characterizes the duties of the proposed receiver as "(1) managing the business of Condor; (2) assessing Condor's assets and holding and managing them; (3) assessing the Defendants' liabilities, including determining the identities of the customers from whom the

24

Defendants have stolen positive credit balances; and (4) reporting an assessment of Condor's operations to the Court, including concerning assets and liabilities and the manner in which to wind down Condor's operations." Pl. Mem. at 36. Indeed, nowhere in the proposed preliminary injunction does it state that the receiver would have power to liquidate the business.

Rather than lose control of the company, Defendants have suggested appointing a monitor who would work with the current management. If all that Condor needed were a good set of compliance regulations and some training for its staff, this might be an acceptable solution. But the Superintendent's evidence, and Mr. Baron's wholly insufficient testimony, have shown that such improvements, while necessary, are far from sufficient.

Mr. O'Connor, the Receiver who has been proposed by the Superintendent and appointed by the Court, is perfectly satisfactory. He has both an MBA and a law degree; he has held a number of officer, director, trustee, and other managerial roles in distressed companies in a variety of industries; and he has direct experience with both restructuring and winding down troubled companies. He has participated in, supervised, and managed reviews of internal audit and controls, which are sorely lacking at Condor, and has experience working with consumer finance companies.

It is imperative that the Receiver take over Condor's operation immediately. The preliminary injunction specifically permits the Receiver, in his discretion, to restart Condor's loan origination business. In the order, I have given the Receiver 20 days to assess whether the company can restart loan origination and report back to the Court. I have also ordered the Receiver to file general progress reports in 20 days, 40 days, and 60 days. The Receiver should understand that getting the company back into operating mode is more important to this Court than taking the time to understand every nuance of its financial picture. Mr. Baron was right

about one thing: this is a simple business. You lend money, you collect on the loans. In order to continue in business, Condor needs to lend money and collect on loans. If the company has indeed laid off everyone who is capable of lending money, that is Mr. Baron's misfortune; I hope he was mistaken.

Dated: May 13, 2014

U.S.D.J.

BY ECF TO ALL COUNSEL

26