

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

**BENJAMIN M. LAWSKY, Superintendent of**
**Financial Services of the State of New York,**

                                    Plaintiff,              No. 14-CV-2863 (CM)

        – against –

**CONDOR CAPITAL CORPORATION**
**AND STEPHEN BARON,**

                                    Defendants.
------------------------------------------------------------

**June 2, 2014**
**FIRST REPORT TO THE COURT**

**DENIS O'CONNOR**
**RECEIVER**
AlixPartners LLP
40 West 57th Street
New York, NY 10019
(646) 746-2465

**Table of Contents**

I.      INTRODUCTION ...................................................................................................................... 3

II.     THE RECEIVER'S ASSESSMENT ........................................................................................ 3

III.    CURRENT STATUS OF THE COMPANY ........................................................................... 5

    A.      The Company's Business and Operations ....................................................................... 5

    B.      Customer Balances and Refunds to Customers .............................................................. 8

        1.      Customer Balances.................................................................................................. 8

        2.      Refunds to Customers ........................................................................................... 11

    C.      Condor's Licenses to do Business ................................................................................ 12

    D.      The New York State Department of Financial Services ............................................... 13

IV.     LOAN ORIGINATION ........................................................................................................ 13

    A.      Background .................................................................................................................... 13

    B.      The state of Condor's loan origination process ........................................................... 14

    C.      Unresolved Compliance................................................................................................ 15

    D.      Unresolved Funding (Wells Fargo credit facility) ....................................................... 16

V.      STEPS TAKEN BY THE RECEIVER.................................................................................. 17

    A.      Control of Condor's Business ....................................................................................... 17

    B.      Communication to Company Employees ...................................................................... 17

    C.      Communication on the Company's Website ................................................................. 17

    D.      Mail................................................................................................................................ 18

    E.      Security and Control ..................................................................................................... 18

    F.      Management of Assets................................................................................................... 19

    G.      Securities and Commodities ......................................................................................... 20

    H.      Payments and Disbursements ....................................................................................... 20

    I.      State, Federal and/or Foreign Courts ........................................................................... 21

    J.      Actions Against the Receiver or Defendants ............................................................... 21

    K.      Continue to Conduct the Business of the Company ..................................................... 22

    L.      Bank Accounts (Citibank operating accounts)............................................................. 22

    M.      Receipts & Expenditures............................................................................................... 23

    N.      Response to State or Federal Authorities...................................................................... 23

VI.  STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE ................................................. 23

VII. THE RECEIVER'S TEAM ................................................................................................. 24

**EXHIBIT**

Exhibit: Condor Capital Listing of Assets & Liabilities

## I. INTRODUCTION

This report is filed in compliance with the Preliminary Injunction and Order Appointing Denis O'Connor Receiver dated May 13, 2014 (the "Order") issued by U.S. District Court S.D.N.Y. (the "Court") by the Honorable Colleen McMahon. As such, this report sets forth the steps and actions taken to date by the Receiver to complete the tasks as set forth in the Order and also sets forth the preliminary findings of the Receiver's verifications and examinations. The Receiver was assisted by representatives of AlixPartners LLP that worked under his supervision. All references to the Receiver's work in this report include work performed by these individuals.

The Receiver and his team arrived at Condor Capital Corporation's ("Condor" or the "Company") offices at 165 Oser Avenue, Hauppauge, New York on May 14, 2014 and have been in control of the Company since.

## II. THE RECEIVER'S ASSESSMENT

On pages 25 and 26 of the Court's Memorandum Decision and Order dated May 13, 2014, the Court states: "The Receiver should understand that getting the company back into operating mode is more important to this Court than taking the time to understand every nuance of its financial picture. Mr. Baron was right about one thing: this is a simple business. You lend money, you collect on the loans. In order to continue in business, Condor needs to lend money and collect on loans. If the company has indeed laid off everyone who is capable of lending money, that is Mr. Baron's misfortune; I hope he was mistaken."

On or about April 29, 2014, Todd Baron terminated the employment of Condor's sales force (approximately 31 employees) and credit group (approximately 12 employees).[1] These two groups, as discussed below, had supported the front-end of the loan origination process through relations with auto dealerships and credit approval of customer auto loans.

---

[1] Todd Baron has represented to the Receiver that the terminated employees of the credit group were offered positions with the company in other departments the following day.

