UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

                  Plaintiff,

     -against-

CONDOR CAPITAL CORPORATION
and STEPHEN BARON,

                  Defendants.

     -and-

WELLS FARGO BANK, N.A., as Agent for
Certain Financial Institutions as Lenders,

                  Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 14 Civ. 2863 (CM)


**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS CONDOR CAPITAL CORPORATION AND STEPHEN BARON TO MODIFY THE PRELIMINARY INJUNCTION ORDER**

**Table of Contents**

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| STATEMENT OF FACTS | 2 |
|     I.  The DFS Action Has Had a Devastating Effect on Condor's Business | 2 |
|     II.  DFS's Allegations Of The Amount of Overpayments Have Proven False, And Condor Has Continued What It Started In 2013 To Refund All Amounts Due | 4 |
|     III.  There Is No Need For The Continued Freeze Of The Defendants' Assets | 6 |
|     IV.  Condor Has Rectified Any Identified Compliance Issues, And Has Committed Itself To Ensure Ongoing Compliance | 7 |
|     V.  Condor Is Capable Of Originating | 8 |
| ARGUMENT | 9 |
| CONCLUSION | 11 |

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    732 F.2d 253, 256 (2d Cir. 1984)......................................................................................10

*Gonzalez v. Axess Trade Co., Inc.*,
    No 04. Civ. 3762, 2005 WL 1384019 (S.D.N.Y. June 9, 2005).............................................10

*U.S. Commodity Futures Trading Comm'n v. Arista LLC*,
    No. 12 Civ. 9043, 2013 WL 3866627 (S.D.N.Y. July 26, 2013) ...........................................10

**Statutes**

12 C.F.R. 10267.17(c)(3)...........................................................................................................6

Defendants Condor Capital Corporation ("Condor") and Stephen Baron, by and through their undersigned counsel, respectfully submit this Motion to modify the May 13, 2014 preliminary injunction order (the "Order") by (1) converting the existing Receiver[1] into a monitor, having the duties hereinafter described (the "Monitor"); (2) permitting Condor immediately to begin loan origination; and (3) unfreezing all of Condor's assets.

## PRELIMINARY STATEMENT

Defendants' warnings at the Order to Show Cause Hearing (the "Hearing") have proven true: despite Condor's and the Receiver's best efforts, the company is further from "getting back into operating mode," to use Your Honor's words, than it was at the time the Receiver was installed. As described below, the workforce at Condor has been depleted; its relationships with banks and dealers have been compromised; and, due to its inability to generate new loans, Condor's portfolio shrinks on a daily basis – meaning the company is very nearly liquidating itself. Contrary, we believe, to the Court's, and perhaps even the Receiver's, intentions.

In the meantime, Condor, in conjunction with the Receiver, already has taken significant steps to rectify the issues identified by the Department of Financial Services ("DFS") in its complaint, and has signed a five-year contract with a world-class compliance firm to ensure there are no longer any compliance issues. Moreover, even though DFS has camped out in Condor's offices for the last six weeks, and despite numerous requests from Condor, DFS has not identified any further compliance issues. By the same token, the alleged customer overpayments have consistently been shown to be slightly more than $1 million dollars, far below the $11 million DFS alleged at the Hearing, and – indeed – even less than the estimate Condor had set forth at the Hearing. Condor has continued its commitment to issuing refunds to customers by

---

[1] Denis O'Connor, appointed by the Court pursuant to the Order. (Order, p. 3.)

1

seeking authority from the Receiver to issue additional refunds, and paying them to customers as they are approved. Finally, based on the First Report of the Receiver, dated June 3, 2014 (the "Report"), there can be no dispute that Condor has the ability to pay all of its customer refunds.

We believe that the actions taken by Condor and by the Receiver since his appointment have stabilized Condor sufficiently such that the individual acting as Receiver can be converted to Monitor status, and that this approach will best serve all stakeholders going forward from this point. Simply put, Condor's business counterparties – in particular, its lenders and the dealer community – are unwilling to engage with Condor for as long as Condor is controlled by a Receiver. Our request, then, is to leave the individual currently acting as Receiver in place as a Monitor, and return control of Condor to its pre-existing management. The Monitor will still report to the Court and to DFS, still be physically present at Condor's offices, be under the direct supervision of Your Honor, and be ready to resume his Receiver status on a moment's notice at Your Honor's direction if things run off the rails. However, Condor's business counterparties will be able to see that Condor's pre-existing management are once again the people to deal with in terms of the future of Condor.

