Denis O'Connor
Receiver
Condor Capital Corporation
c/o Alix Partners, LLP
40 West 57th Street, 28th floor
New York NY 10019



June 9, 2014

Hon. Colleen McMahon
United States District Judge
Southern District of New York
United States District Court
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

RE: *BENJAMIN M. LAWSKY, Superintendent of Financial Services of the State of New York, v. CONDOR CAPITAL CORPORATION and STEPHEN BARON, Case No. 14-CV-2863 (CM)*

Dear Judge McMahon:

I write to respond to Defendants' Motion to Modify the Preliminary Injunction Order submitted on June 4, 2014. For the reasons set forth below, I believe it is premature to convert the Receiver to a Monitor.

I also write to respond to a number of assertions made by the Defendants that are simply false or misleading. I have followed the general topics as outlined in Condor's Memorandum of Law (the "M of L") in Support of Motion of Defendants, Condor Capital Corporation ("Condor") and Stephen Baron.[1]

### Defendants' request for conversion of Receiver to Monitor

The Defendants sight the following reasons (see pg. 4 of 10, M of L) for the conversion of the Receiver to Monitor just 22 days into the Receivership:

i. The workforce at Condor has been depleted;

---

[1] The Receiver was assisted by representatives of AlixPartners LLP that worked under his supervision. All references to the Receiver's work in this report include work performed by these individuals.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 2

2. Condor's relationships with banks and dealers have been compromised; and

3. Condor's portfolio shrinks on a daily basis.

All of the above assertions are true to some degree; however, until the Receiver is confident that Stephen Baron can act in a lawful manner that is respectful of Condor's customers and institute and abide by best in class governance, compliance and internal controls and procedures, the Receiver should remain in place.

As described in detail below, Stephen Baron's past and current conduct leads me to believe a Receiver's continued control of Condor is necessary to protect the customers and stakeholders of Condor. The limited authority and responsibility of the Monitor as outlined by the Defendants will not adequately protect Condor's customers and stakeholders.

**Defendants allege that the New York State Department of Financial Services' ("DFS") Action has had a devastating effect on Condor's business**

Putting aside the fact that the Defendants make limited acknowledgement of their own shortcomings in dealing with their Regulators, customers and employees, Defendants lay the responsibility of the current situation on DFS. The Defendants note:

"...since the DFS commenced this action... The once vibrant office of Condor has been transformed into a ghost town..." (pg. 6 of 16, M of L.)

However, the Defendants do not discuss the fact that the employee terminations were made by Condor's own management. Further, Defendants do not acknowledge that Condor's move to Florida would have

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 3

resulted in a large number of New York based employee terminations in the Credit, Servicing, Funding, Payoff, Legal and Administrative areas.[2]

The Defendants assert:

> "Condor has a long-standing business relationship with multiple banks, but Stephen Baron, who maintained those relationships, has not been allowed to control the affairs of his business or even be onsite." (pg. 7 of 16, M of L.)

The Receiver has met with Stephen Baron twice on the day the Receiver arrived (May 14) and three times subsequently by phone.

I have been clear to Stephen Baron that his presence at the offices will likely be a distraction; however, I have also made clear that any important matters that he needs to address for Condor's or Condor's stakeholders' benefit override my preference for him not being in the office. Stephen Baron has not articulated a single reason to be onsite and rather uses his time with me to argue about paying a principal payment to Wells Fargo of $17 million (as opposed to my view of paying $5 million to Wells Fargo and reserving $11 million for customers), not paying Wells Fargo their contractual default rate of interest, and not paying Wells Fargo's legal fees of approximately $400,000 for the period through May 28, 2014.

The Defendants assert:

> "Until control of Condor returns to pre-existing management, it is nearly impossible to try to repair these relationships." (pg. 7 of 16, M of L.)

---

[2] Todd Baron indicated to the Receiver that the move to Florida was motivated by lower wages of a quality local work force and better living standards. Condor's management, supervisors and sales representatives would have either moved to Florida or remained working remotely. With respect to the selection of Florida, other employees indicated to the Receiver that it was to bring the business near the residence of Stephen Baron in the greater Orlando area.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 4

This simply is not true.

The Receiver has a small team that leverages off Condor's management team. Since the Receiver was appointed, Condor's management team continues to supervise customer service, collections, repossessions, accounting and all administrative functions. With regard to dealer relations, Condor has approximately 3,000 dealer contracts. The point person is the sale representative. Todd Baron fired 31 of the Company's sales representatives two weeks before the Receiver's arrival.

