UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

                                        Plaintiff,                    No. 14-CV-2863 (CM)

        – against –

CONDOR CAPITAL CORPORATION
AND STEPHEN BARON,

                                        Defendants.

--------------------------------------------------------

June 23, 2014
SECOND REPORT TO THE COURT

DENIS O'CONNOR
RECEIVER
AlixPartners LLP
40 West 57th Street
New York, NY 10019
(646) 746-2465

**Table of Contents**

I.    INTRODUCTION ..........................................................................................................3

II.   THE RECEIVER'S ASSESSMENT ...........................................................................3

III.  CURRENT STATUS OF THE COMPANY .............................................................6

   A.   The Company's Business and Operations ...............................................................6

   B.   Customer Balances and Refunds to Customers .......................................................7

      1.   Customer Balances ..........................................................................................7

      2.   Return of Positive Credit Balances to Customers ...........................................8

      3.   Remaining Balances to be Returned to Customers ........................................10

   C.   Condor's Licenses to do Business ........................................................................15

   D.   The New York State Department of Financial Services ........................................16

IV.   LOAN ORIGINATION ............................................................................................16

   A.   Background ...........................................................................................................16

   B.   The State of Condor's Loan Origination Process ..................................................17

   C.   Unresolved Compliance .......................................................................................17

   D.   Unresolved Funding (Wells Fargo Credit Facility) ..............................................18

V.    STEPS TAKEN BY THE RECEIVER .....................................................................20

   A.   Control of Condor's Business ...............................................................................20

   B.   Communication to Stephen Baron and Condor Employees ...................................20

   C.   Communication on the Company's Website ..........................................................21

   D.   Mail .....................................................................................................................21

   E.   Security and Control .............................................................................................21

   F.   Management of Assets ..........................................................................................21

   G.   Payments and Disbursements ...............................................................................23

   H.   State, Federal and/or Foreign Courts ....................................................................25

   I.    Actions Against the Receiver or Defendants ........................................................25

   J.    Continue to Conduct the Business of the Company ...............................................25

   K.   Bank Accounts (Citibank Operating Accounts) ...................................................25

   L.   Receipts & Expenditures ......................................................................................26

   M.   Response to State or Federal Authorities ..............................................................26

VI.   STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE .........................26

1

**EXHIBIT**

Exhibit: Condor Capital Listing of Assets & Liabilities

## I.   INTRODUCTION

This report is filed in compliance with the Preliminary Injunction and Order Appointing Denis O'Connor Receiver dated May 13, 2014 (the "Order") issued by U.S. District Court S.D.N.Y. (the "Court") by the Honorable Colleen McMahon. As such, this report sets forth the steps and actions taken to date by the Receiver to complete the tasks as set forth in the Order and also sets forth the findings of the Receiver's verifications and examinations. The Receiver was assisted by representatives of AlixPartners LLP that worked under his supervision. All references to the Receiver's work in this report include work performed by these individuals.

This report is the second report issued by the Receiver. The first report filed with the Court on June 2, 2014 ("First Report") is incorporated herein by this reference.

The Receiver and his team arrived at Condor Capital Corporation's ("Condor" or the "Company") offices at 165 Oser Avenue, Hauppauge, New York on May 14, 2014 and have been in control of the Company since.

## II.   THE RECEIVER'S ASSESSMENT

The Receiver's assessment in his First Report was that Condor should not re-start its loan origination business until it has completed the following:

> (a) Institute adequate governance, compliance and internal controls and procedures;
>
> (b) Obtain an alternative source of funding or capital; and
>
> (c) Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.

The Receiver engaged Fidelity Information Services, LLC ("FIS") to assist the Company in addressing deficiencies in the areas of governance, compliance and internal controls. FIS and the Company have made good progress in their assessment of inherent compliance risks and evaluation of the control

3

environment in place to assess the effectiveness of the Company's risk management. The next phase of the FIS engagement will include continuing to update company policies and procedures, the implementation of a compliance management system, training of management and employees, ongoing monitoring and a compliance management reporting process. To be clear, FIS and Condor have made good progress evaluating and assessing the Company's current risks and existing control environment and have started to make changes to the Condor's policies and procedures, but the implementation of proper governance, compliance and internal controls still requires significant additional time and effort on the part of FIS and Condor management.

On June 4, 2014, Blank Rome (attorneys for Wells Fargo) filed a letter with the court reiterating the fact that Wells Fargo will not fund any further loan originations. Further, the letter makes clear that Wells Fargo wishes to be repaid as soon as possible and believes that any of Condor's excess cash (after a reserve set aside for Condor's wronged customers) should be used to pay down the existing loan obligations.

