

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/15/14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

                              Plaintiff,

        – against –

CONDOR CAPITAL CORPORATION
AND STEPHEN BARON,

                              Defendants.

No. 14-CV-2863 (CM)

**July 14, 2014**
**THIRD REPORT TO THE COURT**

**DENIS O'CONNOR**
**RECEIVER**
AlixPartners LLP
40 West 57th Street
New York, NY 10019
(646) 746-2465

**Table of Contents**

I.    INTRODUCTION ................................................................................................................3

II.   THE RECEIVER'S ASSESSMENT ...................................................................................3

III.  CURRENT STATUS OF THE COMPANY .......................................................................10

   A.    The Company's Business and Operations .......................................................................10

   B.    Customer Balances and Refunds to Customers ..............................................................11

       1.    Customer Balances.................................................................................................11

       2.    Return of Positive Credit Balances to Customers ...............................................13

       3.    Remaining Balances to be Returned to Customers ..............................................16

   C.    Condor's Licenses to do Business .................................................................................22

   D.    The New York State Department of Financial Services ..................................................22

IV.  LOAN ORIGINATION ....................................................................................................22

   A.    Background.......................................................................................................................22

   B.    The State of Condor's Loan Origination Process ...........................................................23

   C.    Unresolved Compliance...................................................................................................23

   D.    Unresolved Funding (Wells Fargo Credit Facility) ........................................................24

V.   STEPS TAKEN BY THE RECEIVER...............................................................................27

   A.    Control of Condor's Business .........................................................................................27

   B.    Communication to Stephen Baron and Condor Employees.............................................27

   C.    Communication on the Company's Website ...................................................................27

   D.    Mail .................................................................................................................................28

   E.    Security and Control .......................................................................................................28

   F.    Management of Assets.....................................................................................................28

   G.    Payments and Disbursements .........................................................................................30

   H.    State, Federal and/or Foreign Courts ..............................................................................32

   I.     Actions Against the Receiver or Defendants .................................................................32

   J.     Continue to Conduct the Business of the Company .......................................................32

   K.    Bank Accounts (Citibank Operating Accounts)..............................................................33

   L.    Receipts & Expenditures.................................................................................................33

   M.   Response to State or Federal Authorities .......................................................................33

1

VI. STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE .................................................. 34

   A.   Prevent the Diminution in the Value of Assets of Defendants ......................................................... 34

   B.   Pursue Recovery of Defendants' Assets From Third Parties........................................................ 34

   C.   Adjust the Liabilities of Defendants, if Appropriate....................................................................... 35

**EXHIBITS**

Exhibit 1: Condor Capital Listing of Assets & Liabilities

Exhibit 2: Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"

Exhibit 3: Weekly Cash Flow Projection

**I.    INTRODUCTION**

This report is filed in compliance with the Preliminary Injunction and Order Appointing Denis O'Connor Receiver dated May 13, 2014 (the "Order") issued by U.S. District Court S.D.N.Y. (the "Court") by the Honorable Colleen McMahon. As such, this report sets forth the steps and actions taken to date by the Receiver to complete the tasks as set forth in the Order and also sets forth the findings of the Receiver's verifications and examinations. The Receiver was assisted by representatives of AlixPartners LLP that worked under his supervision. All references to the Receiver's work in this report include work performed by these individuals.

This report is the third report issued by the Receiver. The first and second reports filed with the Court on June 2, 2014 (the "First Report") and June 23, 2014 (the "Second Report") are incorporated herein by this reference.

The Receiver and his team arrived at Condor Capital Corporation's ("Condor" or the "Company") offices at 165 Oser Avenue, Hauppauge, New York on May 14, 2014 and have been in control of the Company since.

**II.    THE RECEIVER'S ASSESSMENT**

The Receiver's assessment in the First Report and the Second Report was that Condor should not re-start its loan origination business until it has completed the following:

(a) Institute adequate governance, compliance and internal controls and procedures;

(b) Obtain an alternative source of funding or capital; and

(c) Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.

The status of each of these requirements is as follows:

3

<u>Institute adequate governance, compliance and internal controls and procedures</u>

i)      Institute adequate governance

Corporate governance practices follow a number of principles that often include:

1. An ethical approach in doing business,

2. Accountability and transparency to all stakeholders,

3. Strategic alignment and communication of roles of owners, directors, management and employees, and

4. Adoption of clear and achievable goals.

Following are examples of observations that lead the Receiver to believe that Stephen Baron ("Baron") has not embraced the principles of adequate corporate governance:

1. Baron oversaw and directed employees that engaged in a practice of keeping account balances owed to customers when loans terminated[1] over a period of approximately 20 years and for approximately 20,000 customer accounts.[2]

2. Baron oversaw and directed employees that engaged in a practice of charging customers an interest rate above the contractual annual percentage rate on the face of the contract by using a 360-day count to calculate a daily interest rate and applying that rate to customers over a 365-day period in violation of the Truth in Lending Act ("TILA"). After this practice was identified by the Maryland regulator in June 2013, Condor changed its methods to align with TILA. However, Condor also charged its

---

[1] However, if a customer requested their balance be returned, Condor's practice was to return their balance.
[2] As further discussed in this report, the Company's current approach to address the 360/365 day issue applies a two year look-back period from January 2014, retroactively calculating account balances for accounts terminated in 2012, 2013 and 2014 on a 365-day year basis. Accounts terminated in years prior to 2012 continue to apply a 360-day year calculation. If the 365-day convention were to be applied to the entire loan portfolio, the number of terminated customer loans with positive credit balances would be approximately 40,000.

customers an additional one-eighth of one percent interest.[3] After the Maryland regulators communicated their disagreement with Condor's one-eighth of one percent addition (in August 2013), Condor stopped charging the one-eighth of one percent for Maryland customers only (but continued to charge the one-eighth of one percent to all other customers). On January 27, 2014 Condor ceased charging the one-eighth of one percent for all states and appeared to be in compliance with TILA. Subsequently, on January 29, 2014, Condor added the one-eighth of one percent to only New York State customers whose loans terminated before December 10, 2013 effectively reducing the New York State customer refund checks by this amount.

3.  Baron oversaw and directed employees who engaged in a practice of charging customers for loan termination payments if the customer exceeded 10 business days to make a payment but not refunding any interest if the customer paid early.

4.  Baron built Condor's business from the ground up and hired many of the key managers and supervisors. Many of the Company's employees are loyal to Baron and dependent on him for their compensation. Despite Baron's assertion of being a "big-picture kind of guy,"[4] Baron regularly received daily cash receipt reports, reports on credit guidelines, and collection reports, as well as reviewing certain invoices and disputing fees for services or goods provided to Condor. The Receiver believes Baron was involved in important details of the business and to that end,

---

[3] Condor added one-eighth of one percent to the daily rate using a 365-day count. Baron asserted to the Receiver his belief that this was permitted under TILA's tolerance rules.

[4] Under direct examination at the May 12 hearing regarding his awareness of customer overpayments on loans, Baron stated: "Well, as I stated earlier, my position in the company has been the big-picture kind of guy. I never got involved very much in the minutia of the details of the company. In my purview the company was very simple. We make loans. And then we collect the money. It was never a complicated business. You make an appropriate loan, and you collect it, and everybody is happy. There were other people in the company who dealt with — I don't want to diminish it and call it minutia, but in the details. I was never detail-oriented. But sometime in the fall, this past fall, it was mentioned to me that we had this problem, where we weren't giving refunds. And then, and then of course I was told about all the balances that arose from changes in accounting practices. And I didn't give them much credence. Perhaps I should have."

Baron communicated with and directed employees to effectuate practices that were profitable and reasonable, as well as certain limited practices that were unfair to customers and which violated governing rules for a sales finance company (see items 1 and 2 above).[5]

5. Baron oversaw and directed a Condor executive identified as being responsible for eliminating positive credit balances for approximately 350 legal accounts in 2005 by manually adjusting the accounting records without support.[6]

6. Baron oversaw and directed employees responsible for the filing of erroneous and incomplete reports to New York State's Office of Unclaimed Funds.

