UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――x

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York,

    Plaintiff,

  -against-                                        No. 14 Civ. 2863 (CM)

CONDOR CAPITAL CORPORATION and
STEPHEN BARON,

    Defendants,

  -and-

WELLS FARGO BANK, N.A., as Agent for
Certain Financial Institutions as Lenders,

    Intervenor.

―――――――――――――――――――――――――x

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO MODIFY THE PRELIMINARY INJUNCTION ORDER AND TO REDUCE THE RECEIVER'S FEES

McMahon, J.:

    Plaintiff Benjamin M. Lawsky, the Superintendent of Financial Services of the State of New York, brought this action against Defendants Condor Capital Corporation and Stephen Baron, alleging violations of the Dodd–Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5301 *et seq.*, and New York state financial services and banking laws.

    On May 13, 2014, this Court entered a preliminary injunction and appointed Denis O'Connor of AlixPartners LLP as Condor's Receiver. Currently before the Court is Defendants' motion to (1) modify the preliminary injunction and (2) reduce the Receiver's fees.

1

On July 31, 2014, this the Court held a hearing on the motion at which the Court heard oral argument. For the following reasons, the motion is denied.

## BACKGROUND

Familiarity with this Court's previous opinion in this case, *Lawsky v. Condor Capital Corp.*, No. 14-cv-2863 (CM), 2014 WL 2109923 (S.D.N.Y. May 13, 2014), is presumed.

### I. The Parties

Plaintiff Benjamin M. Lawsky is the Superintendent of the New York Department of Financial Services ("NYDFS" or the "Department"), which was created in 2011 by the merger of the New York State Banking Department and the New York State Insurance Department. New York state law authorizes the Superintendent to take all actions necessary to "protect users of financial products and services," including enforcement of New York's Insurance, Banking, and Financial Services laws. *See* N.Y. Fin. Servs. Law §§ 101-a, 102, and 301(c).

Defendant Condor Capital Corporation is a New York-based sales finance company, wholly owned by Stephen Baron, that was founded in 1994 and licensed by the New York Banking Department in 1996. (Affidavit of Todd Baron dated April 28, 2014 ("April Baron Aff.") ¶ 2-3.) Condor acquires and services automobile loans in New York and more than two dozen other states, primarily for "sub-prime" or "non-prime" borrowers. (*Id.* ¶ 4.)

Defendant Stephen Baron is the sole owner of Condor, and through his ownership he directs and controls the company. (*Id.*) Baron is responsible for and oversees Condor's operations, including the review of all financial information and the formulation and implementation of policies. (Declaration of Brian Montgomery dated April 24, 2014 ("Montgomery Decl.") ¶ 11, 13.) He is authorized to transfer money between Condor's bank accounts as well as to accounts outside of Condor, including his own. (Declaration of Don H. Thompson dated April 24, 2014 ("Thompson Decl.") ¶ 12(d).)

2

Intervenor Wells Fargo Bank, N.A., is Condor's principal lender; its loans to Condor fund Condor's loans to consumers. It is presently owed approximately $224 million, secured by Condor's loan portfolio.

## II.  The Superintendent's Allegations

In November 2013, NYDFS received information indicating possible wrongdoing by Condor, including allegations of theft of positive credit balances owed to customers. (Montgomery Decl. ¶ 16). As the term has been used in this litigation, a "positive credit balance" is money owed by Condor to a customer as a result of an overpayment of the customer's account. (Declaration of J. Terence Smith dated April 24, 2014 ("Smith Decl.") ¶ 37). A positive credit balance may come about if, for example, a customer pays more than the outstanding loan balance; if the car is totaled, and the insurance proceeds exceed the outstanding balance of the loan; or if the customer trades in the car and receives a credit greater than the outstanding loan balance. (Id.).

After receiving this information, NYDFS conducted a "targeted investigation" of Condor to verify the information it received. (Smith Decl. ¶¶ 5, 19-26; Declaration of Wendell Falby dated April 24, 2014 ("Falby Decl.") ¶¶ 5, 8-14). Examiners from NYDFS spent two days at Condor's headquarters meeting with Condor's management and collecting documents, including approximately 200 loan files. (Smith Decl. ¶¶ 21-25; Falby Decl. ¶¶ 9-12).

