```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:                               │
│ DATE FILED:      9/5/14              │
└─────────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**BENJAMIN M. LAWSKY, Superintendent of**
**Financial Services of the State of New York,**

                              Plaintiff,              No. 14-CV-2863 (CM)

          – against –

**CONDOR CAPITAL CORPORATION**
**AND STEPHEN BARON,**

                              Defendants.

-------------------------------------------------

**September 2, 2014**
**FOURTH REPORT TO THE COURT**

**DENIS O'CONNOR**
**RECEIVER**
AlixPartners LLP
40 West 57th Street
New York, NY 10019
(646) 746-2465

**Table of Contents**

I.    INTRODUCTION ...................................................................................... 2

II.   CURRENT STATUS OF THE COMPANY ................................................ 6

   A.   Condor Operations & Personnel ...................................................... 6

   B.   Management of Assets .................................................................... 6

   C.   Customer Balances and Refunds to Customers ................................... 8

     1.   Return of Positive Credit Balances to Customers ......................... 8

     2.   Remaining Balances to be Returned to Customers ...................... 10

   D.   Payments and Disbursements ........................................................ 13

   E.   Response to Customer Complaints ................................................. 16

III.  UNRESOLVED FUNDING ..................................................................... 17

IV.   STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE ................ 19

   A.   Prevent the Diminution in the Value of Assets of Defendants ............... 19

   B.   Pursue Recovery of Defendants' Assets From Third Parties ................ 19

   C.   Adjust the Liabilities of Defendants, if Appropriate .......................... 19

**EXHIBIT**

Exhibit: Cash Flow Projection

## I.    INTRODUCTION

This report is filed in compliance with the Preliminary Injunction and Order Appointing Denis O'Connor Receiver dated May 13, 2014 (the "Order") issued by U.S. District Court S.D.N.Y. (the "Court") by the Honorable Colleen McMahon. As such, this report sets forth the steps and actions taken to date by the Receiver to complete the tasks as set forth in the Order and also sets forth the findings of the Receiver's verifications and examinations. The Receiver was assisted by representatives of AlixPartners LLP that worked under his supervision. All references to the Receiver's work in this report include work performed by these individuals.

This report is the fourth report issued by the Receiver. The first, second and third reports filed with the Court on June 2, 2014 (the "First Report"), June 23, 2014 (the "Second Report") and July 14, 2014 (the "Third Report") (collectively the "Reports") are incorporated herein by this reference.

The Receiver and his team arrived at Condor Capital Corporation's ("Condor" or the "Company") offices at 165 Oser Avenue, Hauppauge, New York on May 14, 2014 and have been in control of the Company since.

The Receiver's assessment in the First Report, Second Report and Third Report was that Condor should not re-start its loan origination business until it has completed the following:

    (a) Institute adequate governance, compliance and internal controls and procedures;

    (b) Obtain an alternative source of funding or capital; and

    (c) Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.

Updates to the status of these requirements are as follows:

2

Institute adequate governance, compliance and internal controls and procedures

Governance, compliance and internal controls and procedures are generally consistent with the status reported in the Third Report. Fidelity Information Services, LLC ("FIS") continues to assist the Company in addressing deficiencies in each of these areas.

FIS has performed a risk assessment of Condor's operations and delivered related applicability and risk control matrices to Company management. In addition to working with Company management to produce revised operating policies and procedures, FIS has also provided a series of classroom training to Condor's employees both in Hauppauge, NY and Lake Mary, FL. The next phase of the FIS engagement includes finalizing policies and procedures, proposed monitoring and review of Company operations, and ongoing training and education.   FIS and Condor have made good progress, but the implementation, practice and monitoring of proper governance, compliance and internal controls still requires additional time and effort on the part of FIS and Condor management.

It remains the Receiver's assessment that with appropriate governance and management and assistance from FIS, Condor is capable of instituting the proper level of controls and procedures. The Receiver has noted progress in this area and continues to assess the control environment.

Obtain an alternative source of funding or capital

On June 4, 2014, Blank Rome (attorneys for Wells Fargo) filed a letter with the court reiterating the fact that Wells Fargo will not fund any further loan originations. Further, the letter makes clear that Wells Fargo wishes to be repaid as soon as possible and believes that any of Condor's excess cash (after a reserve set aside for Condor's wronged customers) should be used to pay down the existing loan obligations.

3

The Receiver and Condor's Counsel, Katten Muchin Rosenman LLP ("Katten") have contacted over 40 parties interested in a refinancing, buying Condor's portfolio of loans or a portion thereof, or potential securitization to repay Wells Fargo. The conversations with these companies had proceeded along a dual track, identifying whether the companies had an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing or securitization option for new loan origination until the weeks of August 11, 2014 and August 18, 2014, when it became apparent to the Receiver that a securitization was not a viable option. Because of the extended period of time the Defendants and the New York State Department of Financial Services ("DFS") are taking to try to reach a settlement, along with the need to implement appropriate governance and management and the timing to complete a pay down of Wells Fargo, a securitization does not appear to be a viable short-term option.

The track to sell all or a portion of Condor's portfolio is progressing as discussed in Section III of this report.

Take the necessary steps with state regulators to put its licenses and ability to finance and service auto sales in good standing.

DFS has coordinated with and requested other state regulators to essentially "hold-back" on steps necessary for canceling Condor's licenses pending the outcome of this litigation. In the First, Second and Third Reports, the Receiver informed the Court that two states, Massachusetts ("MA") and Connecticut ("CT"), had provided the Company with notice of intent to revoke the Company's Sales Finance Company License.

