UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
BENJAMIN M. LAWSKY, Superintendent :
Financial Services of the State of New York, :  CASE NO.: 14 CIV. 2863 (CM)
:
Plaintiff, :
:
-against- :       **Redacted**
:
CONDOR CAPITAL CORP. and STEPHEN :
BARON, :
:
Defendants. :
-------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF THE MOTION SEEKING APPROVAL OF THE SALE AND ENJOINING BARON FROM ASSERTING CERTAIN CLAIMS

**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York  10111
212.589.4200
212.589.4201

*Attorneys for Denis O'Connor,*
*Receiver of Condor Capital Corp.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

FACTS ...........................................................................................................................................3

    I.    THE BACKGROUND OF THE SALE.................................................................3

    II.    THE PPA ..............................................................................................................5

    III.    BARON'S FAILED ATTEMPTS TO INTERFERE WITH AND ENJOIN THE SALE............................................................................................................7

ARGUMENT...................................................................................................................................8

    I.    THIS COURT SHOULD APPROVE THE SALE.................................................9

        A.    The Sale Complies with the Final Consent Judgment ................................9

        B.    The Sale Is in Accordance with the Receiver's Fiduciary Duty to Condor.........................................................................................................10

    II.    THIS COURT SHOULD ORDER BARON TO RELEASE ALL CLAIMS AGAINST THE BUYER AND THE RECEIVER THAT RELATE TO THE SALE ..........................................................................................................14

CONCLUSION..............................................................................................................................16

607415840.14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bakalis*,
  220 B.R. 525 (Bankr. E.D.N.Y. 1998) ................................................................................... 14

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
  No. 86 Civ. 9181 (WK), 1990 WL 138958 (S.D.N.Y. Sep. 19, 1990) .................................. 10

*Corbin v. Fed. Reserve Bank of N.Y.*,
  475 F. Supp. 1060 (S.D.N.Y. 1979) ..................................................................................... 10

*In re Diplomat Constr., Inc.*,
  481 B.R. 215 (Bankr. N.D. Ga. 2012) .................................................................................. 14

*In re Family Christian LLC*,
  Case No. GG 15-00643-jtg, -- B.R. --, 2015 WL 3824980 (Bankr. W.D. Mich.
  June 18, 2015) ................................................................................................................ 13, 14

*Golden Pac. Bancorp. v. Fed. Dep. Ins. Corp.*,
  No. 95 Civ. 9281 (NRB), 2002 WL 31875395 (S.D.N.Y. Dec. 26, 2002) *aff'd
  by* 375 F.3d 196 (2d Cir. 2004) ............................................................................................ 10

*In re Johns-Manville Corp.*,
  517 F.3d 52 (2d Cir. 2008), *vacated and remanded on other grounds*, 557
  U.S. 137 (2009) .................................................................................................................... 14

*In re Scimeca Found., Inc.*
  497 B.R. 753 (Bankr. E.D. Pa. 2013) ................................................................................... 13

**Statute**

28 U.S.C. § 2001 ............................................................................................................................ 8

Denis O'Connor, the Court-appointed receiver ("Receiver") in this action, through his undersigned counsel, respectfully submits this memorandum of law, together with his Declaration, in support of his motion for approval of the sale of the Condor Capital Corp. ("Condor") loan portfolio set forth in the November 23, 2015 Portfolio Purchase Agreement ("PPA) and for an order enjoining Stephen Baron from bringing claims arising from the sale against the Receiver and the buyer, its affiliates, successors, and assigns (together, the "Buyer").

## PRELIMINARY STATEMENT

In May 2014, this Court appointed the Receiver in order to halt the fraudulent practices that Baron directed as Condor's chief executive. The Receiver's mission was clear: sell Condor's business to a third party whom Baron will not control. Since then, the Receiver has worked alongside the New York Department of Financial Services ("DFS") to vet dozens of prospective buyers and their respective offers for Condor's auto loan portfolio. Notwithstanding Baron's repeated attempts to thwart this sale, the Receiver has agreed to sell the bulk of the loan portfolio to the Buyer and both parties have executed the PPA.