3

The loan origination process starts at the auto dealer. With the issuance of the Temporary Restraining Order by the Court on April 23, 2014 (the "TRO") and subsequent termination of the sales force and credit groups, all new loan origination at Condor stopped. An initial question is whether Condor can re-start its loan origination business and how long can Condor be sidelined without permanently impairing its auto loan origination business or goodwill with auto dealers. Auto dealers generally will re-engage banks or lenders like Condor that stop originating loans for a period of time. Re-engaging Condor will be difficult because the auto dealers have lost confidence in Condor's ability to fund. However, Condor has a long history with the auto dealers and should be able to reestablish the necessary relationships to re-start its loan originations (see below for additional details).

A number of deficiencies in Condor's operations were noted in the complaint filed by the Superintendent of Financial Services of the State of New York on April 23, 2014 (the "Complaint"). Based on my observations, examinations, experience and interviews, I can confirm that many of the weaknesses in governance, compliance and internal controls cited in court pleadings by the New York State Department of Financial Services ("DFS") are accurate. Condor needs to rehabilitate itself. Condor has recently taken initial steps to improve governance, compliance and internal controls (discussed in further detail below).

In order to originate loans, Condor needs capital. Historically Condor's origination capital came from their credit facility with Wells Fargo Bank, N.A. ("Wells Fargo") and cash generated by the business. Representatives of Wells Fargo and their counsel asserted to the Receiver on multiple occasions that they want the loan repaid and do not want any new originations to take place. As the end of May 2014, Condor owed Wells Fargo approximately $256 million on a loan portfolio valued at approximately $350 million (after provisions for loan losses).

It is the Receiver's assessment that Condor should not re-start its loan origination business until it has completed the following:

(a) Institute adequate governance, compliance and internal controls and procedures;

(b) Obtain an alternative source of funding or capital; and

(c) Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.

Condor generates approximately $17 million per month in cash receipts. The Company's monthly operating costs (consisting of interest on the Wells Fargo credit facility, payroll, and other selling, general and administrative expenses) are approximately $3 million per month.[2] As of May 31, 2014 Condor had approximately $19.1 million in the Receiver's controlled bank accounts. Thus, Condor appears to have the liquidity and potential equity in its loan portfolio to make an attempt in the short-term at rehabilitation.

Condor has begun to take steps to rehabilitate itself, explore financing options and respond to the regulators. I would expect to report to the Court in another 20 days with regard to the status of these undertakings at that date.

### III.   CURRENT STATUS OF THE COMPANY

#### A.  The Company's Business and Operations

Condor originates and services auto loans for customers generally characterized as "non-prime" or "sub-prime" borrowers. Prior to the issuance of the TRO, the origination of loans was performed primarily through Dealertrack and RouteOne, providers of online credit applications and finance sourcing for auto dealerships. The loans made and serviced by Condor are financed through the secured credit facility with Wells Fargo as well as through the cash generated by the business. All of Condor's new origination activity has been halted as of April 23, 2014.

---

[2] This $3 million estimate includes the increased interest expense resulting from the default interest rate applied to amounts outstanding under the Wells Fargo credit facility.

Condor operates out of two facilities, its primary office at 165 Oser Avenue in Hauppauge, New York as well as a second office at 36 North Skyline Drive in Lake Mary, Florida which began operation in April 2014.

Although the company's original intention was to undertake an orderly shut-down of the operations in Hauppauge and move all operations to the Lake Mary office, the issuance of the TRO has temporarily halted that move. Currently, the 13 employees of the Lake Mary office, consisting of two assistant managers that transferred from Hauppauge and 11 collection agents hired locally, are engaged exclusively in collections and loan servicing.

Condor has represented that the move of the operations to the state of Florida was initiated prior to the 2013 audits by DFS and subsequent action taken. Property records reflecting the purchase of the property by an affiliated entity of Condor in May of 2013 indicate that the move was contemplated prior to the DFS November 2013 audit work.

Although the Northeast represents the greatest concentration of Condor's loan portfolio, moving the operations to Lake Mary would not impair the Company's business. Tasks vital to the business such as sales calls, use of online financing bid providers and collections and loan servicing can all be performed remotely.

With the issuance of the TRO, all loan origination, granting of credit, closing on open deals and access to or extending the Wells Fargo credit facility ceased. Todd Baron terminated 31 sales representatives and 12 employees in the credit department. An additional 20 employees left the company voluntarily. Total headcount was reduced to approximately 51 employees. Of the remaining 51 employees, 38 remained in Hauppauge and 13 in Lake Mary.