## STATEMENT OF FACTS

### I. The DFS Action Has Had a Devastating Effect on Condor's Business

Time has proven exactly what Condor had predicted: that the DFS's actions have devastated a once-thriving company that had been operating in New York for twenty years. Since DFS put Condor in its sights, the following has occurred: (1) Condor has been put in default on its loan to Wells Fargo; (2) 65 employees have quit or been terminated; (3) Condor's portfolio has been depleted; (4) Citibank asked Condor to find a new banking relationship; and (5) Condor's relationship with dealers has been impaired.

First, as a direct consequence of DFS's actions, Condor was put into default on the credit facility ("Credit Facility") provided by Wells Fargo, NA and Bank of Montreal (the "Lenders"), pursuant to that certain Amended and Restated Loan & security Agreement dated October 12, 2006 (as amended, the "Loan Agreement").  The freeze on Condor's assets meant that Condor was unable to make the scheduled May payment on the Credit Facility, which the Lenders cited as one event of default.  Although that default was ameliorated by the Order, the mere existence of a Receiver itself is another event of default, regardless of payment history.  (Campbell Dec.,[2] Ex. 3, Loan Agreement, § 8.6.)  The Lenders are demanding an increase of Condor's interest rate by an additional 2.5%.  (Baron Aff.[3], ¶ 5.)  With an approximate $256,000,000 total loan, this means that Condor must make an additional $500,000 per month in payments.  (Report of Receiver, dated June 2, 2014, Dkt. No. 74, at p. 7.)

Second, since the DFS commenced this action, 65 of Condor's former 116 employees have quit or were laid off.  (Baron Aff., ¶ 8.)  The once-vibrant office of Condor has been transformed into a ghost town, with dozens upon dozens of empty cubicles.  This has obviously had a direct negative effect on the employees who are now out of work, but it has also hurt Condor as whole to lose valuable employees, some of whom had been with the business for nearly 20 years.  (*Id.*)  Though there is still the possibility of rehiring terminated employees that have not yet found jobs, every week that passes ensures that more Condor employees will not ultimately return to their positions because they have found other jobs.

Third, Condor's loan portfolio continues to be depleted every day it is not able to originate loans.  Condor's continuing value comes in its ability to issue new loans.  (Report, at p.

---

[2] The Declaration of Leah Campbell in Support of the Motion to Modify the Preliminary Injunction Order, sworn to on June 4, 2014, and submitted herewith.

[3] The Affidavit of Todd Baron in Support of the Motion to Modify the Preliminary Injunction Order, sworn to on June 4, 2014, and submitted herewith.

20.) Without the ability to generate new loans, the business is essentially in a state of slow liquidation. The longer Condor is inactive and unable to generate new loans, the larger a gap there will be in future income and the harder it will be to restart.

Fourth, Condor's relationships with its Lenders and dealers were obviously severely impacted by DFS's actions. Citibank has asked Condor to find another banking relationship. (Baron Aff., ¶ 7.) The Lenders have told the Receiver they are not interested in dealing with Condor while it is in this state. (Baron Aff., ¶ 5.) Dealers who have submitted financing requests to Condor have gotten no response back. (Report, at p. 14 of 15.) While the Receiver is doing what he can to repair those relationships and try to ensure they continue, Condor believes that no entity is going to seriously consider further commitments to Condor as long as a Receiver is in place. Condor has a long-standing business relationship with multiple banks, but Stephen Baron, who maintained those relationships, has not been allowed to control the affairs of his business or even be on site. (Baron Aff., ¶ 7.) Condor has effectively lost its ability to capitalize on relationships Stephen Baron has built up over twenty years – relationships that it desperately needs now. Until control of Condor returns to pre-existing management, it is nearly impossible to try to repair those relationships.

Condor has lost two-thirds of its employees, its major business relationships have been severely impaired, and is in a state of slow liquidation with its loan portfolio. It is only by converting the Receiver into a Monitor and allowing Condor to originate loans that it will have a chance at recovery; but with every day that passes, that chance slips farther and farther away.