On June 4, the Receiver was provided a letter regarding Citibank's intent to terminate the deposit services currently provided to Condor on the Company's old operating account. Citibank is seeking to terminate the service close of business July 3, 2014. Citibank's counsel has informed the Receiver that Citibank had planned on terminating the deposit services before the issuance of the TRO.

The Defendants assert:

> "It is only by converting the Receiver into a Monitor and allowing Condor to originate loans that it will have a chance at recovery; but with every day that passes, that chance slips farther and farther away." (pg. 7 of 16, M of L.)

I disagree. Condor's chance of recovery is enhanced if it can rehabilitate itself. The Defendants past behavior and practices need to be fairly addressed and corrected. The Judge's original time period is both practical and commercially reasonable for all parties to this dispute.

### Customer Overpayments Retained by Condor

One needs to appreciate that most (over 80%) of Condor's customers do not pay off their loans in the normal course. Whether repossession, trade-in or bankruptcy, the Condor loan regularly terminates

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 5

before the last payment is due. On its face, returning customers' overpayments or positive credit balances is a simple concept. Most people understand what they "owe" and what they "are owed". However, Condor customers did not always have visibility into the disposition of their car

Condor's retention of customer overpayments or positive credit balances, excluding legal accounts[3] and the impact of interest amortization, can be summarized by type as follows:

- Early (~ 70%)
- Normal payoff / Full cycle (~ 20%)
- Car totaled (~ 7%)
- Other (~ 3%)

The terminations categorized as "Early" represent trade-ins at the dealer or early payments by the customer. The early payment process includes Condor providing the customer with a pay-off amount. The pay-off amount provided by Condor includes 10 days of additional interest, an estimate of the time it will take for the actual pay-off to occur. If the customer pays the quoted pay-off amount after more than 10 days, the amount paid is less than the amount owed and Condor would follow-up to seek additional payment.[4]

Conversely, if the customer pays the quoted pay-off amount prior to 10 days, the amount paid would be more than the amount owed, resulting in a positive credit balance. Having inquired of payoff personnel and Condor management, I have been told that these positive credit balances were not returned to customers unless specifically requested by the customer.

The Defendants assert:

---

[3] Please refer to my June 2nd First Report to the Court for a description of these accounts
[4] Condor employees in the Payoff department have explained that customer payments within $10 and dealer payments within $20 of total amount owed would be considered adequate and are not followed up on.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 6

> "Condor told your Honor that the amount of overpayments was 'closer to $1.6 million,' and since then Condor has gone through its accounts in more detail, finding that the amount was even smaller, at a little over one million." (pg. 8 of 16, M of L.)

I would like to point out that Todd Baron's affidavit dated June 4, 2014, the referenced support for this statement, explains that the revised analysis is based on a period of 1996 – 2011, whereas the previous analysis resulting in the $1.6 million was based on a period of 1996 – 2014. Neither the M of L nor Todd Baron's affidavit provide an explanation for what is included or excluded from the calculation of $1.05 million. Accordingly the Receiver inquired of Todd Baron and was told the methodology between the two calculations should be consistent.

My review of the data constituting the approximately $1.6 million, limited to the new time period referred to by Todd Baron, identified discrepancies in excess of $450,000 that are being excluded for unidentified reasons. I am working with Condor management to better understand the discrepancies. Lacking any further explanation, I continue to consider the $1.6 million figure, adjusted for other factors including legal accounts, amortization of interest and refunds to customers, more appropriate than Todd Baron's calculated $1.05 million.

The $1.6 million previously referred to by Counsel for the Defendants was a subset of an approximately $11 million figure referred to by DFS in a preliminary test run of a report prepared by the Company. That report identified all positive credit balances, portions of which, including legal accounts and amortization of interest, Condor management asserts should be excluded. I am still reviewing the components of these categories and the related underlying support. Absent the time to appropriately conclude whether adequate support exists to exclude these components, at this time I believe the $11 million figure is more appropriate as a reserve for potential moneys owed to customers.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 7

The Defendants assert:

> "Since the Hearing, DFS has spent four weeks in Condor's offices trying to substantiate its overreaching allegations, and has not been able to do so because they were not true." (pg. 8 of 16, M of L.)