Condor representatives have contacted parties interested in a refinancing or potential securitization to repay Wells Fargo. The Receiver has also contacted 17 banks and financial institutions to attempt to identify a replacement for the Wells Fargo credit facility. In addition, Wells Fargo has provided contact information for additional potential financiers / buyers. The conversations with these companies will proceed along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.[1]

The Receiver will oversee and take charge of the process, working with Katten Muchin Rosenman LLP ("Katten") and Condor's management (Todd Baron, Donald Kalechofsky and Robert Scalone).

---

[1] Stephen Baron's preference is that a refinancing occurs. The Receiver will support the refinancing option as the preferred exit for Wells Fargo; however, parties only interested in purchasing the portfolio will receive equal access to the process to ensure that a dual track proceeds. This protects Wells Fargo's collateral and the Company should the refinancing or securitization options fail.

4

In the First Report, the Receiver informed the Court that two states, Massachusetts ("MA") and Connecticut ("CT"), had provided the Company with notice of intent to revoke the Company's Sales Finance Company License. Since that time, MA has granted Condor an extension to fulfill the provisions of its related Order and Notice until Wednesday, August 13, 2014. CT has scheduled a hearing related to its actions for July 1, 2014.

The New York State Department of Financial Services ("DFS") has also coordinated with and requested other state regulators to essentially "hold-back" pending the outcome of this litigation with Condor. Further, Condor has begun a meaningful dialogue with DFS to assess governance, remediation and restitution with the objective of resolving a number of issues identified in the DFS complaint.

In summary, Condor has made concrete efforts and measurable progress on all three objectives noted above. I continue to believe that further progress needs to be made before Condor can begin to originate new loans. I would expect to report to the Court in another 20 days with regard to Condor's progress of these undertakings at that date.

Subsequent to the First Report, the Defendants submitted a motion to modify the May 13, 2004 Preliminary Injunction and Order Appointing the Receiver (the "Order") by converting the existing Receiver into a Monitor, permitting Condor to immediately begin loan origination and unfreezing all of Condor's assets. As described in my June 9, 2014 letter to your Honor, Stephen Baron's past and current conduct leads me to believe that a Receiver's continued control of Condor is necessary to protect the customers and stakeholders of Condor. I continue to believe, at this point in time, that the limited authority and responsibility of the Monitor as outlined by the Defendants in their motion will not adequately protect Condor's customers and stakeholders.

**III.    CURRENT STATUS OF THE COMPANY**

### A.  The Company's Business and Operations

Condor originates and services auto loans for customers generally characterized as "non-prime"
or "sub-prime" borrowers. Prior to the issuance of the Temporary Restraining Order by the Court
on April 23, 2014 (the "TRO"), the origination of loans was performed primarily through
Dealertrack and RouteOne, providers of online credit applications and finance sourcing for auto
dealerships. The loans made and serviced by Condor are financed through the secured credit
facility with Wells Fargo as well as through the cash generated by the business. All of Condor's
new origination activity has been halted as of April 23, 2014.

Condor generates approximately $17 million per month in cash receipts. The Company's monthly
operating costs (consisting of interest on the Wells Fargo credit facility, payroll, and other selling,
general and administrative expenses) are approximately $3 million per month.[2] As of June 21,
2014 Condor had approximately $11.1 million in the Receiver's controlled bank accounts. Thus,
Condor appears to have the liquidity and potential equity in its loan portfolio to make an attempt
in the short-term at rehabilitation.

Condor operates out of two facilities, its primary office at 165 Oser Avenue in Hauppauge, New
York as well as a second office at 36 North Skyline Drive in Lake Mary, Florida which began
operation in April 2014.

Although the company's original intention was to undertake an orderly shut-down of the
operations in Hauppauge and move all operations to the Lake Mary office, the issuance of the
TRO has temporarily halted that move. Currently, the 14 employees of the Lake Mary office,

---

[2] This $3 million estimate includes the increased interest expense resulting from the default interest rate applied to
amounts outstanding under the Wells Fargo credit facility.

consisting of two assistant managers that transferred from Hauppauge and 12 collection agents hired locally, are engaged exclusively in collections and loan servicing.

The company continues to service loans, make collection calls, respond to customer inquiries, update customer credit histories, and administer accounts for all loans remaining in the loan portfolio.

### B. Customer Balances and Refunds to Customers

#### 1. Customer Balances

One needs to appreciate that most (over 80%) of Condor's customers do not pay off their loans in the normal course. Whether repossession, trade-in or bankruptcy, the Condor loan regularly terminates before the last payment is due. On its face, returning customers' overpayments or positive credit balances is a simple concept. Most people understand what they "owe" and what they "are owed". However, Condor customers did not always have visibility into the disposition of their car.

A positive credit balance represents a surplus in a customer's account after the loan has been terminated. Approximately 70% of Condor's terminations are categorized as "early", 20% conclude with a normal payoff / full cycle and 7% of Condor's terminations have been the result of the car being totaled. The remaining 3% of terminations are for a variety of reasons.