7. Baron oversaw and directed employees responsible for a practice of having two non-employed individuals on the Condor health benefits plan for extended periods of time.[7]

8. Baron charged expenses that appear to be of a personal nature to the Condor business. Baron made charges on the Condor Corporate American Express credit card despite the Receiver's request to discontinue use of the corporate credit card.

9. Baron oversaw and directed a business that deals with thousands of consumers without making a necessary investment in compliance and controls.

10. Baron oversaw and directed employees responsible for accounting for a business that caused the books and records of the business to be in error and incomplete.

---

[5] The Receiver's basis for this assertion is both numerous discussions with Company employees as well as examining numerous records.

[6] Based on discussions with Condor employees the executive was Michael Hawkins, who ran the day-to-day operations of the Company until he was terminated in October 2011.

[7] Short-term exceptions for hardship of former employees, which were directed by Condor management and approved by the Receiver during the recent terminations made by Condor, are not included in this observation.

6

11. Baron instructed a company officer (Todd Baron) not to participate in executing certain confidentiality agreements used in the due diligence process on behalf of Condor by certain financial entities proposing to re-finance the Wells Fargo loan or purchase the portfolio of customer loans but allowed the officer to execute the confidentiality agreement for the entity that Baron favored.

It is the Receiver's opinion that in order to achieve adequate corporate governance, Condor will need to insulate itself from the control and influence of Baron. This might not be achievable as Baron is the 100% shareholder of Condor and because of Baron's passion to guide and control Condor's business practices.[8]

ii)     Compliance

Since May 30, 2014 Fidelity Information Services, LLC ("FIS") has been assisting the Company in addressing deficiencies in the areas of governance, compliance and internal controls. FIS is in the process of finalizing its compliance risk assessment and delivering related summary documents to Condor management. FIS has also worked with Condor management to develop and update Company policies and procedures. The next phase of the FIS engagement will include the implementation of a compliance management system, training of management and employees, ongoing monitoring and a compliance management reporting process. To be clear, FIS and Condor have made good progress, but the implementation, practice and monitoring of proper governance, compliance and internal controls still requires additional time and effort on the part of FIS and Condor management.

iii)     Internal controls and procedures

---

[8] There were discussions among Condor's counsel and DFS, which the Receiver is aware of but not a party to, in the context of a potential settlement to achieve this insulation from Baron's influence. Significant changes to Condor's organization, such as a completely independent board of directors, a new CEO and other changes in organization and corporate culture were considered. However, the Receiver is informed that DFS has ended those settlement discussions.

As noted above, in addition to assessing Condor's compliance environment, FIS is addressing Condor's deficiencies in internal controls and updating the Company's policies and procedures. It is the Receiver's assessment that with assistance from FIS, management and employees currently in place, subject to the insulation from Baron mentioned above, Condor is capable of instituting the proper level of controls and procedures. The Receiver has noted progress in this area and continues to assess the control environment.

<u>Obtain an alternative source of funding or capital</u>

On June 4, 2014, Blank Rome (attorneys for Wells Fargo) filed a letter with the court reiterating the fact that Wells Fargo will not fund any further loan originations. Further, the letter makes clear that Wells Fargo wishes to be repaid as soon as possible and believes that any of Condor's excess cash (after a reserve set aside for Condor's wronged customers) should be used to pay down the existing loan obligations.

Condor's Counsel, Katten Muchin Rosenman LLP ("Katten") has contacted parties interested in a refinancing or potential securitization to repay Wells Fargo. The Receiver and Katten have also contacted 31 banks and financial institutions to attempt to identify a replacement for the Wells Fargo credit facility. In addition, Wells Fargo has provided contact information for additional potential financiers / buyers. The conversations with these companies have proceeded along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.[9]

The Receiver and Wells Fargo have provided the lists of interested parties to Katten. The Receiver and Katten have contacted the parties identified by the Receiver and Wells Fargo, as well as any additional

---

[9] Baron's preference is that a refinancing occurs. The Receiver will support the refinancing option as the preferred exit for Wells Fargo; however, parties only interested in purchasing the portfolio will receive equal access to the process to ensure that a dual track proceeds. This protects Wells Fargo's collateral and the Company should the refinancing or securitization options fail.

parties identified by the Company and Katten, to have them sign non-disclosure agreements ("NDA") and gain access to the data necessary for their due diligence.

<u>Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.</u>

The New York State Department of Financial Services ("DFS") has coordinated with and requested other state regulators to essentially "hold-back" on steps necessary for canceling Condor's licenses pending the outcome of this litigation. In the First Report and the Second Report, the Receiver informed the Court that two states, Massachusetts ("MA") and Connecticut ("CT"), had provided the Company with notice of intent to revoke the Company's Sales Finance Company License. Further, MA has granted Condor an extension to fulfill the provisions of its related Order and Notice until August 13, 2014. CT scheduled a hearing related to its actions for July 1, 2014. Since the date of the Second Report, the CT Department of Banking proposed to resolve the case without a hearing essentially on terms demanded in their notices and rescheduled the July 1 hearing for August 11, 2014 in order to allow time for a potential settlement with DFS.

The Receiver has been informed that DFS has discontinued its dialogue with Condor with respect to reaching a resolution or settlement of the issues noted in the complaint filed by the Superintendent of Financial Services of the State of New York on April 23, 2014 (the "Complaint"). This puts Condor's New York State (as well as other states) license to operate as a sales finance company in deeper jeopardy of revocation.

The Receiver believes that Condor's inability to effectuate an agreement of settlement with DFS will adversely impact its ability to refinance Wells Fargo at a reasonable cost. Further, as a practical matter, the investment needed to begin new originations would be questioned absent an ability for Condor to operate as a licensed going concern.

9

## III.  CURRENT STATUS OF THE COMPANY

### A. The Company's Business and Operations

Condor originates and services auto loans for customers generally characterized as "non-prime" or "sub-prime" borrowers. Prior to the issuance of the Temporary Restraining Order by the Court on April 23, 2014 (the "TRO"), the origination of loans was performed primarily through Dealertrack and RouteOne, providers of online credit applications and finance sourcing for auto dealerships. The loans made and serviced by Condor are financed through the secured credit facility with Wells Fargo as well as through the cash generated by the business. All of Condor's new origination activity has been halted as of April 23, 2014.

Condor generates approximately $17 million per month in cash receipts. The Company's monthly operating costs (consisting of interest on the Wells Fargo credit facility, payroll, and other selling, general and administrative expenses) are approximately $3 million per month.[10] As of July 11, 2014 Condor had approximately $8.2 million in the Receiver's controlled bank accounts. Thus, Condor appears to have the liquidity and potential equity in its loan portfolio to make an attempt in the short-term at rehabilitation.

Condor operates out of two facilities, its primary office at 165 Oser Avenue in Hauppauge, New York as well as a second office at 36 North Skyline Drive in Lake Mary, Florida which began operation in April 2014.

Although the company's original intention was to undertake an orderly shut-down of the operations in Hauppauge and move all operations to the Lake Mary office, the issuance of the TRO has temporarily halted that move. Currently, the 14 employees of the Lake Mary office,

---

[10] This $3 million estimate includes the increased interest expense resulting from the default interest rate applied to amounts outstanding under the Wells Fargo credit facility.

10

consisting of two assistant managers that transferred from Hauppauge and 12 collection agents hired locally, are engaged exclusively in collections and loan servicing.

The company continues to service loans, make collection calls, respond to customer inquiries, update customer credit histories, and administer accounts for all loans remaining in the loan portfolio.

### B. Customer Balances and Refunds to Customers

#### 1. Customer Balances

One needs to appreciate that most (over 80%) of Condor's customers do not pay off their loans in the normal course. Whether trade-in, repossession or bankruptcy, the Condor loan regularly terminates before the last payment is due. On its face, returning customers' overpayments or positive credit balances is a simple concept. Most people understand what they "owe" and what they "are owed". However, Condor customers did not always have visibility into the disposition of their car.