Based on this investigation, the Superintendent commenced this action, in which he alleged that for "years," Condor has "knowingly and systematically hidden from customers the existence of [their] positive credit balances" and has instead "retained them for itself." (Compl. ¶ 37.)

The Superintendent also alleged that Condor has "programmed its website to conceal its wrongdoing." Id. Condor's website contains a portal that allows customers to log in, view the

3

status of their loan accounts, and make payments. (Declaration of Madaline Martinez dated April 24, 2014 ("Martinez Decl.") ¶ 28). The Superintendent alleged that Condor has "deceptively programmed" its website so that as soon as a customer's loan is repaid in full, his loan account is removed from the system, even if the loan is overpaid and the account has a positive credit balance owed to the customer. (Compl. ¶ 38.) This system, the Superintendent alleges, "falsely indicated to customers—who reasonably relied on Condor to accurately represent the current status of their accounts—that they owed nothing to Condor and, more importantly, that Condor owed them nothing." *Id.* Condor contends that use of its website to make payments or access loan information is "completely voluntary," that not all Condor customers use the web portal, and that Condor also provides customers with the option to access their loan information by phone. (Aff. of Todd Baron dated April 28, 2014 (ECF No. 18) ¶ 9.)

The Superintendent also accused Condor of filing false and misleading unclaimed property reports with the New York State Comptroller's Office, as required by New York's Abandoned Property Law. (Compl. ¶¶ 39-44.) In a letter dated August 28, 2012, regarding open issues from a previous examination, Condor represented that, although New York no longer required the filing of negative unclaimed property reports, Condor's employees understood that any unclaimed funds should be reported to the accounting department so that Condor could file the necessary report. (Montgomery Decl. ¶ 14). Nevertheless, according to the Superintendent, Condor consistently filed "negative" unclaimed property reports—thereby representing that it had no unclaimed property in its possession—and has filed *no* reports since 2012. (Smith Decl. ¶ 42; Montgomery Decl. ¶ 9).

In addition to his allegations regarding positive loan balances, the Superintendent alleged that NYFDS's November 2013 and January 2014 examinations demonstrated "the persistent

4

refusal and failure of Condor and [the Barons] to implement even the most basic policies, procedures and controls necessary to manage a $300 million, state-licensed lending institution." (Compl. ¶ 32.) Specifically, the Superintendent alleged that Condor lacks "any documented policies and procedures for virtually all of its operations, including dealer selection, loan application processing, mail handling, payment processing, assessment of fees and charges, account reconciliations, corporate accounting, regulatory reporting, training, information technology ("IT") systems, and disaster recovery/business continuity," and that it has "no systematic plans or programs to assess or monitor compliance with fair lending, fair debt collection practices, or data-security laws and other applicable consumer protection laws." (Compl. ¶¶ 25; *see* Falby Decl. ¶¶ 25-27; Thompson Decl. ¶¶ 12-13.)

### III. Procedural History

On April 23, 2014, the Superintendent brought a proposed TRO and Order to Show Cause for Preliminary Injunction before this Court. My colleague, Judge Wood, entered the TRO that same day, and twice modified it slightly at Defendants' request, first on April 25, and then again on May 8.

On May 2, 2014, Wells Fargo, acting as agent for a consortium of Condor's secured lenders (the "Lenders"), moved by order to show cause to intervene in this action. Wells Fargo has advocated for a sale of Condor's loan portfolio that would pay Condor's obligations to the Lenders—loan obligations that have been accelerated due to certain Events of Default under Condor's Loan Agreement, and are currently due and owing in full.