MA previously granted Condor an extension to fulfill the provisions of its related Order and Notice. Since the date of the Third Report, MA has granted Condor an additional extension granting the Company until December 1, 2014. In the interim the Receiver has provided MA with requested lists of certain MA customer accounts and refunds issued. CT originally scheduled a hearing related to its actions for July 1, 2014 and subsequently rescheduled that hearing for August 11, 2014 in order to allow time for a potential

4

settlement with DFS. Since the date of the Third Report, the Receiver has been informed that CT subsequently proposed delaying the hearing until the week of September 23, 2014.

Since the Third Report, the Florida Office of Financial Regulation ("FL") has informed the Receiver that it has commenced a desk examination of the records of Condor and a representative of the Maryland Commissioner of Financial Regulation ("MD") has requested certain information pertaining to Maryland customer accounts. The Receiver has provided both FL and MD lists of certain Condor accounts and/or refunds as requested. The Receiver will continue to respond to regulatory information requests as appropriate.

It is the Receiver's understanding that DFS and the Defendants have been working with the Honorable James C. Francis regarding possible settlement, consistent with your Honor's Order of Reference to a Magistrate Judge for the purposes of settlement dated July 31, 2014. The Receiver has had no interaction to what he understands to be ongoing discussions.

The Receiver believes that it is important that a settlement be reached to allow Condor to rehabilitate itself. It is the Receiver's belief that the inability to effectuate an agreement of settlement with DFS would adversely impact Condor's ability to refinance Wells Fargo at a reasonable cost. Further, as a practical matter, the investment needed to begin new originations would be questioned absent an ability for Condor to operate as a licensed going concern.

On August 25, 2014 Condor's counsel filed a Notice of Appeal in response to the Court's Decision and Order entered on August 1, 2014 which denied the Defendants' motion to modify the Preliminary injunction and to reduce the Receiver's fees.

## II.    CURRENT STATUS OF THE COMPANY

### A.    Condor Operations & Personnel

Condor continues to operate out of two facilities, its primary office at 165 Oser Avenue in Hauppauge, New York as well as a second office at 36 North Skyline Drive in Lake Mary, Florida which began operation in April 2014.

On August 12, 2014 the Receiver and Oser 165 LLC (100% owned by Stephen Baron ("Baron")) entered into a short-term lease for the Hauppauge facility covering the period May 14, 2014 – October 31, 2014 with a monthly rent payment due to Oser 165 LLC but payable to Baron of $27,833.33.

Currently the Hauppauge, New York operations consist of 37 employees. 15 employees are focused on servicing and collections. The remaining 22 employees consist of company management and personnel supporting loan payoffs, managing titles, accounting, legal and office administration.

Currently, the 16 employees of the Lake Mary office, consisting of 2 assistant managers that transferred from Hauppauge and 14 collection agents hired locally are engaged exclusively in collections and loan servicing.

The company continues to service loans, make collection calls, respond to customer inquiries, update customer credit histories, and administer accounts for all loans remaining in the loan portfolio.

### B.    Management of Assets

Condor's most significant asset is its loan portfolio. The steps taken to preserve the value of this asset which are outlined in the First Report, Second Report and Third Reports are ongoing. In addition, the Receiver and Wells Fargo have contracted with CSC to provide backup servicing on

6

the Condor loan portfolio. Condor has transferred loan data to CSC and will begin its weekly

backup servicing routines.

The rate of delinquent loans at various dates throughout 2014 is presented below:

| PERIOD END | GROSS LOAN BALANCE | CURRENT-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91-120 DAYS | 120+ DAYS | Total 60+ % |
|---|---|---|---|---|---|---|---|
| 1/31/2014 | 597,057,412 | 532,711,689 | 33,397,048 | 11,125,615 | 4,969,194 | 14,853,866 | |
| | | 89.2% | 5.6% | 1.9% | 0.8% | 2.5% | 5.2% |
| 2/28/2014 | 610,584,056 | 551,824,422 | 28,162,830 | 9,266,972 | 4,983,006 | 16,346,826 | |
| | | 90.4% | 4.6% | 1.5% | 0.8% | 2.7% | 5.0% |
| 3/31/2014 | 632,450,171 | 573,494,807 | 27,701,672 | 8,545,749 | 4,730,254 | 17,977,689 | |
| | | 90.7% | 4.4% | 1.4% | 0.7% | 2.8% | 4.9% |
| 4/30/2014 | 641,920,762 | 569,064,855 | 37,265,681 | 10,658,735 | 4,829,514 | 20,101,977 | |
| | | 88.7% | 5.8% | 1.7% | 0.8% | 3.1% | 5.5% |
| 5/13/2014 | 631,470,104 | 552,534,133 | 39,273,526 | 13,166,535 | 5,467,108 | 21,028,802 | |
| | | 87.5% | 6.2% | 2.1% | 0.9% | 3.3% | 6.3% |