The PPA calls for: (i) Condor to sell the Buyer a large portion of the remaining loan portfolio that accounts for approximately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; (ii) the Buyer to make an up-front payment (based on current calculations) of roughly ▇▇▇▇—equal to 47% of the adjusted unpaid principle balance of those loans as of May 31, 2015—minus holdbacks and monies owed to the Buyer; and (iii) periodic payments from the Buyer to Condor equal to ▇▇ of the net income generated by the conveyed property subject to certain performance benchmarks. The May 31, 2015 valuation was used to ensure the Buyer received the benefit of the bargain it negotiated irrespective of litigation-inspired attempts by Baron to delay or thwart the deal. Now that the PPA is finalized, the only remaining prominent precondition to closing is for this Court to approve the sale.

1

The Receiver reasonably believes that the sale is the best possible deal for Condor under the totality of the circumstances, even though its purchase price was not facially higher than that of the bid submitted by another bidder (the "Losing Bidder"). The Court's July 21, 2015, decision ("July Decision") correctly identified and endorsed the myriad reasons behind this decision:

> *First, it provides Condor with significant guaranteed cash consideration up-front and a potential for periodic consideration should Condor's loan portfolio perform well in the coming years. Second, unlike the Proposed Sale, the facially higher bid submitted by the Losing Bidder is predicated on a series of assumptions and contingencies that are uncertain. Third, the Losing Bidder's offer requires the imposition of a monitor over a minimum of four to five years to ensure compliance under the Final Consent Judgment, which makes this offer more complicated and costly. Fourth, the Proposed Sale is structured as a traditional, arms-length, market-based sale of property, whereas the offer submitted by the Losing Bidder is not market-based and is structured as a servicing agreement. Fifth, its structure ensures that Baron will not exert any influence, directly or indirectly, over the servicing of these loans, as required under the Court-approved terms of the Final Consent Judgment and consistent with the principles underlying this receivership.*

(p. 2.) Simply put, the winning offer provides the best overall value from a risk-management perspective, while the facially higher bid is entirely contingent and structurally flawed. Nothing material has changed since the July Decision to alter this analysis—the PPA encapsulates the same principles and characteristics that this Court endorsed in July. Hence, it is respectfully requested that this Court issue an order approving the sale in accordance with the terms under the PPA.

Additionally, the Receiver respectfully requests that this Court enjoin Baron from bringing claims against the Receiver or Buyer that arise out of or pertain to the sale. This Court is intimately aware of Baron's litigiousness and his repeated attempts to usurp the Receiver's authority. In addition to the unnecessary and meritless litigation he has already brought, it is

anticipated that Baron will sue the Receiver and the Buyer should the sale close. This Court should order Baron to forego all frivolous claims as to the Receiver and Buyer that relate to the sale so that the sale may close and the Baron saga may hopefully end.

## **FACTS**

Because this Court is already familiar with the relevant facts surrounding the sale, below is a short summary of these facts, all of which can be found in the Declaration of Denis O'Connor in Support of the Motion Seeking Approval of the Sale and Enjoining Baron from Asserting Certain Claims ("Receiver's Decl.")