The issuance of the TRO and related suspension of the Company's operating bank account at Citibank caused the Company's operations to be severely curtailed. Due to an inability to draw cash from its Citibank operating account, the following activities essentially stopped:

| ACTIVITY/ PAYEE | CONSEQUENCE |
|---|---|
| Repossession of vehicles/ repossession companies | Repossession of motor vehicles of customers that fell 110 days behind on payment stopped because the repossession companies were not paid. Condor's servicers could not use the assertion of potential repossession to pursue collections from customers. |
| Collection on defaults/ Attorneys and law firms | The attorneys who execute collections on judgments and collections from customers in bankruptcy could not be paid. Thus, judgments could not be pursued or collected. |
| Financing/ Wells Fargo | The April interest payment on the credit facility could not be paid. An Event of Default was declared by Wells Fargo which caused the interest rate on the credit facility to increase from 2.752% to 5.252%. |
| Operations/ Payroll | Due to the fact that the April 25 payroll could not be transferred from the company's Citibank account, Condor's payroll servicer (Paychex) refused services to the company from that date forward. For the subsequent three weeks, payroll was paid through the use of manual company checks which were processed by Citibank under direction from the Court. This caused logistical difficulties for some of the Company's employees, as some banks refused to honor checks drawn on Condor's accounts. Service from Paychex was restored upon the payment to Paychex of a $100,000 deposit from the Receiver. |
| Utilities/ Electric, communications, etc. | Due to non-payment, electricity was temporarily shut off at the Lake Mary office on May 13, 2014. It was restored upon the application of Condor's deposit to the outstanding balance by the utility company. A Receiver check was sent to the utility company for the past due amount. |
| Refund of customer positive credit balances/ Customers | Condor had sent approximately 3,000 refund checks to certain customers with positive credit balances in December 2013, January 2014 and February 2014. Those checks received by customers but not yet cashed would not be processed once the Citibank account was frozen. |

The company continues to service loans, make collection calls, respond to customer inquiries, update customer credit histories, and administer accounts for all loans remaining in the loan portfolio.

### B. Customer Balances and Refunds to Customers

#### 1. Customer Balances

##### a. Positive Credit Balances

A positive credit balance represents a surplus in a customer's account after the loan has been terminated. A positive credit balance can result from insurance payoffs, overpayments, trade-ins, and other reasons. The Company admits that its customers may have positive credit balances for such reasons.[3] The DFS has alleged the Company of attempting to conceal positive credit balances from its customers by systematically shutting down a customer's access to the Company's web portal upon pay-off of its loan, failing to report resulting unclaimed property to the State and maintaining a practice of not refunding such positive credit balances unless specifically requested by a customer. The Company has denied these allegations.[4] In the Declaration of Steven Lord dated May 5, 2014 (the "DFS Declaration"), the DFS refers to a preliminary test run of a report prepared by the Company, at the request of the DFS, that identified positive credit balances remaining on terminated loans. The Company prepared report indicated that approximately 39,000 loans had positive credit balances totaling approximately $11 million. Counsel for the Company has since told the Court they believe the amount of customer refunds that are owed to be "closer to $1.6 million."[5]

---

[3] Answer and Affirm. Def. of Defend. Condor Capital Corp. and Stephen Baron ¶ 2, May 14, 2014.
[4] Ibid.
[5] Transcript of Proceedings re: Hearing held on 5/12/2014 before Judge Colleen McMahon, 12:19.

The Company has explained the difference between the $11 million total originally prepared and the revised estimate of approximately $1.6 million as follows (with additional discussion of each component provided below):

| Components of Positive Credit Balances | Amount |
|---|---|
| a. Positive Credit Balances (per Condor) | $1.7 M* |
| b. Customer Accounts Classified as "Legal" | $5.7 M |
| c. 360-Day/365-Day Calculation | $3.6 M |
| Positive Credit Balances (as cited by DFS) | $11.0 M |

* Rounded from $1.66M to $1.7M

**b. Customer accounts classified as "Legal" ($5.7 million)**

Under certain circumstances, customer delinquent loans which are in legal proceedings can result in positive credit balances. On its face this appears counter intuitive, given the customer is delinquent. For example, if a loan is terminated after the repossession and sale of a customer's vehicle for non-payment, and if the proceeds from the sale of the vehicle at auction do not cover the amount remaining due to Condor, a balance remains due from the customer. Unless written off as uncollectible, these balances remain in the Company's accounting system as amounts due to Condor.