II. **DFS's Allegations Of The Amount of Overpayments Have Proven False, And Condor Has Continued What It Started In 2013 To Refund All Amounts Due**

In its arguments to the Court during the Hearing, DFS alleged that its investigation "has revealed $11 million in customer funds that were misappropriated" and "[t]hat number could be

4

higher." (Transcript of May 12, 2014 Hearing at 6, attached hereto as Campbell Dec. Ex. 1.) That was simply false. Since the Hearing, DFS has spent four weeks in Condor's offices trying to substantiate its overreaching allegations, and has not been able to do so because they were not true. Condor told Your Honor that the amount of overpayments was "closer to $1.6 million," and since then Condor has gone through its accounts in more detail, finding that the amount was even smaller, at a little over one million. (Campbell Dec. Ex. 1 at 12; Baron Aff., ¶ 4.)

To be clear, and as Condor has stated throughout this proceeding, there are amounts properly due to customers due to unintentional customer overpayments. Condor began to repay the overpayments to customers in 2013, and it intends to repay in full. (Report, at p. 11-12.) When Condor identified this problem in the Fall of 2013, it began calculating those amounts and paying them back – far in advance of when DFS first mentioned this issue to Condor in 2014. (*Id.*) In 2013, Condor refunded a total of $257,868.49 to its customers; in 2014, before the Temporary Restraining Order, dated April 23, 2014 ("TRO"), it continued this process and refunded an additional $163,120.47 to customers. (*Id* at p. 12.)

As Your Honor heard at the Hearing, Condor faults itself for not issuing these refunds with more haste, but it did make efforts and always intended to issue them in full. These underpayments, however, represent less than 0.1% of the total amount of loans made by Condor to its customers, and – though serious – the amount required to be repaid is simply not large enough to have any effect on Condor's revenue or economic performance. (Baron Aff., ¶ 4.)

As described to Your Honor at the Hearing, the majority of negative balances in customer accounts represents interest and fees that were legally incurred by Condor in the event of customer defaults and judgments; these amounts were *not* due to be refunded to the customers. (Campbell Dec. Ex. 1, at 15-16.) A substantial portion of the rest of the negative balances in

customer accounts appeared because Condor changed the way in which it calculated interest in the Fall of 2013 to conform to a strict interpretation of 12 C.F.R. 10267.17(c)(3), the "day count rule" of Regulation Z under the Truth in Landing Act. (Report, at p. 10-11.) Condor has been sending out refunds for any customer over the past two years affected by the change in its calculation of interest in accordance with that same section. (*Id.*)

Condor has written refund checks for 2014 and 2013, and the Receiver has authorized those amounts to be sent. (*Id.* at p. 12.) It is a laborious process to check tens of thousands of accounts and sign each check. (Campbell Dec. Ex. 1, p. 47.) Once 2012-2014 are sent out, Condor expects that the remaining amount to be refunded for all previous years is approximately only $1,055,000, covering the years 1996 to 2011. (Baron Aff., ¶ 4.)

### III.   There Is No Need For The Continued Freeze Of The Defendants' Assets

Given the progress in identifying refund amounts and issuing checks described above, the need for any asset freeze even with all of DFS' allegations, has disappeared. DFS sought and obtained an order to freeze Condor's and Stephen Baron's assets due to concerns that Condor "will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing restitution to Condor's injured customers in this action." (TRO at ¶ 2-3.) The amount of restitution, *i.e.* customer overpayments, is being determined by the receiver and is being repaid. (Report, p. 11-12.) As described in the Report, Condor has $19.1 million in the bank already, takes in $17 million every month and only has expenses of $3 million. (Report, p. 5.) There is absolutely no worry that Condor does not have sufficient funds to pay the relatively small amount of overpayments.

Moreover, Condor is still willing to put the full amount of customer overpayments, as identified by the Receiver, in escrow to alleviate any concerns DFS has as to Condor's ability to issue all refund checks. With refunds paid and/or fully funded by the escrow, there is simply no

legal or practical reason that a Receiver needs to be or should be in control of Condor's accounts or that any of Condor's assets remain frozen.

### IV. Condor Has Rectified Any Identified Compliance Issues, And Has Committed Itself To Ensure Ongoing Compliance

To support the need for the preliminary injunction, DFS also cited a number of compliance issues with Condor's business for any ongoing customers. Condor has an existing compliance program. (Baron Aff., ¶ 9.) However, Condor, in conjunction with the Receiver has addressed these compliance issues and improved those policies, showing that it is serious about ongoing compliance by obtaining additional training for the manager of Condor's legal and compliance department. (Baron Aff., ¶¶ 9, 10, Ex. 6.) Condor also signed a contract with Fidelity Information Services, LLC ("FIS"), a national compliance firm, to update Condor's manuals, conduct further training, and ensure that Condor has the resources to remain in compliance in the future. (Baron Aff., ¶ 11.)