As specifically stated on page 13 of my June 2nd First Report to the Court, I "requested that the DFS personnel remain on the Company's premises until their particular work streams were redundant or otherwise no longer necessary...The investigation and compliance teams remain." At my request DFS remained on-site to continue its examination of a sample of 50 customer positive credit balances categorized as legal.

The Company has asserted that such positive credit balances resulting from these files should be excluded from amounts due to customers. While that work stream continues, initial review of the customer files indicates legal judgments were often not kept. These positive credit balances are excluded from the Company's calculation of amounts due to customers despite lacking support for the judgment, a fundamental component of any calculation of over or under payment by the customer. I am working with the Company to attempt to procure judgments to further assess whether the related credit balances are due to customers.

It should further be noted that personnel in Condor's accounting department informed me that refunding positive credit balances to customers was not the company's practice prior to November 2013. Instead, customer refunds would only be paid when a customer called and requested such refunds.

In the complaint filed by the Superintendent of Financial Services of the State of New York on April 23, 2014 (the "Complaint"), DFS alleged that Condor:

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 8

> "...has hidden the existence of positive credit balances by submitting to the New York State Comptroller's Office false and misleading "negative" unclaimed property reports (and, more recently, no reports at all), all of which represented under penalty of perjury that Condor had no unrefunded customer credit balances."

Condor management confirmed that they have not historically remitted any undelivered customer refunds to the proper state authorities. The Receiver has requested copies of unclaimed property reports filed by Condor.

### The Defendants' allegation that "There Is No Need For The Continued Freeze Of The Defendants' Assets"

The Defendants state that:

> "The amount of restitution, i.e. customer overpayments, is being determined by the receiver [sic] and is being repaid." (pg. 9 of 16, M of L)

This statement is misleading for several reasons. First and foremost, the Receiver has only authorized and sent refunds to customers with positive credit balances on loans which terminated in 2013 and 2014. Further, the following factors must still be considered in determining the balance of customer refunds remaining to be sent:

- Condor's history of terminated loans dates back to 1994. Thousands of additional positive credit balances on loans terminated from 1996 through 2012 need to be refunded to customers[^5] or remitted to the state under each state's respective escheatment laws.

---

[^5]: Condor's customer base tends to change addresses more often than other consumers. Contact information for these customers can quickly become obsolete. Therefore, customer balances owed on loans which were terminated in earlier years become progressively more difficult to return to customers as time passes.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 9

- The 360-day/365-day calculation described in my June 2 report has not yet been settled. The Receiver has solicited opinions from the Company's legal counsel and plans to assess the Regulators' view on this issue. The historical date to which the 365-day calculation should be applied has not yet been determined.

- As described in my June 2nd First Report to the Court (pg. 10 of 26), customer accounts classified as "Legal" must be analyzed to determine whether any positive credit balances on those accounts represent amounts due back to customers. Due to the lack of documentation retained by the Company and the accounting deficiencies described in my June 2nd First Report to the Court, this issue has not yet been resolved.

- A determination must be made as to whether interest should be paid to customers on the balances held by the company.[6]

- As described above, Condor management confirmed that they have not historically remitted any undelivered customer refunds to the respective state authorities. Oversight will be required to ensure that the proper policies and procedures over remitting these funds to the proper authorities are in place.

- It is unclear at this time whether the various states in which Condor operates will have differing opinions or requirements on handling the issues described above.

The Defendants also state that:

*"Given the progress in identifying refund amounts and issuing checks described above, the need for any asset freeze even with all of DFS' allegations, has disappeared."* (pg. 9 of 16, M of L.)

---

[6] The Receiver determined that the customer refunds on loans terminated in 2013 and early 2014 should be paid without interest added. These balances became due to customers within the past 18 months. Therefore, the interest which would potentially be applied to these balances would be minimal. In the Receiver's opinion, getting these funds to the customers in a timely manner outweighed the addition of any potential interest on the payments.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 10

The Receiver disagrees with this assertion. Stephen Baron and the Receiver have disagreed over each of the largest cash disbursements made by the Receiver. Specifically:

- **Default interest.** Condor is in default on the Wells Fargo credit facility. Stephen Baron has represented to the Receiver that he believes Condor is in "technical" default. Mr. Baron believes that Condor should therefore pay the previous interest rate of 2.752% as opposed to the default interest rate of 5.252%. The Receiver has determined that Condor is in fact in default and therefore should pay interest at the rate of 5.252% to Wells Fargo.