The majority of terminations, those categorized as "early", represent trade-ins at the dealer or early payments by the customer. The early payment process includes Condor providing the customer with a pay-off amount. The pay-off amount provided by Condor includes 10 days of additional interest, presuming it will take some time for the actual pay-off to happen. If the customer pays the quoted pay-off amount after more than 10

7

days, the amount paid is less than the amount owed and Condor would follow-up to seek additional payment.[3]

Conversely, if the customer pays the quoted pay-off amount prior to 10 days, the amount paid would be more than the amount owed, resulting in a positive credit balance. Having inquired of payoff personnel and Condor management, the Receiver has been told that positive credit balances were not returned to customers unless specifically requested by the customer.

The DFS has further alleged that Condor attempted to conceal positive credit balances from its customers by systematically shutting down a customer's access to the Company's web portal upon pay-off of its loan. Personnel in Condor's information technology group have informed the Receiver that upon termination of a customer's account that customer would no longer have access to his or her account history and balance information on-line even if a positive credit balance still existed[4].

### 2.  Return of Positive Credit Balances to Customers

In late 2013, Condor began to identify customer accounts with positive credit balances in order to return amounts owed to customers. The Company printed refund checks to customers with positive credit balances on seven dates in December 2013 through February 2014. As detailed in the First Report, approximately half of these checks were printed but not signed and sent, remaining in the Company's office.

Since the date of the First Report, the checks that were not signed and sent to customers have been voided in the Company's accounting system. The voiding of the checks has

---

[3] Condor employees in the Payoff department have explained that customer payments within $10 and dealer payments within $20 of total amount owed would be considered adequate and are not followed up on.
[4] The Receiver has recommended to Condor management that the system be changed to only terminate access to accounts when the account balance is equal to zero.

restored the positive credit balances, representing refunds due to customers, in the Company's accounting system. The Receiver has identified the resulting positive credit balances relating to loans terminating in 2012 – 2014 and is in the process of sending those refunds to customers.

Additionally, many of the refund checks from 2012 - 2014 that were sent to customers were not cashed or deposited by customers prior to the Condor Citibank operating account being frozen under the terms of the TRO. The Receiver has identified 1,344 of these checks totaling $115,200 which remain uncashed.[5] The Company will also void these checks and the Receiver will prepare new checks to resend them to customers.

On May 23, 2014, the Receiver resumed the practice of sending refund checks to customers who have terminated loans with positive credit balances. The Receiver has sent checks to customers with positive credit balances on loans terminating in 2012, 2013 and 2014. These 6,777 checks represent $784,155.20 in customer refunds.

Going forward, Condor has initiated a new process to pay customer refunds on a timely basis. If a positive credit balance exists in the Company's accounting system on any loan 30 days after loan termination, a refund is deemed due to the customer. Two times per month, all such positive credit balances are compiled and refund checks are sent to the customers.

In the past, Condor only sent refunds to customers who had contacted the Company and requested the refund. Currently, Condor's process involves sending refund checks to all customers owed such amounts. Condor's customer base tends to change addresses more often than other consumers. Contact information for these customers can quickly become obsolete. Therefore, customer balances owed on loans which were terminated in earlier

---

[5] 628 of these uncashed checks totaling $58,963 relate to loans terminated in 2012 and 2013.

9

years become progressively more difficult to return to customers as time passes. To address this, Condor has initiated a process to handle customer refund checks which are returned to the Company due to incorrect or outdated contact information.

1.  If the returned check contains forwarding information for the customer, the check is resent to the new address.

2.  If the returned check does not contain forwarding information for the customer, attempts are made to call the customer based on the phone numbers contained in the customer file. If the customer can be contacted by phone, an updated address is acquired and used to resend the check.

3.  If the customer cannot be reached, Condor will undertake the steps under the applicable laws concerning the treatment of unclaimed property.

**3. Remaining Balances to be Returned to Customers**

In the First Report the Receiver made reference to a preliminary report prepared by the Company which indicated that approximately 39,000 loans had positive credit balances totaling approximately $11 million. Based on observations and examinations to date, the current status of customer balances remaining to be refunded is as follows (with additional discussion of each component below):

| Components of Positive Credit Balances | First Report to the Court | Second Report to the Court |
|---|---|---|
| a. Positive Credit Balances | $1.7M | $1.5M |
| b. Customer Accounts Classified as "Legal" | $5.7M | $5.6M |
| c. 360-Day/365-Day Calculation | $3.6M | $2.9M |
| Positive Credit Balances | $11.0M | $10.0M |

10

**a. Positive Credit Balances ($1.5 million)**

As explained above, refund of positive credit balances for accounts terminated in 2012, 2013 and 2014 have already been sent to customers. Subsequent to the issuance of these refunds, $1.5 million of positive credit balances remain to be refunded to customers for accounts terminated prior to 2012.