Further, while Condor's customers had a fixed monthly payment, they did not always have visibility into the manner in which those payments were applied toward their principal and interest balances. Condor's practice is to apply the interest rate on the loan to the outstanding loan balance on a daily basis. Each payment received from a customer is applied first to any outstanding interest and fees; any remainder is then applied to the principal balance. As discussed below, in many cases the interest rate applied was higher than the rate specified in the customer's contract.

A positive credit balance represents a surplus in a customer's account after the loan has been terminated. Approximately 70% of Condor's terminations are categorized as "early", 20% conclude with a normal payoff / full cycle and 7% of Condor's terminations

11

have been the result of the car being totaled. The remaining 3% of terminations are for a variety of other reasons.

The majority of terminations, those categorized as "early", represent trade-ins at the dealer or early payoffs by the customer. The early payment process includes Condor providing the customer with a pay-off amount. The pay-off amount provided by Condor includes 10 days of additional interest, presuming it will take some time for the actual pay-off to happen. If the customer pays the quoted pay-off amount after the 10 day period, the amount paid would be less than the amount owed and Condor would follow-up to seek additional payment.[11]

Conversely, if the customer pays the quoted pay-off amount before the 10 day period ends, the amount paid would be more than the amount owed, resulting in a positive credit balance. Having inquired of payoff personnel and Condor management, the Receiver has been told that positive credit balances were not returned to customers unless specifically requested by the customer.

DFS has further alleged that Condor attempted to conceal positive credit balances from its customers by systematically shutting down a customer's access to the Company's web portal upon pay-off of its loan. Personnel in Condor's Information Technology group have informed the Receiver that upon termination of a customer's account that customer would no longer have access to his or her account history and balance information on-line even if a positive credit balance still existed.[12]

---

[11] Condor employees in the Payoff department have explained that customer payments within $10 and dealer payments within $20 of total amount owed would be considered adequate and are not followed up on.
[12] The Receiver has recommended to Condor management that the system be changed to only terminate access to accounts when the account balance is equal to zero.

## 2. Return of Positive Credit Balances to Customers

In late 2013, Condor began to identify customer accounts with positive credit balances in order to return amounts owed to customers. The Company printed refund checks to customers with positive credit balances on various dates from December 2013 through April 2014. As detailed in the First Report, approximately half of these checks were printed but not signed and sent, remaining in the Company's office.

Since the date of the First Report, the checks that were not signed and sent to customers have been voided in the Company's accounting system. The voiding of the checks has restored the positive credit balances, representing refunds due to customers, in the Company's accounting system. The Receiver has identified the resulting positive credit balances relating to loans terminating in 2012 – 2014 and is in the process of sending those refunds to customers.

Additionally, many of the refund checks that were signed and sent to customers were not cashed or deposited by customers prior to the Condor Citibank operating account being frozen under the terms of the TRO. The Receiver has identified 1,344 of these checks totaling $115,200 which remain uncashed.[13]  The Company is beginning the process of voiding these checks and refunding these amounts to customers as appropriate.

Since resuming the practice of sending refund checks to customers who have terminated loans with positive credit balances, the Receiver has sent checks to customers with positive credit balances on loans terminating in 2012, 2013 and 2014. These 9,804 checks represent $1,054,289 in customer refunds.

Prior to June 2013, Condor had historically used a 360-day denominator for daily interest calculations. Thus, a customer's actual interest rate paid was greater than the contractual

---

[13] 628 of these uncashed checks totaling $58,963 relate to loans terminated in 2012 and 2013.

interest rate that the customer had agreed to. Condor changed from a 360-day routine to a 365-day routine for all accounts in June 2013.

The Receiver's understanding from Condor management is that this was done in response to the Maryland regulators' inquiries of Condor's use of a 360-day denominator versus using a 365-day denominator in Condor's interest calculations in order to comply with the regulator's observations.

On June 20, 2013, Condor changed the computer program that calculates account balances ("MORT06") in order to add one-eighth of one percent to all accounts with interest rates greater than 9%. The addition of the one-eighth of one percent was discussed with the Maryland regulators by Condor management. The Maryland regulator adamantly disagreed with the approach of adding one-eighth of one percent to each customer account. The Truth in Lending Act ("TILA") clearly refers to one-eighth of one percent as a margin for error or accuracy tolerance and not an add-on to customers' interest.

On August 28, 2013 Condor removed the additional one-eighth of one percent for Maryland customers only. Customers from states other than Maryland continued to be charged the extra one-eighth of one percent.

On January 27, 2014 Condor removed the one-eighth of one percent for all states, correcting the interest calculation for all customers. Two days later, on January 29, 2014, Condor again added one-eighth of one percent for all New York State customers on loans terminated prior to December 10, 2013.

14

As a result of adding the one-eighth of one percent on January 29, 2014 to loans for New York State customers, approximately 1,200 customer refund checks signed and sent by the Receiver were understated by approximately $67,000.[14]

In their Memorandum of Law dated June 4, 2014, the Defendants asserted that "...Condor faults itself for not issuing these refunds with more haste, but it did make efforts and always intended to issue them in full." Yet Condor directed[15] the addition of the one-eighth of one percent to the interest rate on certain loan balances. It appears that this was done purely to reduce the amount of the refunds being paid to customers.

Condor further asserted in their Memorandum of Law that "These underpayments, however, represent less than 0.1% of the total amount of loans made by Condor to its customers, and – though serious – the amount required to be repaid is simply not large enough to have any effect on Condor's revenue or economic performance." Materiality for business reporting under accepted guidelines has two thresholds: quantitative and qualitative. From a quantitative perspective the Receiver agrees with Condor. However, engaging in a proactive process of keeping approximately 20,000 customer balances (unless requested by the customer) over a 20-year period is qualitatively material to Condor's business practices, to its customers and to its regulators.

Going forward, Condor has initiated a new process to pay customer refunds on a timely basis. If a positive credit balance exists in the Company's accounting system on any loan

---

[14] In the course of sending refund checks to customers, the Receiver checked the calculations of refunded amounts on a sample basis. One of the sampled accounts related to a loan for a New York State customer which had terminated prior to December 2013. The Receiver's recalculation of the interest rate applied to this account did not reconcile with the interest rate stated on the loan. The Receiver investigated this discrepancy and identified the additional one-eighth of one percent which was still being added to loans for New York State customers.
[15] The Receiver questioned Baron, Condor employees and Condor's counsel regarding the addition of the one-eighth of one percent. The explanations provided to the Receiver regarding the addition of the one-eighth of one percent were conflicting and generally insufficient. Baron has stated that he believes that the addition of the one-eighth of one percent was an acceptable practice; however he could not explain why the amount was added back to loans for New York State customers after being removed for all other customers.

30 days after loan termination, a refund is deemed due to the customer. Two times per month, all such positive credit balances are compiled and refund checks are sent to the customers.

In the past, Condor only sent refunds to customers who had contacted the Company and requested the refund.[16] Currently, Condor's process involves sending refund checks to all customers owed such amounts. Condor's customer base tends to change addresses more often than other consumers. Contact information for these customers can quickly become obsolete. Therefore, customer balances owed on loans which were terminated in earlier years become progressively more difficult to return to customers as time passes. To address this, Condor has initiated a process to handle customer refund checks which are returned to the Company due to incorrect or outdated contact information.

1.   If the returned check contains forwarding information for the customer, the check is resent to the new address.

2.   If the returned check does not contain forwarding information for the customer, attempts are made to call the customer based on the phone numbers contained in the customer file. If the customer can be contacted by phone, an updated address is acquired and used to resend the check.

3.   If the customer cannot be reached, Condor will undertake the steps under the applicable laws concerning the treatment of unclaimed property.