On May 12, 2014, this Court held a preliminary injunction hearing at which the Court heard oral argument from counsel for the Superintendent, Defendants, and Wells Fargo, and listened to testimony from Stephen Baron. Following the hearing, the Court concluded that the Superintendent had made his case in every particular. I granted Wells Fargo's motion to

intervene, entered a preliminary injunction (ECF No. 64), and authorized the Receiver to take over Condor's operations. I also required the Receiver to send status reports to the Court at 20, 40, and 60 days after his installation. Defendants did not take an appeal from this order, and the time to do so expired on June 12, 2014. *See* Fed. R. App. P. 4(a)(1).

On June 4, 2014, Defendants moved to modify the preliminary injunction to convert the Receiver into a "monitor," return control of Condor to Stephen Baron, and allow Condor to resume loan originations. Following a hearing on June 10, 2014, the Court denied Defendants' motion. Defendants did not take an appeal from this order, either, and the time to do so expired on July 4, 2014. *See id.*

## IV. Factual Background to the Motion

On July 14, 2014, the Receiver submitted his Third Report to the Court, in which he expressed the view that Stephen Baron "has not embraced the principles of adequate corporate governance." (Third Report at 3.) In the Third Report, the Receiver expressed his continued belief (also found in his first two reports) that to survive, Condor needed to insulate itself from the control and influence of Baron, and to begin loan originations again, Condor would need to find an alternative source of funding by refinancing Condor's existing credit facility—which was all but impossible while the Barons were involved with the company. (*Id.* at 7-8.)

The Third Report presented a number of disturbing findings, including:

- Baron has continued to charge his personal expenses to Condor's Corporate American Express credit card, despite the Receiver's request to discontinue such use. (Third Report at 6.)

- Baron has interfered in the Receiver's search for a new lender by instructing Todd Baron "not to participate in executing certain confidentiality agreements used in the due diligence process" by certain financial entities that are proposing to refinance the Wells Fargo loan or purchase Condor's loan portfolio. (*Id.* at 7.)

- Despite Baron's professions of ignorance to the Court at the May 12 hearing—at which he claimed he "never got very much in the minutia of the details of the company"—the Receiver reports that he regularly received daily cash receipt reports, reports on credit guidelines, and collection reports, and "was involved in important details of the business." (*Id.* at 5-6.)

Of greatest concern to the Court was the Receiver's conclusion that the Barons had operated their business in blatant violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* As the Third Report explains, prior to June 2013, Condor used a 360-day denominator for its daily interest calculations. (Third Report at 13-14.) In response to objections from Maryland financial regulators, Condor changed to a 365-day denominator, but then added one-eighth of one percent to all accounts with interest rates greater than 9%. (*Id.* at 14.) Stephen Baron averred that this decision was based on his and his son Todd Baron's reading of TILA regulations. Specifically, Baron pointed to a guidance document released by the Federal Reserve Board and attached to Baron's affidavit as Exhibit A. But that very document exposed the impossibility of Baron's assertion that he and his son thought they were complying with TILA by using a 360-day-year daily rate:

> [I]f no other charges except interest are imposed, the application of a 360-day-year daily rate over 365 days on a regular loan would not result in an APR in excess of the one-eighth of 1 percentage point APR tolerance *unless the nominal interest rate is greater than 9 percent.*

(Aff. of Stephen Baron dated July 22, 2014, Ex. 1, at 18 (emphasis added).) Condor is a subprime sales finance company; it charges borrowers an average interest rate of 15.5%. The plain language of the TILA regulation makes it clear that lenders who charge more than 9% interest cannot use a 360-day-year daily rate; there is no other way to read it. Furthermore, the regulation does not authorize imposition of extra interest when a 365-day year is used; that number is the allowable "error tolerance" in the APR when a 360-day year is used for lower-interest loans. *See* 12 C.F.R. § 226.14(a).

Regarding Condor's compliance efforts, the Third Report informs the Court that a national compliance firm, Fidelity Information Services, LLC ("FIS"), has made "great progress" in assisting Condor's compliance efforts, but "the road to an effective compliance management system and a culture of compliance is a long one" (Third Report at 23-24.)