| 5/20/2014 | 625,899,445 | 544,332,154 | 40,640,863 | 14,113,775 | 6,124,439 | 20,688,214 | |
| | | 87.0% | 6.5% | 2.3% | 1.0% | 3.3% | 6.5% |
| 5/27/2014 | 621,330,505 | 535,191,563 | 43,397,708 | 14,899,630 | 6,641,010 | 21,200,594 | |
| | | 86.1% | 7.0% | 2.4% | 1.1% | 3.4% | 6.9% |
| 6/03/2014 | 616,030,363 | 529,776,014 | 43,531,304 | 14,377,408 | 6,542,342 | 21,803,295. | |
| | | 86.0% | 7.1% | 2.3% | 1.1% | 3.5% | 6.9% |
| 6/10/2014 | 611,322,476 | 523,791,518 | 43,055,095 | 14,792,366 | 7,116,799 | 22,566,698 | |
| | | 85.7% | 7.0% | 2.4% | 1.2% | 3.7% | 7.3% |
| 6/17/2014 | 607,101,366 | 507,812,933 | 50,565,055 | 17,413,450 | 7,963,637 | 23,346,291 | |
| | | 83.6% | 8.3% | 2.9% | 1.3% | 3.8% | 8.0% |
| 6/24/2014 | 602,493,158 | 499,966,420 | 50,855,727 | 18,142,964 | 8,865,655 | 24,662,392 | |
| | | 83.0% | 8.4% | 3.0% | 1.5% | 4.1% | 8.6% |
| 7/1/2014 | 597,395,837 | 494,637,499 | 49,589,645 | 18,202,820 | 9,374,529 | 25,591,344 | |
| | | 82.8% | 8.3% | 3.0% | 1.6% | 4.3% | 8.9% |
| 7/8/2014 | 591,808,312 | 487,364,278 | 49,886,861 | 18,569,352 | 9,712,410 | 26,275,411. | |
| | | 82.4% | 8.4% | 3.1% | 1.6% | 4.4% | 9.2% |
| 7/15/2014 | 586,826,653 | 477,928,426 | 52,144,926 | 19,475,404 | 10,294,946 | 26,982,951 | |
| | | 81.4% | 8.9% | 3.3% | 1.8% | 4.6% | 9.7% |
| 7/22/2014 | 580,781,681 | 474,678,599 | 49,256,422 | 18,994,930 | 9,982,893 | 27,868,837 | |
| | | 81.7% | 8.5% | 3.3% | 1.7% | 4.8% | 9.8% |
| 7/29/2014 | 576,374,837 | 469,234,123 | 48,831,918 | 18,419,407 | 10,694,969 | 29,194,420 | |
| | | 81.4% | 8.5% | 3.2% | 1.9% | 5.1% | 10.1% |
| 8/5/2014 | 570,348,170 | 468,932,756 | 44,645,714 | 17,374,364 | 9,933,594 | 29,461,742 | |
| | | 82.2% | 7.8% | 3.0% | 1.7% | 5.2% | 10.0% |
| 8/12/2014 | 565,237,686 | 461,899,651 | 45,587,310 | 17,379,309 | 10,150,287 | 30,221,129. | |
| | | 81.7% | 8.1% | 3.1% | 1.8% | 5.3% | 10.2% |
| 8/19/2014 | 559,670,463 | 457,581,977 | 43,256,329 | 17,827,790 | 9,984,552 | 31,019,815 | |
| | | 81.8% | 7.7% | 3.2% | 1.8% | 5.5% | 10.5% |
| 8/26/2014 | 554,503,808 | 450,066,190 | 46,025,240 | 16,505,626 | 9,836,130 | 32,070,622 | |
| | | 81.2% | 8.3% | 3.0% | 1.8% | 5.8% | 10.5% |

The Receiver has noted that the rate of delinquency has increased over the period that the

Receiver has been in place. However, the rate of increase has slowed in the past several weeks.

As described in the Receiver's previous reports, there are a number of factors which contributed

7

to the disruption of the collection process, including the planned move to Florida and the temporary freezing of the Condor bank account under the TRO.  Condor is working to mitigate the effects of these factors by evaluating the most delinquent loans for repossession and hiring and training additional collection personnel to replace experienced collectors that have left the company.

The Gross Loan Balance decreased by $87 million from April 30, 2014 to August 26, 2014 primarily because loan origination stopped on April 23, 2014. The fact that no new loans are being added to the portfolio has the impact of a smaller "current" pool and a smaller overall balance, resulting in a higher percentage in the greater than 30 day categories.

## C. Customer Balances and Refunds to Customers

### 1. Return of Positive Credit Balances to Customers

To date, the Receiver has sent over 41,000 refund checks totaling $5.4 million to customers.  Those refund checks were comprised of positive credit balances arising from the following sources:

| | |
|---|---|
| Positive credit balances and 360/365-day interest calculation included in the $11 million identified by Condor and DFS | $4.8 million |
| Refund checks printed by Condor prior to the Receiver's appointment but not sent to customers (voided and resent by the Receiver) | 0.4 million |
| New York State customers affected by the "1/8" issue | 0.1 million |
| Loans terminated after April 23, 2014 | 0.1 million |
| Replacements for refund checks unable to be drawn on the frozen Citibank account | Less than 0.1 million |
| **Total refund checks sent** | **$5.4 million** |

8

Each of these sources has been described in detail in previous reports filed by the Receiver. Brief descriptions of the nature of these amounts are presented below.

<u>Positive credit balances and 360/365-day interest calculation included in the $11 million identified by Condor and DFS</u>. In the Declaration of Steven Lord dated May 5, 2014, the DFS refers to a preliminary test run of a report prepared by the Company, at the request of the DFS, which identified positive credit balances remaining on terminated loans. The Company-prepared report (the "Positive Credit Balance Report") indicated that approximately 39,000 loans had positive credit balances totaling approximately $11 million. In previous reports, the Receiver has allocated this balance into three categories: a) Positive Credit Balances, b) Customer Accounts Classified as "Legal" and c) 360-Day/365-Day Calculation.