### I. THE BACKGROUND OF THE SALE

This case began because Condor and Baron, as Condor's chief executive, engaged in a longstanding scheme to steal funds from their vulnerable customers. (Receiver Decl., ¶¶ 4-5.) Benjamin M. Lawsky, the former Superintendent of the New York Department of Financial Services ("DFS") brought suit to, among other things, enjoin these practices and seek the appointment of a receiver to protect Condor's customers. (Receiver Decl., ¶ 5.) On May 13, 2014, this Court enjoined Condor and Baron from engaging in any further unlawful conduct and appointed the Receiver (the "Receivership Order"). (Receiver's Decl., ¶ 6.) The Receivership Order identifies the Receiver's duties and obligations and grants the Receiver with broad discretion to handle and manage all aspects of Condor's business, including the power to liquidate or transfer any and all securities or commodities owned by or for the benefit of Condor, as he "deems to be advisable or necessary" and independent of Baron (Receiver's Decl., ¶ 7.) On November 6, 2014, the Receiver dutifully exercised these duties under the Receivership Order by selling the first portion of Condor's loan portfolio at a value and in a manner that this Court endorsed and, ultimately, approved. (Receiver's Decl., ¶¶ 27-29.)

Soon thereafter, this Court issued the Final Consent Judgment, as negotiated between DFS, Baron, and Condor. (Receiver's Decl., ¶ 8.) Under the Final Consent Judgment, the defendants agreed to pay a civil monetary penalty of $3 million, and the Court ordered the Receiver to "sell all remaining loans in Condor's loan portfolio to one or more Independent purchaser(s)." (Receiver's Decl., ¶ 9.) Among other things, the Final Consent Judgment ensures that Baron does not regain control of the business of Condor. (Receiver's Decl., ¶ 9.) It requires the Receiver to sell the remaining loan portfolio to an independent third-party purchaser and to structure the sale in a manner that minimizes the risk that Baron will exert influence, directly or indirectly, over the servicing of these loans at any present or future time. (Receiver's Decl., ¶ 9.)

The Receiver immediately began soliciting bids for Condor's remaining loan portfolio, which consisted of current as well as past due and delinquent loans. (Receiver's Decl., ¶ 32.) On April 24, 2015, he entered into a binding Letter of Intent with prospective buyers, but Baron used his lone veto under the Final Consent Judgment to nix that deal. (Receiver's Decl., ¶¶ 39-40.) The Receiver then re-started the negotiating process, which featured approximately fifteen bids, including one from the Buyer's affiliate that ultimately had the successful bid (the "Successful Bidder"). (Receiver's Decl., ¶¶ 41-42.) During this process, the Receiver came to understand that several potential bidders had heard, directly or indirectly, that Baron was contentious and would likely litigate against any successful bidder other than the one he preferred. (Receiver's Decl., ¶ 41.)

On June 12, 2015, the Receiver received a Letter of Intent from the Successful Bidder. (Receiver's Decl., ¶ 42.) This offer included a substantial up-front payment of approximately ███████, which represented roughly 47% of the unpaid principal balance of that loan portfolio as of April 30, 2015. (Receiver's Decl., ¶ 11.) The Successful Bidder's offer also

4

provided for periodic compensation to be paid to Condor should the loan portfolio perform well in the coming years. (Receiver's Decl., ¶ 12.) After due consideration, the Receiver concluded that this offer was the best transaction for Condor under the circumstances and elected to sell Condor's remaining loan portfolio to the Successful Bidder. (Receiver's Decl., ¶¶ 3, 15-17.)

## II.   THE PPA

On November 23, 2015, the Receiver, on behalf of Condor, and Buyer—a special purpose vehicle created by the Successful Bidder for the sale—executed the PPA. (Receiver's Decl., ¶ 18.) Subject to the terms and conditions set forth in the PPA, at closing, Condor and the Receiver agree to sell and the Buyer agrees to purchase and accept all of Condor's and the Receiver's right, title, and interest in and to the conveyed property free and clear of all liens, and that upon and after closing, the conveyed property will no longer be the property of Condor and will no longer be subject to the control of the Receiver or the Court. (Receiver's Decl., ¶ 20.)