In cases in which Condor pursues the customer for amounts due to Condor and receives a court judgment in its favor, the amount of the judgment, which generally includes statutory interest and may include legal costs, can exceed the amount shown as due from the customer in the Company's accounting system. The amount of the loan due in the accounting system is not updated for the

9

amount of the judgment.[6] Therefore, actual payments received from these customers as a result of the judgment may appropriately exceed the amount shown as due in the accounting system. Within the Company's accounting system, this would result in a perceived positive credit balance. However unless the payments received exceed the judgment amount, the customer is not owed a refund.

A preliminary review of these customer accounts classified as "legal" suggests at least some portion are likely not positive credit balances due to customers. Work is ongoing by the Company, representatives of DFS and the Receiver to analyze the proper classification of the accounts.

c. 360-day/365-day calculation ($3.6 million)

The Company issues loans with fixed rates of interest, generally ranging from 12% – 24%. Absent other factors (such as late fees, transactions fees, etc.), a customer will make the same payment each month, with a portion applied against interest owed and the remainder reducing the principal outstanding on the loan. The amount that is applied to interest is impacted by whether a 360-day or 365-day year is used in computing interest. Depending on other factors, various state and federal regulations (e.g., the Truth in Lending Act) allow the application of either methodology. Historically the Company used a 360-day methodology.

After communicating with a regulator, the Company changed its calculation methodology to use a 365-day year as of January 29, 2014. The Company's contemporaneous records reflect account balances as if a 365-day year had

---

[6] The lack of an updated, comprehensive customer balance within the accounting system is an example of an internal control weakness the Company must address. Doing so is imperative to prevent similar issues in the future and to better serve the auto finance consumer.

10

historically been applied from inception. The difference between using a 360-day year and a 365-day year results in small calculation differences on a monthly basis. When applied retroactively, a previously terminated loan with a $0 balance could now be reflected in the Company's contemporaneous records as showing a positive credit balance.

The Company prepared report showing positive credit balances totaling approximately $11 million used the contemporaneous records which reflect account balances as if a 365-day year had historically been applied. With regards to the interest calculation, this approach produces the highest possible amount due to customers. A subsequent analysis prepared by the Company applied the historical 360-day year calculation for the period prior to January 29, 2014 and applied a 365-day year to the subsequent period. The Company's revised interest calculation resulted in a reduction of its original $11 million positive credit balance by approximately $3.6 million.

Determination of the appropriate day count methodology, and for which periods of time, will impact the amount of the Company's positive credit account balances due to customers. Determination of the appropriate methodology is under review by the Company, its counsel and the Receiver.

## 2. Refunds to Customers

In late 2013, Condor began to identify customer accounts with positive credit balances in order to make refunds to customers on those accounts. The Company printed refund checks to customers with positive credit balances on seven dates in December 2013 through February 2014. Approximately half of these checks were printed but not signed and sent, remaining in the Company's office:

| Date | Checks printed | Sent to customer | Not sent to customer |
|---|---|---|---|
| 12/10/2013 | 1,633 | 1,630 | 3 |
| 12/11/2013 | 139 | 135 | 4 |
| 12/12/2013 | 150 | 76 | 74 |
| 12/17/2013 | 606 | 0 | 606 |
| 12/27/2013 | 2,520 | 0 | 2,520 |
| 1/30/2014 | 823 | 821 | 2 |
| 2/12/2014 | 466 | 465 | 1 |
| | 6,337 | 3,127 | 3,210 |
| Total value | $578,428 | $246,228 | $332,200 |

These 6,337 customer refund checks had the effect of reducing the total positive credit balances due to customers by $578,428. However, the $11 million figure of positive credit balances cited in the DFS Declaration was calculated after these checks were printed and recognized in the loan accounting system. Therefore the 6,337 checks do not cause a reduction in the calculation of the $11 million.

On May 23, 2014, the Receiver resumed the practice of sending refund checks to customers who have terminated loans with positive credit balances. 768 checks were sent on that date totaling $50,581. These refunds included all loans terminated in 2014 through April 23 with positive credit balances upon termination.

Additionally, the Receiver began sending refund checks for customers with positive credit balances on loans terminating in 2013.