Furthermore, in contradiction to DFS allegations that Condor lacked any compliance policies, handbooks, and relevant training materials. This is simply untrue. As described by Todd Baron, Condor did have a compliance program. (Baron Aff. ¶ 9.) It, trained emplyees who handled direct calls with consumers, and issued a manual to guide these employees, the Condor Call Handler Manual. (Baron Aff., Ex. 2.) Condor similarly had in place a Credit Policy and Fair Lending Plan, guiding employees in the loan origination side of the business. (Baron Aff., Exs. 3 & 4.)

In fact, DFS has been at Condor's offices now for almost six weeks monitoring its employees and interactions with customers. In that time, Condor has repeatedly asked DFS to identify any compliance issues or deficiencies that they observe so that Condor can address them. (Baron Aff., ¶ 12.) Condor's lawyers have made the same request to DFS' lawyers. DFS

has not identified a single additional deficiency. (*Id.*) DFS has, in fact, said that all of Condor's employees' interactions with loan holders seem appropriate, evidencing the success of the training they have received on how to treat and interact with customers. (*Id.*)

Condor expects that FIS to set up a long-term relationship to assess Condor's compliance procedures, help to document their procedures, and conduct periodic training of its employees. FIS is a company that specializes in compliance, has an entire library of training materials, and is one of the nation's leading compliance advisors. Condor, with the blessing of the Receiver, sent the manager of its legal and compliance department, Patricia Yasparo, to a four-day compliance training seminar specifically for automobile sub-prime loan industry. (Baron Aff. ¶ 10, Ex. 6.)

As indicated to Your Honor, Condor would have brought in a compliance specialist even sooner if it had not been barred from incurring new expenses under the TRO and Preliminary Injunction. (Campbell Dec. Ex. 1 at p. 21.)

**V.   Condor Is Capable Of Originating**

In his Report, the Receiver cited two additional issues facing Condor in restarting loan origination: Condor's relationship with Wells Fargo, and its relationship with its dealers. (Report, p. 4-5.) Condor has had a long relationship with Wells Fargo, and hopes to mend that relationship, but restoring that relationship will not be possible with a Receiver in place. As noted by the Receiver's report, however, Condor does have sufficient capital available to begin loan origination on its own while it attempts to mend that relationship or secure another relationship. (Report, at 5 (stating Condor has $19.1 million in the bank and nets $14 million a month).) Even better is its relationship with its dealers. As noted by the Receiver, Condor has a long relationship with its dealers, who respect Condor and rely on Condor's business. (Report, p. 14-15.) One dealer from Missouri recently called Katten's offices and asked the undersigned if he knew how long it would be before Condor could finance his loans again. The dealers trust

8

Condor and are looking for the Defendants to return to issuing loans. Condor would obviously like to give these dealers good news soon, but knows the dealers will not wait forever.

## ARGUMENT

Preliminary injunctions are executory and subject to change as needed, and the Court has full discretion to modify its preliminary injunction at any time. *See Gonzalez v. Axess Trade Co., Inc.*, No 04. Civ. 3762, 2005 WL 1384019, at *4 (S.D.N.Y. June 9, 2005), *citing Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984). When modifying a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunction relief in the first place. *Id.*; *see also U.S. Commodity Futures Trading Comm'n v. Arista LLC*, No. 12 Civ. 9043, 2013 WL 3866627, at *1 (S.D.N.Y. July 26, 2013). The time is ripe for such a change.

Condor has paid back substantially all of the customer refunds and is ready to pay back all additional amounts as soon as authorized by the Receiver or as soon as control is given back to Condor. Condor has remedied the glaring compliance deficiencies alleged in DFS's complaint, has proven its commitment to a "best practices" approach to compliance by sending its legal manager to additional compliance training and hiring a nationally-reputable firm to identify any remaining issues and conduct ongoing training. Condor thus proposes to convert the Receiver to a Monitor, who would have the following powers:

- Complete access to Condor's business and financial records.
- Complete access to the premises.
- Would be present for any meetings at which management is making decisions about the business.
- Would be consulted on any compliance efforts and changes that are made.

- Would be consulted on efforts to refund customers funds. Any such efforts would be discussed with the Monitor first before action is taken.