- **Legal fees.** Wells Fargo has included legal fees of $397,000 incurred by its counsel in its most recent interest invoice to Condor. Stephen Baron and Condor management intensely contested reimbursing Wells Fargo for these fees. The Receiver did include these fees in the payment made to Wells Fargo on June 4. The Receiver determined that it is clear from the loan agreement that Condor is responsible for such fees.[7]

- **Prepayments of principal on Wells Fargo credit facility.** To date, the Receiver has made two principal payments to Wells Fargo totaling $11 million. These payments were made from Condor's excess cash after taking into account a reserve of approximately $11 million for customers on terminated loans and an operating cash cushion for the Company. Condor's management has been much more aggressive in determining amounts which they believe can and should be paid to Wells Fargo to reduce the outstanding principal balance.

---

[7] On June 5, the Receiver delivered a letter to Wells Fargo stating that the legal fee appeared excessive and that payment of the full invoice amount was subject to further review and approval upon receipt of a detailed invoice which Blank Rome agreed to provide.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 11

### The defendants' claim that Condor has cured its compliance issue and ensured on-going compliance

In response to DFS' citation of compliance issues, the Defendants assert that it "has an existing compliance program" and that "Condor, in conjunction with the Receiver has addressed these compliance issues and improved those policies..." (pg. 10 of 16, M of L.) I agree that the Company had some documented policies and procedures, but it remains my opinion that "Condor operations are deficient with respect to governance, compliance and internal controls" as explained on page 15 of my June 2nd First Report to the Court. As explained, I have engaged Fidelity Information Services, LLC ("FIS") to assist the Company in changing its control environment. This process is still in its assessment stage. To say the Company has "addressed these compliance issues" is false. This is not an overnight fix. Assessment, which is still in process, is just the first stage. Assessment will be followed by the development of a compliance management system and corporate governance recommendations.

In my role as Receiver I have the authority to see that certain compliance and internal control improvements are pursued. Historically Condor lacked a culture of compliance. Given historical deficiencies under the leadership of Condor management, I have serious concerns that the return of authority to Stephen Baron and/or my conversion to Monitor could be to the detriment of such initiatives.

### The Defendants' assertion that Condor is capable of originating

The Defendants assert:

> "Condor has had a long relationship with Wells Fargo, and hopes to mend that relationship, but restoring that relationship will not be possible with a Receiver in place." (pg. 11 of 16, M of L.)

I disagree with this assertion, and more importantly so does Wells Fargo. As stated in the letter from Wells Fargo to the Court dated June 5, 2014, "Wells Fargo and BMO have made it abundantly clear to the company that they will not fund any further loan originations, and oppose the use of the proceeds of its pledged collateral for any purposes other than the preservation of the collateral, *regardless of whether a receiver is in place.* [Emphasis added.]

In the Defendants' closing argument they assert:

> *Condor has paid back substantially all of the customer refunds... (pg. 12 of 16, M of L.)*

I disagree with this assertion. By my count, there are at least 20,000 customer with positive credit balances remaining in the company's loan portfolio. As stated above, the Receiver has only authorized and sent refunds to customers with positive credit balances on loans which terminated in 2013 and 2014. The factors described above must still be considered in determining the balance of the remaining refunds to be paid.

Additionally, I stated in my June 2nd First Report to the Court that 3,127 of the 6,337 refund checks printed by Condor in December 2013 – February 2014 were signed and sent. The remaining 3,210 checks were not signed and were still located in the Company's office. The figure of 3,210 checks not sent was based on a list provided to me by Condor management and the Company's accounting department. These refunds represented positive credit balances on loans terminated anywhere between 2010 through 2013.

I have reviewed the Citibank account activity, check register report and the checks cashed from December 2013 through the present. This review revealed that there are in fact been more unsent checks than those indicated by the Company. Additionally, of the checks that were sent, approximately 1,300 have not been cashed by customers. According to Condor management, no attempt has been made to redirect the payments or contact the customers to obtain a current mailing address.

Hon. Colleen McMahon
United States District Judge
June 9, 2014
Page 13

Any assertions made by the Company as to how many of the refunds have been paid back cannot be relied upon until a full reconciliation has been made of refund checks printed to date.

### Conclusion

My observations, examinations, experience and interviews to date confirm that a number of the allegations in the Complaint made by DFS are true. For the reasons set forth above, I believe it is premature to convert the Receiver to a Monitor.

Very truly yours,

*Denis O'Connor*

Denis O'Connor
Receiver