**b. Customer accounts classified as "Legal" ($5.6 million)**

Under certain circumstances, customer delinquent loans which are in legal proceedings can result in positive credit balances. On its face this appears counter intuitive, given the customer is delinquent. For example, if a loan is terminated after the repossession and sale of a customer's vehicle for non-payment, and if the proceeds from the sale of the vehicle at auction do not cover the amount remaining due to Condor, a balance remains due from the customer. Unless written off as uncollectible, these balances remain in the Company's accounting system as amounts due to Condor.

In cases in which Condor pursues the customer for amounts due to Condor and receives a court judgment in its favor, the amount of the judgment, which generally includes statutory interest and may include legal costs, can exceed the amount shown as due from the customer in the Company's accounting system. The amount of the loan due in the accounting system is not updated for the amount of the judgment.[6] Therefore, actual payments received from these customers as a result of the judgment may appropriately exceed the amount shown as due in the accounting system. Within the Company's accounting

---

[6] The lack of an updated, comprehensive customer balance within the accounting system is an example of an internal control weakness the Company must address. Doing so is imperative to prevent similar issues in the future and to better serve the auto finance consumer.

system, this would result in a perceived positive credit balance. However unless the payments received exceed the judgment amount, the customer is not owed a refund.

As of the First Report, the Company's classification of "legal" accounts comprised $5.7M of positive credit balances. Sample based testing of the accounts originally classified by the Company as "legal" identified errors in the coding of certain accounts as legal, inadequate supporting documentation including the absence of underlying legal judgments and instances of legal accounts upon which customers appear to have paid amounts in excess of judgments (plus statutory interest). The Company, supported by the Receiver, is working to better understand these discrepancies, obtain judgments and to coordinate with the third party attorneys as necessary.

The ideal next step would be to perform a statistical sample and review of a revised subset of "legal" accounts to test for the existence of any positive credit balances due to customers. To be clear to the Court, a sample under these circumstances would require zero exceptions. An exception would indicate an individual consumer who is owed money from Condor. Extrapolation of exceptions within the sample to the entire population would not work, as it would not specifically identify those customers to whom moneys are owed.

In the event that the issues mentioned above cannot be satisfactorily resolved, or if a sample is selected and contains an exception, the Company will be left to validate and support its assertion that each of these balances shown on the Company's records are not moneys due to consumers on an account by account basis. Such an exercise, given limitations of the account balances in the

12

Company's accounting system and lack of underlying judgments retained in customer files, would be a very time consuming undertaking.

Pending testing and confirmation, based on review performed to date, it is still the Receiver's opinion that a significant portion of the current population likely does not represent positive credit balances due to customers.

c. **360-day/365-day calculation ($2.9 million)**

As described in the First Report, an analysis prepared by the Company applied a historical 360-day year calculation for the period prior to January 29, 2014 and applied a 365-day year to the subsequent period. The Company's analysis reduced its preliminarily calculated $11 million positive credit balance by approximately $3.6 million. The related positive credit balance has been further reduced to $2.9 million by the return of positive credit balances made to customers since that time.

The Company issues loans with fixed rates of interest, generally ranging from 12% – 24%. While the Truth in Lending Act ("TILA") allows for the application of either a 360-day or 365-day year is used in computing interest, it is predicated on the disclosed APR being within one-eighth of one percentage point of the APR charged. It is the Receiver's understanding that the relatively high interest rates often charged by Condor, combined with its historical practice of using a 360-day year for computing interest, resulted in APRs charged to consumers exceeding the APR disclosed on their contracts by more than the tolerable one-eighth of one percent.

Since January of 2014, Condor has been using a 365-day year to calculate interest amortization. With regards to refunds due back to customers, the

13

Company has revised its amortization and refund approach from that initially presented in the First Report. The Receiver understands the Company's revised approach to be based on the Company's and its Counsel's interpretation of TILA and related enforcement action guidance.

The Company's revised approach uses a two year look back period, from the start of the DFS' current examination, using January 2014 as its start date, and retroactively calculating account balances for accounts terminated in 2012, 2013 and 2014 on a 365-day year basis. Based on this change in methodology, approximately $715,000 of additional refunds were made to customers for accounts terminated in 2012, 2013 and 2014; monies previously categorized as "360-Day/365-Day Calculation" in the First Report.

Consistent with the previous methodology, accounts terminated in years prior to 2012 continue to apply a 360-day year calculation, resulting in no change to positive credit balances due to customers related from these accounts.

Condor's methodology is still under review by the Receiver. Among the alternative methodologies being considered by the Receiver are the appropriateness of using January 2014 as the start of the DFS' current examination and the potential need to consider communications with the State of Maryland Department of Labor, Licensing and Regulation in March of 2013 as the starting point for Condor's applicable look-back period. Alternative methodologies currently being considered would not impact the 2012 – 2014 refunds already issued, rather they may increase the look-back period to include additional moneys owed in prior periods.