**3.  Remaining Balances to be Returned to Customers**

In the First Report the Receiver made reference to a preliminary report prepared by the Company which indicated that approximately 39,000 loans had positive credit balances

---

[16] The Receiver questioned Condor employees responsible for dealing with customers who call about refunds, Condor employees responsible for sending out the customer refund checks, and other Condor employees aware of the refund process. None of these employees were willing or able to adequately explain why checks were not sent to all customers who were due refunds.

totaling approximately $11 million. Based on observations and examinations to date, the current status of customer balances remaining to be refunded is as follows (with additional discussion of each component below):

| Components of Positive Credit Balances | First Report to the Court | Second Report to the Court | Third Report to the Court |
|---|---|---|---|
| a. Positive Credit Balances | $1.7M | $1.5M | $1.4 M |
| b. Customer Accounts Classified as "Legal" | $5.7M | $5.6M | $3.6 M |
| c. 360-Day/365-Day Calculation | $3.6M | $2.9M | $2.6 M |
| Positive Credit Balances | $11.0M | $10.0M | $7.6M |

**a. Positive Credit Balances ($1.4 million)**

As explained above, refund of positive credit balances for accounts terminated in 2012, 2013 and 2014 have already been sent to customers. Subsequent to the issuance of these refunds, $1.4 million of positive credit balances remain to be refunded to customers for accounts terminated prior to 2012.

**b. Customer accounts classified as "Legal" ($3.6 million)**

Under certain circumstances, customer delinquent loans which are in legal proceedings can result in positive credit balances. On its face this appears counter intuitive, given the customer is delinquent. For example, if a loan is terminated after the repossession and sale of a customer's vehicle for non-payment, and if the proceeds from the sale of the vehicle at auction do not cover the amount remaining due to Condor, a balance remains due from the customer. Unless written off as uncollectible, these balances remain in the Company's accounting system as amounts due to Condor.

Collections made from these customers may ultimately total more than their historically static loan balance, resulting in a perceived positive credit balance.

17

However, unless the payments made by the customer exceed the amount owed to Condor plus additional costs such as interest and contractual collections costs, the customer is not actually owed a refund.

In cases in which Condor pursues the customer for amounts due and receives a court judgment in its favor, the amount of the judgment, which generally includes statutory interest and may include legal costs, can exceed the amount shown as due from the customer in the Company's accounting system. The amount of the loan due in the accounting system is not updated for the amount of the judgment and a copy of the judgment is often not retained in the customer's file.

The net impact of 1) incorporating the historical accrual of interest beyond termination date as well as 2) allocating a portion of legal fees incurred to contractual collection costs can reduce the positive credit balances attributable to "legal" accounts from $5.6 million as of the Second Report to $0.8 million as of this Third Report. Thus, the "legal" accounts component of the $10 million customer reserve can potentially be reduced by the difference between $5.6 million and $0.8 million, or $4.8 million.

The Receiver notes that DFS does not agree with the conclusions described above. DFS objects to the reduction of the $10 million customer reserve for any portion of the customer accounts classified as "legal" without an account-by-account examination of relevant documents to determine which, if any, of the individual balances represent refunds due back to customers. Condor does not retain all the necessary or relevant documents (e.g., judgments for deficiencies) to conclude that a customer's balance shown in the accounting system is not a positive credit balance. As such, the Receiver has determined that it is

18

appropriate to reduce the customer reserve by $2.0 million instead of the full $4.8 million. Therefore, the positive credit balances attributable to "legal" accounts as of this Third Report are $3.6 million.

The Second Report mentioned the possible use of a statistical sample and review of a revised subset of "legal" accounts to test for the existence of any positive credit balances due to customers. Given the limitations of the account balances in the Company's accounting system and lack of underlying judgments retained in customer files, even a sample based approach including tracking down judgments for each sampled customer account would be a very time consuming undertaking. Accordingly the Receiver adopted the revised calculation approach described above and detailed in Exhibit 2 to more efficiently revise the funds held with respect to legal account positive credit balances to a more appropriate level. The Receiver will work with DFS and Condor to assess an acceptable file-by-file approach.

A reconciliation of the remaining "legal" account positive credit balances or determination that monies are still due to the customer still remains an open task for Condor. The Receiver is working with the Company to determine if a sample based approach of remaining positive credit balances is feasible, or if an account by account review may be necessary.

c. 360-day/365-day calculation ($2.6 million)

As described in the First Report and the Second Report, an analysis prepared by the Company applied a historical 360-day year calculation for the period prior to January 29, 2014 and applied a 365-day year to the subsequent period. The Company's analysis reduced its preliminarily calculated $11 million positive

19

credit balance by approximately $3.6 million. The related positive credit balance has been further reduced to $2.6 million by the return of positive credit balances to customers since that time.

The Company issues loans with fixed rates of interest, generally ranging from 12% – 24%. While the TILA allows for the application of either a 360-day or 365-day year is used in computing interest, it is predicated on the disclosed APR being within one-eighth of one percentage point of the APR charged. It is the Receiver's understanding that the relatively high interest rates often charged by Condor, combined with its historical practice of using a 360-day year for computing interest, resulted in APRs charged to consumers exceeding the APR disclosed on their contracts by more than the tolerable one-eighth of one percent.

Based on the Receiver's and the Company's collective interpretation of TILA and related enforcement action guidance, the current amortization calculation as revised by the Receiver uses a two year look back period, from the start of the DFS' current examination, using January 2014 as its start date, and retroactively calculating account balances for accounts terminated in 2012, 2013 and 2014 on a 365-day year basis. Based on this change in methodology, approximately $1 million of additional refunds were made to customers for accounts terminated in 2012, 2013 and 2014. These were amounts previously categorized as "360-Day/365-Day Calculation" in the First Report.

Consistent with the previous methodology, accounts terminated in years prior to 2012 continue to apply a 360-day year calculation, resulting in no change to positive credit balances due to customers related from these accounts.

20

The revised amortization calculation methodology is still under review by the
Receiver. Among the alternative methodologies being considered by the Receiver
are the appropriateness of using January 2014 as the start of the DFS' current
examination and the potential need to consider communications with the State of
Maryland Department of Labor, Licensing and Regulation in March of 2013 as
the starting point for Condor's applicable look-back period. Alternative
methodologies currently being considered would not impact the 2012 – 2014
refunds already issued, rather they may increase the look-back period to include
additional moneys owed in prior periods.

Determination of the appropriate day count methodology, and for which periods
of time, will impact the amount of the Company's positive credit account
balances due to customers. The amount still owed to customers is currently
estimated to be $2.6 million if the entire history of loans is refunded based on a
365-day methodology.

**d.  Statutory Interest**

A determination should be made as to whether statutory interest should be paid to
customers on the balances held by the company.

As briefly discussed at the Pre-trial Conference on June 10th by an attorney for
DFS and your Honor, statutory interest could potentially increase the amount
owed to consumers. Given the time period customer balances were held by
Condor and New York State's statutory interest rate of 9%, the amount owed
could be considerable. No calculation has been performed, and no reserve has
been made if statutory interest were to be paid.

21

A legal decision needs to be made with respect to statutes of limitation as well as statutory interest. The Receiver will work with the Company and its Regulators regarding the resolution of potential statutory interest owed to customers.

## C. Condor's Licenses to do Business

As described above, Condor is in the process of responding to Massachusetts and Connecticut with regards to their respective notices of intent to revoke Condor's Sales Finance Company License.

## D. The New York State Department of Financial Services

The Receiver has received approximately 100 customer and dealer complaints through DFS dealing with a number of issues, including bounced checks (due to the Citibank account being frozen), alleged overpayments, and disputed fees.

## IV. LOAN ORIGINATION

### A. Background

The loan origination process for sub-prime auto loans starts at the auto dealer. The steps described below represent, generally speaking, the process by which an auto loan becomes part of Condor's auto loan portfolio.

When a customer enquires at an auto dealer about purchasing an auto, a credit check and financial analysis is run. This analysis tells the customer and the dealer approximately how much credit they will be able to acquire for their auto purchase. When an auto is selected by the customer, the loan application details are entered into one of the providers of online credit applications and finance sourcing. If Dealertrack or RouteOne is used, the dealer may select Condor as one of the financiers to provide a quote. When a credit analyst at Condor gets notification that they have been selected, they prepare a rate quote for the loan based upon the customer's credit profile. A

22

Condor credit analyst or sales representative may then call the dealer directly, providing

additional details or encouraging the dealer to select Condor as the financer.