Conversations with banks and financial institutions regarding Condor's loan portfolio are proceeding along a "dual track": companies interested in replacing Wells Fargo as a financing option for loan originations, and companies interested in buying Condor's loan portfolio outright. (*Id.* at 24-25.) The Receiver and Condor's lawyers have contacted a total of 31 parties interested in either refinancing Condor's credit facility or buying its loan portfolio. (Third Report at 25.) Of these, 18 entities have executed non-disclosure agreements ("NDAs"), and 15 have access to Condor's electronic data room for due diligence purposes. (*Id.*) Of the remaining 13 parties, one is in the process of finalizing its NDA and the other 12 have either not responded or declined. (*Id.*) The Receiver was to receive final term sheets from interested parties by July 29, 2014; he hopes to select the winning bidder by August 29, with closing by September 5. (*Id.* at 26.)

The Receiver also informs the Court that regulators from two states, Massachusetts and Connecticut, have already sent Condor notices of their intent to revoke the company's licenses. (Third Report at 9.) Additionally, according to the Superintendent, regulators from "at least five other states" have indicated their intentions to initiate their own revocation proceedings, and have only held off doing so in response to requests from NYDFS. (Declaration of Nancy I. Ruskin dated July 29, 2014 ("Ruskin Decl.") ¶¶ 5-8.) The Superintendent also notes that NYDFS would "likely" initiate its own license revocation proceedings if this Court were to remove the Receiver and permit Baron to retake control of Condor. (*Id.* ¶ 14.)

## DISCUSSION

### I. Standard for Determining the Motion

"An injunction is an ambulatory remedy that marches along according to the nature of the proceeding. It is executory and subject to adaption as events may shape the need, except where rights are fully accrued or facts are so nearly permanent as to be substantially impervious to change." *Sierra Club v. United States Army Corps of Eng'rs,* 732 F.2d 253, 256 (2d Cir. 1984). A a district court's decision whether to modify a preliminary injunction "involves an exercise of the same discretion that a court employs in an initial decision to grant or deny a preliminary injunction." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 141 (2d Cir. 2005).

In this Circuit, the burden on a party seeking to modify a preliminary injunction is not entirely clear. Other Courts of Appeals, including the First and Third Circuits, have required such a party to show that modification is justified by a "significant change in facts or law." *See, e.g., Favia v. Indiana Univ. of Pennsylvania,* 7 F.3d 332, 341 (3d Cir. 1993); *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo,* 551 F.3d 10, 16 (1st Cir. 2008). A number of district courts in this Circuit have applied this standard. *See, e.g., Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.,* 427 F. Supp. 2d 491, 502 (S.D.N.Y. 2006), *aff'd,* 246 F. App'x 73 (2d Cir. 2007); *S.E.C. v. Illarramendi,* No. 11-cv-78 (JBA), 2014 WL 545720, at *3 (D. Conn. Feb. 10, 2014) ("A party seeking relief bears the burden of establishing that there has been a change of circumstances that warrants relief."). The Court will do the same.

### II. Defendants' Motion to Modify the Preliminary Injunction Is Denied.

Defendants have failed to show any change of circumstances warranting modification of the preliminary injunction.

At the July 31 hearing, counsel for Defendants—apparently unfamiliar with the legal concept of a "mandatory" injunction—repeatedly argued that leaving the Receiver in place

9

would be improper because it would fail to maintain the "status quo." But mandatory preliminary injunctions that alter, rather than maintain, the status quo are commonplace, and although they require "a clear showing that the moving party is entitled to the relief requested," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011), the Superintendent has easily met that burden here.

As evidence in support of their claim that the preliminary injunction should be modified, Defendants present affidavits from Stephen and Todd Baron in which the two men object to the Receiver's characterization of their conduct. These objections, however, consist almost entirely of either straw man misrepresentations of the Receiver's statements in the Third Report, or outright falsehoods.

For example, Defendants object to the Receiver's purported allegation that (1) "Condor had a policy in place of withholding positive credit balances from consumers," and (2) "Condor had an official policy of filing erroneous or incomplete unclaimed property reports to the State of New York." Defs. Mem. at 2-3. The Receiver responds that he never said that Condor had any such "polices," and indeed he did not; the Third Report states:

- "Baron oversaw and directed employees who engaged in a *practice* of charging customers for loan termination payments if the customer exceeded 10 business days to make a payment but not refunding any interest if the customer paid early." (Third Report at 5 (emphasis added).)