As described in the July 29 letter to the Court, the Receiver has determined that a refund of all amounts due using a 365-day year calculation is the appropriate approach to follow. Therefore, the 4.8 million in the table above is a portion of the amounts described as Positive Credit Balances and the 360-Day/365-Day Calculation combined. No amounts related to legal accounts have been paid back to customers by the Receiver thus far.

<u>Refund checks printed by Condor prior to the Receiver's appointment but not sent to customers (voided and resent by the Receiver)</u>. In late 2013, Condor began to identify customer accounts with positive credit balances in order to return amounts owed to customers. The Company printed refund checks to customers with positive credit balances on various dates from December 2013 through April 2014. As detailed in the First Report, approximately half of these checks were printed but not signed and sent, remaining in the Company's office.

At the direction of the Receiver, the checks that were not signed and sent to customers were voided in the Company's accounting system. The voiding of the checks restored the positive credit balances, representing refunds due to customers, in the Company's accounting system. The Receiver then identified the resulting positive credit balances and mailed those refunds to customers.

New York State customers affected by the "1/8" issue. As described in detail in the Third Report, one-eighth of one percent was added by Condor to the interest rate for loans for certain customers. As a result, approximately 1,200 customer refund checks signed and sent by the Receiver were understated by approximately $67,000. These amounts have since been refunded to customers.

Loans terminated after April 23, 2014. If a positive credit balance exists in the Company's accounting system on any loan 30 days after loan termination, a refund is deemed due to the customer. At least two times per month, all such positive credit balances are compiled and refund checks are sent to the customers.

Replacements for refund checks unable to be drawn on the frozen Citibank account. A number of refund checks that were signed and sent to customers by Condor prior to the Receiver's arrival were not cashed or deposited by customers before the Condor Citibank operating account was frozen under the terms of the TRO. The Receiver is in the process of identifying those affected customer accounts and replacing the checks which remain uncashed.

2. **Remaining Balances to be Returned to Customers**

As described above and in the First Report, the Positive Credit Balance Report indicated that approximately 39,000 loans had positive credit balances totaling approximately $11 million. Based on observations and examinations to date, the current status of customer

balances remaining to be refunded is as follows (with additional discussion of each

component below):[1]

| Components of Positive Credit Balances | First Report to the Court | Second Report to the Court | Third Report to the Court | Fourth Report to the Court |
|---|---|---|---|---|
| a. Positive Credit Balances / 360-Day/365-Day Calculation | $5.3M | $4.4M | $4.0 M | $0.4 M |
| b. Customer Accounts Classified as "Legal" | $5.7M | $5.6M | $3.6 M | $3.6 M |
| Positive Credit Balances | $11.0M | $10.0M | $7.6M | $4.0 M |

### a. Positive Credit Balances / 360-Day/365-Day Calculation ($0.4 million)

Refunds of positive credit balances for accounts terminated in 1999 – 2014 have

been sent to customers by the Receiver. The remaining balance of $0.4 million

primarily represents refunds due on accounts terminated prior to 1999.[2]

A significant number of the checks disbursed for these refunds are returned to

Condor due to Condor's use of an outdated mailing address. When envelopes are

returned, Condor uses phone numbers and/or email addresses associated with

these accounts to obtain a current address. We expect that a number of customer

refund checks will never be cashed because a correct address cannot be found.

### b. Customer accounts classified as "Legal" ($3.6 million)

Under certain circumstances, customer delinquent loans which are in legal

proceedings can result in positive credit balances. On its face this appears counter

intuitive, given the customer is delinquent. For example, if a loan is terminated

---

[1] As described above and in the July 29 letter to the Court, the Receiver has determined that a refund of all amounts due using a 365-day year calculation is the appropriate approach to follow. Previous Receiver reports broke the Positive Credit Balances and 360-Day/365-Day Calculation into separate categories; however they are presented here as one balance as the customer refund checks covered both components.

[2] A small portion of the balance of $0.4 million represents positive credit balances on customer accounts with credits, write-offs and other adjustments posted to the customer accounts. The Receiver and Condor management are reviewing these balances to determine the correct amount of any refund due to the customer.

11

after the repossession and sale of a customer's vehicle for non-payment, and if the proceeds from the sale of the vehicle at auction do not cover the amount remaining due to Condor, a balance remains due from the customer. Unless written off as uncollectible, these balances remain in the Company's accounting system as amounts due to Condor.

Collections made from these customers may ultimately total more than their historically static loan balance, resulting in a perceived positive credit balance. However, unless the payments made by the customer exceed the amount owed to Condor plus additional costs such as interest and contractual collections costs, the customer is not actually owed a refund.

In cases in which Condor pursues the customer for amounts due and receives a court judgment in its favor, the amount of the judgment, which generally includes statutory interest and may include legal costs, can exceed the amount shown as due from the customer in the Company's accounting system. The amount of the loan due in the accounting system is not updated for the amount of the judgment and a copy of the judgment is often not retained in the customer's file.

Condor has begun an account-by-account review to determine if moneys are owed to customers. Condor is attempting to obtain legal judgments, settlements, or other legal support for each account. Where it has located legal support, Condor has begun to review the payment history relative to the judgment amount plus any additional interest owed (either statutory or as an explicit condition of the judgment/settlement).