As consideration for the conveyed property, the Buyer will make an up-front cash payment equal to 47% the portfolio's unpaid principal balance as of May 31, 2015. (Receiver's Decl., ¶ 2.) After purchase price adjustments necessitated by Condor's and Baron's prior fraudulent practices and Condor's inaccurate accounting procedures, this cash payment will be approximately ▮▮▮▮▮ based on current calculations. (Receiver's Decl., ¶ 2.) However, a portion of the purchase price will be held back under the PPA to satisfy certain indemnity obligations, with the balance to be released pursuant to certain milestones following the closing, and another portion will be paid back to the Buyer to account for the net collections Condor has made since the May 31, 2015 cut-off date. (Receiver's Decl., ¶ 2.) The PPA also provides that Condor will receive periodic compensation equal to ▮▮ of the net income generated by the conveyed property contingent on the loan portfolio reaching certain performance benchmarks in the future. (Receiver's Decl., ¶ 2.)

5

The conveyed property represents all of Condor's remaining loan portfolio, except for charged-off loans that account for approximately ▇ of the cash flow generated from Condor's remaining loan portfolio, worth roughly ▇▇▇▇▇. (Receiver's Decl., ¶¶ 12-14.) The Receiver was unable to reach an agreement with the Buyer as to these charged-off loans because they still need substantial remediation in the wake of Condor and Baron's fraud. (Receiver's Decl., ¶ 13.) The Receiver will require an additional sale in the near future to liquidate these loans. (Receiver's Decl., ¶ 14.) He is considering a sale of these loans to a third-party servicing company, which was one of the original bidders for Condor's remaining loan portfolio. (Receiver's Decl., ¶ 14.) The Receiver originally accepted a letter of intent for Condor's loan portfolio in April 2015 submitted by this bidder and another potential purchaser, but Baron vetoed that deal. (Receiver's Decl., ¶ 40.)

As a consequence of Baron's previous attempts to interfere with and frustrate the Receiver's efforts to sell Condor's assets—explained in more detail below—the PPA requires a Court order (the "Sale Order") affirming, in part, (a) the Receiver's authority to enter into and cause Condor to enter into and be bound by the PPA, and cause Condor to consummate all transactions necessary to complete the sale and conveyance of the conveyed property to the Buyer pursuant to the terms of the PPA, (b) the sale of the conveyed property to the Buyer, (c) that the conveyed property is delivered free and clear of all liens, and (d) on and after closing, the conveyed property is no longer property of Condor and no longer subject to the control or jurisdiction of the Receiver or the Court and no longer part of the Condor estate. (Receiver's Decl., ¶ 21.)

As a further consequence of Baron's conduct, the PPA also requires the Receiver and Condor to use commercially reasonable efforts to obtain for the Buyer, either by way of a court

order or other written agreement, a release and covenant not to sue from Baron, and any of his respective affiliates, representatives, successors, and assigns in a form acceptable to the Buyer. (Receiver's Decl., ¶ 22.)  If the Receiver is unable to obtain such a release despite his commercially reasonable efforts, the Buyer will hold back ▆▆▆▆ of the purchase price to cover legal costs incurred by the Buyer in connection with any litigation by Baron that relates to the sale.  (Receiver's Decl., ¶ 23.)

### III. BARON'S FAILED ATTEMPTS TO INTERFERE WITH AND ENJOIN THE SALE

As this Court well knows, on June 29, 2015, Baron moved to enjoin the sale of the remaining loan portfolio to the Successful Bidder.  (Receiver's Decl., ¶ 48.)  Baron argued that by accepting the Successful Bidder's offer—and not the one that Baron preferred from the Losing Bidder—the Receiver had breached fiduciary duties owed to Condor.  (Receiver's Decl., ¶ 48.)  However, on July 21, 2015, after both parties fully briefed Baron's motion, this Court held that "[b]ecause the proposed deal is in complete conformity with both this Court's injunction appointing the Receiver and the Consent Judgment in this action, Baron has absolutely no likelihood of success on the merits of his motion, and the application for a preliminary injunction is DENIED."  (Receiver's Decl., ¶ 49.)