C.  Condor's Licenses to do Business

The Company is licensed and operates in approximately 30 states. Two states, Massachusetts ("MA") and Connecticut ("CT"), have provided the Company with notice of intent to revoke the Company's Sales Finance Company License. In their respective notices, both MA and CT cite the Complaint and information contained therein as a basis for their respective actions. Both MA and

12

CT question the Company's financial responsibility, character, reputation, integrity and general fitness to continue conducting business in their jurisdictions.

Two additional states have notified the Company of their initiation of examinations. Examinations by state regulators occur in the regular course of business and there is no indication by these additional states that their examinations are related to the DFS initiated proceedings.

### D. The New York State Department of Financial Services

On the day the Receiver arrived at Condor's Hauppauge office (May 14, 2014), a team of 13 DFS representatives were on premises addressing legal, information technology, security, investigation and compliance issues.

The Receiver requested that the DFS personnel remain on the Company's premises until their particular work streams were redundant or otherwise no longer necessary. The legal, security, and information technology teams completed their work streams on Friday May 16, Monday May 19 and Tuesday May 20, respectively. The investigation and compliance teams remain.

## IV. LOAN ORIGINATION

### A. Background

The loan origination process for sub-prime auto loans starts at the auto dealer. The steps described below represent, generally speaking, the process by which an auto loan becomes part of Condor's auto loan portfolio.

When a customer enquires at an auto dealer about purchasing an auto, a credit check and financial analysis is run. This analysis tells the customer and the dealer approximately how much credit they will be able to acquire for their auto purchase. When an auto is selected by the customer, the loan application details are entered into one of the providers of online credit applications and

finance sourcing. If Dealertrack or RouteOne is used, the dealer may select Condor as one of the financiers to provide a quote. When a credit analyst at Condor gets notification that they have been selected, they prepare a rate quote for the loan based upon the customer's credit profile. A Condor credit analyst or sales representative may then call the dealer directly, providing additional details or encouraging the dealer to select Condor as the financer.

The customer then enters into a contract to buy the car after completing all of the necessary paperwork (title, registration, insurance, etc.). If Condor is selected, the paperwork is forwarded to Condor, and Condor in turn sends a check payable to the dealer or an ACH payment to cover the amount of the loan. At times, the dealer receives Condor's payment after the car "rolls off the lot."

## B.  The state of Condor's loan origination process

After resolving compliance and funding issues, Condor could re-enter the loan origination business after being out of it for a period of time. Condor would still face certain business obstacles resulting from the temporary absence from its loan origination business.

On or about April 29, 2014, Todd Baron terminated the employment of Condor's sales force (approximately 31 employees) and credit group (approximately 12 employees). These two groups had supported the front-end of the loan origination process through relations with auto dealerships and credit approval of customer auto loans.

The auto loan origination business is competitive, with each sale-finance transaction bid upon by a number of like companies. Finance managers at the various auto dealerships are responsible for selecting the companies from which bids are solicited for a sale-finance transaction. Prior to the TRO, Condor's sales representatives regularly called dealerships and visited them periodically.

14

Additionally, as described above, credit analysts and sales representatives may have called auto dealers directly upon Dealertrack or RouteOne's notification of a request for a bid from Condor in order to increase Condor's chances of being selected. These calls and visits helped build relationships with the dealership's finance managers. The Company would need to rehire these representatives or adequate replacements and rebuild the network of relationships with dealership finance managers before loan origination could begin again.

The receiver has approved management's request to rehire one of Condor's credit managers and one sales representative.

Additionally, after the Condor Citibank account was frozen on April 23, 2014, checks drawn on the account and some ACH payments to auto dealers bounced. This included payments which had been sent to dealers for deals completed on April 22 or 23. Other dealers, if not affected directly by bounced checks, are likely aware of Condor's volatile financial situation. Were Condor to restart its origination business, certain dealers may try to accelerate or alter the timing of receiving payment from Condor before a financing deal is closed. This could prove difficult for the Company to execute, making dealers less likely to choose Condor as a financing option for a new loan. However, given Condor's history with dealers it is likely that they may revert back to past practices.

## C. Unresolved Compliance

Condor operations are deficient with respect to governance, compliance and internal controls. Condor's customers' loans need to be serviced by a Company deploying best practices. In order for Condor to begin originating new loans, it is the Receiver's assessment that the Company would need to improve its control environment. Changes that should be considered include:

- Creation of a compliance function
- Development of comprehensive written control procedures and operation manuals

15

- Establishment of a training program

- Creation of an employee hotline

- Implementation of vendor review

- Institution of a monitoring program

- Establishment of an independent Board of Directors

- Creation of a legal function to stay current with respect to changes in the regulatory environment and best practices

The Receiver and Condor management reached out to several consulting firms for proposals to assist the Company with the governance, compliance and internal controls tasks described above. The consulting groups of two Big Four accounting firms declined to submit proposals to Condor. Condor received proposals from two consulting firms. The Receiver has engaged Fidelity Information Services, LLC's ("FIS") Enterprise Governance, Risk and Compliance Solutions group to assist the Company.