- Reports to the Court at 40 days and 60 days from the date of the original preliminary injunction.

In addition, Condor would agree to the following additional restrictions during the pendency of this case:

- Condor would still be prohibited from moving additional operations to Florida unless there is Court approval.

- Condor would establish an escrow account in an amount to be determined by the Receiver, based on his findings thus far, to pay for additional refunds (even though Condor has demonstrated it has sufficient capital for all refunds).

To put this case in perspective, the United States Federal Trade Commission recently settled a case against Consumer Portfolio Services, Inc. ("CPS"), a sub-prime loan servicing company in California. According to the complaint, CPS misrepresented amounts owned by consumers, imposed $3.5 million in unlawful fees, extended loans without authorization, failed to inform customers about late fees, engaged in harassing and abusive debt collection practices, debited consumers checking accounts without authorization, and had inadequate loan servicing policies and procedures. (Campbell Dec., Ex. 2.) The FTC agreed to a settlement whereby CPS refunded $3.5 million to 128,000 consumer accounts, assessed additional penalties for CPS's harassing behavior, and imposed a monitor. (*Id.*) Here, what appears to be at issue is only a little over a million dollars of refunds that are due customers that it had already begun paying and this situation has none of the egregious violations allegedly committed by CPS. The result

for Condor, though, has been an inequitable response, resulting in the complete seizure and possibly destruction of their business. Condor has shown that such a response is not necessary.

Maintaining a Receiver is not necessary at this point. The results sought by the Court in appointing the Receiver have, we believe, been fulfilled. With a Receiver in place and loan origination stalled, Condor is prevented from rebuilding its business relationships, rehiring a sales force, generating income, and attempting to save its business. The Receiver is doing what he can, but the Receiver does not know the business like Condor does, does not have the relationships that the Defendants have, and ultimately does not have the greatest stake in making sure that compliance deficiencies are remedied and Condor's reputation is restored. With the majority of refunds already paid to customers and the remaining amounts waiting to go out the door, there is not a further need for a Receiver (as distinguished from a Monitor) in this case, but there is great harm to Condor should the Receiver continue.

## CONCLUSION

As Condor stated at the Hearing before Your Honor, it was and is committed to fully repaying all customer refunds and improving its compliance. Condor had already identified the repayments due to customers and had begun to repay them. It has already repaid amounts for 2014 and 2013 and is ready to cut checks and send the rest out immediately. Condor has taken significant steps not only to address any compliance issues identified by DFS, but ensure there are not additional issues DFS did not identify by bringing in a third party compliance firm with a five year commitment – the exact thing it said it would do before Your Honor. Keeping a Receiver in place will continue to perpetuate the slow liquidation of the company and may very well take it to an unsalvageable position. Please take note that we are not assailing the Receiver or criticizing in any manner the job the Receiver has been doing. Rather, our issue is with the

mere fact of *having* a Receiver.  Further, to be clear, we would ask Your Honor to appoint the individual currently acting as Receiver as the Monitor.  This approach will allow the Court to keep a watchful eye over the company and ensure it will continue to follow through on its promises, but give Condor a chance to rebuild itself.

Condor was and is a good company that has provided jobs for the New York community and desperately needed services to customers nation-wide.  One of Condor's many customers called Katten on May 12, 2014, and related that she had recently driven away from her local dealer happy because she had transportation to get to work with a loan financed by Condor.  The customer was then told, however, that because of the TRO, her financing could not be completed and she was at a loss for what to do as she didn't think any other company would finance her car loan and she desperately needed the car for work.  She faced the prospect of losing her job because Condor was prohibited from helping her.  She and other customers who relied on Condor remain at a loss.  Condor has helped customers over the last twenty years finance cars for their jobs and their lives.  It has provided jobs for employees who feel more than a work relationship with Condor, but value their relationships they have made at Condor, as evidenced by the attached letter from the wife of one of Condor's employees.  *See* Exhibit G.  Condor wants to return to doing that work.

Condor thus respectfully pleads that Your Honor return full control of Condor to the Defendants so that they can begin to resuscitate their business, unfreeze all assets, and order that the Receiver continue on as a Monitor, giving the Receiver a full purview of Condor's actions with reports to the Court at 40 and 60 days.

Dated: June 4, 2014
      New York, New York

By: /s/ Michael M. Rosensaft
Michael M. Rosensaft
Leah Mary Campbell

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
(212) 940-8800
*Attorneys for Defendants*