14

Determination of the appropriate day count methodology, and for which periods of time, will impact the amount of the Company's positive credit account balances due to customers. The amount still owed to customers is currently estimated to be $2.9 million if the entire history of loans is refunded based on a 365-day methodology.

### d. Statutory Interest

A determination should be made as to whether statutory interest should be paid to customers on the balances held by the company.

As briefly discussed at the Pre-trial Conference on June 10th by an attorney for DFS and your Honor, statutory interest could potentially increase the amount owed to consumers. Given the time period customer balances were held by Condor and New York State's statutory interest rate of 9%, the amount owed could be considerable. No calculation has been performed, and no reserve has been made if statutory interest were to be paid.

A legal decision needs to be made with respect to statutes of limitation as well as statutory interest. The Receiver will work with the Company and its Regulators regarding the resolution of potential statutory interest owed to customers.

### C. Condor's Licenses to do Business

As described above, Condor is in the process of responding to Massachusetts and Connecticut with regards to their respective notices of intent to revoke Condor's Sales Finance Company License.

15

### D. The New York State Department of Financial Services

In the First Report the Receiver informed the Court that he had requested the DFS personnel remain on the Company's premises until their particular work streams were redundant or otherwise no longer necessary. The DFS investigation and compliance teams remained on-site at that time, but have since completed their examination of certain customer accounts. Accordingly, DFS is no longer on-site at the Company.

### IV.   LOAN ORIGINATION

#### A.  Background

The loan origination process for sub-prime auto loans starts at the auto dealer. The steps described below represent, generally speaking, the process by which an auto loan becomes part of Condor's auto loan portfolio.

When a customer enquires at an auto dealer about purchasing an auto, a credit check and financial analysis is run. This analysis tells the customer and the dealer approximately how much credit they will be able to acquire for their auto purchase. When an auto is selected by the customer, the loan application details are entered into one of the providers of online credit applications and finance sourcing. If Dealertrack or RouteOne is used, the dealer may select Condor as one of the financiers to provide a quote. When a credit analyst at Condor gets notification that they have been selected, they prepare a rate quote for the loan based upon the customer's credit profile. A Condor credit analyst or sales representative may then call the dealer directly, providing additional details or encouraging the dealer to select Condor as the financer.

The customer then enters into a contract to buy the car after completing all of the necessary paperwork (title, registration, insurance, etc.). If Condor is selected, the paperwork is forwarded to Condor, and Condor in turn sends a check payable to the dealer or an ACH payment to cover

16

the amount of the loan. At times, the dealer receives Condor's payment after the car "rolls off the lot."

### B. The State of Condor's Loan Origination Process

After resolving compliance and funding issues, Condor could re-enter the loan origination business after being out of it for a period of time. Condor would still face certain business obstacles resulting from the temporary absence from its loan origination business.

The auto loan origination business is competitive, with each sale-finance transaction bid upon by a number of like companies. Finance managers at the various auto dealerships are responsible for selecting the companies from which bids are solicited for a sale-finance transaction. Prior to the TRO, Condor's sales representatives regularly called dealerships and visited them periodically.

### C. Unresolved Compliance

As of the First Report, the Receiver had engaged Fidelity Information Services, LLC ("FIS") to assist the Company in addressing deficiencies in the areas of governance, compliance and internal controls. Condor operates in an industry with inherently high risk and had been doing so with minimal mitigating controls.

Since May 30, 2014 FIS has been busy conducting a compliance risk assessment, developing a compliance applicability control/risk matrix, drafting written policies and procedures and making plans for the compliance training of Condor's management and employees. While FIS and the Company have made great progress, the road to an effective compliance management system and culture of compliance is a long one. As described below, the assessment phase is nearly complete, with documentation, implementation, training and assessment still to come.

The first phase of FIS's work, their compliance risk assessment is nearly complete. FIS's risk assessment has included interviews of Condor senior management, the completion of risk

17

assessment questionnaires and the evaluation of compliance risks including the applicability a multitude of federal and state laws and regulations. The purpose of the assessment phase is to identify applicable inherent compliance risks and evaluate the control environment in place to assess the effectiveness of the Company's risk management.

The next phase of FIS's efforts represents the development of a comprehensive compliance management system and the issuance of corporate governance recommendations. Development of a compliance management system will include:

- Compliance cycle and methodologies
- Risk assessment schedule
- Comprehensive compliance policies & procedures
- Compliance training plan
- Consumer complaint response program
- Compliance monitoring plan
- Audit process and reporting
- Compliance management reporting process (to a Board of Directors)

FIS's engagement with Condor will extend beyond the Receiver's time at the Company. The execution of the in-process compliance management system and adherence to best practices with regards to internal controls will be responsibility of Company management. Historically Condor has lacked a culture of compliance. Proper tone at the top and an willingness to invest in best practices will be imperative to a successful compliance program and protection of Condor's customers.