The customer then enters into a contract to buy the car after completing all of the necessary

paperwork (title, registration, insurance, etc.). If Condor is selected, the paperwork is forwarded

to Condor, and Condor in turn sends a check payable to the dealer or an ACH payment to cover

the amount of the loan. At times, the dealer receives Condor's payment after the car "rolls off the

lot."

**B.  The State of Condor's Loan Origination Process**

After resolving compliance and funding issues, Condor could re-enter the loan origination

business after being out of it for a period of time. Condor would still face certain business

obstacles resulting from the temporary absence from its loan origination business.

The auto loan origination business is competitive, with each sale-finance transaction bid upon by

a number of like companies. Finance managers at the various auto dealerships are responsible for

selecting the companies from which bids are solicited for a sale-finance transaction. Prior to the

TRO, Condor's sales representatives regularly called dealerships and visited them periodically.

**C.  Unresolved Compliance**

Since May 30, 2014 FIS has been busy assisting the Company in addressing deficiencies in the

areas of governance, compliance and internal controls. FIS is in the process of finalizing its

compliance risk assessment and delivering related summary documents to Condor management.

The purpose of the assessment phase was to identify applicable inherent compliance risks and

evaluate the control environment in place to assess the effectiveness of the Company's risk

management. In addition to completing its compliance risk assessment, FIS has worked with

Condor management in the development of revised Company operating policies and procedures.

While FIS and the Company have made great progress, the road to an effective compliance management system and culture of compliance is a long one. FIS is scheduled to provide classroom compliance training at both Condor's Hauppauge and Lake Mary offices. The training is scheduled to cover regulatory requirements as well as Condor's internal policies and procedures.

FIS's engagement with Condor will extend beyond the Receiver's time at the Company. The execution of the in-process compliance management system, adherence to best practices with regards to internal controls and appropriate monitoring will be responsibility of Company management. Historically Condor has lacked a culture of compliance. Proper tone at the top and a willingness to invest in best practices will be imperative to a successful compliance program and protection of Condor's customers.

**D. Unresolved Funding (Wells Fargo Credit Facility)**

Wells Fargo has informed the Receiver and the Company that they do not intend to provide Condor with additional funding under the credit facility for new loan originations. Specifically, Wells Fargo wants to be paid and taken out of the credit facility. Additionally, Wells Fargo has asserted that they will not allow new originations to be made using any of the cash currently held by the Company. Wells Fargo's position and demands are set forth in detail in their Intervention Complaint Pursuant to FRCP 24(C) and filed with the Court on June 20, 2014. In order to resume loan originations the Company needs an alternative source of funding.

Condor representatives have contacted parties interested in a refinancing or potential securitization to repay Wells Fargo. The Receiver and Katten have also contacted numerous banks and financial institutions to attempt to identify a replacement for the Wells Fargo credit facility. In addition, Wells Fargo has provided contact information for additional potential financiers / buyers. The conversations with these companies will proceed along a dual track,

24

identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.

Specifically, the Receiver and Katten have contacted a total of 31 financiers / buyers to execute NDAs and have established an electronic data room for the financiers / buyers.

Of the 31 financiers / buyers that have been contacted, 18 have executed NDAs and 15 of these have access to the electronic data room. The companies which have executed the NDA have been provided access to the electronic data room to perform their due diligence as appropriate.[17] Of the remaining 13 institutions, one institution is still in the process of finalizing the NDA and the other 12 have either not responded or have declined interest in the loan portfolio.

The electronic data room has been populated with a number of items including:

- An electronic loan schedule as of June 22, 2014 containing detailed information regarding the loan portfolio;[18]

- A loan-level monthly performance report as of June 30, 2014 containing the payment / delinquency status and other loan-level information;

- Audited Condor Capital Corporation financial statements for the years ended June 30, 2013 and 2012;

- Two reports provided to Wells Fargo as of February 2014 summarizing Condor's compliance with the various financial convents contained in the Wells Fargo facility and the payment and delinquency status of the loan portfolio;

---

[17] Three companies signed NDAs but have not proceeded to gain access to the data room because a Condor officer was directed by Baron not to cosign the NDA with the Receiver. The 15 remaining companies that signed NDAs gained access to the data room having the Receiver's signature but not the Condor officer's signature.
[18] Names, addresses, and other personal information of customers was omitted from the loan file placed in the data room.

- A transaction timeline outlining deadlines for the bidding / refinancing process and

- Sample transaction term sheets for key terms and conditions for a purchase or a refinancing of the loan portfolio.

According to the transaction timeline, the Receiver has asked the financiers / buyers to provide an initial indication of bid, terms, and structure by July 16, 2014. We anticipate having discussions of those initial indications between the interested parties and the company from July 17 through July 25, 2014, with final term sheets due on July 29, 2014. The Receiver's plan is to analyze the bids with Baron, Condor's management and Katten and communicate feedback to the interested parties by August 15, 2014 and select the winning bidder by August 29, 2014. Closing of the transaction is targeted for September 5, 2014.

The Company has expressed a strong preference to pursue a refinancing of the loan portfolio and begin originations and is in the process of retaining a certain investment bank (the "Investment Bank") to pursue a securitization transaction.[19] The Investment Bank has indicated to the Receiver and the Company that it anticipates that the securitization transaction will take approximately 60 days to complete, which would include pursuing credit ratings from one to two nationally recognized credit rating agencies. However, this timeline could be subject to delays if additional material issues arise. The Investment Bank has also stated that the credit ratings process will require the successful settlement of this litigation. As discussed previously, the Receiver has been informed that DFS has discontinued its dialogue with Condor with respect to reaching a resolution or settlement. If the Company is unable to obtain credit ratings for a securitization transaction, the Investment Bank believes that an "un-rated" transaction may be possible, however, this may result in additional delays, complication, and cost to the Company.

---

[19] The Investment Bank has an NDA executed by Todd Baron, the Receiver and the Investment Bank and has access to the electronic data room.

The Receiver will support the refinancing option and will supervise the process and efforts of Condor and its Counsel to execute the dual-track process discussed above. Further, the Receiver continues to believe the dual-track process protects Wells Fargo's collateral and the Company should the refinancing or securitization options fail.

## V.    STEPS TAKEN BY THE RECEIVER

### A.  Control of Condor's Business

The Receiver remains in control of the Company's business, overseeing Condor's collection efforts, customer service, and other operating activity. Condor has not begun any new loan originations.

### B.  Communication to Stephen Baron and Condor Employees

The Receiver has been on premises at Condor's office in Hauppauge daily since the Order, overseeing the Company's management and employees.

The Receiver has informed Baron that he should not work at Condor's office because his presence at the offices will likely be a distraction; however, any important matters that Baron needs to address for Condor's or Condor's stakeholders' benefit override the Receiver's preference for him not being in the office.

The Receiver has also approved the hiring of additional full-time employees in the loan collection department as needed and temporary staffing on an ad hoc basis.

### C.  Communication on the Company's Website

When the Receiver arrived at Condor, the Company's website contained language required by the TRO, as well as a link to the TRO. At the Receiver's direction, the Company updated its website to include a link to the Order.

27

### D. Mail

The Receiver has diverted incoming mail to his attention for review before dissemination to appropriate Company employees.

### E. Security and Control

The Receiver continues to maintain oversight of physical and electronic security. To supplement daily compressed and encrypted back-ups that are securely electronically transferred to a secure off-site service, the Receiver continues to run weekly back-up tapes and maintains them on-site in the locked server room to which only the Receiver has access.

### F. Management of Assets

Condor's most significant asset is its loan portfolio. The steps taken to preserve the value of this asset which are outlined in the First Report and the Second Report are ongoing. In addition, the Receiver and Wells Fargo have contracted with CSC to provide backup servicing on the Condor loan portfolio. Representatives from CSC were on site on June 19 and June 20 to initiate the backup process.