- "Baron oversaw and directed employees responsible for the filing of erroneous and incomplete reports to the New York State's Office of Unclaimed Funds." (Third Report at 6.)

But this is semantic squibbling. The Receiver reported that this conduct goes back at least 20 years. This Court views a "practice" that extended to all customers and was followed for 20 years to be a corporate *policy*, whether written down or not. It is a policy; it is a practice; it is wrong.

10

Defendants claim that Baron "has built a business worth, by all estimates in this action, $600,000,000." Defs. Mem. at 4. But as the Receiver explains in his response to Defendants' motion, this number represents the gross amount of all loans in the Condor portfolio—$446 million of unpaid principal, along with $154 million of future unearned interest. It includes no offsets for bad debts or for the $217 million that Condor currently owes to Wells Fargo (secured by the loan portfolio), which Condor has to repay. No third-party buyer would include this future unearned interest in its valuation, especially given the subprime nature of Condor's loans.[1]

Defendants also call it "uncontested" that "when Mr. Baron learned that a certain amount of customer balances did exist in 2013, he directed that those balances be refunded." Defs. Mem. at 2. But the Receiver—in a presentation that I credit (because, having seen Mr. Baron testify in person, I find him incredible as a witness)—has explained that this is false, or at least grossly misleading. Baron himself testified at the May 13 hearing that he had failed to issue refund checks to customers with positive credit balances, and that the checks sat in a pile on his desk, unsigned.

Defendants also object to the Receiver's characterizations of Condor's compliance efforts. First, they argue that "Condor did have an existing compliance program," because "with 30 states auditing the company, it stands to reason that Condor must have had a compliance program in place." Defs. Mem. at 6. Apparently expecting the Court to simply accept this bald, unsupported *ipse dixit*, Defendants go on to point out that Condor has hired Fidelity Information

---

[1] Equally inaccurate is the claim, made by counsel for Defendants at the July 31 hearing, that there remain only $1.3 million in positive credit balances that have yet to be paid to customers. As outlined by the Receiver—and as admitted in Defendants' papers, if not at oral argument—this number fails to include (1) that portion of Condor's unpaid positive credit balances that the Receiver has categorized as "legal" (estimated to be $3.6 million) and (2) positive credit balances stemming from Defendants' shell game with respect to 360- versus 365-day interest calculations (estimated to be $2.6 million). (*See* Third Report at 17.)

11

Services, LLC ("FIS"), a national compliance firm, to update Condor's manuals and conduct further training. Defendants claim that "FIS will remain in Condor's offices for at least the next three years." But as the Receiver points out, Condor's contract with FIS (which Todd Baron claims to have signed, but which was actually signed by the Receiver) can be terminated by Condor at any time with no penalty. The Receiver also points to ongoing activities by the Barons that are inconsistent with good corporate governance, including Stephen Baron's ongoing use of Condor's Corporate American Express credit card for personal expenses. And he reports that some lenders are not willing to do business with Condor as long as the Barons remain in place, while others (including investment banks that would be able to maximize value for everyone, including the Barons, by securitizing the portfolio) will not seriously explore that option until the Barons settle this lawsuit—an impossibility, since they have effectively broken off negotiations with DFS by demanding that Stephen Baron be reinstalled as Condor's CEO.

This Court entered the preliminary injunction in this case on May 13, 2014; Defendants chose not to take an appeal from that order, or from the Court's denial of its first motion to modify the injunction on June 10, 2014. As far as I am concerned, Defendants face a heavy burden if they wish to dissolve it now—a burden they have come nowhere close to meeting. Defendants appear to be playing fast and loose with the truth in their papers; I do not consider Stephen Baron fit to run this or any other business. The Receiver is the only person involved with the company who has proven to my satisfaction that he actually knows what he is doing. To remove him at this point would be madness.