Where support for the judgment or settlement amount can be ascertained, the Receiver believes this process is likely to result in much of the positive credit

balances currently reflected in the Company's records not resulting in moneys owed to customers. Accordingly, the Receiver believes that the portion of the customer reserve due to positive credit balances found in legal accounts is appropriate pending further review and potential reduction.

### c. Statutory Interest

A determination should be made as to whether statutory interest should be paid to customers on the balances held by the company.

As briefly discussed at the Pre-trial Conference on June 10th by an attorney for DFS and your Honor, statutory interest could potentially increase the amount owed to consumers. Given the time period customer balances were held by Condor and New York State's statutory interest rate of 9%, the amount owed could be considerable. No calculation has been performed, and no reserve has been made if statutory interest were to be paid.

A legal decision needs to be made with respect to statutes of limitation as well as statutory interest. The Receiver will work with the Company and its Regulators regarding the resolution of potential statutory interest owed to customers.

### D. Payments and Disbursements

The Receiver has continued to make payments and disbursements from the Company's assets that are necessary or advisable for carrying out the directions of, or exercising the authority granted by the Court's order. Such payments include:

- Payroll

- Interest payments to Wells Fargo on the credit facility at default rates[3]

- A total of $63 million in principal payments to Wells Fargo, reducing the loan from $261 million to $198 million.

- Amounts owed to repossession companies

- Payments to other vendors used by the Company in the normal course of business (including overdue charges and bounced payments)

- Customer refunds

- Legal and professional fees

See the attached Exhibit for a weekly cash flow projection for Condor through October 2014.

Legal and professional fees include the following payments to law and professional firms:

- $641,000 to Katten for services through July 15, 2014 (approximately two months)

- $503,000 to Blank Rome, attorneys for Wells Fargo, for the period through July 29, 2014 (approximately three months)

- $95,000 to Chapman and Cutler LLP, attorneys for BMO Harris Financing, Inc. for the period through July 30, 2014 (approximately three months)

- $628,000 to AlixPartners LLP representing the Receiver's fees through July 12, 2014 (approximately two months)

- $59,000 to FIS for professional fees for their assistance to the Company in addressing deficiencies in the areas of governance, compliance and internal controls

- $28,000 to Schlam, Stone & Dolan, conflicts counsel for Condor's dispute as to Wells Fargo's actions

- Payments to several law firms for collection services to Condor

The Receiver also expects Condor to receive invoices for additional legal and professional fees in the near future, including:

---

[3] An Event of Default was declared by Wells Fargo which caused the interest rate on the credit facility to increase from 2.752% to 5.4052%.

- Legal fees of Reardon Scanlon Vodola Barnes LLP, local counsel for the Defendants to handle the dealings with the Connecticut and Massachusetts regulators.
- Legal fees of Baker Hostetler for advising the Receiver on the portfolio purchase agreement discussed in Section III of this report.

The $63 million in principal payments to Wells Fargo were made from excess cash after taking into account a reserve of approximately $7 million[4] for customers on terminated loans, as well as an operating cash cushion for the Company.[5] The Default interest rate on the Wells Fargo credit facility nearly doubled the interest expense on the Company's debt. This $63 million in principal re-payments will save Condor approximately $3.5 million annually.

At August 31, 2014 the Company had approximately $7.7 million of cash before applying the customer reserve and after the $63 million in principal payments to Wells Fargo.

The Receiver will only authorize payments that comply with the Court's order and that meet the "ordinary and necessary" guidelines of the U.S. Internal Revenue Service. The Receiver has not made the following payments either requested by or for the benefit of Baron:

- Maintenance payments and assessments on condominiums held in Baron's name,
- Credit card charges on Baron's personal credit card, and
- Credit card charges made by Baron on the Condor corporate credit card that appear to be personal in nature.[6]

---

[4] After considering the amount of refunds paid to customers by the Receiver and the Receiver's review of the accounts classified as "legal", the reserve held by the Receiver for customer refunds has been reduced to approximately $7 million. The $7 million reserve includes both obligations to customers not yet paid as well as checks disbursed to customers but not yet cashed.

[5] In total, the Receiver expects to send refund checks to customers of approximately $6 million. The projections herein represent the estimate of the refund checks cashed over this period. The amounts of uncashed checks / unclaimed property will ultimately be remitted to the relevant state authorities. To date, refund checks totaling approximately $5 million have been sent to customers.

[6] The Condor Corporate American Express account is used by employees for ordinary and necessary expenses. The Receiver paid the balance due on the Corporate American Express account to prevent it from being closed for non-payment. The expenses of Baron that appear personal in nature were charged to a receivable account due from

As discussed previously herein and stated in a letter to the Court dated August 13, 2014, the Receiver determined that payment of rent to Baron for the use of the Hauppauge, NY office building is reasonable, necessary, and advisable, pursuant to his authority pursuant to Section 9(k) of the Order. As such, a payment for rent was made to Baron in the amount of $73,060.37 on August 15, 2014.

As explained in the Third Report, Citibank has officially informed the Receiver that it has decided to terminate Condor's cash management agreement and all services Citibank was engaged to perform thereunder including all ACH services effective as of the close of business on November 3, 2014. The Citibank accounts shall remain open until that date as long as the Receiver is in place. The Receiver has recently opened a separate bank account at another bank; however the bank has not agreed to service Condor's high-volume customer receipt activity. This bank account will be available for use beyond November 3, 2014. The Receiver has begun to deposit funds for uncashed customer refunds, which will eventually be escheated to the applicable states, into this separate account. As noted in the Receiver's previous reports, the Receiver and Condor management have been unsuccessful in finding a replacement for Citibank.

**E. Response to Customer Complaints**

If Condor receives a complaint through the ordinary course of business, the complaint is logged, researched and a response provided to the customer or other third party. The Receiver has also received approximately 130 additional customer and dealer complaints through DFS dealing with a number of issues, including general inquiries, bounced checks (due to the Citibank account being frozen), alleged overpayments and disputed fees. With the assistance of the Company, the Receiver continues to respond to these complaints as received.

---

Baron. The Receiver has removed Baron from the account. Further, Baron repaid these amounts in connection with netting these amounts against rent due to OSER165 LLC.

## III.    UNRESOLVED FUNDING

Wells Fargo has informed the Receiver and the Company that they do not intend to provide Condor with additional funding under the credit facility for new loan originations. Specifically, Wells Fargo wants to be paid and taken out of the credit facility. Additionally, Wells Fargo has asserted that they will not allow new originations to be made using any of the cash currently held by the Company.[7]

In a Memorandum Decision and Order dated August 1, 2014, the Court: (1) granted the Receiver full power and authority to effect a refinancing of Condor's lending operations, or a sale of Condor's loan portfolio, and (2) set a date certain of October 31, 2014 by which the Receiver must close a refinancing or sale of the Condor loan portfolio, and cash Wells Fargo out.

The Receiver and Katten have contacted numerous banks, sales finance companies and financial institutions since June 2014 to attempt to identify a replacement lender for the Wells Fargo credit facility or potential buyers of all or a portion of Condor's loan portfolio. The conversations with these companies have proceeded along a dual track, identifying whether the companies have an interest in 1) buying the current loan portfolio, and/or 2) replacing Wells Fargo as a financing option for new loan originations.

Specifically, the Receiver and Katten have contacted over 40 financiers / buyers to execute NDAs and have established an electronic data room for the financiers / buyers. More than 20 of these institutions have executed NDAs and have been granted access to an electronic data room in order to perform their due diligence as appropriate.

In addition to the electronic data room, interested parties have been invited to perform on-site diligence at Condor's offices. Those parties conducting on-site diligence have been provided

---

[7] Wells Fargo's position and demands are set forth in detail in their Intervention Complaint Pursuant to FRCP 24(C) and filed with the Court on June 20, 2014. In order to resume loan originations the Company needs an alternative source of funding.

with (1) access to electronic and paper copies of complete loan files for over 100 loans selected by the Receiver (these loans were selected with a random number generator with concentration in the top 10 states in which Condor originates loans); (2) access to Condor's loan servicing platform (with the supervision of AlixPartners' staff); and (3) interviews with Condor's senior management to ask questions and better understand the company's operations.

With respect to a potential sale, the Receiver is exploring numerous options including a sale of Condor's entire loan portfolio or a partial sale of Condor's portfolio with proceeds sufficient to retire the Wells Fargo Facility and provide some financing for new originations. On August 25, 2014 a draft Portfolio Purchase Agreement was distributed to potential buyers to mark-up and submit back to the Receiver as indications of final bids by September 4, 2014.

The Receiver anticipates concluding the on-site diligence process and analysis of final bids in mid-September 2014, with a targeted closing by the end of September or early October 2014.

The Company has expressed a strong preference to pursue a refinancing of the loan portfolio and begin originations and is in the process of retaining a certain investment bank (the "Investment Bank") to pursue a securitization transaction.[8] The Investment Bank has indicated to the Receiver and the Company that it anticipates that the securitization transaction will take at least 60 days to complete, which would include pursuing credit ratings from one to two nationally recognized credit rating agencies.[9] The Investment Bank has stated that the credit ratings process will require the successful settlement of this litigation. The Company and the DFS are working towards reaching a resolution or settlement. The Receiver understands that a settlement may not be fully consummated until September 2014. This delay, along with the anticipation that a new management team would have to be put in place at Condor (in order to conduct a "road-show" for the securitization), renders the likelihood of closing a securitization transaction by October 31,

---

[8] The Investment Bank has an NDA executed by Todd Baron, the Receiver and the Investment Bank and has access to the electronic data room.
[9] The Investment Bank has indicated that the Company would not likely pursue an un-rated transaction.

2014 to be very low. Therefore, the Receiver is proceeding on the current path with the interested parties to close a transaction in order to repay Wells Fargo by the end of September or early October.

The Receiver is also aware of the prospects of standalone buyers, including one being promoted by Baron and his Counsel in a transaction that would involve the assumption of the entire Wells Fargo facility and future participation in earnings by Baron. It is too early in the process to assess the merits of these potential transactions.

## IV.   STEPS THE RECEIVER INTENDS TO TAKE IN THE FUTURE

In addition to the efforts described below, the Receiver and his team continue to effectuate the procedures outlined in Section V of the Third Report.

### A.  Prevent the Diminution in the Value of Assets of Defendants

The Receiver will continue his efforts to determine if the Company can begin new originations. The Receiver will continue to ensure that Condor's most significant asset (its auto loan portfolio) is (a) being serviced properly, (b) monitored for aging issues, and (c) protected from customer delinquencies through collection, repossession and auction efforts.

### B.  Pursue Recovery of Defendants' Assets From Third Parties

Aside from Condor's ongoing collection efforts from customers whose loans were terminated for repossession, car damage and theft, the Receiver is not aware of any material assets of the Company in third party hands.

### C.  Adjust the Liabilities of Defendants, if Appropriate

The Receiver will continue his efforts in analyzing the Defendants' liability to customers for positive credit balances, interest charges and any other related deficiencies and adjust

19

accordingly. The Receiver will also act on claims made by terminated employees for owed

compensation, benefits, and related issues. Finally, the Receiver will coordinate with Condor and

Condor's Counsel in responding to state regulators' actions.


*     *     *     *     *

This report sets forth my assessment based on my Receivership to date. My assessment may be amended

and or supplemented based upon information that subsequently comes to my attention.


_Denis O'Connor_

Denis O'Connor

Receiver

EXHIBIT

02-SEP-2014  13:47   From:18002272644   Page:23/24

Condor Capital Corporation
Cash Flow Projection

| | June 2014 | Weeks 2 - 5 | Week 6 | | | Week 7 | | | Week 8 | | | Week 9 |
| | | July 1 - August 1 | w/e August 8 [5 days] | | | w/e August 15 [5 days] | | | w/e August 22 [5 days] | | | w/e August 29 [5 days] |
| | ACTUAL | ACTUAL | ESTIMATE | ACTUAL | OVER (UNDER) | ESTIMATE | ACTUAL | OVER (UNDER) | ESTIMATE | ACTUAL | OVER (UNDER) | ESTIMATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning cash | $ 19,133,919 | $ 10,952,464 | $ 8,604,768 | 4,664,768 | $ - | 8,792,274 | 8,792,274 | $ - | $ 7,572,617 | 7,572,617 | $ - | $ 8,228,604 |
| **Cash receipts (Note 1)** | | | | | | | | | | | | |
| Customer payments - Checks / Money Orders | 5,018,464 | 5,251,938 | 1,026,000 | 3,143,938 | 117,938 | 1,026,000 | 1,281,295 | 255,295 | 1,026,000 | 1,273,728 | 247,728 | 1,026,000 |
| Customer payments - ACH | 5,917,027 | 6,570,590 | 1,206,500 | 1,237,505 | 31,005 | 1,206,500 | 1,162,157 | (44,343) | 1,206,500 | 1,344,294 | 137,794 | 1,206,500 |
| Customer payments - Credit cards | 2,206,060 | 2,108,129 | 465,500 | 542,402 | 76,902 | 465,500 | 456,906 | (8,594) | 465,500 | 561,490 | 95,990 | 465,500 |
| Payoffs | 5,865,772 | 6,596,165 | 1,216,000 | 1,614,648 | 398,648 | 1,216,000 | 1,180,582 | (35,418) | 1,216,000 | 1,122,739 | (93,261) | 1,216,000 |
| **Payments** | | | | | | | | | | | | |
| Principal payments to Wells Fargo | (26,000,000) | (20,000,000) | (3,000,000) | (3,000,000) | - | (4,000,000) | (4,000,000) | - | (3,000,000) | (3,000,000) | - | (6,000,000) |
| Interest payments to Wells Fargo | (1,156,417) | (1,099,853) | (1,086,592) | (1,045,305) | 41,287 | | | | | | | |
| **Legal fees and professional fees** | | | | | | | | | | | | |
| Stark Reese / Chapman and Cutler | (306,572) | (86,739) | (100,000) | (114,546) | (14,546) | | (290,489) | (290,489) | (350,000) | | 350,000 | |
| Kasten Muchin Rosenman | (350,686) | (289,465) | | - | | | (339,180) | (339,180) | (275,000) | | 275,000 | |
| AlixPartners | | | (35,000) | - | 35,000 | | | | | (22,181) | 275,000 | |
| FIS | | (36,419) | | (2,897) | (2,897) | | | | | (4,304) | (22,181) | (20,000) |
| Other | | (16,322) | | (2,897) | (2,897) | | | | | (4,304) | (4,304) | |
| Refund checks (Note 8) | (507,975) | (436,519) | (50,000) | (231,215) | (181,215) | (500,000) | (609,217) | (109,217) | (700,000) | (445,198) | 254,802 | (500,000) |
| Payroll | (297,306) | (301,843) | (100,000) | (69,293) | 30,705 | (42,000) | (41,217) | 783 | (42,000) | (41,725) | 275 | (67,000) |
| S. Baron - Rent | | (45,374) | | | | (74,000) | | | | (73,060) | (73,060) | |
| Construction (Florida) | (729,449) | (45,374) | | | | | | | | | | |
| Repossession activity | (94,077) | (78,809) | (10,000) | (4,018) | 5,982 | (10,000) | (3,910) | 6,090 | (10,000) | (27,109) | 17,109 | (10,000) |
| Dealer refunds | (63,995) | (65,401) | | (13,935) | (13,935) | | (10,089) | (10,089) | | | | |
| Property taxes | | (28,057) | | | | | | | | | | |
| Utilities (Note 2) | (72,174) | (21,915) | (25,000) | (19,976) | (29,976) | (15,000) | | 15,000 | | | | (15,000) |
| Other (Note 3) | (182,524) | (167,583) | (25,000) | (38,800) | (16,800) | (25,000) | (6,435) | 18,565 | (25,000) | (32,687) | (7,687) | (25,000) |
| **Ending cash** | $ 10,952,464 | $ 8,604,768 | $ 8,312,176 | 8,792,274 | $ 480,098 | 8,040,274 | 7,572,617 | $ (467,657) | $ 7,084,617 | 8,228,604 | $ 1,143,987 | $ 7,585,604 |

| | | | | | ESTIMATED ——————▶ | |
|---|---|---|---|---|---|---|
| Cumulative principal payments to Wells Fargo | $ (29,000,000) | $ (49,000,000) | $ (52,000,000) | $ (56,000,000) | $ (59,000,000) | $ (65,000,000) |

*Line items in the schedule above which are shaded in grey will change when the actual results are updated each week.*

Note 1: The breakout among the categories below is approximate. Bankruptcy payments and legal collections are included in "Customer payments - Checks / Money Orders." Trade-ins and auction sales are included in "Payoffs."
Note 2: Includes telephone, gas, electric and cable for both the New York and Florida offices.
Note 3: Includes such expenses as legal, office supplies, postage and shipping, stationary, temporary staff, IT support and insurance.
Note 4: The increase in payroll costs over the estimated amount was due to the health benefits payment which was not factored into the projections for the week.
Note 5: The increase in payroll costs over the estimated amount was due to the catch up of 401k contributions deducted from employee checks in April and May (periods in which Condor paid employees with manual checks) but not deposited with the 401k service company.
Note 6: This temporary variance is primarily due to the timing of projected disbursements and will reverse in future periods.
Note 7: Construction costs represent residual amounts owed to the construction company which performed the build out of the Lake Mary, Florida facility.
Note 8: In total, the Receiver expects to send refund checks to customers of approximately $6 million. The projections herein represent the estimate of the refund checks cashed over this period. The amounts of uncashed checks will ultimately be remitted to the relevant state authorities. To date, refund checks totaling approximately $5 million have been sent to customers.
Note 9: Difference represents increased payroll costs over the estimate related to the catch up of payroll tax withholdings from weeks in which manual checks were used for payroll ($12k) and higher healthcare costs than estimated ($13k, due to new employees added to the benefits plan and the catch up from previous months).

EXHIBIT

Cedar Capital Corporation
Cash Flow Projection

| | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 |
|---|---|---|---|---|---|---|---|---|---|
| | w/e September 5 (4 days) ESTIMATE | w/e September 12 (5 days) ESTIMATE | w/e September 19 (5 days) ESTIMATE | w/e September 26 (5 days) ESTIMATE | w/e October 3 (5 days) ESTIMATE | w/e October 10 (5 days) ESTIMATE | w/e October 17 (5 days) ESTIMATE | w/e October 24 (5 days) ESTIMATE | w/e October 31 (5 days) ESTIMATE |
| Beginning cash | $ 7,303,804 | $ 7,082,804 | $ 7,560,804 | $ 7,158,804 | $ 7,661,804 | $ 7,581,804 | $ 7,449,804 | $ 7,107,804 | $ 7,700,804 |
| **Cash receipts (Note 1)** | | | | | | | | | |
| Customer payments - Checks / Money Orders | 810,100 | 1,060,000 | 1,060,000 | 1,060,000 | 1,060,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| Customer payments - ACH | 965,100 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 | 1,270,000 |
| Customer payments - Credit cards | 372,400 | 490,000 | 490,000 | 490,000 | 490,000 | 490,000 | 490,000 | 490,000 | 490,000 |
| Payoffs | 972,500 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 | 1,280,000 |
| **Payments** | | | | | | | | | |
| Principal payments to Wells Fargo | (3,000,000) | (3,000,000) | (4,000,000) | (3,000,000) | (4,000,000) | (3,000,000) | (4,000,000) | (3,000,000) | (4,000,000) |
| Interest payments to Wells Fargo | | (1,050,000) | | | | (1,260,000) | | | |
| Legal fees and professional fees | | | | | | | | | |
| Blank Rome / Chapman and Cutler | | (100,000) | | | | (120,000) | | | |
| Katten Muchin Rosenman | | | | (350,000) | | | | (350,000) | |
| AlixPartners | | | (275,000) | | | | (375,000) | | |
| FTI | (35,000) | | | | | | (35,000) | | |
| Other | | | (20,000) | | (20,000) | | | (10,000) | |
| Refund checks (Note 8) | (400,000) | (400,000) | (150,000) | (150,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) |
| Payroll | (42,000) | (42,000) | (42,000) | (67,000) | (42,000) | (42,000) | (42,000) | (42,000) | (75,000) |
| S. Baron - Rent | (42,000) | | | | (28,000) | | | | |
| Construction (Florida) | | | | | | | | | |
| Repossession activity | (10,000) | (20,000) | (10,000) | (10,000) | (10,000) | (10,000) | (20,000) | (10,000) | (10,000) |
| Dealer refunds | | | | | | | | | |
| Property taxes | | (15,000) | | (15,000) | | | | (15,000) | |
| Utilities (Note 2) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Other (Note 3) | | (25,000) | (25,000) | (75,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Ending cash | $ 7,082,804 | $ 7,560,804 | $ 7,158,804 | $ 7,661,804 | $ 7,581,804 | $ 7,449,804 | $ 7,107,804 | $ 7,700,804 | $ 7,685,804 |
| Cumulative principal payments to Wells Fargo | $ (65,000,000) | $ (68,000,000) | $ (72,000,000) | $ (75,000,000) | $ (79,000,000) | $ (82,000,000) | $ (86,000,000) | $ (89,000,000) | $ (93,000,000) |

Note 10: The number of customer refund checks mailed through week 6 of the projection, and therefore the number of customer refund checks cashed, has increased significantly from the initial estimates.
Note 11: Payment was forecasted for July.