On July 24, 2015, Baron requested that this Court stay the sale to allow the Second Circuit time to rule on the appeal.  (Receiver's Decl., ¶ 50.)  The Court rejected Baron's request, noting there was "absolutely no ground to stay in face of meritless appeal."  (Receiver's Decl., ¶ 50.)  Undeterred, on July 28, 2015, Baron filed a notice of appeal in the Second Circuit Court of Appeals and concurrently moved for a stay pending the appeal of this Court's decision refusing to enjoin the sale.  (Receiver's Decl., ¶ 51.)  On August 19, 2015, a day after oral

argument, the Second Circuit denied Baron's request for a stay because he failed to meet the requisite standard. (Receiver's Decl., ¶ 52.)

## ARGUMENT

As this Court has already held, the sale is the best possible deal for Condor under the circumstances. (July Decision, p. 2.) To close on this deal, all that remains is a Sale Order, consistent with the express terms of the PPA and 28 U.S.C. § 2001. The Receiver also requests that this Court enjoin Baron from bringing any claims against the Buyer and Receiver and with respect to the sale.

This Court should issue a Sale Order because the sale complies with the terms of the Final Consent Judgment and guarantees Condor substantial compensation for the portfolio being sold. As fully explained herein, the Receiver carefully vetted all the bids he received for Condor's loan portfolio and reasonably determined that there was no better deal. Indeed, this Court recently endorsed the Receiver's selection of the Successful Bidder over the Losing Bidder and determined that the proposed sale will "yield substantial benefits to Condor." (July Decision, p. 10.) Nothing material has since changed and this Court should formalize its approval of the sale by Court order.

This Court should also enjoin Baron from bringing any claims against the Buyer and the Receiver in relation to the sale. Baron's disagreement with the Receiver's selection of the Successful Bidder has already resulted in baseless litigation in this Court and in the Second Circuit Court of Appeals. It is anticipated that Baron will commence yet another round of litigation against the Receiver and now also the Buyer should the sale close, based on the same baseless arguments that this Court and the Second Circuit have already rejected.

I.   **THIS COURT SHOULD APPROVE THE SALE**

    A.   <u>**The Sale Complies with the Final Consent Judgment**</u>

The Final Consent Judgment governs the sale of Condor's remaining loan portfolio. It establishes a set of procedures for the Receiver to follow, including the timing of the sale and the manner in which he shares information with third parties to the sale. (Receiver Decl., ¶ 9.) It also provides, in relevant part, that the Receiver must: (i) sell Condor's loan portfolio to a purchaser who is independent of Baron; and (ii) structure the sale in a manner that ensures that "Baron shall exercise no influence, directly or indirectly, over the servicing of these or any other loans at any present or future time, and shall include in any documents memorializing any such sale transaction language to this effect." (Receiver Decl., ¶ 9.) And it grants DFS the right to reasonably reject any potential sale. (Receiver Decl., ¶ 9.)

The Receiver has complied with the sales procedures under the Final Consent Judgment. He timely entered into a binding Letter of Intent with the Successful Bidder soon after Baron vetoed the original deal in April. (Receiver's Decl., ¶ 39.) At each step, the Receiver shared bid letters with Baron and his counsel and considered prospective buyers that Baron preferred, consistent with the procedures under the Final Consent Judgment. (Receiver's Decl., ¶ 41.)

The Receiver has also complied with the substantive conditions under the Final Consent Judgment. By its terms, the PPA ensures that the Buyer is "independent" of Baron, as defined in the Final Consent Judgment. (Receiver Decl., ¶ 16.) Specifically, no one affiliated with the Buyer is related by blood or marriage to Baron or is his current of former business associate or personal acquaintance. Nor is anyone affiliated with the Buyer a current or former attorney, fiduciary, or other advisor who has represented Condor, Baron, or any person related by blood or marriage to Baron.

Also, the sale is structured so that Baron does not provide any undue influence over the servicing of Condor's loans.  It is an arms-length, market-based sale where the Buyer assumes most of the economic benefits and risks associated with the future performance of the loan portfolio.  (Receiver's Decl., ¶ 16.)  As this Court already held, this structure ensures that "the Successful Bidder will [have] . . . substantial economic incentives to manage and service the loans independent of outside influences."  (July Decision, p. 13.)  Moreover, the PPA expressly notes six additional steps the parties will undertake to further ensure that Baron does not exert any influence on the loan portfolio moving forward.  (Receiver Decl., ¶ 47.)

Last, but not least, DFS has not exercised its right of rejection under the Final Consent Judgment as to the sale.  (Receiver's Decl., ¶ 16.)  And, since Baron already exercised his lone right of rejection under the Final Consent Judgment in a prior deal, no other party may reject the sale.  (Receiver's Decl., ¶ 40.)

### B. The Sale Is in Accordance with the Receiver's Fiduciary Duty to Condor

This Court should also approve the sale because the Receiver has acted in accordance with his fiduciary duty to Condor in entering into the PPA.  A receiver acts in accordance with his fiduciary duty to the receivership company if he exercises reasonable business judgment. *See, e.g., Golden Pac. Bancorp. v. Fed. Dep. Ins. Corp.*, No. 95 Civ. 9281 (NRB), 2002 WL 31875395, at *9 (S.D.N.Y. Dec. 26, 2002) *aff'd by* 375 F.3d 196 (2d Cir. 2004); *Citibank, N.A. v. Nyland (CF8) Ltd.*, No. 86 Civ. 9181 (WK), 1990 WL 138958 (S.D.N.Y. Sep. 19, 1990); *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060, 1071 (S.D.N.Y. 1979).  As this Court correctly held, the test is an objective one, where "the task of this Court is not to decide whether it agrees with the Receiver's decision but, rather, whether the Receiver exercised his discretion in a reasonable manner, in good faith, and for sound business reasons."  (July Decision, at p. 11.)

And it is necessarily deferential, "so that the Receiver can effectively and efficiently manage the business of Condor now that DFS has removed Baron from its operation." (*Id.* at 10.)

### 1. The Receiver Reasonably Believes that the Sale Is the Best Deal for Condor

This Court held in July that "all the evidence demonstrates that the Receiver exercised his Court-given discretion to enter into a perfectly acceptable [sale], one that will yield substantial benefits to Condor." (July Decision, pp. 9-10.) The sale contains the same material elements that makes it the superior deal then and now. Its payment structure includes a substantial up-front cash payment, with only a small portion of the purchase price contingent on the performance of the loan portfolio. (Receiver's Decl., ¶¶ 2-3, 15-17.) This payment, which is equal to 47% of the unpaid principal balance as of May 31, 2015, originally was ▓▓▓▓ but has now been reduced to ▓▓▓▓ to cover unpaid principal balance adjustments for customers in bankruptcy, additional remediation fees and costs owed by Condor relating to overcharges by Condor, and to subtract the value of a portion of Condor's loan portfolio that includes charged-off loans that are no longer part of the sale. Receiver's Decl., ¶ 12.) This reduction accounts for additional remediation costs that Condor owed due to the Defendants' fraud and the fact that Condor is now selling approximately ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Receiver's Decl., ¶ 2.)[1]

The reason why the Receiver agreed to sell these loans at 47% of their value is that nearly 73% of these loans are past due. (Receiver's Decl., ¶ 11.) Even so, this cash payment is far more than any other competing offer and consistent with the Receiver's stated preference that a portion of the purchase price be paid up front. As this Court correctly noted, this preference "takes into account the time value of money and the uncertainty over the future performance of

---

[1] The Receiver may sell, subject to further guidance form the Court, the remaining charged-off loans that account for approximately 3% of the value of the portfolio to a third-party.

11

the loan portfolio." (July Decision, p. 12.) In other words, Condor is guaranteed substantial compensation for its loan portfolio with no contingencies, strings attached, or a parade of horribles that will leave it with a substantially lower sum.

Conversely, the competing offer from the Losing Bidder has no guaranteed compensation. Its purchase price, while facially higher than any other offer, is based entirely on compensation that is contingent on the future performance of the loan portfolio over a period of years. (Receiver's Decl., ¶ 16.) As this Court noted in its July Decision, the contingent nature of the losing bid means that "depending on how things work out, what appears to be a higher bid today may well turn out to be a lower bid!" (p. 3.) Even worse, it could turn out to be demonstrably lower if Condor's loan portfolio continues to underperform, as it has in recent months. These obvious financial risks forced the Receiver to discount the facially higher price of the losing bid.

The sale is also the best deal for Condor because it complies with the terms of the Final Consent Judgment. As described above, the sale checks all the required boxes under that agreement and, for that reason, DFS has decided not to exercise its right to reject the deal. The same cannot be said about the Losing Bidder's offer, whose structure "is less like a sale and more like a servicing agreement," where Baron essentially assumes all the economic risks and benefits and hence has an economic incentive to interfere with the servicing of the loan portfolio. (July Decision, p. 13.) In its February 25, 2015 letter to this Court, DFS expressed its concerns that such a structure may not comply with the Final Consent Judgment—(Receiver's Decl., ¶ 37)—and this Court echoed those concerns in its July Decision. (p. 13.) Thus, in addition to all the financial risks, the Losing Bidder's offer also carries the very real risk that it would be

rejected by this Court, DFS, or both, based on its deal structure alone.  The Receiver factored in these transactional risks when evaluating the competing offers.  (Receiver's Decl., ¶¶ 41-47.)

Another reason the sale is the best deal for Condor is that it allows this receivership to end in relatively short order.  The sale transfers title of the loans that represent substantially all of the cash flow generated by Condor's loan portfolio from Condor to the Buyer.  (Receiver's Decl., ¶ 42.)  After that, the Receiver's remaining tasks are to sell the charged-off loans that are not included in this sale in a separate sale and defend Condor and himself in the Second Circuit appeal Baron commenced, before the receivership may end.  (Receiver Decl., ¶ 14.)  Conversely, the Losing Bidder's offer has the effect of prolonging the receivership another four to five years.  Because that deal is structured like a servicing agreement instead of a sale, it requires the appointment of a portfolio supervisor to monitor Baron over the life of the loan portfolio.  (Receiver's Decl., ¶ 35.)  As this Court correctly found, "[w]hile this proposal lessens the risk that Baron will exert influence over the loan portfolio, it principally ensures that Condor would have to pay a Court-approved supervisor and his legal counsel to monitor Baron for at least the next four to five years." (July Decision, p. 14.)  Not only would this result in a disfavored extension of the receivership, it would also "add[] to Condor's costs and lessen[] the value of the Losing Bidder's offer." (*Id.*)

### 2. Courts Have Ratified the Receiver's Approach in Similar Cases

The July Decision analyzes, and this Court agreed with the reasoning of, several cases where fiduciaries opted to sell property to the bidder with the second highest purchase price because the overall offer provided the best value under the totality of the circumstances. (pp. 15-19 (analyzing cases).)  Those cases explain that fiduciaries reasonably exercise their business judgment by discounting facially higher bids because of the risks associated with them.  *See, e.g.*, *In re Family Christian LLC*, Case No. GG 15-00643-jtg, -- B.R. --, 2015 WL 3824980, at *16

(Bankr. W.D. Mich. June 18, 2015); *In re Bakalis*, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998); *In re Diplomat Constr., Inc.*, 481 B.R. 215 (Bankr. N.D. Ga. 2012); *In re Scimeca Found., Inc.* 497 B.R. 753 (Bankr. E.D. Pa. 2013). The reasoning is that, in the context of a sale, a fiduciary is a conservator of property and hence "must, to the extent possible, be *risk averse*" with such property. *Bakalis*, 220 B.R. at 530-31 (emphasis added). For that reason, this Court held that it was the Receiver's fiduciary duty "to consider more factors than just the price of the bid, such as the risks associated with each bid and the probabilities that the proposed terms will come to fruition." (July Decision, p. 15.)

The Receiver has exercised this duty in good faith and to the best of his abilities. For almost a year, he negotiated with dozens of potential purchasers regarding the sale of the remaining loan portfolio. He worked in good faith with DFS, Baron, and their respective legal counsel at each appropriate step of the negotiations. (Receiver's Decl., ¶ 41.) After Baron vetoed the first deal in April 2015, the Receiver dutifully entered into a second round of negotiations with prospective buyers, including the buyer that Baron preferred. (Receiver's Decl., ¶ 41.) He analyzed all the factors pertaining to each offer, including the economic return to Condor and each offer's compatibility with the Final Consent Judgment. (Receiver's Decl., ¶ 15.) And, in the end, the Receiver reasonably discounted the facially higher offer given its significant financial and transactional risks. (Receiver's Decl., ¶ 2.) As this Court, *Bakalis*, and its progeny make clear, the Receiver acted in accordance with his fiduciary duty to Condor by valuing the deal that is most risk averse. 220 B.R. at 530-31.

## II. THIS COURT SHOULD ORDER BARON TO RELEASE ALL CLAIMS AGAINST THE BUYER AND THE RECEIVER THAT RELATE TO THE SALE

The Receiver also respectfully requests that this Court enjoin Baron from bringing any claims against the Receiver and the Buyer that relate to the sale. The PPA requires that the

Receiver and Condor undertake commercially reasonable efforts to have Baron release his claims against the Buyer that relate to the sale before the sale can close. (Receiver's Decl., ¶ 25.) The reasons for this request should be obvious to this Court. Baron has repeatedly attempted to usurp the Receiver's authority throughout this receivership. (*See* July Decision, p. 3 (acknowledging Baron's "repeated efforts to usurp the Receiver's Court-given authority").) These efforts recently culminated in baseless litigation, where Baron baldly accused the Receiver of breaching his fiduciary duty to Condor even though Baron "offer[ed] not a scintilla of evidence" to this effect. (July Decision, p. 10.) Given this pattern of behavior, it is very likely that, after the sale closes, Baron will continue his litigation tactics against the Receiver and, now also, the Buyer. In fact, the PPA provides for a holdback provision in the event no release is issued, wherein the Buyer will hold back ▮▮▮▮▮ of the purchase price to cover legal costs incurred by the Buyer in connection with any litigation by Baron relating to the sale. (Receiver's Decl., ¶ 23.)

This Court has jurisdiction to enjoin any such future litigation because such claims would directly affect the receivership property. *See, e.g.*, *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), *vacated and remanded on other grounds*, 557 U.S. 137 (2009) (holding in the analogous bankruptcy context that a Court has jurisdiction to enjoin third-party claims that directly affect the *res* of the estate). Without a Court-ordered release, Baron will be free to continue using litigation tactics until he gets what he wants or otherwise frustrates the objectives of this Court and the DFS. Hence, this Court should order Baron to release such claims as to the Buyer and the Receiver to ensure that the sale will close without further delays and to prevent Baron from further hindering this receivership.

## **CONCLUSION**

For the foregoing reasons, the Receiver respectfully asks that this Court approve the sale, require Baron to sign a release, and enjoin Baron from any claims against the Receiver and the Buyer that relate to the sale.

Dated: New York, New York
       November 24, 2015

**BAKER & HOSTETLER LLP**

By: /s/ Marc D. Powers
    Marc D. Powers
    Torello H. Calvani
    Marco Molina
    45 Rockefeller Plaza
    New York, New York  10111
    212.589.4200
    212.589.4201

*Attorneys for Denis O'Connor, Receiver of Condor Capital Corp.*