**D.  Unresolved Funding (Wells Fargo credit facility)**

Wells Fargo has informed the Receiver and the Company that they do not intend to provide Condor with additional funding under the credit facility for new loan originations. Specifically, Wells Fargo wants to be paid and taken out of the credit facility.  Additionally, Wells Fargo has asserted that they will not allow new originations to be made using any of the cash currently held by the Company. In order to resume loan originations, the Company appears to need an alternative source of funding.

16

## V.    STEPS TAKEN BY THE RECEIVER

### A.  Control of Condor's Business

The Receiver has assumed full control of the Company's business. This included, after speaking to Stephen Baron, Defendant, asking him to vacate the Company's place of business while the Receiver attempts to accomplish his duties as agent of the Court.

### B.  Communication to Company Employees

The Receiver conducted town hall meetings with the employees of the Company during which he explained his role as Receiver and directed all employees to read the TRO and the Order. The Receiver advised the Company employees that preservation of Condor assets and maximization of stakeholder value is an underlying principle of Receiverships. The Receiver further advised his efforts would be directed at addressing the Court's Order which included assessing the ability of the Company to begin new auto loan originations and rehabilitating itself. The Receiver also stated that Condor's employees were stakeholders and they need to advise the Receiver if they have any issues regarding their day to day activities. Finally, the Receiver opened the town halls to questions and answers. The Receiver conducted the town hall meeting in person in Hauppauge and telephonically with employees in Lake Mary.

On May 21, 2014 Todd Baron sent termination letters prepared by the Receiver and Todd Baron to sales employees terminated prior to the Receiver's arrival. That communication included relevant information including but not limited to health and dental insurance coverage, COBRA, 401k contributions and commissions and expense reimbursement, as appropriate.

### C.  Communication on the Company's Website

17

When the Receiver arrived at Condor, the Company's website contained language required by the TRO, as well as a link to the TRO. At the Receiver's direction, the Company updated its website to include a link to the Order.

**D. Mail**

The Receiver has diverted incoming mail to his attention for review before dissemination to appropriate Company employees.

**E. Security and Control**

Subsequent to the issuance of the TRO on April 23, 2014, DFS secured the New York office of the Company located at 165 Oser Avenue, Hauppauge, New York. DFS facilitated the removal of the existing keycard access and facilitated the changing of the physical external, internal (including file room) and server room locks. With physical control of the Company's server room, DFS ran daily back-up tapes over which they maintained a chain of custody and transported to an off-site location.

Prior to the Receiver's appointment, the Company instituted a clean-desk policy, requiring that all potential and current customer files and information be secured and locked in designated locations.

The Receiver assumed possession of the keys previously controlled by DFS and has maintained oversight of physical security. The Receiver has since re-installed electronic keycard access to the building and granted access rights on an employee by employee basis as appropriate. Some vehicles repossessed are temporarily stored on-premises at the Company's Hauppauge location. The Receiver has reinstituted the practice of locking access to said vehicles outside of business hours.

With regards to electronic security and data retention, the Receiver has confirmed with the Company's service provider that daily compressed and encrypted back-ups are performed and securely electronically transferred to a secure off-site service. To supplement these records, the Receiver has run weekly back-up tapes and maintained them on-site in the locked server room to which only the Receiver has access. The Receiver also initiated the retention of emails on the Company's server for selected employees on a go-forward basis.

Electronic access to the Company's accounting system and shared electronic files requires an employee to have a password protected user-ID with necessary access permissions. The Receiver reviewed all user-ID's removing some ID's and revising user access levels of others. Each employee was then required to reset his or her user-ID password.

### F. Management of Assets

Condor's most significant asset is its loan portfolio. The Receiver has taken the following steps to preserve the value of this asset:

- Contacted five different companies to obtain proposals for electronic back-up and potential servicing of the Company's loan portfolios. This service would be crucial in the event of a loss of the Company's ability to continue collection and loan servicing. Two proposals have been received. The Receiver is in the process of finalizing the selection of one of these companies.

- Provided appropriate monetary incentives to Condor collection personnel to promote employee retention

- Approved the hiring of up to five additional collection personnel (three in Hauppauge and two in Lake Mary)

- Monitored the Company's daily cash collections, customer loan receivable aging's and delinquencies

19

- Held daily conference calls with the secured lenders and their counsel to discuss status of the loan portfolio and the steps taken to maintain its value

The rate of delinquent loans at various dates throughout 2014 is presented below:

| PERIOD END | GROSS LOAN BALANCE | CURRENT-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91-120 DAYS | 120+ DAYS | Total 60+ % |
|---|---|---|---|---|---|---|---|
| 1/31/2014 | 597,057,412 | 532,711,689 | 33,397,048 | 11,125,615 | 4,969,194 | 14,853,866 | |
| | | 89.2% | 5.6% | 1.9% | 0.8% | 2.5% | 5.2% |
| 2/28/2014 | 610,584,056 | 551,824,422 | 28,162,830 | 9,266,972 | 4,983,006 | 16,346,826 | |
| | | 90.4% | 4.6% | 1.5% | 0.8% | 2.7% | 5.0% |
| 3/31/2014 | 632,450,171 | 573,494,807 | 27,701,672 | 8,545,749 | 4,730,254 | 17,977,689 | |
| | | 90.7% | 4.4% | 1.4% | 0.7% | 2.8% | 4.9% |
| 4/30/2014 | 641,920,762 | 569,064,855 | 37,265,681 | 10,658,735 | 4,829,514 | 20,101,977 | |
| | | 88.7% | 5.8% | 1.7% | 0.8% | 3.1% | 5.5% |
| 5/13/2014 | 631,470,104 | 552,534,133 | 39,273,526 | 13,166,535 | 5,467,108 | 21,028,802 | |
| | | 87.5% | 6.2% | 2.1% | 0.9% | 3.3% | 6.3% |
| 5/20/2014 | 625,899,445 | 544,332,154 | 40,640,863 | 14,113,775 | 6,124,439 | 20,688,214 | |
| | | 87.0% | 6.5% | 2.3% | 1.0% | 3.3% | 6.5% |
| 5/27/2014 | 621,330,505 | 535,191,563 | 43,397,708 | 14,899,630 | 6,641,010 | 21,200,594 | |
| | | 86.1% | 7.0% | 2.4% | 1.1% | 3.4% | 6.9% |

The Receiver has noted that delinquency has increased over the course of the past several weeks. The fact that no new loans are being added to the portfolio has the impact of a smaller "current" pool and a smaller overall balance, resulting in a higher percentage in the greater than 30 day categories. There are a number of other factors impacting the trend which the Company and the Receiver are analyzing.

### G. Securities and Commodities

Company management has represented to the Receiver that Condor does not have any security or commodity accounts and none have been noted during our examination.

### H. Payments and Disbursements

The Receiver has made payments and disbursements from the Company's assets that are necessary or advisable for carrying out the directions of, or exercising the authority granted by the Court's order. Such payments include:

- Payroll

- Interest payments to Wells Fargo on the credit facility at default rates[7]
- A $5 million principal payment to Wells Fargo on May 22, 2014
- Amounts owed to repossession companies
- Payments to other vendors used by the Company in the normal course of business (including overdue charges and bounced payments)
- Customer refunds

The $5 million principal payment to Wells Fargo was arrived at by the Receiver after taking into account a reserve of approximately $11 million for customers on terminated loans, as well as an operating cash cushion for the Company. The Default interest rate on the Wells Fargo credit facility nearly doubled the interest expense on the Company's debt. This $5 million principal re-payment will save Condor in excess of $250,000 annually.

At May 31, 2014 the Company had approximately $19.1 million of cash before applying the customer reserve and after the $5 million principal payment.

## I. State, Federal and/or Foreign Courts

With the exception of Condor's ongoing collection efforts including bankruptcies and pursuing judgments, the Receiver has not deemed it necessary at this time to institute, compromise, adjust appear in, intervene in, or become party to proceedings in state, federal or foreign courts to preserve or recover the assets of the Defendants.

## J. Actions Against the Receiver or Defendants

At this point in time, the Receiver is not aware of any actions against the Receiver or Defendants with the exception of the MA and CT regulators as previously discussed.

---

[7] An Event of Default was declared by Wells Fargo which caused the interest rate on the credit facility to increase from 2.752% to 5.252%.

## K. Continue to Conduct the Business of the Company

The Receiver has overseen the Company's continued collection efforts on its loan portfolio. As discussed in the Receiver's Assessment, the Receiver has not authorized new originations for the reasons stated.

## L. Bank Accounts (Citibank operating accounts)

The Company historically used two accounts at Citibank: i) a checking account and ii) an ACH account which received automated payments which were swept daily into the checking account (together, the "old operating accounts"). The receiver took the following steps to secure the cash held at Citibank:

- Opened a new operating account with Citibank under the Receiver's control (the "new operating account")
- Transferred $16.2 million from the Company's old operating accounts to the new operating account, leaving approximately $700,000 in the old operating accounts to cover outstanding payroll checks, NSF checks and reversed ACH deposits
- Restricted access to and removed all previous signers on the old operating accounts
- Acquired "read only" online access to the old operating accounts for Condor's controller, allowing him to identify and process rejected ACH deposits
- Acquired "read-only" online access to the old operating accounts for the Receiver
- Confirmed with Citibank that the old operating accounts will still be used to collect ACH deposits from customers
- Established a procedure with Citibank wherein funds are to be swept from the old operating accounts to the new operating account on a weekly basis in amounts determined by the Receiver based upon the balance in the old operating account

Citibank has informed the Receiver that they will allow the use of the old operating account for receiving ACH deposits for a period of approximately thirty days from May 15, 2014.

**M. Receipts & Expenditures**

The Receiver is overseeing the Company's efforts of maintaining records of all receipts and expenditures made.

**N. Response to State or Federal Authorities**

As discussed above, Condor's Licenses to do Business, two states have provided the Company with notice of intent to revoke the Company's Sales Finance Company License. The Receiver has had discussions with representatives of both states' regulatory representatives for the purpose of allowing this DFS initiated process to proceed and to allow Company counsel to respond as appropriate.

## VI. STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE

**A. Prevent the Diminution in the Value of Assets of Defendants**

The Receiver will continue his efforts to determine if the Company can begin new originations. The Receiver will continue to ensure that Condor's most significant asset (its auto loan portfolio) is (a) being serviced properly, (b) monitored for aging issues, and (c) protected from customer delinquencies through collection, repossession and auction efforts.

**B. Pursue Recovery of Defendants' Assets From Third Parties**

Aside from Condor's ongoing collection efforts from customers whose loans were terminated for repossession, car damage and theft, the Receiver is not aware of any material assets of the Company in third party hands.

23

### C.  Adjust the Liabilities of Defendants, if Appropriate

The Receiver will continue his efforts in analyzing the Defendants' liability to customers for positive credit balances, interest charges and any other related deficiencies and adjust accordingly. The Receiver will also act on claims made by terminated employees for owed compensation, benefits, and related issues. Finally, the Receiver will coordinate with Condor and Condor's counsel in responding to state regulators' actions.

### VII.  THE RECEIVER'S TEAM

The Receiver is supported by three Directors from AlixPartners LLP, with three separate areas of expertise: (a) interim management (b) forensic accounting (c) information management and technology. The Receiver's team is experienced and leverages off Condor's management and supervisors in all relevant situations to achieve efficient results.

\*    \*    \*    \*    \*

This report sets forth the preliminary assessment based on my Receivership to date. My assessment may be amended and or supplemented based upon information that subsequently comes to my attention.

_Denis O'Connor_

Denis O'Connor

RECEIVER

24

## Exhibit: Condor Capital Listing of Assets & Liabilities

### February 28, 2014

#### ASSETS:

| | |
|---|---:|
| Repossessed vehicles, net | $ 1,437,959 |
| Loan contracts receivable, net | 322,045,874 |
| Mortgage loan receivable | 122,934 |
| Cash and cash equivalents | 2,400,486 |
| Deposits | 18,000 |
| Accounts receivable, net | 8,748,829 |
| Property and equipment, net | 475,695 |
| Due from affiliate | - |
| Due from shareholder | - |
| Other assets-due from Oser | 5,717,917 |
| Other assets-due from officer/affiliate | 13,154,891 |
| Deferred loan costs | 937,061 |
| | $355,059,646 |

#### LIABILITIES:

| | |
|---|---:|
| Notes payable | $243,000,000 |
| Due to affiliate | 41,268,709 |
| Income tax payable | 6,015,358 |
| Accounts payable, accrued expenses and deferrals | 15,073,713 |
| | $305,357,780 |