**D. Unresolved Funding (Wells Fargo Credit Facility)**

Wells Fargo has informed the Receiver and the Company that they do not intend to provide Condor with additional funding under the credit facility for new loan originations. Specifically,

18

Wells Fargo wants to be paid and taken out of the credit facility. Additionally, Wells Fargo has asserted that they will not allow new originations to be made using any of the cash currently held by the Company. In order to resume loan originations the Company needs an alternative source of funding.

Condor representatives have contacted parties interested in a refinancing or potential securitization to repay Wells Fargo. The Receiver has also contacted 17 banks and financial institutions to attempt to identify a replacement for the Wells Fargo credit facility. In addition, Wells Fargo has provided contact information for additional potential financiers / buyers. The conversations with these companies will proceed along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.

The Receiver will oversee and take charge of the process, working with Katten Muchin Rosenman LLP ("Katten") and Condor's management (Todd Baron, Donald Kalechofsky and Robert Scalone).

Katten has begun discussions for the potential replacement of Wells Fargo as a financier for new loan origination with potential new financiers. The Receiver and the Company have executed a Non-Disclosure Agreement ("NDA") and are in the process of creating an electronic data room for the potential financiers / buyers.

Condor's preference is to refinance and replace Wells Fargo and begin originations. The Receiver will support the refinancing option and will supervise the process and efforts of Condor and its Counsel to execute the dual-track process discussed above.

19

## V. STEPS TAKEN BY THE RECEIVER

### A. Control of Condor's Business

The Receiver remains in control of the Company's business, overseeing Condor's collection efforts, customer service, and other operating activity. Condor has not begun any new loan originations.

### B. Communication to Stephen Baron and Condor Employees

The Receiver has been on premises at Condor's office in Hauppauge daily since the Order, overseeing the Company's management and employees.

The Receiver has informed Stephen Baron that he should not work at condor's office because his presence at the offices will likely be a distraction; however, any important matters that Stephen Baron needs to address for Condor's or Condor's stakeholders' benefit override the Receiver's preference for him not being in the office.

On May 21, 2014 Todd Baron sent letters prepared by the Receiver and Todd Baron to sales employees terminated prior to the Receiver's arrival. That communication included relevant information including but not limited to health and dental insurance coverage, COBRA, 401k contributions and commissions and expense reimbursement, as appropriate.

The Receiver has approved the termination of one employee in the collections department for performance-based reasons. The Receiver has also approved the hiring of 3 additional full-time employees in the loan collection department and temporary staffing on an ad hoc basis.

On June 18, 2014, the Receiver had a second "town-hall" meeting with employees in Hauppauge, New York (in person) and Lake Mary, Florida (by phone). The Receiver discussed the status of the Company's progress with respect to addressing compliance and controls, Wells Fargo refinancing/buyout and interaction with its regulators.

20

## C. Communication on the Company's Website

When the Receiver arrived at Condor, the Company's website contained language required by the TRO, as well as a link to the TRO. At the Receiver's direction, the Company updated its website to include a link to the Order.

## D. Mail

The Receiver has diverted incoming mail to his attention for review before dissemination to appropriate Company employees.

## E. Security and Control

The Receiver continues to maintain oversight of physical and electronic security. To supplement daily compressed and encrypted back-ups that are securely electronically transferred to a secure off-site service, the Receiver continues to run weekly back-up tapes and maintains them on-site in the locked server room to which only the Receiver has access.

## F. Management of Assets

Condor's most significant asset is its loan portfolio. The steps taken to preserve the value of this asset which are outlined in the First Report are ongoing. In addition, the Receiver and Wells Fargo have contracted with CSC to provide backup servicing on the Condor loan portfolio. Representatives from CSC were on site on June 19 and June 20 to initiate the backup process.

The rate of delinquent loans at various dates throughout 2014 is presented below:

| PERIOD END | GROSS LOAN BALANCE | CURRENT- 30 DAYS | 31-60 DAYS | 61-90 DAYS | 91-120 DAYS | 120+ DAYS | Total 60+ % |
|---|---|---|---|---|---|---|---|
| 1/31/2014 | 597,057,412 | 532,711,689 89.2% | 33,397,048 5.6% | 11,125,615 1.9% | 4,969,194 0.8% | 14,853,866 2.5% | 5.2% |
| 2/28/2014 | 610,584,056 | 551,824,422 90.4% | 28,162,830 4.6% | 9,266,972 1.5% | 4,983,006 0.8% | 16,346,826 2.7% | 5.0% |
| 3/31/2014 | 632,450,171 | 573,494,807 90.7% | 27,701,672 4.4% | 8,545,749 1.4% | 4,730,254 0.7% | 17,977,689 2.8% | 4.9% |
| 4/30/2014 | 641,920,762 | 569,064,855 88.7% | 37,265,681 5.8% | 10,658,735 1.7% | 4,829,514 0.8% | 20,101,977 3.1% | 5.5% |
| 5/13/2014 | 631,470,104 | 552,534,133 87.5% | 39,273,526 6.2% | 13,166,535 2.1% | 5,467,108 0.9% | 21,028,802 3.3% | 6.3% |
| 5/20/2014 | 625,899,445 | 544,332,154 87.0% | 40,640,863 6.5% | 14,113,775 2.3% | 6,124,439 1.0% | 20,688,214 3.3% | 6.5% |
| 5/27/2014 | 621,330,505 | 535,191,563 86.1% | 43,397,708 7.0% | 14,899,630 2.4% | 6,641,010 1.1% | 21,200,594 3.4% | 6.9% |
| 6/03/2014 | 616,030,363 | 529,776,014 86.1% | 43,531,304 7.1% | 14,377,408 2.3% | 6,542,342 1.1% | 21,803,295 3.5% | 6.9% |
| 6/10/2014 | 611,322,476 | 523,791,518 85.7% | 43,055,095 7.0% | 14,792,366 2.4% | 7,116,799 1.2% | 22,566,698 3.7% | 7.3% |
| 6/17/2014 | 607,101,366 | 507,812,933 83.6% | 50,565,055 8.3% | 17,413,450 2.9% | 7,963,637 1.3% | 23,346,291 3.8% | 8.0% |

The Receiver has noted that delinquency has increased over the course of the past several weeks. The Gross Loan Balance decreased by $34 million from April 30, 2014 to June 17, 2014 primarily because loan origination stopped on April 23, 2014. The fact that no new loans are being added to the portfolio has the impact of a smaller "current" pool and a smaller overall balance, resulting in a higher percentage in the greater than 30 day categories. There are a number of other factors impacting the trend which the Company and the Receiver are analyzing, such as:

- Seasonality – Summer is traditionally a slower time for collections
- "Angry calls" from customers increasing call time and reducing the number of calls made/day
- Customers are aware of Condor's problems and may attempt to avoid making required payments
- Data issues (for example, the delayed updating of bounced checks and ACHs in the Company's system, processing of refunds, halted processing of credit card payments due to the vendor canceling the Company's account, etc.)

22

- The planned move to Florida temporarily disrupted collections practices

## G. Payments and Disbursements

The Receiver has continued to make payments and disbursements from the Company's assets that are necessary or advisable for carrying out the directions of, or exercising the authority granted by the Court's order. Such payments include:

- Payroll
- Interest payments to Wells Fargo on the credit facility at default rates[7]
- A total of $24 million in principal payments to Wells Fargo, reducing the loan from $261 million to $237 million.
- Amounts owed to repossession companies
- Payments to other vendors used by the Company in the normal course of business (including overdue charges and bounced payments)
- Customer refunds
- Legal and professional fees

Legal and professional fees include the following payments to law firms:

- $351,000 to Katten Muchin Rosenman LLP, the Defendants' attorneys, for services through June 12, 2014
- $352,000 to Blank Rome, attorneys for Wells Fargo, for the period through May 28,2014
- $45,000 to Chapman and Cutler LLP, attorneys for BMO Harris Financing, Inc. for the period through May 20,2014
- Payments to several law firms for collection services to Condor

The Receiver also expects Condor to receive invoices for additional legal and professional fees in the near future, including:

---

[7] An Event of Default was declared by Wells Fargo which caused the interest rate on the credit facility to increase from 2.752% to 5.252%.

- The Receiver expects to issue a statement to the Court this week for services rendered by him and his team in the amount of $280,800 for the one-month period ending June 14, 2014.

- Legal fees of Schlam, Stone & Dolan, conflicts counsel for Condor's dispute as to Wells' actions

- Legal fees of Reardon Scanlon Vodola Barnes LLP, local counsel for the Defendants to handle the July 1, 2014 hearing in Hartford, CT with the Connecticut Regulators

The $24 million in principal payments to Wells Fargo were made from excess cash after taking into account a reserve of approximately $10 million[8] for customers on terminated loans, as well as an operating cash cushion for the Company. The Default interest rate on the Wells Fargo credit facility nearly doubled the interest expense on the Company's debt. This $24 million in principal re-payments will save Condor approximately $1.3 million annually.

At June 21, 2014 the Company had approximately $11.1 million of cash before applying the customer reserve and after the $24 million in principal payments to Wells Fargo.

The Receiver will only authorize payments that comply with the Court's order and that meet the "ordinary and necessary" guidelines of the U.S. Internal Revenue Service. The Receiver has not made the following payments either requested by or for the benefit of Stephen Baron:

- Maintenance payments and assessments on condominiums held in Stephen Baron's name,

- Stephen Baron's salary,

- Credit card charges on Stephen Baron's personal credit card, and

---

[8] In light of the refunds paid to customers by the Receiver and the Receiver's review of the accounts classified as "legal", the reserve held by the Receiver for customer refunds has been reduced to $10 million. This reserve was $11 million as of the date of the First Report.

   -   Credit card charges made by Stephen Baron on the Condor corporate credit card that appear to be personal in nature.

The Receiver has had discussion and communication with Stephen Baron and his Counsel regarding potential payments to Stephen Baron or entities owned by Stephen Baron. The Receiver expects Stephen Baron's Counsel to address the Court with regard to the background and circumstances of these potential payments.

## H. State, Federal and/or Foreign Courts

With the exception of Condor's ongoing collection efforts including bankruptcies and pursuing judgments, the Receiver has not deemed it necessary at this time to institute, compromise, adjust appear in, intervene in, or become party to proceedings in state, federal or foreign courts to preserve or recover the assets of the Defendants.

## I. Actions Against the Receiver or Defendants

At this point in time, the Receiver is not aware of any actions against the Receiver or Defendants with the exception of the MA and CT regulators as previously discussed.

## J. Continue to Conduct the Business of the Company

The Receiver has overseen the Company's continued collection efforts on its loan portfolio. As discussed in the Receiver's Assessment, the Receiver has not authorized new originations for the reasons stated.

## K. Bank Accounts (Citibank Operating Accounts)

As explained in the First Report, Citibank informed the Receiver that they will allow the use of the old operating account for receiving ACH deposits for a period of approximately thirty days. In a letter dated June 4, 2014, Citibank officially informed the Receiver that it has decided to

terminate Condor's cash management agreement and all services Citibank was engaged to
perform thereunder including all ACH services. Citibank will make this termination effective as
of the close of business on July 3, 2014.

The Receiver and Condor management have contacted nine banks to inquire about opening a new
account, transferring Condor's funds and entering into a service agreement with a new bank.
Seven of those banks have declined to do business with Condor.

### L. Receipts & Expenditures

The Receiver is overseeing the Company's efforts of maintaining records of all receipts and
expenditures made.

### M. Response to State or Federal Authorities

As discussed above, Condor's Licenses to do Business, two states have provided the Company
with notice of intent to revoke the Company's Sales Finance Company License. The Receiver has
had discussions with representatives of both states' regulatory representatives for the purpose of
allowing this DFS initiated process to proceed and to allow Company Counsel to respond as
appropriate.

## VI.    STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE

### A. Prevent the Diminution in the Value of Assets of Defendants

The Receiver will continue his efforts to determine if the Company can begin new originations.
The Receiver will continue to ensure that Condor's most significant asset (its auto loan portfolio)
is (a) being serviced properly, (b) monitored for aging issues, and (c) protected from customer
delinquencies through collection, repossession and auction efforts.

As detailed above, the Receiver has contacted a number of buyers / financiers to attempt to
identify a replacement for the Wells Fargo credit facility. The conversations with these companies

26

and the additional companies provided by Wells Fargo have proceeded along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.

The Receiver considers the identification of a replacement for the Wells Fargo credit facility a crucial step in allowing Condor to begin originations and preserve the value of the Company's loan portfolio.

**B. Pursue Recovery of Defendants' Assets From Third Parties**

Aside from Condor's ongoing collection efforts from customers whose loans were terminated for repossession, car damage and theft, the Receiver is not aware of any material assets of the Company in third party hands.

**C. Adjust the Liabilities of Defendants, if Appropriate**

The Receiver will continue his efforts in analyzing the Defendants' liability to customers for positive credit balances, interest charges and any other related deficiencies and adjust accordingly. The Receiver will also act on claims made by terminated employees for owed compensation, benefits, and related issues. Finally, the Receiver will coordinate with Condor and Condor's Counsel in responding to state regulators' actions.

\* \* \* \* \*

This report sets forth my assessment based on my Receivership to date. My assessment may be amended and or supplemented based upon information that subsequently comes to my attention.

*Denis O'Connor*

Denis O'Connor

RECEIVER

27

**Exhibit: Condor Capital Listing of Assets & Liabilities**

**February 28, 2014**

**ASSETS:**

| | |
|---|---|
| Repossessed vehicles, net | $ 1,437,959 |
| Loan contracts receivable, net | 322,045,874 |
| Mortgage loan receivable | 122,934 |
| Cash and cash equivalents | 2,400,486 |
| Deposits | 18,000 |
| Accounts receivable, net | 8,748,829 |
| Property and equipment, net | 475,695 |
| Due from affiliate | - |
| Due from shareholder | - |
| Other assets-due from Oser | 5,717,917 |
| Other assets-due from officer/affiliate | 13,154,891 |
| Deferred loan costs | 937,061 |
| | $355,059,646 |

**LIABILITIES:**

| | |
|---|---|
| Notes payable | $243,000,000 |
| Due to affiliate | 41,268,709 |
| Income tax payable | 6,015,358 |
| Accounts payable, accrued expenses and deferrals | 15,073,713 |
| | $305,357,780 |