Beginning the week of July 7 and continuing the week of July 14, Condor began transferring loan data to CSC so that CSC can map the data and begin its weekly backup servicing routines.

The rate of delinquent loans at various dates throughout 2014 is presented below:

| PERIOD END | GROSS LOAN BALANCE | CURRENT-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91-120 DAYS | 120+ DAYS | Total 60+ % |
|---|---|---|---|---|---|---|---|
| 1/31/2014 | 597,057,412 | 532,711,689 89.2% | 33,397,048 5.6% | 11,125,615 1.9% | 4,969,194 0.8% | 14,853,866 2.5% | 5.2% |
| 2/28/2014 | 610,584,056 | 551,824,422 90.4% | 28,162,830 4.6% | 9,266,972 1.5% | 4,983,006 0.8% | 16,346,826 2.7% | 5.0% |
| 3/31/2014 | 632,450,171 | 573,494,807 90.7% | 27,701,672 4.4% | 8,545,749 1.4% | 4,730,254 0.7% | 17,977,689 2.8% | 4.9% |
| 4/30/2014 | 641,920,762 | 569,064,855 88.7% | 37,265,681 5.8% | 10,658,735 1.7% | 4,829,514 0.8% | 20,101,977 3.1% | 5.5% |
| 5/13/2014 | 631,470,104 | 552,534,133 87.5% | 39,273,526 6.2% | 13,166,535 2.1% | 5,467,108 0.9% | 21,028,802 3.3% | 6.3% |
| 5/20/2014 | 625,899,445 | 544,332,154 87.0% | 40,640,863 6.5% | 14,113,775 2.3% | 6,124,439 1.0% | 20,688,214 3.3% | 6.5% |
| 5/27/2014 | 621,330,505 | 535,191,563 86.1% | 43,397,708 7.0% | 14,899,630 2.4% | 6,641,010 1.1% | 21,200,594 3.4% | 6.9% |
| 6/03/2014 | 616,030,363 | 529,776,014 86.0% | 43,531,304 7.1% | 14,377,408 2.3% | 6,542,342 1.1% | 21,803,295 3.5% | 6.9% |
| 6/10/2014 | 611,322,476 | 523,791,518 85.7% | 43,055,095 7.0% | 14,792,366 2.4% | 7,116,799 1.2% | 22,566,698 3.7% | 7.3% |
| 6/17/2014 | 607,101,366 | 507,812,933 83.6% | 50,565,055 8.3% | 17,413,450 2.9% | 7,963,637 1.3% | 23,346,291 3.8% | 8.0% |
| 6/24/2014 | 602,493,158 | 499,966,420 83.0% | 50,855,727 8.4% | 18,142,964 3.0% | 8,865,655 1.5% | 24,662,392 4.1% | 8.6% |
| 7/1/2014 | 597,395,837 | 494,637,499 82.8% | 49,589,645 8.3% | 18,202,820 3.0% | 9,374,529 1.6% | 25,591,344 4.3% | 8.9% |
| 7/8/2014 | 591,808,312 | 487,364,278 82.4% | 49,886,861 8.4% | 18,569,352 3.1% | 9,712,410 1.6% | 26,275,411 4.4% | 9.2% |

The Receiver has noted that delinquency has increased over the course of the past several weeks. The Gross Loan Balance decreased by $50 million from April 30, 2014 to July 8, 2014 primarily because loan origination stopped on April 23, 2014. The fact that no new loans are being added to the portfolio has the impact of a smaller "current" pool and a smaller overall balance, resulting in a higher percentage in the greater than 30 day categories. There are a number of other factors impacting the trend which the Company and the Receiver are analyzing, such as:

- Seasonality – Summer is traditionally a slower time for collections
- "Angry calls" from customers increasing call time and reducing the number of calls made/day
- Customers are aware of Condor's problems and may attempt to avoid making required payments
- The planned move to Florida temporarily disrupted collections practices

29

## G. Payments and Disbursements

The Receiver has continued to make payments and disbursements from the Company's assets that are necessary or advisable for carrying out the directions of, or exercising the authority granted by the Court's order. Such payments include:

- Payroll
- Interest payments to Wells Fargo on the credit facility at default rates[20]
- A total of $37 million in principal payments to Wells Fargo, reducing the loan from $261 million to $224 million.
- Amounts owed to repossession companies
- Payments to other vendors used by the Company in the normal course of business (including overdue charges and bounced payments)
- Customer refunds
- Legal and professional fees

Legal and professional fees include the following payments to law and professional firms:

- $351,000 to Katten for services through June 12, 2014 (approximately one month)
- $413,000 to Blank Rome, attorneys for Wells Fargo, for the period through June 25,2014 (approximately two months)
- $71,000 to Chapman and Cutler LLP, attorneys for BMO Harris Financing, Inc. for the period through June 24,2014 (approximately two months)
- $288,000 to AlixPartners LLP representing the Receiver's fees through June 14, 2014 (approximately one month)
- Payments to several law firms for collection services to Condor

The Receiver also expects Condor to receive invoices for additional legal and professional fees in the near future, including:

---

[20] An Event of Default was declared by Wells Fargo which caused the interest rate on the credit facility to increase from 2.752% to 5.401%.

30

- The Receiver expects to issue a statement to the Court next week for services rendered by him and his team for the one-month period ending July 14, 2014.
- Legal fees of Schlam, Stone & Dolan, conflicts counsel for Condor's dispute as to Wells Fargo's actions
- Legal fees of Reardon Scanlon Vodola Barnes LLP, local counsel for the Defendants to handle the July 1, 2014 hearing in Hartford, CT with the Connecticut Regulators
- Professional fees of FIS for their assistance to the Company in addressing deficiencies in the areas of governance, compliance and internal controls

The $37 million in principal payments to Wells Fargo were made from excess cash after taking into account a reserve of approximately $8 million[21] for customers on terminated loans, as well as an operating cash cushion for the Company. The Default interest rate on the Wells Fargo credit facility nearly doubled the interest expense on the Company's debt. This $37 million in principal re-payments will save Condor approximately $2.0 million annually.

At July 11, 2014 the Company had approximately $8.2 million of cash before applying the customer reserve and after the $37 million in principal payments to Wells Fargo.

The Receiver will only authorize payments that comply with the Court's order and that meet the "ordinary and necessary" guidelines of the U.S. Internal Revenue Service. The Receiver has not made the following payments either requested by or for the benefit of Baron:

- Maintenance payments and assessments on condominiums held in Baron's name,
- Baron's salary,
- Credit card charges on Baron's personal credit card, and

---

[21] After considering the amount of refunds paid to customers by the Receiver and the Receiver's review of the accounts classified as "legal", the reserve held by the Receiver for customer refunds has been reduced to approximately $8 million. If Condor successfully addresses the issues detailed above under the section titled "The Receiver's Assessment," the Receiver expects to request Wells Fargo to allow the Company to use $1-$2 million of this reduction in the reserve to fund new loan originations.

31

- Credit card charges made by Baron on the Condor corporate credit card that appear to be personal in nature.[22]

The Receiver has had discussion and communication with Baron and his Counsel regarding potential payments to Baron or entities owned by Baron. The Receiver expects Baron's Counsel to address the Court with regard to the background and circumstances of these potential payments.

### H. State, Federal and/or Foreign Courts

With the exception of Condor's ongoing collection efforts including bankruptcies and pursuing judgments, the Receiver has not deemed it necessary at this time to institute, compromise, adjust appear in, intervene in, or become party to proceedings in state, federal or foreign courts to preserve or recover the assets of the Defendants.

### I. Actions Against the Receiver or Defendants

At this point in time, the Receiver is not aware of any actions against the Receiver or Defendants with the exception of the MA and CT regulators as previously discussed.

### J. Continue to Conduct the Business of the Company

The Receiver has overseen the Company's continued collection efforts on its loan portfolio. As discussed in the Receiver's Assessment, the Receiver has not authorized new originations for the reasons stated.

---

[22] The Condor Corporate American Express account is used by employees for ordinary and necessary expenses. The Receiver paid the balance due on the Corporate American Express account to prevent it from being closed for non-payment. The expenses of Baron that appear personal in nature were charged to a receivable account due from Baron. The Receiver has removed Baron from the account.

32

### K. Bank Accounts (Citibank Operating Accounts)

As explained in the First Report, Citibank informed the Receiver that they will allow the use of the old operating account for receiving ACH deposits for a period of approximately thirty days. As explained in the Second Report, in a letter dated June 4, 2014, Citibank officially informed the Receiver that it had decided to terminate Condor's cash management agreement and all services Citibank was engaged to perform thereunder including all ACH services effective as of the close of business on July 3, 2014. After the date of the Second Report, representatives of DFS requested Citibank to extend Condor's use of the account for another four months. Citibank and the Receiver reached an agreement under which Citibank agreed to move the effective date of the termination to November 3, 2014.[23] The Citibank Accounts shall remain open until that date as long as the Receiver is in place.

The Receiver and Condor management have contacted nine banks to inquire about opening a new account, transferring Condor's funds and entering into a service agreement with a new bank. Eight of the nine banks have declined to do business with Condor. The ninth bank is still considering our request.

### L. Receipts & Expenditures

The Receiver is overseeing the Company's efforts of maintaining records of all receipts and expenditures made.

### M. Response to State or Federal Authorities

As discussed above, Condor's Licenses to do Business, two states have provided the Company with notice of intent to revoke the Company's Sales Finance Company License. The Receiver has had discussions with representatives of both states' regulatory representatives for the purpose of

---

[23] The agreement between Citibank and the Receiver will be presented to the Court shortly in the form of a Stipulation and Order for the Court to review.

allowing this DFS initiated process to proceed and to allow Company Counsel to respond as appropriate.

## VI. STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE

This report is the third and final report from the Receiver called for under the Order. The Receiver will continue to report to the Court on an ongoing basis as the Court determines necessary.

### A. Prevent the Diminution in the Value of Assets of Defendants

The Receiver will continue his efforts to determine if the Company can begin new originations. The Receiver will continue to ensure that Condor's most significant asset (its auto loan portfolio) is (a) being serviced properly, (b) monitored for aging issues, and (c) protected from customer delinquencies through collection, repossession and auction efforts.

As detailed above, the Receiver and Katten have contacted a number of buyers / financiers to attempt to identify a replacement for the Wells Fargo credit facility. The conversations with these companies and the additional companies provided by Wells Fargo have proceeded along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.

### B. Pursue Recovery of Defendants' Assets From Third Parties

Aside from Condor's ongoing collection efforts from customers whose loans were terminated for repossession, car damage and theft, the Receiver is not aware of any material assets of the Company in third party hands.

34

**C. Adjust the Liabilities of Defendants, if Appropriate**

The Receiver will continue his efforts in analyzing the Defendants' liability to customers for positive credit balances, interest charges and any other related deficiencies and adjust accordingly. The Receiver will also act on claims made by terminated employees for owed compensation, benefits, and related issues. Finally, the Receiver will coordinate with Condor and Condor's Counsel in responding to state regulators' actions.

\*     \*     \*     \*     \*

This report sets forth my assessment based on my Receivership to date. My assessment may be amended and or supplemented based upon information that subsequently comes to my attention.

*Denis O'Connor*

Denis O'Connor

Receiver

**Exhibit 1: Condor Capital Listing of Assets & Liabilities**

**February 28, 2014**

**ASSETS:**

| | |
|---|---:|
| Repossessed vehicles, net | $ 1,437,959 |
| Loan contracts receivable, net | 322,045,874 |
| Mortgage loan receivable | 122,934 |
| Cash and cash equivalents | 2,400,486 |
| Deposits | 18,000 |
| Accounts receivable, net | 8,748,829 |
| Property and equipment, net | 475,695 |
| Due from affiliate | - |
| Due from shareholder | - |
| Other assets-due from Oser | 5,717,917 |
| Other assets-due from officer/affiliate | 13,154,891 |
| Deferred loan costs | 937,061 |
| | $355,059,646 |

**LIABILITIES:**

| | |
|---|---:|
| Notes payable | $243,000,000 |
| Due to affiliate | 41,268,709 |
| Income tax payable | 6,015,358 |
| Accounts payable, accrued expenses and deferrals | 15,073,713 |
| | $305,357,780 |

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**          **Exhibit 2**

Background

Under certain circumstances, customer delinquent loans which are in legal proceedings can result in

positive credit balances. On its face this appears counter intuitive, given the customer is delinquent. For

example, if a loan is terminated after the repossession and sale of a customer's vehicle for non-payment,

and if the proceeds from the sale of the vehicle at auction do not cover the amount remaining due to

Condor, a balance remains due from the customer. Unless written off as uncollectible, these balances

remain in the Company's accounting system as amounts due to Condor.

Collections made from customers may ultimately total more than their historically static balance, resulting

in a perceived positive credit balance. However unless the payments made exceed the amount owed plus

some additional costs such as interest and contractual collections costs that we will describe in greater

detail, the customer is not owed a refund.

The positive credit balances associated with legal accounts in Condor's accounting system totaled

approximately 3,000 accounts and $5.7M as of the First Report and $5.6M as of the Second Report.

Accounting and Record Retention Deficiencies

In the previous example, the difference between the loan balance due to Condor and the amount collected

as a result of re-sale of the vehicle remains in Condor's accounting system as a receivable. However, at

the functional termination of the legal loan (often coinciding with the sale of the vehicle), Condor's

accounting system stops recording additional interest owed on the account. This can result in a severely

understated loan balance, as legal accounts often take years to collect.

In cases in which Condor pursues the customer for amounts due to Condor and receives a court judgment

in its favor, the amount of the judgment, which generally includes statutory interest and may include legal

costs, can exceed the amount shown as due from the customer in the Company's accounting system. The

1

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**     **Exhibit 2**

amount of the loan due in the accounting system is not updated for the amount of the judgment and a copy of the judgment is often not retained in the customer's file.

If a customer makes payment on a legal account it is often facilitated by an external attorney. If the attorney collects a hypothetical $1,000 payment from the customer, it is customary that the attorney retains a portion, e.g., $300 or 30%, as per agreement with Condor and remits a check to Condor for the remaining $700. Condor's records credit the customer for the full $1,000 paid to the attorney, reducing the amount owed by the customer by $1,000[1].

Condor's loan agreement includes the following language:

> *Collection Costs: If you [Condor] hire an attorney to bring a lawsuit to collect any*
> *amount owing under this Contract, I [customer] will pay you [Condor] attorney's fees up*
> *to 15% of the amount then due, plus court costs, or such amounts as the court allows.*

Per the above terms, it is the Receiver's understanding that Condor would be in its right to charge the customer up to 15% of the amount due as a legal fee/collection cost. Despite paying attorney's fees in the general range of 25-30%, Condor's accounting system does not currently expense the customer for collection costs, instead treating the full amount paid by the customer as a direct reduction to balance due.

For reasons including the aforementioned discontinuation of accrued interest, not recording judgment amounts and not updating customer accounts for contracted collection costs, the legal loan balances as reflected in Condor's accounting records are systemically understated. Therefore, actual payments made and credited to a customer's account may exceed the historical amount due as shown in Condor's accounting system, resulting in a perceived positive credit balance. However unless the payments made exceed the balance or judgment amount plus accrued interest and contractual collection costs, the customer is not owed a refund.

---

[1] Generally, the $700 cash receipt would be recorded with transaction code "PA" and the $300 portion retained by the attorney recorded with transaction code "CA".

2

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**          Exhibit 2

Testing and Review

The Second Report (page 12) refers to sample based testing performed on the accounts originally classified by the Company as "legal." As described in the report to the Court, sample testing identified 1) errors in the coding of certain accounts as legal, 2) inadequate supporting documentation including the absence of underlying legal judgments and 3) instances of legal accounts upon which customers appear to have paid amounts in excess of judgments (plus statutory interest).

To address 1) above, errors in the coding of certain accounts as legal, certain accounts lacking indicia of legal payments have been excluded from our analysis for potential reduction of apparent positive credit balances. That exclusion process is further described below.

Due to the lack of judgments contained in customer files and lack of related information contained in Condor's accounting system, our preliminary analysis excludes an account's judgment date from our calculation. Instead of applying contractual loan interest until judgment date and statutory interest from judgment forward, as is often the case in files supported by judgments, our calculation applies only state specific statutory interest from the date of termination forward. The Receiver believes this to be a conservative approach, with statutory interest consistently being less than Condor's contractual rates.

Finally, with the exception of one account still under review[2], those accounts upon which customers appear to have paid amounts in excess of judgment (plus statutory interest) have been reconciled and the apparent positive credit balance reduced to zero upon the application of contractual collection costs to the account. That process is also described in greater detail below.

Recalculation of Account Balances Incorporating Accrued Interest and Collection Costs

---

[2] With regards to the account still under review, the apparent overpayment has been brought to the attention of Condor's legal department and they have requested the related ledger detail from the third-party attorney to whom the account was outsourced for legal remedy.

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**     **Exhibit 2**

Conscious of the above identified issues, the Receiver with the assistance of Condor management attempted to recalculate legal account balances by incorporating the historical accrual of interest beyond termination date as well as allocating a portion of legal fees incurred to contractual collection costs.

Legal Accounts

"Legal" accounts were identified by Company management as those containing a value in the field designated as "ATTYCDE." Any accounts with positive credit balances were considered for recalculation. Based in part on the testing referenced above, the Receiver excluded certain accounts from recalculation and considers their positive credit balances as subject to customer repayment pending further review. Characteristics used to exclude certain accounts from recalculation were as follows:

- No "CA" payments applied to the account within Condor's accounting system
  "CA" transaction codes are used to indicate the portion of a customer's payment retained by the attorney as per the terms of the attorney's agreement with Condor. Accounts containing a ATTYCDE but lacking CA payments have been excluded. This approach includes the exclusion of an exception noted by DFS in its review of certain NY accounts wherein an account had an ATTYCDE but upon further review did not appear to have been a legal account outsourced for collection.

- ATTYCDE = "IHC" (INHOUSE COLLECTIONS)
  Accounts where the collection process is handled in-house by Condor rather than outsourced to external attorneys.

- ATTCDE = "0"
  Individual case of apparent mis-coding.

Interest

4

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**          **Exhibit 2**

As mentioned previously, Condor's accounting system stops accruing interest on accounts when
the account is coded as terminated. The timing of the termination coding regularly coincides with
the sale of the automobile within legal accounts. Despite the accounting system's failure to
continue to accrue interest on the account, interest is due to Condor.

In the context of a judgment, on a state by state basis, interest is often awarded at the contractual
rate (generally ranging from 12-24% for Condor). However, Condor's accounting system does
not record the judgment date, nor do they keep a copy of the judgment in the customer's hardcopy
file. Accordingly, our recalculation assumes the accrual of interest continues from the termination
date through the last recorded entry in Condor's accounts payable system.

Mechanically, our recalculation uses a basic future value calculation assuming the total of
customer payments subsequent to account termination are spread evenly, on a monthly basis, over
the period from termination to last entry in Condor's accounts payable system. This is arguably a
conservative approach in the customer's favor, as it assumes payment from the time of
termination when legal accounts often do not receive payment for an extended period due to the
time required for the account and its collection to proceed through the legal process.

The interest rate applied to each loan is the legal rate in the state associated with the respective
account. This is also believed to be conservative in that a judgment would often apply the higher
contractual rate to the period prior to judgment and allow for statutory interest for the period
subsequent to judgment. Lacking readily available judgment information, our calculation uses
the lower statutory rate for the period subsequent to account termination through the last entry in
Condor's accounts payable record.

#### Collection Costs

As previously referred to, Condor's loan agreement includes a contractual liability of the
customer for collection costs in the amount of "attorney's fees up to 15% of the amount then

5

**Detail of Procedures Taken to Assess Customer Accounts Classified as "Legal"**          **Exhibit 2**

due." Condor contracted external attorneys to assist in the collection of legal accounts, but did not
effectively charge the customer for the related costs.

Our recalculation charges a customer's account for the lesser of a) 15% of the account balance at
termination and b) actual legal fees coded to the account as indicated by transaction code "CA".
By applying collection costs we are effectively reducing the amount of customer payments
previously 100% applied as a reduction of amount owed. The amount of our recalculation is
capped by the contractually stipulated 15% of the amount due at account termination.

### Conclusion:

Condor's records indicate $5.6 million of positive credit balances attributable to legal accounts. For
reasons including the discontinuation of accrued interest, not recording judgment amounts and not
updating customer accounts for contracted collection costs, the legal loan balances as reflected in
Condor's accounting records are systemically understated. Accordingly, the Receiver with the assistance
of Condor management attempted to recalculate legal account balances by incorporating the historical
accrual of interest beyond termination date as well as allocating a portion of legal fees incurred to
contractual collection costs.

The application of just post termination interest to legal accounts results in a reduction to positive credit
balances of approximately $4 million. The application of just collection costs to legal accounts results in a
reduction to positive credit balances of approximately $2 million. Because the application of either
expense reduces some balances to zero, and a positive credit balance cannot be reduced further, the
application of both post termination interest and collection costs does not result in a reduction of $6
million (the aggregate of the two independent applications). Rather, the application of both post
termination interest and collection costs to legal customer accounts results in a $4.8 million reduction to
positive credit balances. Post-application of these expenses to the legal accounts, positive credit legal
balances total $0.8 million.

6

Exhibit 3

Condor Capital Corporation
Weekly Cash Flow Projection
Through July 2014 (including actual June 2014)

| | June 2014 ACTUAL | Week 1 w/e July 4 (3 days) ESTIMATE | Week 2 w/e July 11 (5 days) ESTIMATE | Week 3 w/e July 18 (5 days) ESTIMATE | Week 4 w/e July 25 (5 days) ESTIMATE | Week 5 w/e August 1 (5 days) ESTIMATE |
|---|---|---|---|---|---|---|
| Beginning cash | $ 19,133,919 | $ 10,952,142 | $ 12,265,142 | $ 8,772,085 | $ 8,370,085 | $ 8,038,085 |
| Cash receipts | | | | | | |
| Customer payments - Checks / Money Orders | 5,018,464 | 650,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| Customer payments - ACH | 5,916,305 | 760,000 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 |
| Customer payments - Credit cards | 2,286,069 | 290,000 | 490,000 | 490,000 | 490,000 | 490,000 |
| Dealer payoffs | 5,965,772 | 770,000 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 |
| Payments | | | | | | |
| Principal payments to Wells Fargo | (24,000,000) | (1,000,000) | (6,000,000) | (4,000,000) | (4,000,000) | (3,000,000) |
| Interest payments to Wells Fargo | (1,198,417) | | (1,099,853) | | | |
| Legal fees and professional fees | | | | | | |
| Blank Rome / Chapman and Cutler | (396,772) | | (86,739) | | | |
| Katten Muchin Rosenman | (350,696) | | | (350,000) | | |
| AlixPartners | | | (288,465) | | (300,000) | |
| Other | | | | (20,000) | | (20,000) |
| Refund checks | (507,975) | (50,000) | (50,000) | (75,000) | (75,000) | (75,000) |
| Payroll | (297,306) | (42,000) | (42,000) | (42,000) | (42,000) | (67,000) |
| Construction (Florida) | (228,449) | | | | | |
| Repossession activity | (94,077) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Dealer refunds | (89,995) | | | | | |
| Property taxes | | (30,000) | | | | |
| Utilities | (22,176) | | (11,000) | | | (11,000) |
| Other | (182,524) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Ending cash | $ 10,952,142 | $ 12,265,142 | $ 8,772,085 | $ 8,370,085 | $ 8,038,085 | $ 8,950,085 |

14-JUL-2014  16:09   From:18002272644