The need for the Receiver is even more obvious in light of his discovery of Defendants' blatant violation of TILA. It was never, as Defendants claim, "customary industry practice" to use a 360-day-year denominator in calculating customers' interest charges for subprime loans.

The very same Federal Reserve document on which the Barons apparently relied (without bothering to consult legal counsel) *explicitly* states that application of a 360-day-year daily rate over 365 days would violate TILA if applied to loans with nominal interest rates greater than 9 percent. Moreover, Defendants appear to have employed TILA's one-eighth-of-one-percent "tolerance" as a piggy bank rather than a cushion for error.

According to the Superintendent, financial regulators from at least five other states have delayed instituting their own license revocation proceedings, solely based on this lawsuit and their confidence that the Receiver can lawfully operate Condor's business and manage its assets. (Ruskin Decl. ¶ 7.) And if this Court were to remove the Receiver, the Superintendent would likely initiate his own license revocation proceedings against Condor. (*Id.* ¶ 14.) Citibank has agreed to work with the Receiver-managed company until November 3, 2014; no one suggests that it would adhere to that commitment if the Receiver were removed. Any of these events would likely result in Condor's demise.

In sum, there is no reason to modify the injunction and every reason in the world to continue it. Defendants' motion is denied.

### III.  Defendants' Motion to Reduce the Receiver's Fees Is Denied.

In the alternative, Defendants seek an order reducing the Receiver's fees, which they characterize as "excessive." For support, Defendants observe that the Receiver's $78,000/week bill "almost doubles Condor's entire payroll including upper management." Def. Mem. at 11. But the vast majority (70%) of Condor's payroll is for customer-service, collection, and payoff personnel. Any comparison of these salaries to fees for highly trained, emergency financial consultants is meaningless.

The Receiver's fees are not overly high, and are well-deserved, especially since the Receiver appears to be making progress. Defendants' motion is denied.

## IV. Wells Fargo's Requests

In its opposition to Defendants' motion, and in a separate letter to the Court on July 21, 2014, Wells Fargo has made two requests of its own.

First, Wells Fargo asks this Court to "cloak the Receiver with all rights and powers necessary to effectuate a repayment of the Lenders"—essentially, the bank asks that the Receiver be given the power to negotiate on his own for a sale of Condor's loan portfolio, without interference from the Barons. (Letter from Harris N. Cogan dated July 21, 2014 (ECF No. 99), at 2.) I had thought the original preliminary injunction gave the Receiver this authority, but let me be clear: the Receiver has full power and authority to effect a refinancing of Condor's lending operations, or a sale of Condor's loan portfolio, in any way he sees fit, without interference from Stephen Baron or anyone acting under his direction. The Receiver may sign documents on Condor's behalf, including non-disclosure agreements and documents granting potential lenders access to Condor's electronic data room, without seeking the permission of Stephen Baron or anyone acting under his direction. Stephen Baron has no authority whatsoever when it comes to the operations of Condor Capital Corporation.

Second, Wells Fargo asks this Court to set a date certain by which the Receiver must close a refinancing or sale of the Condor loan portfolio, and cash Wells Fargo out. Wells Fargo prefers a deadline of September 5—the date by which the Receiver hopes to conclude a deal, as outlined in the Third Report—but stated at the July 31 hearing that it would be satisfied with a deadline of October 31, which happens to fall just before November 3, the date on which Citibank plans to terminate its banking agreements with Condor. (*See* Stipulation and Order dated July 22, 2014 (ECF No. 103).) If the Receiver is not able to close a refinancing or sale of the loan portfolio by then, or otherwise restructure the company's debt, Condor will have much

14

bigger problems than it has today. The Receiver is comfortable with an October 31, 2014 "drop dead" date; so is this Court.

## CONCLUSION

For the foregoing reasons, Defendants' motion to modify the preliminary injunction and to reduce the Receiver's fees is denied. The Clerk of the Court is directed to remove Docket No. 106 from the Court's list of pending motions.

Dated: August 1, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL